**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 81**

### **Declaration of Ernest Eugene Barrett**

I, ERNEST EUGENE BARRETT, declare as follows:

I am the father of Kenneth Edward Barrett, the oldest of three sons born to me and Gelene Dotson Barrett during our marriage. At the time I married Gelene, even before we had children, I almost immediately started running around with other women. When Gelene and I started having children, I did not give much thought to fatherhood and I was mostly an absent father. Today, these many years later, I wish I could take it back and do for my children what they needed and be the kind of parent they deserved. At the time, though, I had my mind set on doing whatever I wanted as long as I was working.

I always worked and was determined not to live in the kind of poverty I knew as a child growing up. I went into the glass business and worked myself up from pushing brooms to production superintendent. When I retired, I was earning about $76,000 a year and had a good life. It was a far cry from the way I lived as a youngster.

I grew up dirt poor, in a log cabin with a dirt floor, no running water and an outhouse in Akins, Oklahoma, outside of Sallisaw. We had a wood stove for heat and a wood cook stove. We all worked and barely scratched out a living for my mother, father, two brothers and two sisters. I was the oldest child who survived and was born August 8, 1938. Three other babies were born, but they died. The next oldest who survived, Margaret, was born December 26, 1941. She died from cancer in 1995. After Margaret, there was Ike, born May 31,1944, Linda, born May 30, 1946, and then came Gary, who was born January 23, 1948.

1

One of my earliest memories is being taken out of school to work in the fields alongside my parents. As my brothers and sisters got big enough to walk and carry a load, they joined us in the field. Every year we pulled cotton in western Oklahoma, picked strawberries in Stillwell, and picked beans in Moffitt, Oklahoma. It was backbreaking work, even for little children, because we had to stoop, bend, and carry our loads up one long row and down the next from sun up to sundown. It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it. When cotton season came, we worked or we starved. When we went back home after cotton season, we ate mostly beans, potatoes, and commodities that were handed out as public assistance to farm families.

In those days, school was a luxury that came only after work was done. I went to school when I could during the times when my family came back to Akins from working cotton and other crops. I went to school off and on through the eighth grade in Akins and then started high school. High school was different for me than for most of the other students. I met Gelene in high school before I had to quit after finishing the eleventh grade. We sort of dated twice, but I did not have any money to date and my family lived a good 12 miles from town in the country. I made the football team but had to quit because I could not get to after school practices. We lived far out in the country and no one could pick me up and drive me back and forth. Lots of students came from poor families, but my family had it even tougher. Other students made fun of me and laughed at me because of the way I dressed. I wore my shoes and clothes until they wore out,

2

and then we had to patch them and keep wearing them. I figure I had to fight every boy in my high school class to hold any respect.

My family had some pretty serious mental problems that folks whispered about back in those days. My father, A.J. (Andrew Jackson), had enormous moods swings from being an alright guy to being totally out of control where nothing could stop him from attacking us. He was sent to the mental hospital in Vinita for a month and was in and out of jail in Sequoyah County for public drunkenness. My father's father, Isaac Clifford Barrett, managed a big ranch until he committed suicide by taking cow black leg medicine. My brother Ike and my sister Linda also have mental problems.

As the oldest boy in the family, I tried to protect my mother and the other children, but I was no match for my father until I was half grown. My father beat my mother and us children with his fists and with anything he could get his hands on. I tried to get between him and my mother when he attacked her. I got beaten more than the other children and learned never to cry when my father hit me. I figure I have a very high pain threshold because I do not remember feeling a hell of a lot. Gary was the only child to hit my father back and that happened when Gary got bigger than Dad. My father was 5'11" and weighed 185. Gary was 5'11" and weighed 270. Gary's nickname was Hoss.

I was three months short of 17 the last time I stepped between my father and mother to try and protect her. My father hit me across the shoulder with a 19-inch metal file that busted my shoulder wide open. My shoulder still has a scar. I left home that day just running because I knew that if I stayed at home I

3

would have to kill my father to protect the others. I was 6'3" and weighed 187 pounds. My mother stayed with him all those years and put up with his abuse but I could not. My mother, Ada, was churchgoing and devout; she did not believe in leaving a marriage no matter how bad it was. Plus, my father was difficult to figure out because he was also a decent guy when he was sober. He worked on a pipeline for two or three weeks and then come home, went on a bender, and just went crazy. There was no stopping him. He died at the age of 52, sitting on the back porch with a cup of coffee in his hand. He just laid his head back and died. The coffee didn't spill.

When I left home, I knew what hard work was and was not afraid of it. I moved to Tulsa, where I got a room in a house and got a job in the Hartley Cabinet Shop in May 1955. In March 1957, I lost my job because of a recession and had to return home for two months. I joined the Marines and got my first lesson in drinking and chasing women. I was in such good physical shape that basic training was a walk in the park for me. I had been tossing hay bales since I was 12. I got an honorable discharge in 1960 and met up with my family in Clinton, Oklahoma, where they were picking cotton.

After I came home, I saw Gelene in Sallisaw; she was back home for a visit and had been living with her aunt and uncle in Joliet, Illinois. They had helped her get a job at Walgreens. I had been planning to apply for a job with Oklahoma Highway Patrol, a civil service job, when I ran into her. She had dark brown hair and dark brown eyes and because I didn't just fall off a cabbage wagon I knew she had had a lot of experience with men. I was swept away by

4

how beautiful she was.  Gelene called her aunt and uncle in Joliet, and they talked me into coming to Joliet.  They told me I could make a lot of money at Kerr glass, and they could get me a job.

When we got married, I was a physical supernatural.  I could work eight hours, go to a bar, get into as many brawls as there were, come home, sleep and go back to work.  I was strong as a bull and would fight anybody that wanted to fight. I did not beat them up so that they couldn't work.  Once I knocked them down I did not kick them in the head or anything.

I did pretty much whatever I wanted to and did not think about Gelene or, later on, the boys, other than working and supporting them.  I would go out, drink as much as I wanted, and chase women.  I kept that up for years until I met Doris, my third wife in 1985.  I tried to keep my drinking away from the house and in bars.  I was a Canadian Club (whiskey) straight with a water chaser drinker and drank a fifth at a time. Marriage brought out the worst in Gelene.  She drank right from the beginning of the marriage and straight through when she was pregnant.  She was miserable and complained constantly about how unhappy she was.  She got mad over any little thing and had foul moods.  When she got pregnant, she was miserable.  Her bickering was constant.  I stayed away from home as much as I could, working 16 hours shifts.  I'd rather work a straight 16 hours than listen to her.  I was a trouble-shooter at the plant and could memorize machinery blueprints.  At the end of seven years, I was a supervisor, spurred on by never wanting to be as poor as I was growing up.  I preferred staying at the plant rather than facing Gelene and her drinking.

5

I was not around the house much when Kenny was a little baby but I heard all about how hard it was to sooth him. He was colicky and cried all the time. When he got a little bigger, he could not sit still. Even if I could get him to watch television, his feet were always moving, and he was bouncing. I cannot sit around either, but I am not as bad off as Kenny was. Even though he was a handful, he was a beautiful little boy.

When the boys got older, I took the boys with me when I hunted and fished. I liked taking Kenny with me hunting. Sometimes his little legs would give out and I had to carry him on my shoulders. Boy, he loved that. Kenny was fearless, but that he was a sensitive little boy too who cried if you hurt his feelings.

When I went home, I would never know which Gelene I would get, what condition she would be in. I did not want to turn into my father and beat my wife and children. One time Gelene cut up the front of my shirt with a knife when I was wearing it. I slapped her twice and messed up her nose pretty good, gave her two black eyes and split her lip open. It was around 1963 or 1964.

I discovered women when I was in the Marines and I just thought I had to be with different women until I finally met up with Doris in 1985. When I was married to Gelene I stayed away from home every few months for a night or two with other women. Once, in 1966, I moved in with a woman for a couple of years and left Gelene and the two boys. Gelene was always running back to Sallisaw where she was her daddy's number-one girl.

6

I felt bad about leaving my two boys, Kenny and Richie, but I could not take Gelene anymore. I was still young and immature myself so I wasn't much of a husband either. I just put the boys out of my mind as much as I could. After a couple of years I could not keep the boys out of my mind and I went back with Gelene in 1967. We moved in to the same mobile home I had been living in with my girlfriend. Even though we were back together, neither Gelene nor I had changed any. We both drank as much as we could, and I still stayed away from home. I was arrested time after time and went before the same judge for drunk and disorderly conduct and fighting. The judge told me if he ever saw me again, he was going to jail me for a year. It was my nature and I was out of control when it came to fighting and drinking.

I called a friend in New Jersey and he knew where I could get a job. I left Kerr Glass and moved my family to New Jersey. My new job was at a plant in Wharton, New Jersey, and we lived in Stanhope first and then pretty soon moved to Lake Hopatcong. I kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time.

Gelene left me for good in Lake Hopatcong. She was at the end of her rope, but I did not much care. She used to whip the boys over any little thing and whipped them all the time. She had a bad habit of saying cruel things not just to me but to the boys, too. Kenny was always upsetting her because he could not sit still and was always into everything. He loved my tools and he was always getting into them. I would find them all over the yard and in the woods. It made

7

me pretty mad. Kenny always had a mechanical aptitude that was out of this world.

When Gelene left me, Kenny wanted to stay with me but I was not set up to take care of him and work. Besides, Gelene would not hear of it. Kenny kicked and screamed to stay with me. He was 10 or 11 years old and did not want to go with his mother back to Oklahoma. The day Gelene left, she took my paycheck, two of my friends' paychecks that I had won in a draw poker game, which she returned to their wives, and left me with forty-seven cents. I stayed single for five years before I married my second wife and then for six years before I married Doris. I was married to Diane Kay Wilson from 1977-1979, and we lived in Dunkirk, Indiana. I paid Gelene child support, $150.00 per child until each reached 18 and also gave Gelene extra money for the children's school clothes every fall. I also paid their medical, dental and life insurance but Gelene told the children I never gave her any money. Years later, I showed Kenny canceled checks to prove I had paid because he did not believe me. I came back to Sallisaw at least once a year for a week to spend time with the boys.

Kenny always wanted to live with me. I let him come three times after the divorce, the first time in Dunkirk, Indiana, where Kenny completed ninth grade. Kenny resented my wife Diane and it got the best of me. I lost control when he sassed her, and I hit him pretty hard in the chest. He went flying slamming against the wall. One time I overheard Kenny and some boys talking about running from a fight. I told Kenny, "That's not the way to live your life. If you want, I'll teach you how to fight." Kenny did not show any interest in learning to

8

fight or any interest in fighting. Kenny was not much of a fighter. Now his brother Steve, he was different. He would have taken your lights out. Kenny went back to Sallisaw after that summer and soon quit school for good. He had a hard time with lessons but could do anything with his hands.

Diane and I moved to Sand Springs, Oklahoma, around 1979. I was still drinking, but no longer getting drunk or getting into fights at bars. I worked and made a decent living. We got Kenny a job and made a down payment on a Camero for him. Kenny did alright for two or three months but he could not stay away from Sallisaw. Kenny quit his job and went home. I had to take the Camero back when Kenny could not meet the payments. It hurt Kenny that I took the car back. Diane and I divorced and I lived by myself a while until Doris moved in with me in Sand Springs around 1985. Doris and I married in Fort Smith, Arkansas, on December 28, 1990.

Kenny had bouts of depression and did things that did not make any sense. Sometimes he would be very down but other times he would be manic, always on the go and upbeat. Kenny cried a lot when he and Abby were separated. He bawled like a baby when he talked about it. In 1986, when Kenny was separated from Abby and was very depressed, he stayed with Doris and me. I got him a job with Kerr Glass and he was making real good money. Kenny had a truck. He worked about three months and then left in the middle of a shift, just walked away from a $200,000 machine that he left running. Soon after that, he tried to kill himself by shooting himself in the chest with a shotgun I had lent his youngest brother Steve. Kenny worked hard when he worked, but he never

9

seemed to be able to live on his own. He lived with his wife and lots of times they lived with Gelene, he lived with me, or he lived right next to Gelene. He was not an independent person and had to be close to home.

My father died in 1969, and my mother died in 1977. She was as good a woman as there is, but she had a hard life between my father being half crazy and always poor. I believe in calling a spade a spade, and I would never call myself a good father. I still kick myself over the way I lived my life and the way I treated my children, I can't help but ask myself if I had been a good father or if I had stayed with Gelene if Kenny would be where he is. I've tried to make it up to him by standing by him since all this trouble. I went to both state trials every day. I had just started a new job when the federal trial happened so I could only go to that once or twice a week.

Kenny's trial attorney, Mr. Hilfiger, only interviewed me a few minutes before I testified. I did not know what kind of information could help my son, so I just answered questions the best I could.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator when we talked.

I declare, under penalty of perjury, that the foregoing ten (10) page declaration is true and correct.

Executed by me this __10__ day of 2009, in __Creek__ County, Oklahoma.

Ernest Eugene Barrett

10

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 82**

## DECLARATION OF JACK GORDON

I, Jack Gordon, declare the following:

I am a lawyer admitted to practice in the courts of the State of Oklahoma, the various federal district courts in Oklahoma, the United States Court of Appeals for the Tenth Circuit, and the United States Supreme Court.

I was second chair counsel to attorney John David Echols in Kenneth Eugene Barrett's second trial in state court. I was primarily responsible for the second stage of trial, which never occurred, because Mr. Barrett was acquitted of first degree murder and was convicted of manslaughter.

Our second stage psychological expert witness was Dr. Jeanne Russell of Tulsa, Oklahoma. I had prepared her testimony and the testimony of other witnesses based on the investigation and reports that were generated by the investigators working with us on the state case, including Roseann Schaye, who had acted as a mitigation investigator for Mr. Echols before Mr. Barrett's first state trial.

I am aware that after Mr. Barrett's second state trial, he was charged in federal court. I am also aware that Mr. Echols, for a time, represented Mr. Barrett in federal court, but withdrew before the trial. I am aware that Roger Hilfiger and Bret Smith of Muskogee represented Mr. Barrett in his federal trial.

I was never contacted by either Mr. Hilfiger or Mr. Smith regarding the work I did on Mr. Barrett's state case for the penalty phase. Nor did either Mr. Hilfiger or Mr.

1

Smith, or anyone working for them, retrieve my file in Mr. Barrett's case.

I did not write this declaration. The above information was related to one of Mr. Barrett's current counsel. I have read carefully the contents of this declaration, and it accurately reflects what I told one of Mr. Barrett's current lawyers.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

Executed by me this _2_ day of March, 2009, in _Rogers_ County, Oklahoma.

Jack Gordon

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 83**

## <u>DECLARATION OF GWENDOLYN CRAWFORD</u>

I, Gwendolyn Crawford, declare the following:

I am Kenneth Barrett's maternal cousin.  My mother, Phyllis Crawford, is Kenny's mother's sister.

My family has struggled with mental illness a lot.  I have bipolar disorder and am treated for it.  For a long time, my family had no idea what to make of my moodiness. When I was a child, I paid a terrible price because family and friends thought I could control my mood swings. I used to smoke a lot of marijuana, before I figured out that it was the exact wrong treatment for what ails me.  I am taking prescription drugs now, and it has allowed me to control my moods much, much better.

Both my children have mental problems.  My 24-year-old son Brandon cannot speak and is clearly developmentally challenged. He is a dear boy, warm and responsive.  My daughter, Brandie Hill, also has depression, and is possibly bipolar, but she is fearful of treatment.  Her husband, Shawn Hill and I encourage her to get treatment, and we are hopeful she will make the right decision some day.

For a while, I lived in a trailer just below Kenny's shack on the other side of the ditch that OHP came though when they raided Kenny's.  Sometimes Shawn and Brandy lived with me there, too.  It would have been impossible for a Mazda to go through the two-foot deep ditch without bottoming out and destroying her transmission and oil pan as Brandie Price had testified.

–1–



I know Kenny, and he would not talk about killing police or going down in a blaze of glory. That would not have been Kenny.

I have known Cindy Crawford for years. She is married to my brother, Travis Crawford.

It is my personal opinion that Cindy Crawford is a totally dishonest person. I am also aware that her reputation in the community for honesty and truthfulness is extremely poor. I would describe Cindy Crawford as one of the biggest manipulators I have ever seen. She can turn the "water works" on and off to get what she wants, and can also be charming when she needs to be to get something of advantage to herself. Cindy Crawford has broken into my house and stolen from me on numerous occasions in order to get money to buy drugs. She is basically a compulsive thief and a liar. Cindy Crawford has made false referrals to the Oklahoma Department of Human Services regarding my family. It is common knowledge in the community that Cindy Crawford has worked as a "snitch" for local law enforcement for a long time to get others in trouble and to avoid getting in trouble herself.

My problems with Cindy Crawford reached the point where I actually took a shot at her, and had to go to court over it. The court case was resolved with me being put on probation. When I was in court to resolve my case, a lady came up to me and asked if I needed her to testify for me because Cindy Crawford, on the previous day, had beaten this lady's daughter severely with a beer bottle.

-2-



I love my brother Travis very much, but there was no helping him when he was around Cindy and taking drugs. Travis told me that before he testified in Kenny Barrett's trial, he did two hits of methamphetamine, and was under the influence of the drug when he testified.

I was aware that Kenny was on trial in 2005. No defense attorney or investigator ever spoke to me about my immediate family or Kenny regarding Kenny's case until last month. Until recently, no one working on Kenny's case asked me about Cindy Crawford's honesty, either. If someone had asked me to testify about the things in this declaration, I would have done so.

After investigators working on Kenny's case asked me about my family and Cindy, one of them came back and showed me this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigators during our meetings.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct.

Executed by me this 27 day of February 2009, in Sequoyah County, Oklahoma.

Gwendolyn Crawford

—3—

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,    )
    )
          *Plaintiff,*    )
    )
v.    )     **Case No. 6:04-CR-00115-JHP-SPS**
    )
KENNETH EUGENE BARRETT,    )
    )
          *Defendant.*    )

**EXHIBIT 84**

## Declaration of Issac Barrett

I, Issac Barrett, declare the following:

I am Kenneth Barrett's uncle on his father's side of the family. Ernie Barrett, Kenny's father, is my brother.

My wife, Oleta, and I lived on a nice little ranch in Akins, Oklahoma, on land that was inherited by various members of my family. We have a few horses, a few head of cattle, a good dog, and six cats that are self-taught copperhead killers. We also have cougars, coyotes, and bear around here, and we have to keep an eye out for them. I used to hunt but don't care about it anymore. Oleta and I feed deer and wild turkeys all winter, always at the same time of day. If we're late, the deer make a sound and let us know it. Our property is surrounded by woods, and lots of people would think it is pretty idyllic. My grandfather owned 1/3 of this land by himself and 2/3 of this land, twenty acres, with my Uncle John. They died intestate as did my parents. Uncle John's only child Elnora Long, my half-aunt and half cousin, got John's ten acres, which I bought from her. The remaining 20 acres was divided among my grandfather's and Uncle John's grandchildren. We each got 11/144. I bought out most of my family and paid better than the appraised value, and traded for the rest or acquired it by quiet title. Before I bought it, it had lain dormant from 1962-1980; no one lived on it or worked it.

We are able to enjoy life now because we worked hard for it; Barretts are hard working people. Busted my leg twice and my collarbone once. I drive a construction truck for a small outfit now. Before that, I was a production supervisor for 10 years at an open pit, strip surface mine, in Huntington, Arkansas. My job at the mine eventually became a union job. I spent two years in college at West Arkansas College. When I was



growing up, I worked on ranches. When I was 15 or 16, I broke horses for $15.00 a horse. I rode a horse every day for six weeks, and if the horse got broken in, I got paid.

From 1917 to 1943, my grandfather and namesake, Isaac Clifford Barrett, managed a 20,000-acre ranch owned by a Kansas doctor, B.B. Ralph. The ranch has since been carved up some, but much of it is a hunting preserve.

My family goes back a ways around here, and we heard interesting stories about them. My grandfather Isaac married Mary Ellen Maxwell whose mother was Mattie Newby. Mattie married William Maxwell. Mattie and William had nine other children besides my grandmother Mary: Hazel, Opal, Ivy Harold, Howard, Jim, a boy named Ann, Sam and Albert. Isaac didn't like to ride in cars. He used a wagon and a team of mules. He was a walker most of all. He didn't have much to say. He chewed tobacco. We called him Papa. We always had a big garden.

Isaac was a fair man. When I was three or four Isaac told me, "I'm going to take Mr. Rogers some green beans, radishes and new potatoes—he's been sick, bad off— he's our neighbor; we need to share with him." "Please let me go!" I asked. At first he said no because the grass was so high and he was carrying two large buckets. I begged him, "Please!" Isaac agreed and said, "All right, but you have to keep up with me," and I did. Coming home, we passed a pear orchard and I asked if we could pick one. He said, "No, they're not our pears." I tried to argue with him and pointed out that he just gave Mr. Rogers all that food, but he explained, "That's because we have plenty—that doesn't entitle us to these pears." That's the way he was.

Isaac sure had his burdens to carry after he married into Mary Maxell's family. She walked around the yard talking to herself. At night, she would wake up, wash jars,



and think she was canning.  Mary's brother, Howard Maxwell, who worked for Douglas Aircraft in Tulsa, was Loony Tunes and his son Dean Maxwell put a gun to his head and pulled the trigger about 10 to15 years ago.  Dean is buried in Akins Cemetery.

Papa (Isaac) committed suicide by ingesting a remedy for black leg cattle disease.  My mother told me he killed himself because he had a broken heart.  The range was open in Isaac's day. Isaac eventually assembled a small herd, and was cow rich.  His son Wilson, they called him Barney, hounded him to sell the herd and invest the money.  Finally, Isaac gave in. He sold the herd and never saw the money again after giving it to his son.  Took away Isaac's way of life.  He had nothing left.  He killed himself November 24, 1952, and is buried in Akins cemetery.  My grandmother died a little more than ten years later, on December 25, 1963.

Whatever good Isaac had in him, and there was plenty of it, did not pass down to his son, A.J., who was my father.  A. J. married my mother, Ada Mae Hatter.  I loved my father because he was my father, but as a person he was the sorriest man I ever met in my life.  I was born in Marble City, Oklahoma, and then my family moved to Akins, Oklahoma. Both are in Sequoyah County.  We lived a hard life. I had three other brothers who died at or near childbirth; the oldest was two weeks old. Two are buried in Akins cemetery. The stillbirth is buried back in the mountains.

The cabin we lived in had no electricity or running water. Our well water was not usable for humans, although it was all right for animals and crops. We had to haul our water.  My parents got electricity in 1957. Six years later, they got water and a drain. The entire family had to work in the fields traveling from one crop to the next.  We worked strawberry crops, and one time we went to California to pick potatoes.



My father was an abusive alcoholic and a bully who only cared about himself. He mortgaged cattle that he didn't own and left it to us kids, every one of us, to pay the debt off by picking cotton and green beans. His mom and dad once bought him a pair of shoes—we were so poor—he didn't like them so he threw them in the fireplace. He would destroy his own stuff. His attitude was always, "I'm bigger than you—the hell with you." My brother Ernie is a lot like my father.

If my father was in a bad mood, he hit me or the other kids with any damn thing, belt, club, board, or limb. He hit all of us and my mother. I never knew from one day to the next what was going to happen. He was drunk for two weeks at a time. I could never bring my friends around. Sometimes he was away, working pipeline or the lime quarry. Nobody wanted him to be at home because of the crazy things he did. He raped and impregnated one of my sisters, Margaret. He beat her bad if she came home from a date late, and once she said, "Beat me some more, I don't care; you've done everything else." I didn't know what she meant at the time, but now I do. My sister went to New Orleans, had the baby, and gave it up for adoption. My father went to Vinita to the state mental hospital but came back after a month. He was constantly messing around with other women, and rumors flew around that he fathered another child.

When I turned 14, I had had enough of him beating my mother and us kids. The next time he hit my mother, I hit him back with a fireplace poker that opened a five-inch gash. I knocked him out cold. When he came to, I said, "You touch my mother again and I'll kill you." I think he knew I would. He never hit her again when I was around, but he hit her plenty when I wasn't there, busting her eardrum one time when he slapped her. As I got older, I just stayed away from him.

–4–



Some of my family had some pretty serious problems as they grew up.  Kids in school called my brother Ernie "Loco" because of the way he acted, and he never completely straightened out.  Ernie was pretty cruel and treated us kids pretty rough.  When he made us cry, he thought it was funny.  He would destroy what little things we might have.  My sister Linda is not mentally stable and has treatment by a psychiatrist.  My other sister Margaret left home, moved to Bloomington, Illinois, married Morris Cochran and had three boys with him (Kurt, Kent, and Kelly).  She died from cancer in 1995.  My brother Gary seems to be doing pretty well, but he struggles with a dark side he keeps hidden pretty well.

Ernie married Gelene, and I felt sorry for her.  Ernie was Mr. Playboy and good for that one thing only--to use and to walk on women. He botched his marriage. He was always flashing dollars, but  he didn't mind taking money from others, even our poor mother. In the Marine Corps, he got in trouble and was going to go to jail unless Mama sent him $1,000. She borrowed it. We picked cotton to pay it back. In 1969 when dad died, mama had to send Ernie money so he could come home for the funeral, but he always acted like Mr. Big.

My mother knew there was something wrong in the head with Ernie, but she covered up as best she could. Ernie would roll dad if he was drunk and passed out and dad had any money.  Once when Ernie came to visit after his divorce from Gelene, Ernie was driving a new Corvette and he passed his children on the street. I was riding with him.  The children were wearing worn, ragged clothes. I said, "Let's stop; there's your kids." He refused to stop and said, "All they want out of me is money." I think Kenny was 15 or 16 then. It was right pitiful.  The less Ernie wanted Kenny, the more Kenny



worshipped him.

Gelene had something wrong with her, too. I would come over and some new boyfriend would just be getting out of bed—you never had any idea who was going to be there in the morning. My mother used to keep Kenny and Richie. When Gelene was at Mama's she did not drink, but when she had money, Mama would not see her again until she drank it up. Gelene was a drunk when she was in high school. I met a man who said that when Gelene worked in Walgreens in Joliet right after high school, before she met Ernie, she would get drunk with him, strip for him, and sleep with him. Gelene had two extremes—alcoholic and Jehovah's Witness—and she was definitely in the alcoholic mode when she begat Kenny.

Gelene's dad, Hugh Dotson, was a strange duck. He could not sit down and talk, like he was paranoid, looking around all the time.

There was a pattern in my family that went right down the line—the two suicides and Kenny's attempted suicide—mental illnesses of one kind or another that showed itself in so many ways. The dots connect. Look at Ernie, our father, grandfather and great grandfather. Ellie Long, who is my grandmother's daughter, but is so close to our age we called her "Sis," has serious mental problems. She's a nut out. Where I'm going with this is that I think Kenny was a very paranoid person. Something was wrong with him even when he was a little one. As he got older, Kenny's moods were all over the place.

I was aware that my nephew Kenny Barrett was tried in federal court in 2005. Before or during his trial, no lawyer or investigator working on Kenny's case contacted me. Had I been contacted, I would have provided the information in this declaration and would have testified if asked to do so.

An investigator currently working on Kenny's case asked me to tell him about my family.  I did not write the declaration myself but I have read it carefully and it says what I told the investigator when he asked me.

I declare, under penalty of perjury, that the foregoing 7-page declaration is true and correct.

Executed by me this 2 day of March, 2009, in Sequoyah County, Oklahoma.

Issac C. Barrett



**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 85**

## Declaration of Janice Sanders

I, Janice Sanders, declare as follows:

I am Kenneth Barrett's maternal cousin and neighbor. I presently live with my mother, Ada Blount, who is Gelene Dotson's mother's sister. My husband Tom Sanders is Monk Sanders's uncle. My husband and I are presently separated. He lives just down the road from us in the house we used to live in together.

Kenny was a hyper little boy, the most hyper child I have ever seen. Kenny could not sit still, no matter what. Kenny also had strong feelings.

I love Kenny and was never afraid of him. That did not stop me from calling the police on Kenny on several occasions for playing the radio too loud or because I thought a bullet had accidently whizzed by my mother one afternoon when Kenny was firing his gun and she was outside. That call to the sheriff brought five law enforcement vehicles to Kenny's place and resulted in John Philpot inspecting Kenny's rifle to see if it was legal. I watched them there from across the road. I saw the police drive onto Kenny's property and saw him hand the rifle to John Philpot, the Sheriff. John looked at the rifle and gave it back, and the police left.

Carolyn Joseph told me that Kenny once threatened to burn my house down because of my calling the police on him, but neither of us took it seriously, not for a minute. Once when I was walking by his property Kenny threatened my dog, if it ever came on to his property. I never did take it seriously. Kenny would never hurt anyone or anything.

In fact, one of Kenny's dogs once attacked a poodle I owned and Kenny put his own dog down for doing it although he loved that dog, and he couldn't have been more

apologetic. The vet fixed my dog up fine, but Kenny often asked about the dog and never stopped saying how sorry he was that it happened. About two weeks before the raid, Kenny drove up to everybody's property in the area and told them that he had lost a gun while riding in a pasture on his four-wheeler. He was warning folks to keep their children out of that pasture until he found his gun so that they would not pick it up and accidentally hurt themselves.

About a week before the incident, and about two weeks after Johnny Philpot had come by and visited Kenny on his porch, I drove over to Kenny's house. The gate was open. I asked Kenny if I could give him a Bible. He took it and he could not have been any sweeter. I told him we cared about him.

I was awake at the time of the raid on September 24, 1999, and living with my husband. I had awakened to go to the bathroom and had just gone back to bed when the shooting started. I did not see any police lights when I got out of bed, although from the way my house is situated, unless I went to the kitchen or the front door I could not have seen the road. I did not go to the kitchen when I went to the bathroom.

When the first rounds were fired, I assumed it was Kenny, because Kenny often fired into the air at night. Kenny did not fire what sounded like semi-automatic or automatic weaponry when he fired into the night or when he fired during the day. It was always one or more distinctly separate shots. Soon, I no longer thought it was Kenny because of the large number of rounds fired and the rapid firing. I had no idea what was going on outside, who was shooting, and then it stopped as suddenly as it had begun. It all happened so fast. My mother called me after the shooting had stopped for a minute or two and said she saw police lights.

Page 2 of 4



I have always wondered if there were really a warrant out for Kenny's arrest, as I learned later after the raid. Why didn't they arrest Kenny then, when John Philpot came out a few weeks earlier or when they had his weapons and there were five police cars on his property?

At the state trial, the prosecution subpoenaed me and made me read aloud the words on the sign that Kenny had on the gate. This upset me, both because the sign was meaningless and because I had never read the sign before they showed it to me.

Mr. Littlefield came to see me. Johnny Philpot accompanied him. Mr. Littlefield got angry with me when I told him that I thought that Kenny's state sentence was fair and that it was un-American to try him again since he had been convicted and sentenced. Mr. Littlefield said, "You want him living next door to you again?" And I said, "Why not?" I told him that I thought the state sentence was fair and that I wasn't afraid of Kenny. Mr. Littlefield was very hateful to me.

Mr. Hilfiger came to my house with a heavyset younger man whose name I do not know. I told him everything I am stating in this declaration except the part about Kenny being hyper. Mr. Hilfiger did not ask anything about Kenny's childhood or background. The man with Mr. Hilfiger said, "Aren't you going to put her on the stand?" He was referring to me. Mr. Hilfiger said, "No." The man with Mr. Hilfiger acted like he could not understand why Mr. Hilfiger felt that way.

I recently told an investigator working on Kenny's case the information I am saying in this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that this 4-page declaration is true and

Page 3 of 4



correct.

Executed by me this 27 day of Feb 2009, in Sequoyah County,

Oklahoma.

Janice Sanders

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 86**

---

## Declaration of Kathy Trotter

I, Kathy Trotter, declare as follows:

I am Kenneth Barrett's paternal first cousin. My parents are Ike and Ruth Barrett. Ernie Barrett is my uncle.

I grew up in Fort Smith from the second grade through the seventh, when we moved to Alma, Arkansas, where I spent my eighth and ninth grades. I moved to Sallisaw in my sophomore year where I stayed with my father. My parents divorced in 1977. I stayed in Sallisaw until the middle of my senior year in high school when I went back to Arkansas to live with my mother because I found my dad too demanding and controlling. I drove back to Sallisaw every weekend to see my friends. My brother Glenn, who is four years younger than I am spent 20 years in the U.S. Navy, married a Japanese woman and moved to Japan upon his retirement.

You cannot pick your family, so I have learned to live with mine. Several of our relatives have serious mental health problems that can be traced to chemical imbalance and depression. My aunt Linda, who is my father's sister, is mentally ill, as are Ernie Barrett and Elnora Long. My dad calls Elnora, "Sis" because they are about the same age, even though she is his grandmother's daughter. I call her Ellie. She is very emotionally unstable. All the children loved her, but she flip-flops and her moods are unpredictable. She will say she loves you on one extreme and that you are dirt on the other. She is prone

K.T.

to snap, start shaking really badly, and whatever is on her mind comes flying out of her mouth. She is manic-depressive.

I have also had mental health issues. In 1985, I was an inpatient at Harbor View in Fort Smith for one week for a chemical imbalance, anxiety and depression. Two years ago, I weaned myself off medication I was prescribed in 2006 by Dr. Tom Coburn of Muskogee.

Kenny had a tough time coming up with the parents he had. His mother Gelene used to drop Kenny and his two brothers off at the home of their grandmother, Ada Mae Barrett so she could party with my Aunt Linda Riley. My parents told me Gelene was a drunk right out of high school and I never saw a reason to doubt that. I always thought Gelene was mean, that she had a mean spirit. The way she would talk to us kids was angry. I was afraid of her. Maybe because Kenny was older, Kenny did suffer more verbal abuse from her than her other two children.

Back then we called Kenny hyper. He was erratic and temperamental. He did not have a family that loved him or cared for him, and it was apparent to me that Kenny was deeply troubled. He would do irrational things, like ride bikes down a dangerously steep, extremely bumpy hill. He could be very kind and generous and he could be very agitated and mischievous. I had to be a tough girl to hang with him, but it was something I wanted to do. I love Kenny; I care about him

Kenny's grandmother, Ada Mae, adored him. When she died in 1976 Kenny was just 14. It was as if the only adult who ever cherished him had gone. The family split apart when she died, but for Kenny it was worse because his father had recently deserted him at the age he most needed direction. Ada Mae was very well thought of, and was someone who worked extremely hard. My father is a lot like she was.

Mr. Smith, one of Kenny's lawyer's, spoke to me a few minutes before I testified. When I was on the witness stand, he did not ask me any of the questions that he asked me when we spoke beforehand. He never asked me about our family's history of mental health issues, either before I testified or on the witness stand. I thought my testimony was pointless.

I gave this information to a man who recently came to talk to me and said he was an investigator working on Kenny's case. He asked me if I would read this declaration to see if it says what I told him when we talked, and if I would sign it as part of Kenny's case. I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct. Executed by me this 24th day of February, 2009, in Sequoyah County, Oklahoma.

Kathy Trotter

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 87**

**Declaration of Linda Riley**

I, Linda Riley, declare the following:

My husband, Fred Riley is a former barber who receives disability for PTSD, a consequence of his service in Viet Nam during the war. I have twin daughters, Stephanie and Jennifer, both of whom struggle with bipolar disorder. Stephanie's seven-year-old son, Ben Thomas, has been diagnosed with Asperger's Syndrome. Jennifer's' disorder was discovered when she was training in the military during the first Gulf War, and she now receives disability from the U.S. Air Force.

Growing up was difficult because of what we had to go through. My mother was Ada Mae Hatter Barrett, who was born September 10, 1919. My father was A.J. Barrett, and he was a drunk. We all had a lot of resentment toward mom for staying with him. We loved her and respected her, but there was a part that didn't because of what we had to go through growing up with the humiliation and the shame. Wearing old clothes, clothes with holes, starting high school and not having the clothes we needed. I got along a lot better with my mom in her later years. All those bad feelings about my mom were very strong until my daddy died. After he died, I was getting more mature, I looked back, and I saw how incredible she was. She fixed her own sewing machine, cooked from scratch, and raised five children. She had two breach babies at home by herself. Women didn't have the choices to leave back then that they have now. They had nowhere to go and no one to help them.

My father had plenty of rage in him. Dad worked for St. Clair Lime in Marble City driving a truck, but his drinking caused him to lose his job. Mom started to work in

Page 1 of 8



1951 when my brother Gary and I were little. We stayed with Granny Bell and Papa (Isaac Clifford) when she worked. She did not work long at first but went back to work when I was 12. She worked in the Sallisaw hospital laundry from 1958 until her death, March 24, 1976. She was a hard working woman. My dad did not want her to work, but we would have starved without her income. Granny Ida knew a lady who had a field of purple hull peas. The lady said my mom could have what was left for our cattle, but we picked them and that's what we ate for two whole weeks, that and cornbread. That was in 1958.

My mother was a very unhappily married woman. Although she loved my father, she nagged him. When he had had enough, he went to town and got a bottle of whiskey. My mom did not like my grandparents and had great resentment towards her mother-in law, Granny Bell (Mary Ellen Barrett) and her sister-in law, Esther Marie Barrett Floyd.

My grandparents had plenty of nice things, and my mom thought they should have shared more with her. My grandparents were wonderful to me, and I was Aunt Esther's favorite. She told me so. Aunt Esther tried to give me her 10-acre pasture in 1991, but I had two daughters starting college and besides I could never live in Akins again because of the shame of growing up there.

I am not like my brothers. I moved away from the family right after Mom died. I did not want to be like them, fighting all the time, with no loyalty or kindness for each other. My sister Margaret felt the same way and moved to Bloomington, Illinois. I worked as a machine operator at Planter's Peanuts for some 21 years and before that I worked for two years at McDonnell Douglas in Tulsa.

Page 2 of 8

We think my dad was bipolar. My mom sent him to the insane asylum in Vinita. This is the same place where my father's granddad, whose name was also Andrew Jackson Barrett. died. My dad's granddad is buried at Maple Cemetery and has a military stone.

My dad used to puncture the tires on my mom's car and would threaten to cut her throat.  On the other hand, when I was pregnant with Craig, my daddy said he would buy me two pantsuits if I had a boy. When Craig was born, he took his money from digging graves and we went shopping together. He kept his promise. He was so proud.

I was not afraid of my father.  One time, my mother had been hiding from him in the woods all day and I found her. Daddy had cut the phone lines, which he often did. He could be meaner after a drunk than when he was drinking. I went to the house and called him a son of a bitch and told him I was going to the neighbor's to call the sheriff. Dad said if I walked off that hill, he would shoot me. I walked out and was going down the hill when I saw the gravel skip near my feet before I heard the shot, but I kept going.  I called E.W. Floyd, Pretty Boy's brother, the sheriff. He arrested my father, but Mom had him out by sundown. It made me resent her and that's when I decided she was on her own.

The last time I saw my dad alive, I had driven down from Broken Arrow to see my mother.  I walked into the kitchen and I could see from Mama's face that Daddy had slapped her and daddy had messed up the house like he did when he went berserk. I confronted Dad, and he told me to get my ass in my truck and go back where I came from.  Mama gave me a look and I knew if would be best for her if I left. That was the

last time I saw him alive. The next time I saw him he was on the slab and I said, "I love you daddy, but you were one mean drunk old son of a bitch."

Daddy was a cruel person at times. My sister Margaret told me in 1994 that my dad had raped my mother's younger sister, Wanda, when she was 13-years old, soon after Mama and Daddy were married. When Mama asked him why, he said because he wanted to be the first one. Granny Ida later took Wanda to Rocky Point, Oklahoma, to have a clothes-hanger abortion, so there's no telling how many times he abused Wanda. We never knew why our girl cousins couldn't come to our house, but now that questioned is answered.

I went to family therapy by myself more than once. I take Welbutrin, which is prescribed by my family doctor. I felt like I needed something. I didn't think I was depressed, but my family did. I married Fred Riley on September 30, 1980, in Poteau, Oklahoma; he is my fifth husband. I did not have children with Fred or with two of my other husbands. I married Jimmy Holden in March 1976 in Fort Smith and divorced him the same year. I married Bill Harris April 7, 1979 in Fort Smith and divorced him a few months later. I married Pat Sherrard in Inola, and divorced him in Sallisaw.

Ernie and Gelene had a volatile marriage. They got married on a dare.

They were wild. Gelene always drank. There is no doubt in my mind she drank all through her pregnancy with Kenny. To be fair, we had no knowledge back then of how bad alcohol could be for the fetus. In 1968, Richard, my first ex husband, took Craig when he was a baby and me to visit them. Gelene would get out of control. One night we drove into Chicago. We went to a supper club, ate, and had a good time until Gelene got

Page 4 of 8

up on the table and started dancing. She was famous for that. She wanted attention; she was a doll, but she did not have to do that. When Gelene had Stevie, the marriage was over. It was a funny marriage – they both loved the children, loved to party and they were both wild. Whatever their marriage was, it worked for them sometimes. Ernie loved them all. He is very complex.

In 1964, when Gelene left Ernie for the first time, she brought the two babies back to Oklahoma. It was the winter and she moved in with my mom and dad.

Mom worked and daddy would go squirrel hunting every day. Gelene would stay in bed all day with Richie, every day. She did not get out of bed until my mother had dinner on the table. Kenny was three and a half. He would cry when my mother went to work. My mother showed Kenny so much love and tenderness. Kenny would just wander around in the cold house alone without a wood fire to warm the place. Gelene did not change Richie's diapers.

Gelene was depressed. She did not drink around my parents. She ignored Kenny. He was neglected. I would come out there and find him with a cold fried egg in his hand. I would take him to my apartment and run the tub – he was filthy. He would play with the Ivory soap like it was a boat. I got him a haircut. Kenny had nothing to eat. Gelene would not even get out of bed to feed him. I would come and he would have a box of Rice Krispies in his hand. Mom took Kenny to see Dr. Bob Mitchell because Kenny was so frail and wouldn't eat anything but those Rice Krispies. They discovered then that he had a heart murmur and Dr. Mitchell had mom put Kenny on beer to help him gain weight, but that didn't last long because my daddy would drink the beer, so Kenny



remained frail and thin.

Kenny never had a chance. I remember when they were living with my parents, I found Kenny standing on one of the chairs, looking out the window. "What you doing bubby?" I asked. "My daddy's going to come get me," he said. "He has a fast car." It was that way forever. Sometimes I would find him sitting next to his mom's bed waiting for her to wake up. I feel like I abandoned him when I moved away around this time to Broken Arrow.

Gelene, Kenny and Richie stayed at my parent's house for five months. At first, Gelene felt safe at my parents. She could not go to her own people. Hugh was a strange man. Then one day A.J. told Gelene he was going into town to get condoms and that when he came home he was going to have sex with her. Gelene moved Kenny and Richie to Aunt Ruth's before A.J. got back. At that time, my mother did not believe Gelene, but when Mama was on her deathbed, she begged for Gelene to come. Mama told Gelene that she was so sorry she hadn't believed her. There is no telling what Kenny saw and heard back then, when he was wandering around alone at mom and dad's house.

Kenny was the cutest boy. He had the sweetest smile. He loved everybody. He didn't have anybody looking out for him after my mom died. Steve was whining and crying. Richie was tattling. Kenny was just yelled at by Gelene. Kenny's whole life she screamed at him. He once told his Aunt Phyllis that he would lay awake nights because he couldn't get her voice out of his head. Kenny just wanted to be left alone by her, to avoid her, but she never gave him a break. He didn't have a moment's peace; she was incessantly nagging and screaming at him. He had to have taken himself somewhere else

Page 6 of 8



emotionally and mentally to endure this.

Gelene would do anything in the world for anyone. Nothing is any trouble for her. What would be an inconvenience for others is not for her. She is a Jekyll and Hyde – you never know who you're going to get. To her Kenny was always trouble, like she took Ernie out on him. He was always doing something wrong, could never do anything right. He was left to watch his brothers all the time while she partied. She wanted them not to love their daddy. She would tell them stuff you don't tell your kids, like when her child support was late.

When Gelene was in a Jehovah's Witness mode, one Christmas she brought the children out to my mother's, and would not allow the children to receive the gifts we had bought them. Jehovah's Witnesses do not celebrate Christmas in the manner of most other Christian faiths. I took her into another room and I told her in no uncertain terms she was not going to take Christmas away from the children or my mother. If she refused, I would have taken her down like a dog. Gelene left, and the children got their presents.

I love Kenny; I did not go to the trial but I was always praying for him.

After I spoke with an investigator working on Kenny's case, he asked me if I would provide the information I gave him to the court. I did not write out this declaration myself but I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 8-page declaration is true and correct.

Executed by me this 28 day of February 2009, in

Page 7 of 8



_____ County, Arkansas.

Linda Riley

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 88**

## DECLARATION OF MIKE MACKEY

I, Mike Mackey, declare the following:

I have known Cindy Crawford for several years. It is my understanding that she testified against Kenneth Eugene Barrett at his federal trial in Muskogee for the murder of an Oklahoma Highway Patrol Trooper.

Before or during Mr. Barrett's federal trial, I was not contacted by any attorneys or investigators working on his behalf. Had I been contacted, I would have given them the following information about the honesty of Cindy Crawford, and would have been willing to testify.

To put it bluntly, Cindy Crawford is the most wickedly evil person I have ever run across. She will do or say anything to get other people in trouble, if she can get something out of it and if she thinks she will benefit. She is totally dishonest, and lies constantly. This is not only my personal belief, but I am also aware that her reputation for honesty in the community is horrible. In the past, Cindy Crawford has made false referrals to the Oklahoma Department of Human Services regarding me and my step son, who is mentally handicapped, and has also used false information in an effort to get victim protective orders. For example, I once saw her walking down the road while I was driving by. I did not stop and speak to her, and did nothing to her. Within days of this non-incident, she sought a victim protective order against me. She has made false claims of wrongdoing against other members of her family. Cindy Crawford has broken into my

1

home on numerous occasions and stolen things in order to buy drugs. It is common knowledge in the community that Cindy Crawford has worked as an informant for the police for an extensive period of time and has managed to stay out of trouble herself because of this. She "works the system" in order to get whatever she can that will benefit her.

An investigator working on Kenny Barrett's case asked me to provide this declaration. I did not write the declaration myself, but I have read it carefully and it says what I told the investigator during our meeting.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

Executed by me this __1__ day of __March__, 2009, in __Sequoyah__ County, Oklahoma.

_Michael W. Mackey_

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 89**

*U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

## DECLARATION OF MYLA H. YOUNG, Ph.D.

I, Myla H. Young, declare as follows:

1.      I am a clinical psychologist licensed to practice in the State of California, specializing in neuropsychology and neuropsychological assessments.    I am Board Certified in Neuropsychology by the American Board of Professional Neuropsychology (ABN).  I am a member in good standing of the American Psychological Association and its subspecialty divisions in Clinical Neuropsychology and Forensic Psychology; the National Academy of Neuropsychology; the International Neuropsychological Society; and the Society of Personality Assessment.

2.      I am currently in private practice and conduct neuropsychological evaluations of criminal offenders, medical patients, psychiatric patients, and medical-legal patients.  I have conducted neuropsychological evaluations of children, adolescents, and adults.  I am an instructor of continuing education courses in the Neuropsychological Evaluation of Criminal Offenders and Introduction to Neuropsychology at the University of California, Berkeley, and at Alliant University.

3.      I hold a doctorate in Clinical Psychology from Alliant University, formally known as the California School of Professional Psychology in San Francisco, California.  I received my Masters Degree in Experimental Psychology from Towson State University in Baltimore, Maryland, in 1977.  I earned my Bachelor of Arts Degree in 1975 with a major in Psychology from the University of Guam.

4.      From 1984 to 1985, I completed a pre-doctoral internship at Garfield Geropsychiatric Hospital in Oakland, California.  During this internship, I performed neuropsychological and psychological evaluations of geriatric patients who were hospitalized for medical, neurological, or psychiatric disorders.

5.      I completed a pre-doctoral internship at the McAuley Neuropsychiatric Institute at St. Mary's Hospital in San Francisco, California, from 1985 to 1987.  While at St. Mary's Hospital I conducted neuropsychological and psychological evaluations of children, adolescents, and adults

1

who were hospitalized for psychiatric treatment, and provided treatment to these same individuals. I also conducted neuropsychological evaluations of adults who were hospitalized for medical treatment or who were recovering from neurosurgery, neurological and other medical disorders.

6.    In 1989, I completed a post-doctoral fellowship in neuropsychology at San Francisco General Hospital/University of California, San Francisco. During this time I conducted neuropsychological and psychological evaluations of patients hospitalized for medical, neurological, and psychiatric disorders. I conducted neuropsychological and psychological evaluations of children and adolescents who had been referred to the Child and Adolescent Sexual Abuse Resource Center. In addition, I participated in research that evaluated the neuropsychological, neurophysiological (evoked potential), and psychological functioning of men and women who tested positive and negative for the human immunodeficiency virus (HIV).

7.    From 1990 to 2005, I was employed by the California Department of Mental Health at the Correctional Medical Facility, a California State Prison, in Vacaville, California. During this period I served as a staff psychologist, providing neuropsychological and psychological assessments of individuals who had been admitted for acute and sub-acute psychiatric treatment while confined in the California Department of Corrections. I was part of an interdisciplinary treatment team and served as the clinical coordinator responsible for the development, implementation, and evaluation of a behavioral milieu treatment program. I provided staff training in neuropsychological assessment and behavioral treatment and psycho-diagnostic evaluation, and supervised pre-licensed Ph.D. candidates. I also trained and supervised pre-doctoral psychology interns and conducted seminars in neuropsychological and personality assessment of children at Oakes Children's Center in San Francisco, California. I trained and supervised pre- and post-doctoral psychology interns and conducted seminars in neuropsychological and personality assessment of children, adolescents and adults at the McAuley Institute of St. Mary's Hospital in San Francisco, California.

8.    From 1995 to 2000, I served as the Program Consultant for Psychology for the California Department of Mental Health facility located within the Correctional Medical Facility at

Vacaville, California, and served from 2000 to 2005 as the Senior Supervising Psychologist in the same prison's psychiatric treatment program. In these positions, I was the psychology consultant to the Executive Director, Medical Director, and Program Directors, was responsible for research and program evaluation, provided clinical supervision and consultation, and provided direct inmate/patient care. I was also the principal investigator for research, program evaluation, and treatment outcome measurement. I developed, accomplished accreditation of, and served as the director for an American Psychological Association accredited psychology intern training program, provided seminars in neuropsychological assessment, and provided individual and group supervision to psychology pre-doctoral interns and post-doctoral fellows.

9.    From January 1990 to June 2004, I served on the Adjunct Faculty at Alliant International University/California School of Professional Psychology where I taught courses on neuropsychological assessment. I was the dissertation chairperson for several doctoral students and served on the dissertation committees of numerous other doctoral students. The students pursued varied and wide-ranging areas of investigation involving both children and adults, psychotic and non-psychotic individuals, and persons confined in penal institutions as well as persons not so confined. I am the primary author of several studies which have appeared in peer-reviewed publications involving the prison population and the secondary author of several additional peer-reviewed publications.

10.   I have been the principal presenter at several professional conferences including: Asilomar Forensic Mental Health Conference; Patton State Hospital Forensic Mental Health Conference; California Psychological Association; American Correctional Mental Health Services Association; Behavioral Health Institute Conference; and the International Organization of Psychophysiology. I have been qualified as an expert witness in criminal cases in state and federal criminal courts in California, Nevada, Washington and Hawaii and in civil cases in California state courts.   Further description of my education and professional experiences is included as Addendum A.

3

11.    I was asked by the current post-conviction attorneys for Kenneth Barrett to complete a neuropsychological evaluation of Mr. Barrett to determine if he experiences brain damage and, if brain damage exists, the nature, severity and functional impact of that brain damage.

## A.    Introduction: Brain Functioning and Neuropsychological Assessment

12.    The science of clinical neuropsychology studies the relationship between the brain and behavior. Because the brain is the human organ that drives behavior, any injury or insult has the potential to adversely affect a person's actions, thought processes, cognitive abilities and psychological functioning. Conversely, observable behavioral deficits, including failure to meet developmental milestones and impaired scholastic, occupational and/or social functioning may suggest compromised brain anatomy or neurophysiology. Consequently, historical, academic, vocational, medical/psychiatric, family, and social history information may provide reasons to suspect brain dysfunction or damage and make a comprehensive neuropsychological evaluation appropriate and/or medically indicated.

13.    A competent evaluation of neuropsychological functioning requires administration of a full battery of standardized neuropsychological tests, review of information from documents that are available, interviews or reports of interviews of those who have knowledge of the individual's history, and interviews with the individual being evaluated. Focus of information sought includes family, medical, psychiatric, and social histories, circumstances of prenatal development, circumstances of childhood and adolescent development, educational, work, offense information, and description of current functioning.

14.    A comprehensive neuropsychological testing battery also includes measures of different aspects of brain functioning, including general mental ability (intelligence), sensory perception, motor functions, attention and concentration, verbal and visual memory and learning, expressive and receptive language, psychomotor and executive functioning (abilities to think, organize, reason, plan, inhibit impulses, think and act flexibility). Based on knowledge of brain anatomy, brain functioning, and neurological disorders, instruments used in a neuropsychological evaluation are developed to identify and measure cognitive deficits caused by brain dysfunction,

4

and, if impairment is demonstrated, to provide an indication of the potential cognitive and behavioral consequences of disrupted brain functioning for the individual.

15. Neuropsychological testing is guided by understanding of the phylogenetic structure of brain structures and brain connecting systems. One such developmental understanding was proposed by Ivan Yakovlev in 1967 and is supported and relied upon by contemporary neuroscientists in understanding brain function and dysfunction.

16. Yakovlev described the brain as organized in three separate but related systems, with three primary connecting systems. There is a primitive nuclear core of the brain, the allocortex, which includes the brain stem, reticular activating system, pons, medulla and cranial nerves, and functions to maintain consciousness, metabolism, respiration, and circulation and to filter stimuli received from the environment. The middle system, the neocortex, includes limbic system structures including the hypothalamus, hippocampus, thalamus, basal ganglia and amygdala, serves primary functions of motivation, memory, arousal, emotion and mood. The outer layer, the isocortex, includes the sensory and motor cortices, corpus callosum, cerebrum (occipital, parietal, temporal, and frontal lobes) and cerebellum. Orbitofrontal-paralimbic, hippocampal-paralimbic and subcortical-limbic connection circuits provide a "flow" of information throughout the brain (Yakovlev & Lacours, 1964/1967; Bear, Connors & Paradiso, 2001).

17. In addition to knowledge of the phylogenetic development of the brain, neuroscientists have known for many years that the normal brain develops in a predictable and unchangeable sequence. Brain regions responsible for arousal, filtering information, auditory, visual, and tactile/kinesthetic abilities develop first; brain regions responsible for analyzing and integrating information sequentially develop next; and brain regions responsible for simultaneously analyzing and integrating information develop last, with the brain continuing to develop through adolescence and into young adulthood.

18. In early childhood, the primary portions of the brain that function for motor, sensory, attention filtering, visual dimension and color, and analyzing language sounds undergo the greatest maturation. In middle childhood, the secondary portions of the brain that function to develop abilities for reading, writing, spelling, arithmetic and other secondary language

5

academic skills undergo the greatest maturation. In adolescence and into young adulthood, the tertiary portions of the cerebrum, particularly the temporal and frontal cortices undergo the greatest maturation (Luria, 1966/1973/1986).

19.    As the brain develops, those brain regions that are maturing the most are also those brain regions that are most vulnerable to brain damage, identified as the "vulnerability hypothesis." Consequently, the child who experiences brain trauma between the ages of approximately 8 – 12 years is most vulnerable to subsequent severe leaning disabilities. The adolescent who experiences brain injury between the ages of 12 and 16 years is most vulnerable to subsequently impaired executive functions. Additionally, brain insult(s) as a child interferes with further development of all other brain systems and structures (Pfefferhan, 1994; Gied, 1999; Sowell, 2000/2001/2003; Adelman, 2002; Casey, 2000/2005; Durston, 2001; Gogtay, 2004).

### B. Risk Factors and Indications of Neuropsychological Dysfunction

20.    Social and medical history data obtained in interviews with Mr. Barrett and contained in records that reportedly were available at the time of his trial indicated the existence of several risk factors and potential etiologies for congenital and/or acquired brain dysfunction. The pertinent information I reviewed included excerpts of academic records from Tommie Spear Junior High School, Sallisaw, Oklahoma and Jan County High School, Portland Indiana; Universal Cumulative Record, Plainfield Community Consolidated School District, Plainfield, Illinois; medical records from Sequoyah Memorial Hospital, Sallisaw, Oklahoma, St. Francis Hospital, Tulsa, Oklahoma, Wagoner Community Hospital, Wagoner, Oklahoma, and Bill Willis Community Mental Health Center, Sallisaw, Oklahoma; and a Disability Determination Unit Record, Sallisaw, Oklahoma. I also reviewed psychological evaluation test data obtained by Faust Bianco, Ph.D., Tulsa, Oklahoma, in August 2000 and psychological evaluation test data and a report prepared by Bill Sharp, Ph.D., Norman, Oklahoma, in October 2002. These data suggested potential insults to Mr. Barrett's brain functioning resulting from head trauma(s), both in childhood and as an adult; possible prenatal insult and brain development abnormality; and adolescent and adult abuse of alcohol and other drugs. Documented symptoms of possible

6

psychiatric disorders were also indicative of neurological brain substrate abnormality and consequent brain dysfunction.

21.    Mr. Barrett's history of potential head trauma(s) include a childhood injury, at age eight or nine years when he was struck in the head with some type of "steel ball" on the school yard. Mr. Barrett's description of the incident ("I just remember waking up and them picking me up") suggests loss of consciousness as a result of this incident, and as an adult, Mr. Barrett has a skull indentation which he attributes to this childhood injury.    At the approximate age of 22, Mr. Barrett also may have suffered a head injury, with consequent loss of consciousness, in a motorcycle accident.    He was treated at Sequoyah Memorial Hospital, Sallisaw, Oklahoma, and the Emergency Room Records describe "treatment for MVA," right periorbital area pain, edema, and possible head trauma. Immediately following his arrest in 1999 for his current commitment offense, Mr. Barrett was treated at St. Francis Hospital, Tulsa, Oklahoma, for multiple gunshot wounds and "bruising to the left eye and superficial abrasions to forehead...superficial blunt head trauma").

22.    Head traumas may cause damage to the cellular units of the brain (neurons), which transmit and store information.  The blood vessels transmitting oxygen and nutrients through the brain are also damaged.  Multiple small, and/or single large bleeds (hematomas) within the brain can occur.  The brain swells, pressing against the rigid bony skull, causing further damage to the brain.  Extensive research describing the damaging effects of head trauma as a child and head trauma as an adult is currently known and was well established in 1999.  Two sources which provide a representative description of this historical and current research are found in Kolb & Wishaw (2003) and  Silver, McAllister, & Yudofsky (2005).

23.    Mr. Barrett also may have been exposed to dysgenic disorder as the result of teratogenic effects of substance use by his mother during her pregnancy with him, as well as secondary to his mother's psychopharmacological treatment for depression during her pregnancy.  These factors are known to be associated with brain development abnormality, brain dysfunction and abnormal development of the fetal brain (Rasansen, 1999; Steissguth 1990; Tizabi, 1997; Cornelius, 2001; DiPietro; 2002, Ernst; 2001; Huizink, 2004; Weizman, 2002).  Mr. Barrett reports childhood

7

exposure to alcohol beginning at age seven, when his father provided alcohol to him and his brother, resulting in his severe intoxication and subsequent emesis. He indicates that he then consumed alcohol and other drugs "on a regular basis" beginning at approximately the age of 14 years, with particularly severe drug abuse between the ages of 16 and 18. Drug use was then reportedly intermittent until age 32 when it again became severe until the time of the offense for which he was incarcerated. The research describing the damaging neurocognitive effects of alcohol and drug abuse is currently known, and was well known in 1999. Two resources which provide a representative description of this past and current research include Tapert (1999) and Heimer (2003), as well as Kolb & Wishaw, 2003 and Adams, 2009.

24.    Medical records dating from several years before Mr. Barrett's arrest documented his hospitalization for a suicide attempt, as well as medically indicated need for psychopharmacological treatment with antidepressant and with antipsychotic medications. Brain abnormalities and consequent neuropsychological impairments associated with  major psychiatric disorders have been known for more than a decade. There is substantial research describing the neurological bases of psychiatric disorders, particularly the neurological bases of depression, bipolar, and psychotic disorders, and there is substantial research describing the neuropsychological patterns of impairment associated with these psychiatric disorders (Heaton, 1998; McIntosh, 2005; Savitz, 2008) to site a few sources of this extensive literature.

25.    This information about Mr. Barrett's history indicated the appropriateness of conducting a comprehensive neuropsychological assessment both in 1999 and currently.

### C. Nature and Circumstances of the Neuropsychological Evaluation

26.    I conducted approximately 16 hours of neuropsychological evaluation of Kenneth Barrett over the course of three days on February 9 - 11, 2009. Mr. Barrett is a 47 year old White male. The evaluation was conducted at the United States Penitentiary, Terra Haute, Indiana in a confidential room without distraction or interruption. The examination room was reasonably quiet, reasonably private and with adequate ventilation and climate control. Mr. Barrett was not physically restrained during the evaluation and the evaluation proceeded uninterrupted. Multiple breaks in testing were taken, and Mr. Barrett was provided drink and snack. Mr. Barrett's

8

clinical presentation, which I observed during the evaluation, was consistent with the results of neuropsychological testing.

27.    Mr. Barrett completed 9 years of formal education, and school records for his 8th and 9th grade school experiences, as well as cumulative record from his 1st and 2nd grades were available at the time of this evaluation. It is unclear from these school records, but Mr. Barrett reports that he repeated the 8th grade of school and that he participated in special education for learning disability. He has attempted to complete a General Education Degree (GED) at several points in time, but has not been able to pass the required test. Mr. Barrett indicated that he is currently studying to take the GED examination again. He reports that he has taken several "pre-tests," but has not been able to successfully pass these pre-examinations.

28.    From the results of testing measures and from my own observations, Mr. Barrett fully cooperated with the evaluation, gave his best effort on all tests, and made no attempt to manipulate, fake or exaggerate his neurological dysfunction. Specific evaluation of Mr. Barrett's effort on and attitude toward the assessment was obtained through administration of tests that were specifically developed to determine the validity of the individual's effort on and attitude towards testing, including the 15 Item Test, the Test of Malingering Memory (TOMM), Green's Word Memory Test (WMT) and the Forced Choice Subtest of the California Verbal Learning Test (CVLT-II).    These tests have demonstrated validity and reliability in distinguishing between individuals who are known to be attempting to manipulate their test ability and those who are not, with as high as 93% accuracy (Lee, 1992; Millis, 1995; Rees, 1998) for some of these tests. Mr. Barrett's abilities on these tests indicate that he was expending his best efforts in this evaluation and was not attempting to feign or exaggerate any deficits in his abilities.

29.    Mr. Barrett's attitude towards and effort on testing was also evaluated considering the expected consistency of his test ability within each test, across different measures of the same test, and across different neuropsychological tests that are known to be measuring the same brain region and functions. Mr. Barrett's attitude and effort on testing were further evaluated considering events in his personal history, what is known about potential brain damage

9

associated with those events of his personal history, and the consistency of Mr. Barrett's history, his brain function/dysfunction, and his neuropsychological testing abilities/disabilities.

30.     In addition to these validity testing measures, my own clinical observations of Mr. Barrett confirmed that he was cooperating and putting forth exceptional effort on testing.   He worked consistently, attempted all tasks that were requested of him and persisted until tasks were completed or terminated.   He was intent on completing the tasks asked of him and was particularly intent on trying to accomplish tasks that were difficult for him.  On several occasions Mr. Barrett asked me if he could re-attempt a previously administered test which was difficult for him. These observations were consistent indications that Mr. Barrett was marshalling all of his resources to complete neuropsychological testing and was putting forth an earnest effort to perform well.

31.     Consideration of all of these elements indicates that Mr. Barrett was putting forth substantial effort to complete neuropsychological testing, was cooperating with testing, and was not attempting to manipulate his abilities.  This evaluation is considered to be a valid measure of Mr. Barrett's neuropsychological profile, and can be relied upon in establishing conclusions about his brain functioning.

32.     Although he reported a history of what he identified as migraine headache, Mr. Barrett reported that he was not experiencing headache nor was he experiencing any other unusual pain on the days of testing.  On each day of testing he indicated that his sleep and eating were no different from his usual patterns.  He indicated that he did not require glasses and was able to see all information that was presented to him.  He was not experiencing any peripheral numbness in his hands or fingers.  Mr. Barrett reported a history of tinnitus, but indicated that he was not experiencing tinnitus on the days of testing, and that he was able to hear all information that was given to him.  Although he reported several serious medical disorders (Hepitis A, Hepitis C, prostate disorder, persisting staph infection and consequent eczema, and chronic ulcers) he indicated that he was not experiencing any unusual pain or discomfort on days of testing.  Mr. Barrett reported that although he has been prescribed both antidepressant and antipsychotic medications in the past that he was not currently prescribed and was not currently taking any

psychotropic medications. Although he has a history of past suicide attempt and psychiatric treatment, Mr. Barrett reported that his mood was reasonably stable, that he was not experiencing perceptual alternations such as hallucination, was not experiencing other psychotic symptoms and did not experience suicidal ideation or plan.

33.    Mr. Barrett reported that he was taking an anti-inflammatory medication but did not know the name or dosage, and that he was taking Prilosec for treatment of ulcers. He reported that he had not experienced any additional medical disorders of note since his incarceration at United States Penitentiary, Terra Haute, Indiana (USP Terra Haute, Indiana) for this offense. Mr. Barrett has an extensive past drug use history. Although he acknowledged availability of drugs in incarcerations facilities, he reported that he had not used any drug or alcohol since his incarceration at USP Terra Haute, Indiana. Mr. Barrett has a history of prior tobacco use. He indicated, however, that his last tobacco use was in 2005.

34.    Kenneth Barrett expressed his willingness to participate in this evaluation. He was advised of, understood and agreed to limits to his confidentiality. Although testing conditions were quite adequate, functional manifestation of Mr. Barrett's neuropsychological deficits made evaluation challenging at times. He presented as mildly hypomanic. His speech was rapid, he often started to respond to a question before the question was completed, at times was tangential, and often arbitrarily changed the focus of his discussion without warning indicating likely racing thought ("sometimes I just think too fast"). When attempting to provide information, Mr. Barrett often exhibited circumstantial speech, describing extensive, often irrelevant details. He responded to all requests, but often "talked around" the topic, rather than providing a direct response. He was not able to provide a simple "yes" or "no" response to questions that clearly called for only such a response. Although he provided many details, Mr. Barrett's thinking often was overly concrete and he often did not appear to fully understand testing instructions, often requiring test instructions to be presented several times, and in several different ways. Mr. Barrett appeared to be somewhat aware of his presentation, at times acknowledging that he sometimes "talked too much" and at times apologized for beginning to answer a question or provide a response before I had completed my question. Mr. Barrett responded positively to

11

appropriate clinical interventions, however, further assuring that all information obtained is valid and reliable.

35. All neuropsychological tests administered have appropriate and documented standardization, reliability and validity. All tests administered are often used and are generally accepted in the neuropsychology community. In addition to the previously described validity tests (15 Item Test, Test of Malingering Memory (TOMM), Green Word Memory Test, CVLT II Forced Choice Subtest), the neuropsychological tests administered to Mr. Barrett included the following instruments: Wechsler Adult Scale of Intelligence Test (WAIS IV); Wide Range Achievement Test – Third Edition (WRAT-III); Smell Identification Test, Reitan-Klove Sensory Perception Examination, Finger Tapping Test, Grooved Pegboard, Seashore Rhythm, Speech Perception Test, California Verbal Learning Test (CVLT-II), Wechsler Memory Test (WMS IV), Rey Complex Figure Test; Executive Functioning Test (EFT), Wisconsin Card Sorting Test, and Short Category Test (SCT). Attempt was made to administer the Paced Auditory Serial Addition Test (PASAT). Mr. Barrett was quite cooperative with his attempts to complete this test, but he was simply unable to understand the instructions. Instructions were provided in the standardized format. Instructions were then also repeated several times, paraphrased several different ways, and demonstrated with examples. The PASAT was discontinued after the third trial. The administered neuropsychological battery consists of the most sensitive and reliable standardized tests currently available for measuring neuropsychological functioning that are also compatible with the testing conditions at USP Terra Haute, Indiana. All of these tests – or their predecessor editions – the methodology, and the research on which I based my conclusions were available and accepted in the neuropsychological community, and valid at the time of Mr. Barrett's arrest and trial in 1999.

### D.        Results of Testing

36.    Overview: For Mr. Barrett, understanding of his brain dysfunction is particularly dependent on understanding the functions associated with the frontal cortex, temporal cortex, and interconnecting systems between these brain cortices. The frontal cortex is comprised of three general cortices—motor cortex, premotor cortex, and prefrontal cortex. The motor cortex

provides a mechanism to control execution of movement of limbs, hands, feet and fingers. The pre-motor cortex selects and carries out the movements to be executed including repetitive movements and actions in response to external cues. The pre-motor cortex also primarily mediates information that is communicated by the parietal cortex, cingulated cortex, and basal ganglia. The prefrontal cortex allows the individual to accommodate complexity and accommodate stress, and is responsible for thinking and acting, referred to as "executive functioning." Executive functioning is the ability to organize, think, reason, problem solve, initiate actions, monitor actions and change actions as needed based on information received. More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation. Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders. The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.

37. The temporal cortex encompasses the primary auditory cortex, secondary visual cortex, and structures of the limbic system. Primary functions of the temporal cortex are both verbal and visual memory and learning, processing speech sounds and speech emotional tones, and interpreting speech sounds, tones and emotional meaning. The temporal cortex is also responsible for processing visual information and the ability to recognize facial expressions, and interpret facial emotions. Significant impact of temporal cortex dysfunction is particularly implicated in amnesia, hyper-religiosity, hypergraphia, fear, paranoia, impulsiveness and aggressive outbursts in addition to the previously described cognitive disabilities. Brain functioning associated with frontal and temporal cortices has been known, is described and is documented in multiple sources for many years. Two resources which provide a representative description of frontal and temporal brain functioning are Kolb & Wishaw, 2003 and Grant & Adams, 2009.

13

38.    The hallmark of Mr. Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex. The impairment of cognitive functioning produced by these deficits is manifested in a pattern of ability and disability indicating that although Mr. Barrett is generally able to reasonably access and provide information that is long-standing and that he has rehearsed and learned, his ability to actively attend to, take in, and learn and recall new information is significantly impaired.    While his previously learned information remains reasonably stable and accessible, Mr. Barrett's ability to actively process and comprehend new information in the "here and now" is significantly compromised. Indicative of extensive dysfunction in Mr. Barrett's prefrontal cortex regions, his test performance was significantly impaired on executive functioning tasks which primarily required cognitive flexibility, particularly the ability to flexibly inhibit and change his thinking and actions in response to requirements of the task or situation (perseveration). Also typical of individuals with significant prefrontal cortex impairment, Mr. Barrett exhibited multiple instances of confabulation, where he unknowingly provided information that had no real relationship to the problem at hand. He presented that information in a self-assured way, seemingly not recognizing the errors—at time even absurdity —in his thinking. Mr. Barrett was not purposefully "making up" information but, as is typical in prefrontal cortex damage, he reported information that was inaccurate, at times illogical.

39.    Intellectual Functioning: Mr. Barrett's general mental ability was evaluated using the most recent revision of the Wechsler Adult Intelligence Scale (WAIS IV), which was published in January 2009. WAIS-IV consists of 15 subtests, 10 of which are required. Four Composite Indexes are developed (Verbal Comprehension Index (Vocabulary, Similarities, Information); Perceptual Reasoning Index (Block Design, Matrix Reasoning, Visual Puzzles); Working Memory Index (Digit Span Arithmetic Letter-Number Sequencing); and Processing Speed Index (Symbol Search, Coding).

40.    Mr. Barrett's abilities on this test demonstrate overall intellectual functioning in the low average range. His full scale intelligence quotient (FSIQ) is 84 (95% Confidence Index = 80 –

88), placing him in the 14th %ile. His acquired knowledge, verbal reasoning, and attention to verbal material is in the average range (VCI = 95, 37th %ile) (95% Confidence Index = 90 – 101). His fluid reasoning, spatial processing, attentiveness to detail, and visual-motor integration is in the low average – average range (Perceptual Reasoning Index = 92, 30th %ile) (95% Confidence Index = 86 – 99). His ability to actively receive, organize and recall information (Working Memory Index) was, however, significantly lower and in the borderline - low average range (WMI = 83, 13th %ile) (95% Confidence Index = 77 – 91). His ability to attend and concentrate, recall information, and reproduce the information that he recalls (Processing Speed Index) was even lower and in the borderline range (PS = 76, 5th %ile) (95% Confidence Index = 70 – 87).

41.    Significantly lower abilities to actively receive, attend and concentrate, organize, recall and reproduce information as measured on the WAIS-IV Working Memory and Processing Speed indexes, are particularly relevant to understanding Mr. Barrett's brain dysfunction, including the pronounced disparity between his ability to access his stable fund of knowledge and his significant inability to appreciate and make sense of new information.

42.    Compromised prefrontal, temporal, and connecting systems (Orbitofrontal Paralimbic Connection; Hippocampal Paralimbic Connection; Frontal Subcortical Connection) relaying information from the frontal cortex to all other brain regions is particularly indicated. This pattern of brain function and dysfunction provides explanation as to why Mr. Barrett's overall intellectual quotient can be in the low average range even in the face of significant current brain dysfunction. This pattern also explains why at some point in time his overall intellectual quotient may have been measured as higher.

43.    Sensory and Motor Functioning: Mr. Barrett's sensory functioning was evaluated using the Smell Identification Test (SIT) and the Reitan-Klove Sensory-Perceptual Examination (SPE). His olfactory sensory abilities on the SIT were in the normal range (4 errors, 49th %). His abilities to accurately receive bilateral simultaneous auditory, visual, and tactile stimulation were normal. His tactile-finger recognition was normal. Mr. Barrett's finger-tip number writing perception, however, was significantly bilaterally impaired. He had 10 errors for his right hand

15

(T = 34, mild-moderate impairment) and 8 errors for his left hand (T = 32, mild-moderate impairment). Whereas other sensory-perceptual abilities in this examination represent simple sensory perception, finger-tip number writing perception is more complex. This ability requires more concentrated attention and more communication of information from the sensory strip in the posterior area of the frontal cortex through the frontal-hippocampal-limbic connection to and from the parietal cortex. This sensory perceptual ability also requires more complex communication across the corpus callosum to and from the right and left brain hemispheres. Dysfunction of the sensory cortex and communication of the sensory cortex to other brain regions is indicated for Mr. Barrett.

44.     Mr. Barrett's motor coordination and repetition were evaluated using the Finger Tapping and Grooved Pegboard tests. He experienced mild-moderate bilateral impairment on both of these measures (Finger Tapping Right T-34; L T=32; Grooved Pegboard Right SS = -1; Left SS = -1). Dysfunction within the frontal motor cortex and communication of information from the frontal motor cortex to other brain regions is indicated.

45.     Attention and Concentration: Mr. Barrett's attention and concentration were evaluated using Seashore Rhythm and Speech Sounds Perception tests. As has been previously described, Mr. Barrett was not able to comprehend and carry out instructions to complete the Paced Auditory Serial Addition Test (PASAT) and this test was discontinued after the third trial.

46.     There are multiple indications that Mr. Barrett experiences impaired attention and concentration. During testing he frequently had to be re-directed to the task at hand and when he was not able to sustain his attention, frequent breaks on tests which had multiple subtests were needed. Additionally, his abilities on several neuropsychological tests which are strongly weighted to the ability to attend and concentrate (WAIS IV Digit Span, Letter-Number Sequencing, Symbol Search, Coding; Executive Functioning Trail Making Tests) were particularly impaired. Attention and concentration is primarily mediated by the prefrontal cortex, subcortical reticular activating system, and communication between these two brain regions through the frontal-subcortical connecting system, indicating dysfunction of these brain structures and connections for Mr. Barrett.

16

47.    Memory and Learning:  Multiple aspects of Mr. Barrett's memory and learning were evaluated assessing his ability to learn and recall information that was presented both verbally and visually and—in both of these modalities—assessing his immediate, delayed, free recall, interference, recognition and forced choice recall of information.    Memory and learning were evaluated using the California Verbal Learning Test (CVLT II), Wechsler Memory Scale (WMS IV), memory trials of the Rey Complex Figure Test (Rey), and Working Memory Index of the WAIS IV.  Mr. Barrett's abilities across these measures of memory and learning portray a distinct pattern of memory function and dysfunction.  On several measures his memory was within or above the normal range (Rey Complex Figure Immediate Recall T = 59, 82%; Rey Complex Figure Delayed Recall T = 59, 82%; Rey Recognition T = 51, 54%; WMS IV Auditory Memory = 95, 37th %ile; Immediate Memory = 108, 70th %ile; Delayed Memory = 100, 50th%; On CVLT II, his standard scores ranged from normal to mild-moderate impairment = +1.5 to -1.5).  On other measures of memory and learning, however, his ability was significantly impaired.    Mr. Barrett's ability to actively receive, organize and recall information (WAIS IV working memory) and his ability to concentrate, recall and reproduce information (WAIS IV processing speed) were within the borderline-low average range.  On the Wechsler Memory Scale (WMS IV) his Visual Working Memory (VWMI) was in the extremely low to borderline range (VWMI = 70, 2nd %ile), his delayed recall of word pairs was in the borderline range (WMS IV Paired Associates Delay = SS 8, 25th %ile ), his ability to store, manipulate, and ignore irrelevant or competing information was in the mildly impaired range  (Spatial Addition = SS 6, 9th%ile), and his ability to keep a mental image of a design in mind and to recall the relative spatial position of this information was in the moderately impaired range (Symbol Span SS = 4, 2nd%ile ).    Also of note, Mr. Barrett had a significant number of repetition errors indicating perseverative thinking (CVLT repetition errors = -1, mild impairment).  This same impairment of his ability to flexibly shift his thinking and acting was demonstrated across multiple tests of executive functioning, as described below.  Memory and learning is primarily mediated by the limbic system hippocampus, temporal cortex, prefrontal cortex and connecting systems among

these brain structures (Frontal-subcortical connecting system; Orbitofrontal Connecting System; Frontal-hippocampal Connecting System).

48.    Language:    Mr. Barrett's secondary language was evaluated using the Wide Range Achievement Test (WRAT3). This test measures academic achievement in three areas: Reading Word Recognition, Spelling, and Arithmetic Skills. Mr. Barrett's abilities on the WRAT3 placed him in the 25th percentile in reading recognition (high school equivalent), but in the 5th percentile (6th grade equivalent) in spelling, and the 7th percentile in arithmetic (7th grade equivalent).

49.    Executive Functioning:    As previously described, executive functioning is an umbrella construct, which encompasses abilities to think, reason, problem solve, make reasoned decisions, anticipate consequences of decisions and actions, and modify actions in response to information received from the environment. Executive functioning includes abilities to initiate, monitor and change actions depending on needs of the situation. Executive functioning also includes abilities to inhibit thinking and actions, understand and develop ways to accommodate complex situations, and inhibit thinking and actions as required by the situation. Executive functioning is mediated by the frontal cortex, predominantly by the prefrontal cortex, and through connections from the frontal cortex to all other brain regions. Intact executive functions are necessary for managing a wide range of experiences in daily living. Accommodating stressful situations, understanding complex constructs and situations, being able to plan and deliberate potential ways of solving a problem or situation, being able to describe why actions are selected or not selected for action, anticipating the consequences of those decisions, and changing decisions and actions based on understanding of the problem or situation are all examples of executive functioning abilities. Adequate executive functioning is demanded when a situation or problem is complex and/or stressful and requires the ability to understand, as well as to act thoughtfully. More specifically, executive functioning requires the individual to incorporate feedback concerning the effect of each piece of information and then consider how the new information affects subsequent actions or choices or requires the individual to modify his thinking and actions or change a course of action as needed by the problem or situation. The executive

functioning process is dynamic in that it requires continuous attention to, evaluation of, and incorporation of new information and inhibits thinking and actions as needed to solve the problem or situation (Delis, Kaplan & Kramer, 2001; Gioia, Isquith, Guy & Kenworthy, 1996/1998/2000). Mr. Barrett was significantly impaired across multiple tests of executive functioning, with his impairment ranging from mild to severe.

50.     The frontal cortex is the largest brain structure in the human brain, comprising 20-25% of all brain tissue. The frontal cortex is divided into four regions--motor, mesial, dorsolateral and orbitofrontal. Each of these regions mediates executive functioning, but each of these regions also is predominantly responsible for different aspects of executive functioning. For example, the motor region primarily regulates motor coordination and integration and repetition of motor abilities.  The mesial region primarily regulates emotion, motivation, drive, spontaneity, motor aspects of speech, and the ability to monitor actions. The dorsolateral lateral region primarily regulates organization, initiation, planning, flexible thinking, problem solving, the ability to categorize and organize information and memory, and—in combination with the mesial region— the ability to monitor and change actions. The orbitofrontal region primarily regulates judgment, insight into deficits, irritability and emotional lability, olfaction, disinhibition, and control of actions. The orbitofrontal region also plays a particularly interactive role with the limbic system, assessing and altering emotional responsivity and inhibition of thought and actions. Knowledge of executive functioning and the role of executive functioning has been known by neuroscientists for many years, since and prior to 1996 (Benson, 1996; Casey, 1997; Constantine, 2004; Frank, 2006; Hinson, 2003; Janowsky, 1989; Kritchevsky, 1989; Lyketsos, 2004; Nagahama, 2005).

51.     Mr. Barrett's executive functioning was evaluated using tests that make up the Executive Functioning Test (EFT) (Trail Making Tests, Verbal Fluency Tests, Design Fluency Tests, Color-Word Interference Tests, Sorting Tests, Twenty Questions, and Tower Test), Wisconsin Card Sorting Test (WCST), and Short Category Test (SCT). Across EFT subtests, Mr. Barrett was able to accurately complete some tasks. He was, however, significantly impaired in his abilities on other tasks of executive functioning, with his impairment ranging from mild to

severe. A distinct pattern in the nature of Mr. Barrett's impairment on EFT measures was apparent.

52. With the exception of his ability to complete the Twenty Questions subtest of the EFT, Mr. Barrett had some significant impairment on each of the EFT subtests. Trail Making Test is a series of four individual tests which primarily evaluate visual-scanning, attention, motor and the ability to flexibly switch thinking and actions. Mr. Barrett's ability to quickly scan the task was moderately impaired (SS = 4); his ability to sequentially process numbers was in the borderline range (SS = 8); his ability to sequentially process letters was mildly impaired (SS = 7) and his ability to flexibly shift his thinking and actions was mildly impaired (SS = 7). Of particular note, Mr. Barrett made multiple errors of several types on Trail Making. He had a significant number of errors where he was not able to effectively scan information, focusing on the relevant and ignoring the irrelevant (Omission Errors = 13%th, mild impairment); he had a significant number of errors correctly moving information in the expected order (Sequencing Errors = 16th ile – below average); and he had a significant number of errors where he could not order numbers and letters of the alphabet while sequentially and flexibly switching from number to letter (Set Loss Errors = 22% - below average). Overall, the number of errors that Mr. Barrett had on Trail Making Tests was impaired (SS = 7, mild impairment).

53. Verbal Fluency Tests evaluate the ability to initiate and report verbal information, and this was a relative strength for Mr. Barrett. He was successfully able to retrieve and report letters and words and he was able to switch his verbal descriptions (Letter Fluency SS = 8; Category Fluency = 10; Category Switching SS = 10). Mr. Barrett again, however, had a significant number of errors in this process (Switching Accuracy SS = 5, mild impairment; Percent Switching Accuracy SS = 4, moderate impairment).

54. On tests which evaluate fluency of visual information, Mr. Barrett's abilities were similar to his fluency with verbal information. Design Fluency was a relative strength for him (Filled Stimuli SS = 12; Empty Stimuli SS = 10; Design Switching SS = 10). Mr. Barrett's accuracy in carrying out these tasks was, however, significantly impaired (Percent Switching Accuracy SS = 8, borderline impairment).

20

55.    A similar pattern of ability/disability was demonstrated on EFT tests of the ability to name colors and words and his ability to withhold the familiar while reporting the accurate but less familiar (Color-Word Interference Tests (Color Naming SS = 10, average range; Word naming = SS 7, mild impairment; Inhibition = SS = 9, average range; Inhibition Switching SS = 10, average range).  Again, despite his ability to simultaneously process this information was significantly impaired (Inhibition Errors = SS 6, mild impairment; Inhibition/Switching Errors SS = 7, mild impairment).

56.    On tests of concept formation and conceptual knowledge (Sorting Tests) Mr. Barrett was successfully able to develop concepts (Free Sorting SS = 8 and 9, below average - average range).  His ability to transfer his skills to understand and describe concepts presented to him, however, was significantly impaired (Recognition Description SS = 3, moderate-severe impairment).

57.    Mr. Barrett's ability to view a problem and, using his hands, to manipulate objects (Tower Test) was within the normal range (SS = 11, average range).   In the process, however, Mr. Barrett's ability to accomplish this task while inhibiting his thinking and action was severely impaired.  Mr. Barrett reports substantial work history as an automobile mechanic.  He reports with pride that he could approach a difficult automobile mechanical problem and fix it but he could not explain *how* he went about fixing the problem, *why* he did what he did to fix the problem, or to *replicate* the process at another time on another vehicle.  Completing the EFT Tower Test is somewhat similar to completing an automotive repair project.  Completion of the Tower Test has two simple rules…move one piece at a time and always put a small object on top of a larger object.  Mr. Barrett was not able to inhibit his responding and he broke the "rule" a significant number of times ((Move Accuracy Ratio SS = 3-severe, moderate impairment; Rule Violations SS = 7, mild impairment).   Persistent errors on tests of executive functioning, as well as on tests of memory and learning, represent significant perseverative thinking and acting (tendency to rigidly repeat the same thought and action even though the situation or problem has changed) and tendency towards confabulation (the recitation of inaccurate often absurd experiences to unknowingly fill in gaps of memory) for Mr. Barrett.

58.    The entire frontal cortex system is required to complete these tests on the EFT. The pattern of Mr. Barrett's success and failures across the tests, however, indicate that the greatest prefrontal cortex impairment for him is within the dorsolateral and orbitofrontal regions, with relative sparing of structures within the mesial prefrontal system.

59.    The Wisconsin Card Sorting Test (WCST) is one of the oldest, most researched, and most utilized tests of executive functioning available to neuropsychologists (Buros, 2009). It requires the individual to place cards with different symbols, numbers of symbols printed in various colors in piles under four key cards according to a pattern that the individual must deduce from the examiner's feedback to the individual's decisions for placement of the cards. Although the entire frontal cortex system is involved in successfully completing this test, current neuroimaging research demonstrates particular involvement of the dorsolateral prefrontal region (Nagahama, Okina, Suzuki, Nabatame & Matsuda, 2005). Mr. Barrett's ability to complete the WCST is significantly impaired, with Mr. Barrett experiencing impairment on 67% of the WCST measures, with impairment severity ranging from mild to severe. The total number of errors made by Mr. Barrett on the WCST places him equal to or below the 1st %ile. The number of perseverative errors made by Mr. Barrett was impaired (Perseverative Errors = 42nd%ile); and the number of nonperseverative errors was severely impaired ≤1st %ile).

60.    One of several abilities measured by the WCS is the ability to develop a simple concept and then to carry out that simple concept. Mr. Barrett experienced significant difficulty developing the concept required by this test (Conceptual Level Responses = ≤ 1st %). Of particular concern, Mr. Barrett frequently repeated out loud the "rule" he was using to solve this problem. Nevertheless, he was unable to carry out the "rule" he had stated (Categories Completed = 0). When impaired, his impairment was consistently in the severe range. Current research demonstrates a significant relationship between ability/inability to grasp and to consistently carry out the demands of the WCST and daily functioning such as driving an automobile or successfully returning to work after a closed head trauma (Macklin, Horner, Harvey, & Stevens, 2005).

61.    Again, the WCS requires the entire prefrontal system to successfully complete. Dorsolateral and orbitolateral prefrontal regions are, however, primarily involved in completing this test (Nagahama, Okina, Suziki, Nambatome, & Matsuda, 2006).

62.    Category Test is another well-known and respected measure of functioning of the prefrontal cortex. Category Test was developed by Halstead in 1979, and one of the first standardizations of the Category Test was in 1985 (Reitan & Wolfson,). The Short Category Test (SCT, 1989) is a current revision of the Category Test. Using stimuli from the original Category Test, the SCT was developed as an instrument that could be more easily transported, more easily administered, and requires less time to accomplish the same goal. SCT and Category Test are significantly related (discriminate validity = .93) and reliable (reliability co-efficient = .81). SCT also has good sensitivity, correctly classifying 83% of individuals who do/do not experience brain damage. This indicates that these two tests are measuring the same construct and same brain region. Category Test and SCT are highly related (.93 to .80), providing confidence in substituting SCT for the longer, more demanding Category Test. (Buros, 2009).

63.    Similar to the WCST, the Category Test assesses an individual's ability to solve problems which require abstract concept formation, use abstract principles, and understand complex information. Whereas neuroimaging has demonstrated the WCST to be primarily mediated by the dorsolateral region of the frontal cortex, the Category Test appears to be primarily mediated by the posterior frontal cortex, anterior parietal cortex, and connecting systems between these brain regions.

64.    Like his abilities on the WCST, Mr. Barrett's abilities on the SCT were also severely impaired. SCT requires the individual to develop a concept to solve a problem, carry out the actions needed to accomplish the concept they developed, and flexibly change their thinking and acting in response to information that is actively provided to the individual by the neuropsychologist who is administering the test. The test requires that the neuropsychologist to verbally respond to each choice as being "right" or "wrong" while the test is actively being taken. The objective is for the individual to be able to develop a concept, try the concept out, and if their concept is accurate ("right") continue applying the concept, but if the concept is

inaccurate ("wrong") to change the concept and try out a different concept.    Out of 100 possible responses, Mr. Barrett was wrong 64% of the time, making 64 errors.    The measured significant impairment on this test means that I had to say to Mr. Barrett 64 times that he was "wrong."

65.    Mr. Barrett was not able to learn from the information he was being provided and his abilities on this test were severely impaired (T = <24, <1st%ile).    Again, Mr. Barrett often stated the concept or "rule" he had developed, but then did not carry out that rule that he had just stated. The SCT assesses an individual's capacity for abstract reasoning and complex concept formation, as well as the individual's ability to flexibly change their thinking and actions considering information that they are provided.    SCT is a measure of functioning of the entire prefrontal cortex system, evaluating abilities that are similar to those measured by the WCST.

66.    In summary, Mr. Barrett's abilities and disabilities on neuropsychological testing portray the picture of an individual who, despite reasonably adequate general mental ability, nevertheless experiences significant brain damage and consequent brain dysfunction primarily of prefrontal and temporal cortices, which are necessary for the brain to effectively communicate information and function effectively.    The nature and severity of brain dysfunction would negatively impact all aspects of Mr. Barrett's daily functioning, and would particularly impair his abilities to organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment.    His disabilities would be further exacerbated under conditions of complexity and/or highly stressful situations.

67.    I hold each one of the observations, findings, and conclusions I have reached above to a reasonable degree of scientific certainty and would have advised trial counsel and testified in accordance with them if called as a witness during Mr. Barrett's trial.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United States and the State of California on March 5, 2009.

Myla H. Young, Ph.D.

24

Addendum A

Myla H. Young, Ph.D., ABN

MYLA H. YOUNG, Ph.D., ABPN
Diplomate – American Board of Professional Neuropsychology
PSY 11916

## RESUME

*Office:*
1475 North Broadway # 335
Walnut Creek, CA 94596

*Mailing:*
1630 North Main Street #357
Walnut Creek, CA 94596

(925) 952-4350
925 945-8991 (FAX)
mylayoung@sbcglobal.net

**LICENSE-Psychology**

California        August, 1990        PSY 11916

**CERTIFICATION**

Board Certification in Neuropsychology – American Board of
    Professional Neuropsychology (ABPN)

Certification in Hare Psychopathy Checklist-#99-20
    Robert Hare, Ph.D.

**EDUCATION**

Ph.D.            Alliant International University
                 (Formerly California School of Professional
                 Psychology)
                     San Francisco, California
                     Doctor of Philosophy/Clinical Psychology
                     January, 1988

M.A.             Towson State University
                     Baltimore, Maryland
                     Master of Arts/Experimental Psychology
                     June, 1977

B.A.             University of Guam
                     Agana, Guam
                     Bachelor of Arts/Psychology
                     June, 1975

1

**POST-DOCTORAL FELLOWSHIP**

University of California/San Francisco General Hospital
San Francisco, California

January 1988 - January 1990

**PRE-DOCTORAL INTERNSHIPS**

McAuley Neuropsychiatric Institute of St. Mary's Hospital
San Francisco, California

July 1985 - July 1987

Garfield Geropsychiatric Hospital
Oakland, California

October 1984 - July 1985

**PROFESSIONAL WORK EXPERIENCE - Current**

| | |
|---|---|
| Private Practice | Neuropsychological Assessment Child, Adolescent and Adult Forensic, Medical, Psychiatric, Medico-Legal, Educational |

March 1992 - Present

| | |
|---|---|
| Continuing Education Faculty | Alliant International University Neuropsychological Evaluation of Criminal Offenders |

2000 - Present

| | |
|---|---|
| Continuing Education Faculty | University of California-Berkeley Neuropsychological Evaluation of Criminal Offenders Introduction to Neuropsychological Assessment |

2005 - Present

2

**PROFESSIONAL WORK EXPERIENCE - Prior**

Senior              California Department of Mental Health
Supervising         Correctional Medical Facility
Psychologist        Vacaville, California

                    Psychology Consultant to Executive Director,
                      Medical Director and Program Directors
                     Principal Investigator for Research Project
                     Program Evaluation, Program Development,
                       Treatment Outcome Measurement
                     Director-American Psychological Association
                      (APA) Psychology Intern Training Program
                     Director-Psychology Fellowship Training
                       Program
                      Standards of Practice/Quality Assurance
                      -Psychology Service
                      Staff Selection/Evaluation - Psychology
                       Service
                      Clinical Supervision and Consultation -
                      Psychology Service

              Staff Psychologist - January 1990 - June 1995
              Program Consultant - June 1995 - January 2000
              Senior Psychologist - January 2000 - July 2005


Adjunct             Alliant University - Berkeley/Alameda
Faculty                 Instructor: Neuropsychological Assessment
                                    Cognitive Bases of Behavior

                    Dissertation Chairperson:
                            -Neuropsychological Assessment of
                                Psychotic and Non-Psychotic
                                Inmate/Patients
                            -Neuropsychiatric Description of
                                Children in Day Treatment
                            -HIV/AIDS-Affected Children:  A
                              Study Utilizing the Rorschach To
                                Identify Depression
                            -Self Mutilation:  Analysis of
                                a Psychiatric Forensic
                                Population
                             -Relationships of Rorschach and
                                MMPI2 to the PCL-R among
                                Mentally Ill Felons

3

Dissertation Committee:
-Development of Special
    Aggression Content Scales for
    Rorschach Test Administration
    within a Prison Population
-Neuropsychological and Cognitive
    Correlates of Academic
    Achievement in a Child
    Psychiatric Sample
-Emotional Descriptors of
    Adolescents Who Have
    Committed Homicide
-Rorschach Responses/Piagetian
    Cognitive Development in Eight
    to Twelve Year Old Children
-Understanding Malingering:
    Theory and Treatment

1990 - 2005

| | |
|---|---|
| Training, Assessment, Consultation | Oaks Children's Center<br>    San Francisco, California<br>Training and Supervision of Pre-Doctoral<br>    Psychology Intern<br>Seminars in Neuropsychological and<br>Personality Assessment of Children<br>1992 - 1995 |
| Training, Assessment, Consultation | McAuley Institute of St. Mary's Hospital<br> San Francisco, California<br>Training and Supervision of Pre/Post-<br> Doctoral Psychology Interns/Fellows<br> Seminars in Neuropsychological Assessment<br> Of Children, Adolescents, Adults<br><br>1992 - 1995 |
| Research Training | University of California-San Francisco<br> NIDA Research Grant:  Longitudinal<br> Study of HIV Related Cognitive<br> Impairment in Groups of Gay Men and IV<br> Drug Users<br><br>1988 - 1990 |

4

| | |
|---|---|
| Child & Family Counselor | Florida United Methodist Children's Home Enterprise, Florida<br>Child & Family Counselor at a Residential Treatment Facility for Children/Adolescents<br>Individual and Group Counseling<br>Parent Education<br>Court Liaison<br>Consultation to Residential Group Home<br>Consultation to Children in Foster Care |

1978 - 1980

| | |
|---|---|
| Adjunct Faculty | University of Central Florida<br>Valencia Community College<br>Seminole Community College<br>Lake-Sumter Community College<br>Orlando, Florida<br>General Psychology<br>Developmental Psychology<br>Child & Adolescent Psychology<br>Research Methods<br>Learning Theory and Animal Behavioral Training Laboratory |

1980 - 1984

**RESEARCH EXPERIENCE**

| | |
|---|---|
| Principal Investigator | California Department of Mental Health<br>Correctional Medical Facility-Vacaville<br>Prospective description of demographic, neuropsychological and emotional functioning in psychiatrically hospitalized males |

1994 - 2005 (Project Completed)

| | |
|---|---|
| Principal Investigator | California Department of Mental Health<br>Correctional Medical Facility-Vacaville<br>Multimethod description of inmates referred for psychiatric treatment from Pelican Bay State Prison |

1994 - 1997 (Project Completed)

5

| | |
|---|---|
| Principal Investigator | California Department of Mental Health Correctional Medical Facility-Vacaville Development and Evaluation of a Behavioral Milieu Program in a Forensic Psychiatric Treatment Program |

1990 - 1993 (Project Completed)

| | |
|---|---|
| Participant | Spine Institute of San Francisco - Medtronic Spinal Cord Stimulator Project Principal Investigator: J. Schofferman, M.D. |

1996 - 1998 (Project Completed)

| | |
|---|---|
| Post Doctoral Research Assistant | University of California-San Francisco Psychiatric Aspects of AIDS Dementia in Gay Men and IV Drug Abusers Principal Investigators: Alicia Boccellari, Ph.D. J. Dilley, M.D. |

1988 - 1990 (Project Completed)

| | |
|---|---|
| Post Doctoral Research Assistant | McAuley Neuropsychiatric Institute of St. Mary's Hospital Longitudinal Study of Infant Attachment Principal Investigators: H. Massey, M.D. J. Afterman, M.D. |

1988 -1990 (Project Completed)

| | |
|---|---|
| Doctoral Dissertation | Neuropsychological and Piagetian Cognitive Development:  A comparison of children's responses to the Luria-Nebraska Neuropsychological Battery-Children's Revision, Piagetian Tasks, and the WISC-R |

| | |
|---|---|
| Master's Thesis | Piagetian Moral Development:  A comparison of children's responses to Piagetian Moral Intentionally stories presented in both verbal and videotaped versions |

| | |
|---|---|
| Graduate Research Assistant | Towson State University Piagetian Cognitive Development Behavioral Treatment |

6

**PROFESSIONAL PRESENTATIONS**

Contra Costa Department of Defense Seminar Martinez,
California. *When juvenile offenders become adult
offenders: A prospective look* (July, 2006)

California Psychological Association Conference San Jose,
California. *The sexual offender in prison psychiatric
treatment: A multimethod description* (April, 2003)

Forensic Mental Health Association of California Conference
Asilomar, California. *The sexual offender in prison
psychiatric treatment: A multimethod description*
(March, 2003)

International Organization of Psychophysiology Montreal,
Canada *Profiles of Violent Mentally Ill Incarcerated
Males: Neuropsychology and Psychophysiology* (August,
2002)

California Psychological Association Conference Pasadena,
California *Research in Prison Psychiatric Treatment*
(May, 2002)

American Correctional Health Services Association
Conference Costa Mesa, California *Profiles in Violence*
(September, 2001)

Forensic Mental Health Association of California Conference
Asilomar, California *Profiles in Violence* (March,
2001)

Behavioral Health Institute Conference – Los Angeles, CA.
*Latinos is Forensic Psychiatric Treatment* (September,
2000)

Forensic Social Work Conference – Palm Springs, California
*The Violent Psychopath in Treatment* (May, 2000)

Forensic Mental Health Association of California Conference
Asilomar, California *Danger to Self and Danger to
Others: A description of Inmates Who Harm Themselves
or Harm Others* (March, 2000)

California Psychological Association Conference, San Jose,
California
*Neuropsychological and Psychological Evaluations in
A Forensic Psychiatric Setting* (March, 2000)

7

Forensic Mental Health Association of California Conference
Asilomar, California  *The Violent Psychopath in Psychiatric Treatment* (March, 1999)

Patton State Hospital Mental Health Conference, Patton, California *The Violent Psychopath in Psychiatric Treatment* (September, 1999)

Patton State Hospital Mental Health Conference, Patton, California *Psychopathy in a Forensic Psychiatric Population*(September, 1998)

Forensic Mental Health Association of California Conference Asilomar, California *A Multimethod Approach to Understanding Psychopathy* (March, 1998)

Patton State Hospital Mental Health Conference, Patton, California *Violence in the Community and Assaut in Prison:  A Multimethod Approach*(September, 1997)

Forensic Mental Health Association of California Conference Asilomar, California *Patterns of Violence: Demographic, neurocognitive, diagnostic, and emotional descriptions of inmates with high and low violence histories.* (April, 1997)

California Department of Corrections-Pelican Bay-Pelican Bay, California *Description of Inmate/Patient Populations Demographic, Cognitive, Neuropsychological, and Psychological Correlates with Violence* (July, 1996)

California Department of Corrections-Preston School for Boys – Ione, California *Demographic, Cognitive, Neuropsychological, and Psychological Correlates with Age of Offense* (July, 1996)

California Department of Corrections-Director's Cabinet Meeting – Sacramento, California *Description of Inmate/Patient Population* (July, 1996)

California Department of Corrections-Northern Regional Warden's Meeting – Folsom State Prison *Description of Inmate/Patient Population* (July, 1996)

8

California Department of Corrections-Warden's Meeting – CMF Vacaville, California *Description of Inmate/Patient Population* (June, 1996)

Patton State Hospital Forensic Mental Health Conference. *Development of a Forensic Psychiatric Treatment Program Based on Empirical Description of the Population* (October, 1995)

Patton State Hospital Forensic Mental Health Conference. *Opening Address – The Changing Face of Forensic Mental Health: The Challenge Described* (October, 1994)


## PUBLICATIONS

Young, M. H., Justice, J., & Erdberg, P. (2008). *The Rorschach Test in a prison population.* (Manuscript in press).

Young, M. H., Justice, J., & Erdberg P. (2008). *Sex offenders in prison psychiatric treatment: A biopsychosocial description.* International Journal of Offender Therapy and Comparative Criminology. (in press).

Young, M. H., Justice J., & Erdberg, P. (2007). *A comparison of rape and molest offenders in prison psychiatric treatment.* (Manuscript in review).

Schofferman, J. & Young, M. H. (2007). *Previously unrecognized cognitive and psychological disorders in patients with chronic neck pain due to whiplash and other forms of cervical trauma.* Pain Medicine, (Manuscript in revision).

Young, M. H., Justice, J., & Erdberg, P. (2006). Risk of harm: Inmates who harm themselves while in prison psychiatric treatment. *Journal of Forensic Sciences, 51*(1), 154-162.

Young, M. H., & Justice, J. (2003). Risk Factors for assault while in Prison Psychiatric Treatment. *Journal of Forensic Sciences, 49*(1), 141-149.

Justice, J. & Young, M. H. (2002). *Managing violence in a Supermax facility: A discussion of research findings and their application to reducing violence in supermax*

*institutions and beyond.* In D. Neal (ed.) Supermax Prisons (pp. 99 – 118). Lanham, MD. American Correctional Association.

Young, M. H., Siemsen, R., & Roman, T. (2000). Neuro-psychological and personality assessment in a forensic psychiatric setting. *California Psychological Association Convention Abstracts.*

Young, M.H., Justice, J., & Erdberg, P. (2000). A multi-method description of psychopathy among forensic psychiatric inmates. In C. Gacono(Ed.) *The Clinical Forensic Assessment of Psychopathy: A Practitioner's Guide* (pp. 313-332). Mahwah, New Jersey, Erlbaum.

Young, M.H., Justice, J., & Erdberg, P. (1999). Risk factors for violence among incarcerated male psychiatric patients: A multimethod approach. *Assessment, 6,* 243-258.

Young, M. H. & Justice, J. (1997). Neuropsychological functioning of inmates referred for psychiatric treatment. *Archives of Clinical Neuropsychology, 13,* 303 – 318.

Dilley, J., Boccellari, A., Davis, A., Young, M., & Bacchetti, P. (1989). Relationships between neuro-psychological and immune variables in HIV positive asymptomatic men. *IV International Conference on AIDS. Montreal, Canada.*

Dilley, J., Boccellari, A., Davis, A., Young, M. & Bacchetti, P. (1989). Relationships between neuro-psychological and immune variables in HIV positive asymptomatic men. *Abstract and oral presentation. American Psychiatric Association, May 11, 1989. San Francisco, CA.*

Young, M.H. (1977). Visual Modality as a Preferred Mode presentation for Piagetian Moral Intentionally. *Monographs of Lida Lee Tall Learning Research Center.* Towson State University

10

**PROFESSIONAL AWARDS**

University of Guam                    Graduation - Magna Cum Laude
                                       June, 1975

Towson State                         Graduation - Magna Cum Laude
University                            June, 1978


California School of                 Superior Accomplishment Award
Professional Psychology               Dissertation
                                      June, 1988

State of California                  Superior Accomplishment Award

Department of Mental Health          Exceptional Job Performance
Correctional Medical                  April, 1993
Facility

State of California                  Superior Accomplishment Award
Department of Mental Health           Exceptional Job Performance
Correctional Medical                  April, 1995

State of California                  Outstanding Accomplishment
Award
Department of Mental Health           Exceptional Job Performance
Correctional Medical                  September, 1999
Facility


**PROFESSIONAL ASSOCIATIONS**

-American Board of Professional Neuropsychology (ABPN)
-American Psychological Association (APA)
    Division 40:  Clinical Neuropsychology
    Division 42:  Forensic Psychology
-California Psychological Association (CPA)
-National Academy of Neuropsychology (NAN)
-International Neuropsychological Society (INS)
-Society for Personality Assessment (SPA)


   April, 2008


11

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 90**

## DELCARATION OF PAUL RICKIE LUNSFORD

I, Paul Rickie Lunsford, declare the following:

I am a friend of Kenneth Barrett and had known him seven or eight years at the time the police raided his shack in 1999. I am married and have two children with my current wife and two other children by a former runner up to Miss California. I grew up in California in the Bakersfield area and lived in many place in Central California and in the Mammoth Lakes area, which is how I got my Oklahoma nickname, "California Rick."

I am a former baker and cake decorator, a trade I practiced both here in Oklahoma and in California. I baked the cakes for the grand openings of the Wal-Mart super centers in Fort Smith, Arkansas. One of the cakes was an exact replica of the store, about twelve feet long and five-feet high. Every shopper got a piece of the store. I decorated Kenny's birthday cake every year. If I ever needed him, he was always there. There are a lot of people, but few characters and Kenny's a character. Kenny was trustworthy.

I first met Kenny when I brought him my 1992 Ford Escort, a hatchback, to him to repair. I cannot recall what was wrong with it or what Kenny charged, but Kenny had a reputation in the community as an excellent mechanic who was fair. At the time, I lived about a half-mile down the road from Kenny. Kenny and I developed a friendship. Some time prior to the raid, I set up a listening device in Kenny's garage, a security monitor so that Kenny could hear in the house if someone broke in. There were never any other listening devices on the grounds. Kenny set up the motion sensor light at the back door of the house himself. These devices were not to detect police; they were like anyone's burglar alarm.

1

I was at Kenny's house from noon on September 22, 1999 through 9:00 P.M. on September 23, 1999. On 9/22/08, at about noon, I went by Kenny's to drop off a truck I was selling to Kenny. The truck was a 1964 Chevy Custom Cab. I sold it for $1500, some cash, a stereo, and a 30-30. I remained at Kenny's for the next 33 hours. I parked the truck in front of the garage.

Kenny and I stayed up for the next 33 hours; we were doing methamphetamine. During this time, there were a lot of people coming and going to Kenny's. Monk Sanders never came by during that 33-hour period. However, others, including Travis Crawford, came by to do drugs, which he often did. In the late afternoon, on September 23, 2008, Kenny, a few others, and I were standing near the fence to Kenny's property. Travis came over from his parents' place and asked Kenny if he had seen the white SUV with tinted windows that went by, which was of particular note because it had gone down a dead end road and not yet returned. Travis said he thought they were police.

Kenny did not trust Travis at all; Travis made him nervous. Travis was pretending to watch Kenny's back, but Kenny knew better. Kenny was not nervous about the police. He was nervous about Travis. Travis is a real flaky person who was a police informant. Kenny shrugged Travis off and Travis went back to his house. Once Travis had left, Kenny told us that anyone who wanted to leave could. Kenny said, "Hey, you guys might want to leave because the car that drove by was cops." Kenny was concerned the police would come by his place and that we would all get in trouble because we were all holding drugs. Kenny opened the gate to let out anyone out who wanted to go. There were three or four of us. The others left, but I remained with Kenny. Kenny re-locked the

2

gate and we went back to the house or the garage without our seeing the SUV again.

Kenny never said anything about going down in a blaze of glory. Kenny would not say that or want that. That was not who Kenny was.

Kenny had a case pending at the time. I knew about the case because once Kenny had borrowed my phone to call his lawyer. I knew Kenny had a case, but I never heard that there was a warrant out for Kenny.

I left about three hours before they raided Kenny's place. Toby, Kenny's son, was the only one still there besides Kenny. Toby was living there at the time.

I knew Travis Crawford and Cindy Crawford. They acted as if they would do anything if their freedom were threatened and therefore their ability to get dope.

I have never been interviewed before or during Kenny's trial by an investigator or defense attorney working on Kenny's behalf.

An investigator working on Kenny's case asked me about Kenny, our friendship, what I knew about the raid, and Travis and Cindy Crawford. After I told him what I knew, he asked if I would give a written statement. He showed me this declaration and asked me to read it carefully. I have and it says what I told the investigator during our meetings. If I had been asked to testify about the same things at Kenny's trial this declaration is what I would have said.

I declare, under penalty of perjury, that the foregoing 3 page declaration is true and correct.

Executed by me this _26 Feb_ day of 2009, in _Sequoyah_ County, Oklahoma.

3



Paul Rickie Lunsford

4

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 91**

---

## Declaration of Phyllis Crawford

I, Phyllis Crawford, declare the following:

I am Kenneth Barrett's maternal aunt; Gelene Dotson, who is Kenny's mother, is my sister. I live with my husband, Roger. My son, Travis Crawford, has lived here on and off for many years. Our home is adjacent to Gelene's home and in front of Mark Dotson's home. I can see Kenny's old shack from my home. My family grew up on this land, and many of us still live around here.

We are a close knit family and, like all families, have our quarrels and disputes, but we try hard to help each other out. We feel guilty that we did not do more for Kenny. We did not do anything to get him the kind of mental health treatment he needed, even though our family has had to deal with mental illness for a long time.

Neither Gelene nor Ernie was ready to be a parent. I lived with Gelene and Ernie in Joliet for a few months when Roger was in the service at Ford Ord. Gelene was four months pregnant with Kenny. Even at that time, Gelene drank from the moment she woke up until she went to bed. When Ernie came home from work, Gelene immediately started in on him. Often, he would turn around and leave. I had intended on staying longer, but I could not stand it.

We knew that Kenny was different because he needed so much more attention as a child than the other children. He was extremely sensitive and cried over every little thing from the time he was small until he was a grown man. He was always hyperactive, on the go, into everything, and could not sit still. He would break down and cry easily.

Kenny had a very difficult relationship with both his parents, but he loved them dearly. Gelene never gave Kenny a kind word, and she screamed at him over anything.

When Kenny was about 11, Gelene called me because Kenny was crying and would not come out of his room. My husband Roger and I went over to their house and talked to Kenny. Kenny told us that he could not get his mom's voice out of his head. The only time Gelene talked to him was to scream. That is so sad.

Gelene had a lot of problems, especially with alcohol and men, that affected Kenny badly. Gelene had different men in the house all the time right when Kenny was entering his teenage years, and it was very confusing for him.

Gelene was and is a bona fide alcoholic, although she denies it. Gelene, who is three years older than I am, started drinking in high school. She used to beat me up with her fists. Now, Gelene drinks beer from the time she gets up until she goes to bed. She screams all the time, and I can hear it in my house after it's gone through her walls and across our yards. She cannot control her emotions. Gelene takes after our father, who was also a heavy drinker who generally wanted to fight when he was inebriated. My dad's relatives were drinkers as well.

Ernie, Kenny's father, was also a drinker. He hardly had anything to do with him after the divorce, and everyone could see how much it hurt Kenny. Ernie used to come to town once a year, and I remember him coming by to show off his new Corvette when his children did not have shoes or decent clothes to wear.

Kenny was never able to be independent as a grown man. His emotions got in the way of his being able to live too far from home. As an example, a couple of years before the incident, Kenny had run to my house in tears, crying, "The laws are after me. They're coming! What should I do?" I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did. Kenny had been

afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail. I have never been afraid of Kenny.

Kenny tried to stay close to home, always worked hard and took pride in his work. He would give you the shirt off his back if you needed it. Kenny was crazy about Abby, his wife. They married young and had a little boy in no time. After Kenny married, he and his wife lived off and on with his mother, and after his divorce he moved back home, building a little shack next door to this mother's. His suicide attempt tells it all. A friend and I witnessed it right from my front window. I almost passed out. Kenny pulled his truck into his mother's driveway, went in her house and got Steve's gun, came outside and shot himself. We rushed over to him, and heard him mumbling and not making any sense. An ambulance came and took him to the hospital where he stayed almost two weeks.

We have learned a lot about depression and mental illness as our children grew up. It runs in our family. I have depression and I get treated for it. My daughter Gwen is bipolar, and her son has a rare disorder that makes him unable to talk or mature; he is like a little child. My son Travis also has to have psychiatric treatment for anxiety and panic attacks and lives with me and my husband.

This whole tragedy with the police officer did not have to happen. Instead of raiding Kenny's house in the middle of the night, all they had to do was come to me and I would have walked over to his house and told him that he had to come with me and be arrested and he would have come.

I know that my son Travis testified in the federal trial against Kenny. I was here in December 2008 when an investigator working on Kenny's case listened to what Travis

Page 3 of 4

had to say about his testimony. My husband, Roger, was here and listened to the conversation, too. I have read the part of Roger's declaration where he talks about what Travis told the investigator, and I agree that is what Travis told him.

This declaration I am giving includes what I told the investigator when he asked me about Kenny, our family, Kenny's upbringing, and his interview with Travis. I did not write the declaration myself, but it says what I told the investigator.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this _22_ day of Feb 2009, in _Sequoyah_ County, Oklahoma.

Phyllis Crawford

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 92**

## DECLARATION OF ROGER CRAWFORD

I, Roger Crawford, declare the following:

I am Kenny Barrett's uncle by marriage. I am married to Phyllis, who is the sister of Gelene Dotson, Kenny's mother. We live next door to Gelene, and Kenny lived next to Gelene on the other side of her house.

My son is Travis Crawford. He is married to Cindy Crawford. I have known Cindy for years. I don't like to talk bad about anyone, but Cindy is a very dishonest person, and has been dishonest and untrustworthy for as long as I have known her. Cindy basically lies about anything and everything, especially if it means she can get something for herself. It is not only my personal opinion that Cindy is very dishonest, but I know that she has that reputation in the community. Cindy has gotten victim protective orders against people that were based on false information, and has even falsely informed on her own family members through the state Department of Human Services.

I am aware that Cindy has worked as an informant for the local police around here to avoid getting into trouble herself for things she has done. When Cindy testified against Kenny Barrett at his federal trial, I believe she was in some type of trouble, as she has been afterwards, but never had to serve a day in jail. My son Travis was also in legal trouble at the time he testified against Kenny Barrett, but he never had to do any jail time, either. I believe that is also true of the other informant witnesses who testified against Kenny.

At the time of Kenny's federal trial, his lawyers did not ask me about my

Page 1 of 6

RC

knowledge of Cindy Crawford's dishonesty and reputation for dishonesty. Had they asked, I would have told them the things I said above and would have testified to her dishonesty.

An investigator named Leonard Post interviewed my son Travis on December 11, 2008 at my residence. My wife Phyllis and I were present when Mr. Post interviewed Travis. I recall that Travis told Mr. Post the following during the interview:

Travis told Mr. Post that he is Kenneth Barrett's first cousin on his mother's side of the family.

Travis related to Mr. Post that he and Kenny Barrett used to hunt and fish together, and were close. Travis said he was at Kenny's home practically every day. Travis told Mr. Post that Kenny was very generous to him, and would do anything in the world for him. Travis told Mr. Post that Kenny Barrett liked to help people and rarely left his property. Kenny would eat meals at his mother's house, and sometimes friends would bring him food.

Travis told Mr. Post that he had had a long struggle with drugs and has anxiety and panic attacks. He told Mr. Post that his mind does not work that well. Travis gave the example of going out to his truck to get something, and by the time he gets there, he will have forgotten what it was he was going to get. Travis told Mr. Post that when he gets problems with anxiety, he gets so nervous that he just does whatever it is that comes to mind. Travis told Mr. Post that he was like this as a child as well. As Travis told Mr. Post, and as I know, he is under a doctor's care and is trying to be healthy. Travis told

Mr. Post that he was a long term methamphetamine user, and he thinks he would die if he used drugs again. As I am also aware, and as Travis told Mr. Post, Travis was told by his doctor that if he ever shot up drugs again, it would likely kill him.

Travis told Mr. Post that he is aware that his drug use was caused by psychological problems that he has and that he does not understand. Travis told Mr. Post that psychological problems run in his mother's side of the family, something I am also aware of. Travis told Mr. Post that he has three children (our grandchildren), one daughter and two sons. Travis talked about how his oldest child is a grown woman who suffers from bipolar disorder. Travis stated to Mr. Post that in his opinion, one of his sons seems a little slow and is having a hard time. Travis said that his other son, however, is a straight-A student, and Travis hopes that he will turn out alright.

Travis told Mr. Post that he had problems in school and joined the United States Army, trying to straighten himself out. Travis said that he was not able to handle Army life and spent two months in the brig. Travis said he just couldn't keep up with all the rules and was late to formation. It made him feel terrible when people he trained with in the Army made fun of him when they marched by the stockade. Travis told Mr. Post that he got a less than honorable discharge from the Army.

Also when Travis was talking to Mr. Post in front of me and his mother, Travis said that he testified falsely in Kenny Barrett's trial. Travis told Mr. Post that at the time he testified, he was living in so many places and was so strung out, that he did whatever he was told in order to keep out of trouble. Travis told Mr. Post that for several years



before Kenny was arrested for shooting the trooper, through Kenny's two state trials and federal trial, and up until about four months before Mr. Post came to talk to him, he had been doing methamphetamine all day, every day. Travis told Mr. Post that when he testified against Kenny Barrett, he was high on meth. He also told Mr. Post that all of the snitches who testified against Kenny Barrett were on dope and high when they testified. Travis stated that he and the other snitches were also high on drugs when they were interviewed by prosecutor Mike Littlefield. Travis told Mr. Post that anybody who had been around drug addicts would have known that. Travis told Mr. Post that when John Philpot took him to see Mike Littlefield, he was sure Mr. Philpot knew he (Travis) was stoned. Travis told Mr. Post that at the time he was interviewed by Mike Littlefield, he felt as though he was already under arrest, and "didn't know if he was ever going to come back home."

Travis told Mr. Post that when Mr. Littlefield interviewed him about Kenny Barrett, he was scared to death of losing his freedom and said whatever he thought Littlefield wanted him to say. Travis said that when Mr. Littlefield asked him if Kenny Barrett said that he (Kenny) "was going down in a blaze of glory," before Travis could answer, Mike Littlefield told him all the bad things that would happen to him if he "lied." Travis told Mr. Post that he was so scared that he said, "yes," that Kenny Barrett would go down in a blaze of glory if the cops came to his residence. Travis said that when he gave this answer, he was panicking because he was afraid. Travis told Mr. Post that Mr. Littlefield told him he knew things about him. Travis repeated that he was extremely

*RC*

scared during his interview with Mr. Littlefield and said whatever it was Mr. Littlefield indicated he wanted Travis to say. Travis told Mr. Post that he never heard Kenny Barrett state that he was "going down in a blaze of glory" or anything like that.

Travis admitted to Mr. Post that he had testified against somebody before he testified in Kenny's case. That time, Travis said that he had been arrested for bad checks and was afraid of going to jail. Travis said the prosecution at the time of that case let him work for them so he would not get charged in the check case. Travis told Mr. Post that he wore a wire and made four or five drug buys. Travis said to Mr. Post that he believes he could have been killed while working for the police. Travis related that he had to testify against the person he bought drugs from, even though the police lied to him and told him he would not have to testify.

Travis stated to Mr. Post that he was aware John Philpot was at Kenny's residence just two weeks before the raid that led to the trooper getting killed. Travis said that when Mr. Philpot went to Kenny's place two weeks before the raid, Mr. Philpot had inspected Kenny's guns without any problem. Travis told Mr. Post that Kenny told him the local police had a drug case against him (Kenny), but it was not serious. Travis said to Mr. Post that Kenny Barrett never told him anything about an outstanding warrant for Kenny's arrest. Travis said to Mr. Post that at the time he testified against Kenny, he thought having a warrant and having a case were the same thing, but he now knows they are two different things.

Mr. Post asked Travis about the sign Kenny put on his fence. Travis told Mr. Post

that Kenny put a sign on his fence just a couple of days before the police raided Kenny's property and Trooper Eales was killed. Travis told Mr. Post the sign was not directed at the police, but it was meant for anybody. According to what Travis told Mr. Post, the sign was to scare people away from trespassing on Kenny's property and stealing his stuff.

As I said before, I was interviewed by investigators working on Kenny's case, and my wife and I were present when Travis was interviewed. After the interviews, I was shown this declaration and was asked if it is accurate about what I told the investigators and what I heard Travis tell Mr. Post. I have read this declaration carefully and it says what I told the investigators and what I heard Travis say.

I declare, under penalty of perjury, that the foregoing 6-page declaration is true and correct.

Executed by me this _22_ day of _FEBRUARY_, 2009, in _SEQUAYAH_ County, Oklahoma.

_Roger Crawford_

RC

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 93**

---

## Declaration of Ruth Harris

I, Ruth Harris, declare as follows:

I am Kenneth Barrett's maternal aunt. Kenny's mother, Gelene, is my oldest sister, followed by Phyllis, then me, and then Carolyn. All the girls in the family are about two years apart. Our brother Mark is the youngest child in the family.

My husband, Jerry Harris, and I have been married for 45 years and have two grown children, both doing well. Our daughter Michelle and her husband run two family businesses, a cleaning business and an equipment rental business. Their two boys, Javan, 24, and Alex, 19, are in good health. Our son, Faron, manages a furniture store in Tulsa and has two children, Dallas, 16, and Mandy, 11. Faron was not as fortunate as Michelle in his relationships. He has been married three times. He was hurt badly by his first two wives, both of whom began associating with people outside our religion.

Jerry and I are deeply religious and are Jehovah's Witnesses. We raised our children in the faith, and they are raising their children in the congregation. Jerry and I protected our family from being around those who are not Jehovah's Witnesses so we were not around our sisters and their families very much when our children were growing up. Bad associations spoil useful habits. If we are around people who are cursing and doing bad, it influences us. Peer pressure can make children do bad things, and I tried to keep my children from that.

We made a conscious decision to be around people who are true to the Bible and have the same moral standards as we do. Jehovah's Witnesses all believe the same exact

–1–

RH

way whether we are from Fort Smith or anywhere in the world.  We share the same doctrine that the only answers are in God's Kingdom and that Jesus is King.  We pay taxes, and we respect the government, but we do not vote because our allegiance is to God's Kingdom. The Bible teaches us that the only true government is the Kingdom of God. As Jehovah's Witnesses, we love everyone and do not hate the person doing wrong. We avoid talking about the bad side of people, but I make an exception for Kenny's father.

Ernie Barrett was not a good husband or father. Ernie did not come around and visit his children the way he should have.  He was absent in their lives.  I know he regrets that now. Ernie has always been for Ernie. My aunt Mary Real taught Ernie at Marble City Elementary School and said Ernie was a mean child. I do not feel good when I say bad things about people. I hope Ernie is a better person than he used to be because he was not a good father—he went his way and let Gelene take care of the kids.

My family also had problems that they have had to deal with.  My father had a drinking problem and was high-strung and quick tempered, but he tried to be a good father and he lived up to his responsibilities.  My sister Carolyn has depression, and one of her daughters also has depression.  Phyllis's son, Travis, is doing very poorly mentally, which is made worse by his use of drugs.

Gelene moved back to Oklahoma with the boys when Kenny was around nine. Kenny took the divorce very hard and probably blamed himself for it as children commonly do.  We planned for Kenny to live with me and my family to help him adjust

–2–

*R d/*

better. It did not work out. He wouldn't come home with us; he wanted to go with his dad. Gelene did not have a husband to help her raise her children the way Jerry helped me. She had to raise three bronchy boys alone. She was strapped financially. She drank the way she did because that was her way of dealing with adversity. She did not set any boundaries for the boys who were allowed to do whatever they wanted

Kenny was a sweet boy as a child, but I knew there was something emotionally wrong with him. He was hyper, never sitting still, moving all the time. He was more hyper than any child I ever saw. He had a short attention span. He needed a lot of structure and support, but he did not receive any. The boys got to running around with other kids who were bad associations.

As an adult, Kenny was a sweet person, nice, and respectful. I am prejudiced because I love him. Kenny loved Abby, who was really sweet, and their son was a doll. I believe that Kenny had a family substance abuse problem that may have hidden his mental illness. After he and Abby divorced, we tried to help him. His only security was with Gelene because he did not have anybody else. My husband went to see Kenny to talk about the Bible and how he could straighten out his life. We were never afraid of him and do not believe he would intentionally hurt anyone.

This entire tragedy could have been avoided if the police had let the family know they needed to arrest Kenny. Kenny is a very kind person who does not want to bring harm to others. We attended Kenny' two state trials every day and his federal trial twice because we cared for him.

-3-

After speaking with an investigator working on Kenny's case, I have made this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 4 page declaration is true and correct.

Executed by me this _15_ day of 2009, in ___LeFlore___ County, Oklahoma.

___Ruth Harris___

Ruth Harris

—4—

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,    )
    )
                  *Plaintiff,*    )
    )
v.    )        **Case No. 6:04-CR-00115-JHP-SPS**
    )
KENNETH EUGENE BARRETT,    )
    )
             *Defendant.*    )

**EXHIBIT 94**

## DECLARATION OF SALLY DAVIS Johnson

I, Sally Davis, declare the following:

I knew Monk Sanders for a period of several years, and last saw him in 2004. I lived with him for a period of one year. I lost track of him when he went to prison for arson and robbery of a Chinese restaurant.

On one occasion, Monk Sanders used fraud and lies to get me to go somewhere with him. During our relationship, he came to my ~~school~~ house one day and said he needed to talk to me. I told him I could talk to him, but not for long, because I had to get back to school. At his request, I left with him in his car. After I got in his car, he drove me to Vian, Oklahoma and kidnapped and held me against my will for 8 days. During this period of time, he stabbed me and beat me on a daily basis. He kept lying to me, telling me he would take me home when my bruises healed, but since he kept beating me, the bruises would not heal. At one point when I tried to escape, Monk Sanders threw a knife at me and stabbed me in the foot. At another point, Monk Sanders cut me from my neck to my chin. This wound bled very profusely. After 5 days of being kidnapped by Monk Sanders, he finally turned himself in on another charge. I was held against my will by his mother, Evelyn Sanders, for another 2 or 3 days. At the end of this, the police finally came and got me. Evelyn Sanders tried to cover up my bruises with make-up. A police report was made regarding this incident.

Monk Sanders is an extremely dishonest person even when he is sober, but he is

1

100 times more dishonest when he is on drugs. I could never believe anything he said about any subject. He is extremely untrustworthy, and took me along on a stealing spree where he stole from practically everyone he knew in order to get money for drugs. I informed the police about this, because I wanted out of it. Monk Sanders has stolen from me before and also stole from my family in order to get drugs. He even once stole my children's toys and pawned them for drug money.

On one occasion, Monk Sanders has threatened my mother Linda Davis because she would not tell him where I was. He told her that if she did not reveal where I was, when he found me he was going to cut my tongue out.

I know Kenny Barrett. My ex-husband and I would occasionally hang out with Kenny Barrett and his wife. I never knew Monk Sanders to have any association with Kenny Barrett.

I was never contacted or interviewed by any lawyers representing Kenny Barrett during his federal trial. Had I been contacted, I would have given them the above information and would have testified if asked to do so.

An investigator working on Mr. Barrett's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully, and it says what I told the investigator during our meetings.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

2

Executed by me this __l__ day of __March__, 2009, in

__Sequoyah__ County, Oklahoma.

Sally Davis Johnson

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 95**

## Declaration of Shawn Hill

I, Shawn Hill, declare the following:

I am related to Kenneth Barrett by marriage. My wife, Brandy Hill, is the granddaughter of Phyllis Crawford, who is Kenny's mother's sister. My wife's mother is Gwen Crawford who is Phyllis Crawford's daughter. I am a contractor and work every day to support my wife and our two children.

My wife and I both had drug problems, which we have handled and dealt with successfully. I served eighteen months, with the remainder of a 20-year prison sentence suspended upon completion of a drug program, for possession of methamphetamine.

I know Kenny pretty well. I lived with him from June through October 1998. My wife and I also lived off and on with Gwen, my wife's mother, in a trailer just below Kenny's shack on the other side of the ditch that OHP came though. It would be impossible for a Mazda to go through the two-foot deep ditch, as Brandy Price testified at trial, without tearing out its undercarriage and making the Mazda inoperable. You don't need to know much about cars to know that.

Kenny hardly left his property for several years, long before his arrest for selling any drugs. Kenny did not talk about killing police or going down in a "blaze of glory." He was not the kind of person to say something like that. The police drove by his place all the time, and they knew he would not shoot at them. Tom Sanders would sometimes call the cops over noise disturbances, and the police would drive by. Kenny was used to it. He acted as if "I'm here if you want me." What I mean by that is that his attitude was not threatening; I mean he wasn't hiding.

1

The sign on Kenny's gate was put there on the 9/22/99 because meth fiends had climbed across his fence the night before and awakened him. It had nothing to do with the police.

I was out at Kenny's frequently and know some of the people who testified against him in his federal trial.

Brandie Price is known in the community as a dope whore who would do or say anything to obtain drugs.

Monk Sanders has a reputation in this community as a thief, a liar, and a snitch. He was never in Kenny's house because Kenny would never have let him in. We all stayed far away from Monk. I could not believe they let him on the witness stand because he had been arrested so many times. He is well known as someone who lies to get favorable treatment. When Monk is in jail, he gets beaten up by other inmates for the lies he tells. Monk was addicted to pain killers.

Cindy Crawford's reputation around here is that she's dishonest, evil and worthless.

Karen Real is pretty messed up. Kenny and Karen were life-long friends. She stayed for a while in Kenny's house. She has been arrested numerous times and she informed on her boyfriend Doss Gann in exchange for favorable treatment. Some people will take what they got coming and some will do anything to get out of it. She is known to be the latter.

Randy Thurman is as low as you get. He is known around here as a thief who will testify against anyone to save his own skin.

In 2001 or 2002, my wife Brandy and I were brought into ADA Robbie Cowan's office and asked to roll on Chip Teague, Boss Green and Diane Wynn. They wanted us to say whatever we knew about these individuals and the drug trade. We declined. Ten days later, Cowan was no longer a D.A. He had resigned.

2



I recently gave this information to a man who told me he was an investigator working on Kenny's case. I did not write the declaration myself. When the investigator came back and asked me if I would provide this declaration for Kenny's case, I read it carefully. It says what I told the investigator during our meeting.

Had I been asked to testify at Kenny's trial about what is in this declaration, I would have.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct.

Executed by me this _26_ day of _February_ 2009, in _Sequoyah_ County, Oklahoma.

Shawn Hill

3

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 96**

## Declaration of Toby Barrett

I, Toby Barrett, declare the following:

Kenneth Barrett is my father, and Abby Stites is my mother. I am their only child.

I was born and raised around Sallisaw. I went to Brushy Elementary School and Central High in Sallisaw. My mother had me held back in the first grade because she was not satisfied with my progress. I stayed in school throughout the 11th grade, when I withdrew. It was hard for me to focus my attention on school.

When I was 12 or 13 my parents separated for good. I lived mostly with my mom, but lived with my dad and Gelene, my grandmother, for most of a year when my parents first split up. Gelene drank beer like most of us drink water, but she drinks more moderately now. I moved back in with my dad when I was 18 for several months before the incident. He wanted me to return to school. We were working on the Camaro the night of the raid so that I could use it to go back to school. The raid changed everything, but I finally obtained a diploma from a Christian school.

Now I work on an offshore oilrig for two weeks at a time, two weeks on and two weeks off. I make pretty good money, which is important because I do not want to go in debt since I have two sons to raise. When I'm home in Sallisaw, I stay to myself mostly and with my girlfriend who just moved here, other than spending time with my sons, Toby Joe who is six and Ty Lee who is four. Their mom married a fellow who treats the boys well, so I get along with him. The boys spend more time with their stepfather than with me, which is all right because I am not a jealous person. I just want what is best for my boys.

and it is nothing he would have hid from me.

Just before they raided the place, the first thing I saw were taillights that went past the driveway and then a flash of light—maybe like the interior light of a car when somebody opened a door to get out. Then an SUV and a Crown Vic went up my great grandma's driveway and then the Bronco turned toward the house and I yelled "Dad." I don't recall how many times I yelled it. It all happened so fast. I thought I saw dad come onto the porch for just a second, and then the Bronco was just coming over the ditch made a boom, like it bottomed out, if that's where the sound came from. I looked at the porch again and my dad was already gone.

The Bronco's headlights were coming toward me at first. I know for sure that nothing hit the Bronco until it came to a stop in front of the house, because that's when the windshield exploded and a cop knocked me down and wouldn't let me look toward the house. There may well have been shots before that—again it happened so fast and I was so scared, but my dad wasn't on the porch and I know for sure that nothing hit the Bronco before it came to a stop.

If my dad went to the roll top desk to get his handgun when he saw the headlights coming, which he said he did, for sure they could have seen his silhouette through the curtain. If he went into that room, they would have seen his silhouette.

The first police lights I seen was on the police car that crashed through the gate when the shooting was over. I'm sure of that. There was no vehicle near me. The cop who knocked me down must have come over Grandma's fence.

I spoke to Mr. Hilfiger once, I'm not sure where, and asked him if he was going to

Page 3 of 4

want me to testify at the trial.  He said he was weighing whether it would be helpful for my dad or not, but that he expected I would. He never asked me about my father's mental problems, my home life or about me or my mom. I never spoke to him again.

I have been interviewed by an investigator who told me he is working on my dad's case.  Later he asked me if I would give him a declaration of what I told him.  He showed me this declaration and I have read it carefully.  It says what I said to the investigator.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this __23__ day of __Feb,_____ 2009, in __Seq._____ County, Oklahoma.

Toby Barrett

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,    )
    )
        *Plaintiff,*    )
    )
v.    )    **Case No. 6:04-CR-00115-JHP-SPS**
    )
KENNETH EUGENE BARRETT,    )
    )
        *Defendant.*    )

---

**EXHIBIT 97**

---

## DECLARATION OF SYLVIA GELENE DOTSON

I, SYLVIA GELENE DOTSON, declare the following:

I am Kenneth Eugene Barrett's mother. He is the first of three children born to me and his father, Ernest Eugene Barrett, during our marriage. To understand Kenny you have to know something about my family, how he fit into it, and how he came to live in his little shack on our family's property.

Family and hard work meant everything to my parents whose families go back generations in this part of Oklahoma. My parents and their parents always helped out each other and their children by finding jobs that let them feed their families in tough economic times, working together, and working land near each other. Through the years, my family has lived through wars, droughts, and lean economic times. We have worked our way back and forth across this country, all the way to California and up to Joliet. We had to deal with real poverty even when we worked from sunup to sundown. We dealt with mental illness and suicides, and more than our share of problems with alcohol and drugs, but we survived it as a family.

My father, Hugh Dotson, was one of six children (Hugh, Eleanor, Warren, Lela, John E. and Christine) whose great grandparents were from around Sallisaw, Oklahoma. Dad's wiife, Hattie Gertrude Real, who is my mother, was born in 1921 in rural Vian, Oklahoma. The Reals worked a piece of property north of the Dotsons. Hattie parents, Alan Real and Ida Goodwin Real, were my maternal grandparents. They were farmers like everyone else. They grew anything they could—mainly peanuts and cotton. No one had running water or

1

electricity until the later1940s.  They knew the value and the cost of hard labor because nothing was easy or taken for granted in those days.

Dad's younger brother, Warren, is 90 or so and lives in Kellyville, outside of Tulsa, about two and a half hours from Sallisaw.  His children are Nona, who lives with him; Linda Rogers who lives in Sapulpa; Judy who lives in Kellyville; and Karen who lives in Bunch, Oklahoma.  One of Dad's sisters, Christine Cook, lived in Sallisaw.  Dad's sister, Eleanor, married Gene Masterson, and they moved off to Joliet, Illinois, had two children, Nelda, who died recently, and Jim, who lives in Antioch, California.  Lela, another one of Dad's sisters, lived in Wichita, Kansas. The Joliet connection ended up being pretty important in my life because that's where Kenny's dad, Ernie, and I lived after we married.

Back when Dad married my mother, he did odd jobs and barely earned enough to live on.  I was born in 1940 in an old tumble down house in Vian. We moved out of that house before my sister Phyllis was born in 1942 to a house owned by my Grandpa Alan Real. That house is now gone but the land is still in the family and my cousin Mike lives on it. Not too long passed before we moved to what was known as the Granny Golden Place before my next sister Ruth was born, then back to that old tumbledown house. After that, we moved less than a mile away to another house where my youngest sister Carolyn was born. All the houses were in pretty bad shape even by standards back then. We had no running water, electricity or plumbing and used wood stoves for heating and kerosene for cooking.  All that moving made Dad all the more set on owning his own land, but it took a good many more years for him to be in a position to buy

2



40 acres.  At the time, I just figured this was the way life was.  I did not have aspirations back then.

After Dad got out of the army, he went to classes in agriculture on the G.I. Bill in Sallisaw. Uncle Carl Cook, who was married to Dad's sister Christine, taught agriculture there. It was night classes, not college, more like a technical school. Dad learned how to run a farm, a big farm, not just a home farm.  When I was six, the family moved to the Dwight Mission School, an Indian school run by the Presbyterians. I always heard we were part Indian and think that I am 3/16 Cherokee.

Dad ran Dwight Mission's farm. The school provided a house for our family that had electricity and plumbing. There was no kindergarten in those days and I went to first and 2nd grade at Dwight Mission, and then they shut the school down.  They sent Dad, who took us along, to the Menaul School in Albuquerque, New Mexico.  It was a high school. Dad ran the cattle and vegetable farm. The kids that went to the school were the farm hands and Dad was the overseer.  I spent third grade in Albuquerque, and then we moved to Missouri when I was nine.

The fellow who had been the superintendent of Dwight Mission stayed in contact with my dad. When the Presbyterian Church started an orphanage in Farmington, Missouri, and purchased another farm, the superintendent asked Dad to run it. I loved Missouri. We had good neighbors and kids to play with. We had pigs and went sledding in the snow on the hills above the farm.  I had started the sixth grade when the superintendent lost his job and we had to move back to

3



Oklahoma where we lived for two or three months with Uncle Carl and Aunt Christine. There was no work around there. I was eleven years old and wanted to go to school in Blunt, Oklahoma, but the school was closed when we first got there because a lot of families chopped cotton in the spring and pulled cotton balls in the fall. Most of the country schools shut down because kids joined their parents in working in the fields and traveling to where the cotton needed tending.

My Uncle Jim and Aunt Rosy Newton, Rosy Real Newton, Mom's sister, had a place here in Oklahoma but they had to go to California part of every year to make money working on a ranch. I don't know why they called it a ranch, because they raised crops, but they called them ranches. We ended up going to California with them when Christmas vacation came. We moved to Shafter, just outside of Bakersfield, California, in 1952. Aunt Valerie, my paternal grandmother's sister, was married to Monroe Bell, and they lived in Weedpatch, California. Their son-in-law was the accountant for Pelletier Farms, which owned a big farm, and he helped Dad get hired as an irrigator. I was almost 12.

In 1952, I attended a school in Maricopa that was flattened by an earthquake so classes in the seventh, eighth and half the ninth grades were held in a Quonset hut. I made many friends. There were 30 or 40 houses on the farm, all with kids. We were not migrant workers, but people who lived there permanently. We went from one person's house to another. The children were welcomed wherever they went. We played Kick the Can and other children's games. It was a joyful time, and I was a happy child. My mother, Hattie, was unhappy about a whole lot of things, but she was happy when we lived at the

4



California farm.

My mother's unhappiness seemed mainly to be about the family not owning their own place. She was not happy after they returned to Oklahoma until she and Dad were finally able to get their own place. Land is just something very important to us and always has been. Out in California, Dad worked seven day weeks, 12 hour-days, and got two weeks vacation during which we came back home to Oklahoma. He was tired from too much work but he never considered working less. He didn't take us to California to stay. Oklahoma was home, and we always knew we went out there to make enough money to buy our own place back home.

After my brother, Mark, the youngest child, was born in 1961, Dad finally saved enough to buy 40 acres. By that time, I had left home and was already married to Ernie. Much later, Dad gave each of his five kids 8 acres. He had lived to see his dream come true. Kenny was living on that land when the shooting happened.

Dad was strict with his children and was not one to show favors, but Mom favored Carolyn until Mark was born. Mom did things for Mark and his kids that she did not do for the rest of her children. I always felt it took something away from me and my children.

I was about to turn 15 in April 1955 when, in January, we picked up stakes. I didn't want to leave. I had friends on the farm and at Maricopa High School. I was interested in my friends more than anything else. I was really good at English, but I didn't know enough to be interested in it. When we moved

5

back to Oklahoma Dad rented a place for us to live.  I rode a school bus to

Sallisaw High School, and a man with a station wagon picked up my sisters

Phyllis, Carolyn and Ruth and drove them to McKey Grade School.  In high

school, I was in FHA (Future Homemakers of America), but had to drop out

because Dad could not pick me up.  I had to ride home on the school bus. I took

a class in dramatics and the teacher said I was a natural born actress, but I

couldn't be in the junior or senior plays because Dad would not come and get

me. Dad wanted me to play basketball. In Maricopa, I played volleyball and I was

good. We didn't lose one match. But the girls at Sallisaw High had been playing

basketball since the sixth or seventh grade and I was getting too late a start to

catch up to them. I regret I didn't play basketball.  I had a couple of boyfriends,

but nothing serious.  I even dated Ernie a couple of times.

I really planned on going to college after I graduated from Sallisaw High

School in 1958. I made arrangements to go to Connors College, but I didn't know

what I wanted to do. Dad's sister Eleanor (Masterson) asked me to spend the

summer in Joliet and helped me get a job as a waitress at Walgreen's, which

had full-service restaurants back then. I still planned on going to school. I was

making new friends. My teachers in high school pressed me to be an English

teacher. I thought about that. I read and still do read mysteries all the time, like

Jane Withers and the Hardy Boys. I was always interested in them. I am

presently a member of the Mystery Guide Book Club. Back then, though, I just

didn't have the initiative to go to college.  One of my customers at Walgreens

was an air force recruiter and I thought about going in that direction.

6



Right when I was trying to figure out what to do with my life, I came home to Sallisaw on vacation and ran into Ernie again. He was just back from the Marines. I was crazy about Ernie and remembered him from high school where he was ahead of me.  Ernie left high school, served in the Marines and came home kind of like a knight in shining armor. He was a handsome fellow. I was so taken by him that I didn't realize he was not the same boy I knew in high school and that he had changed, none for the better. We were not the same people we were back in high school, but I never imagined that life with Ernie could be so terrible, not just for me, but for the children we had together.

My cousins were pushing me to marry him, telling me what beautiful children we would have. I thought it would be the real American dream.  My mom and dad had worked together and stayed together to get the things they wanted, to own their own land, and to raise their children among family.  I married Ernie on July 8, 1960, and Kenny was born in Joliet on June 29, 1961.  We had a very difficult marriage right from the start but we were young and neither one of us really understood what lay ahead.  I try not to think about those years.

Ernie did not want a family or a wife, much less children.  He left me for other women right after we married. I think he had a lot of problems that made him have to have all those women to make himself feel like a man.  When I was pregnant with Kenny, he left me one night and did not come back for days. He did this all the time I was pregnant with Kenny.  Whenever he took off like that, my Aunt Eleanor would come by and bring me food, because he left me no money and he would have the pickup.  I was pretty miserable then, and Eleanor

7



tried to keep me company.  We would have a few beers, talk, and plan what to do next.  Eleanor and I would go looking for him—he would be out drinking.  We would go to bars and they would tell me he wasn't there.  It was a constant thing.  Once I even went to a woman's apartment looking for Ernie—the woman said he wasn't there, but I heard his voice. It was humiliating and embarrassing and hurt a lot.  I was alone, pregnant, and really depressed. I wish we had known then what we know now about how having just a little beer can affect your baby—none of us would have had a drop. I couldn't believe what I had gotten myself into and wondered if there would ever be a way out of it.

I started battling with Kenny before he was born.  My pregnancy with Kenny was very difficult.  I was in constant pain above my pelvis.  He moved all the time and kicked me all the time. I could never get comfortable.

Kenny was born with a lump on top of his head, larger than a knot, which went away in a about two or three years. His days and nights were mixed up when he was a baby.  He did not sleep at night and slept in the daytime.  I was exhausted by it.  Kenny was a very difficult baby and child.  He was colicky and nothing could comfort him, not even breastfeeding him, which I did for six months.  He cried and fussed all the time. At first I thought all babies must be like this, but after I had my other two sons I realized something was wrong with Kenny.  He was very, very active and moved around without thinking about what he was doing. Still, by the time he was one he did not walk and this worried me.  But by the time he was 18 months, he was walking all right.

When he was a toddler, he had to go to the hospital for several different

8

accidents. He got into everything.  He had to have his stomach pumped two different times after he managed to climb to a top cabinet. Once he ate baby aspirins and the other time he ate ex-lax.  I also had to rush him to the hospital when he pulled a bag of groceries off the table and a large can fell on his head, busting his head open and raising a big knot. He could not be still.  Any little thing could upset him, but it took a lot to calm him. I know that babies falling and hitting their heads is not so uncommon, but Kenny had far more than his share of accidents no matter how hard I tried to protect him. This was not true with my other boys. Kenny had the measles once and ran a fever so high it scared me. I took him to the doctor and he was so concerned he prescribed a fever reducer. My other two boys got the measles' vaccine, which didn't exist before Kenny caught them.

My second son, Richard Andrew, was born June 24, 1964, in Joliet, almost three years to the day after Kenny. Soon after Richie was born, Ernie and I separated for three years.  Kenny, Richie, and I lived with another woman who had two boys of her own for a while but we had to move back to Sallisaw for two years. I could not support two boys on my own. Kenny really loved his dad and missed him a lot when we were separated.  I always wondered if that separation caused some of Kenny's problems because he never got over it. That's one reason Ernie convinced me to go back to him.  My third son, Steve was born in January 1969 in Joliet, Illinois.  Ernie still had his other women, though. There was never a time he did not have other women.

Kenny was a handful, and I did not get any help from my husband with the

9

children. Kenny had a difficult time in school and was in Special Ed classes part of the time. He failed reading and arithmetic in the first grade and had a hard time keeping up with the other kids. It was very difficult for him to read. In the second grade, when they taught phonics he never grasped it. He never did well in school and he finally gave up. I didn't know what I could do.

Ernie would not even talk to me about what was going on with me, the kids and him. It drove me crazy. I tried to talk to him about it because it is not in my nature to be a passive person. I begged, pleaded, threatened, and cried with Ernie about his women. Ernie would just tell me it was none of my business and to shut up. We split up and got back together and threatened to leave each other over and over. We always had a difficult time of it. Ernie did not drink at home but drank at bars away from home and could not hold his liquor. I was very depressed at times.

We left Joliet and moved to New Jersey to try and find a place where we could start our lives over. He said he wanted to have a fresh start, straighten himself out, but that's not what happened. Even having a job at Thatcher Glass where he worked didn't help. He started seeing another woman almost as soon as we got there. He moved out on me and the kids and lived with her, but I let him move back in. Ernie would leave and move in with other women or not come home for days on end. He gave me gonorrhea twice. We got into some pretty bad fights because I couldn't stand his not coming home nights anymore, and he gave me two black eyes and split my lip. There were terrible scenes with us screaming at each other, Kenny and his brothers crying and scared and not

10



knowing how to make us stop fighting, and then the time he hit me.

I liked Hopatcong, New Jersey; I liked the people and I liked the country; I wish I could have afforded to stay, but I finally left Ernie, told him I was leaving for good. I'm the one who left that time; all the other times it was him. He asked me to stay. He said his behavior didn't have anything to do with his love for me or the kids. He said, "Someday I'll get too old to do this and we'll have a good life." I agreed to stay, but I wanted to move into my own room and he would have to leave me alone—I mean not have sex with me anymore. He said no, that it wasn't going to be that way.

Dad had always insisted I stick it out, but now he said he wanted me to come home. Daddy paid for the ticket. My parents did not hate Ernie—they just didn't like the way he did me. Ernie went from one woman to the next before he finally settled down with Doris, his wife now.

I don't even hate Ernie; I just have no use for him, not so much for what he did to me but for what he didn't do for the kids. He was always talking about how big he was and telling the boys "'you ain't never going to be as big as me.'"

I came home to Oklahoma in 1972, and Ernie and I divorced June 20, 1973. I dated and had a few boyfriends before I married Paul Dudley in 1982, when Stephen was 12. Paul and I owned a bar together but he did not know how to be a husband. He was violent and attacked me, beating me black and blue. I divorced him after three years but we were in the process of getting back together when he was murdered in Las Vegas. I took my maiden name back.

When Kenny and his brothers were growing up, I had my hands full with

11

three boys and basically no husband. A woman is not cut out for discipline, and it is not a good role for a woman to play. I whooped my kids with a belt or a switch, the same way I was raised. Spare the rod, spoil the child. Ernie did not beat the kids because his dad beat him and Ernie hated it. I had to make up for the discipline Ernie would not give the boys. I had to be especially hard on Kenny because he went from one thing to the next, was never still, and almost drove me crazy. He was more than hyper. He was emotional about things that did not matter. He would cry and scream like there was no tomorrow.

Kenny never adjusted after we moved back to Sallisaw for good. He really missed his dad, but his dad did not show him any affection. His dad came every year or so to see the boys but used it as a time to show off a new car for a few minutes rather than spend any real time with the boys, although once or twice he would take them hunting, which is the only way he ever related to the boys. Kenny got pretty depressed and lost interest in school. He had to repeat the eighth grade. He went to live with Ernie and Ernie's new wife in Dunkirk, Indiana, but that didn't work out and he came back to Sallisaw as soon as he finished ninth grade. I told him he had to work, and he got a job at the local racetrack. When school started up again he went for a few days and then just quit and went to work full time.

When he was 16 or 17, Kenny was beaten up by police officer John Philpot who broke his own hand while breaking my boy's face after Kenny was arrested for squealing his tires. The FBI investigated the whole thing. Kenny always loved working on cars. They were his pride and joy. He was out driving

12



one of his souped-up cars and got arrested, taken to jail, and beaten all over his face. His nose was bloodied, and his jaw and collarbone broken. A highway patrolman held my son's head back by the hair while John Philpot beat him. An assistant district attorney said he just stepped out of the room and missed what happened. Everyone in law enforcement interviewed by the FBI gave a different story. You should have seen the pictures of his face, made you so mad and want to cry at the same time. I think they would have brought a case, but Kenny wanted the FBI to drop it he was so afraid. It was a big thing in Kenny's life and really traumatized and terrified him.

Kenny always worked hard and his bosses liked him. He was a good worker, strong, and able. By the time Kenny was 18, he was working on pipelines and oilrigs and traveling all over, not just in Oklahoma but to other states. He was a builder and could frame and put up apartments. He was proud of his work.

Kenny met and fell in love with Abby Stites, a wonderful girl. I love her like a daughter to this day. Kenny was 19 and Abby was 16 when they married in 1980. Kenny and Abby's marriage was always rocky, though, and they were more unhappy than happy even though they loved each other. They were too young and Kenny was far too mentally unstable. Their son, Toby, was born December 1, 1980. Toby, Kenny and Abby lived with me a lot of the time when Toby was little.

Kenny had terrible mood swings and periods of depression that lasted for days. He withdrew—anything upset him—and he was paranoid about

13



everything. Abby tried to stay with him, but he needed help for his mental problems and she could not figure out what to do for him. She begged him to go to doctors, and he tried it a time or two, but he went downhill further and further.

He tried to kill himself in January 1986 in my front yard. He came right into the house, got Steve's shotgun, went back to the front yard by his truck and shot himself. We all ran out of the house and thought we had lost him for sure. He almost died in the hospital but he survived and returned home after losing a lung and suffering other internal damage. Abby had him committed to a psychiatric hospital in early October 1986 to try and get him help, and for a while he did better, but he could never hold on to happiness. Abby and Kenny wanted the marriage to work for the sake of their son, but Abby finally ended the marriage in the fall of 1995. Kenny never recovered.

Kenny was not able to live on his own. When he and Abby would separate, Kenny always came home to me. After he and Abby broke up for good, he moved back home. He was a lost soul. Nothing in his life ever mattered but Abby and Toby. Sometimes I could see how hard he was trying to hold it together for them, but he couldn't do it. He just couldn't do it no matter how hard he tried. It was so sad, so he came home to me.

He asked his grandfather and got his blessings to build a place to live on a piece of land next to my house. This was on the part of a few acres he still owned that I knew he planned to give me, which he did before he died.

With $150.00 and whatever scraps he could find, he built himself a little shack. He was so proud. He showed it off to everybody, but it was nothing much,

14



pretty bare, three tiny rooms and an attic space for sleeping. It had no water, or toilet, or electricity. He put a porch on it though.

He ran an electrical cord from my trailer to his shack for electricity, and he ate his meals and showered at my trailer.  He became more and more reluctant to leave our family's property and he became more and more paranoid, although plenty of friends visited him so you could never call him a loner.

I knew he had serious mental problems but I hoped if he lived close to me and just worked on his cars and fixed things for people, he might be able to make it.  My family has seen a lot of mental illness, alcoholism and suicide so I know what depression does to people.  Sometimes, Kenny was manic and thought everything was wonderful, but he became frustrated and irritable over any little thing and was depressed and withdrawn at times.  His moods changed from one extreme to the other.  We knew he was mentally disturbed and suffering.

As time went on, he did a little better, built a garage—more like a storage shed—and fixed cars and pickup trucks for friends and neighbors. Cars were his only other love besides Abby and Toby.

Friends brought him food and went grocery shopping for him.  He ate most of his meals at my trailer, and I cooked for him.  I hoped and prayed he was going to make it.  At least, I believed, with him living right next door he was safe and I could keep an eye on him.  We had our arguments; that's for sure.  He was so paranoid and crazy at times, I was at my wit's end, but I knew he did not have anyplace else to go.

15



The night of the shooting, I got home after working a 12-hour shift, saw Kenny and Toby working on a car by the garage, and was too tired even to say hello. I knew Kenny and Toby were already over and ate, because there had been food in the icebox for them and it was gone. I was sound asleep when I woke up to gunshots. At first, I thought it was Kenny shooting skunks, and then there was so much shooting and then it stopped like it never happened. I looked out the window and all I could see was a cloud of dust and a lot of people yelling, and the phone rang—it was Phyllis, my sister across the way, who wanted to know what was happening because she was scared to go out and she was wondering where Travis, her son, was—because he had been home just before. I told her I hadn't seen him. I walked back to my room and I saw a black and white police car in my driveway without any lights and then a black and white police car coming through Kenny's gate with just its headlights on. One thing I know is they did not have their red and blue lights on.

I never believed there would come a time when the police would come in the middle of the night to arrest him. If they had told me or my other family members or even Kenny, we would have brought him to the jail or the police could have come out and taken him to the jail without any trouble at all. They had come on his property before and sat on his porch talking to him and inspected his rifles, which were legal, and Kenny never gave them any trouble. If fact, John Philpot had been out to talk to him just a few weeks before this all happened.

Mr. Hilfiger and Mr. Smith, Kenny's lawyers, never talked to me about my

16

family's history in Oklahoma, how much our land meant to us, how we always worked for what we had, and how some of our people, including Kenny, had mental problems. Our people go back for generations in these parts and we are close to each other even though we have our misunderstandings from time to time. I know my family would have answered any questions they had about Kenny, his life, and his problems, but the lawyers only talked to us in a hurried way. They came to my house once, more to see where Kenny lived than to talk to me. They didn't ask me anything except about what I saw the night they came for Kenny. The day I came to testify, they didn't tell me what they wanted me to talk about in court or what they would be asking me except if I loved Kenny and would miss him if he was executed,

An investigator working on Kenny's case now asked me to give the information in this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meetings. I have looked at copies of five photographs the investigator showed me that he said would be attached to my declaration. They are pictures of the shack next to my place that Kenny built. The shack looks like it looked around 1999. I have put my initials on the copies he showed me. The investigator also showed me copies of two pages from a baby book that I had given him. The stuff not checked is stuff Kenny could not do when he was supposed to and it really worried me. Funny the things you can remember like how he couldn't follow the light when I shined a flashlight at his eyes and moved it. I have initialed the pages the investigator showed me.

17



I declare, under penalty of perjury, that the foregoing 18-page declaration is true and correct. Executed by me this ___9___ day of March 2009, in ___Sequoyah___ County, Oklahoma.

Sylvia Gelene Dotson

18

6:04-cr-00115-RAW    Document 404-3    Filed in ED/OK on 03/16/09    Page 138 of 153

## am I supposed to do all this ?

(Mother will check if I do)

### AT ABOUT THREE MONTHS    MORE OR LESS

Lift chest clear of surface when placed face down _(a whee)_

Straighten knees when held erect _(a wee)_

Hold head erect and steady when held to shoulders ✓

Sit on lap, hold head erect and steady with support of ribs only ✓

Follow flashlight with eyes: vertically_____ horizontally_____ circularly_____

Smile in response to Mother's voice ✓

Observe anyone speaking_____ Inspect hand_____ Laugh aloud_____

Manipulate object placed in hand_____ Splash in bath_____

Make stepping movements when held erect_____

Open mouth at sight of nipple before lips are touched_____

### AROUND SIX MONTHS

Hold head erect when carried ✓

Sit alone on flat surface momentarily ✓

Stand firmly with help when held erect ✓

Roll from back to stomach and vice-versa on flat surface ✓

Reach and grasp for an object when in sitting position ✓

Pick up one-inch cube with fingers ✓

Scoop up ⅛-inch cube ✓    Discover feet ✓

Look at object with which am playing ✓

Look at floor for fallen toy when in high-chair or lap_____

Make various vocalizations ✓

Notice difference between familiar persons and strangers ✓

Not much affected by strangers, new scenes or solitude ✓

Crow and coo actively when pleased ✓

Cry and fret when toy is taken ✓

[ 20 ]

### I'M GETTING BIGGER NOW!

### AT ABOUT NINE MONTHS

Sit on floor and handle playthings without losing balance ✓

Crawl on stomach, making some progress ✓

Creep on hands and knees ✓

Bang table with toys or other objects ✓

Knock down block houses in play_____

Oppose thumb and forefinger in picking up one-inch cube_____

Wave "bye-bye" or play "peek-a-boo" instinctively_____

Take bottle in and out of mouth ✓

Respond to animated facial expressions_____

Bowel control_____ Respond when name is called ✓

Express vocal sounds upon recognition of familiar person or object_____

Associate outdoor clothing with being taken out_____

May react to strangers_____

Reach for objects persistently_____

Say "ma-ma" or "da-da" or equivalent_____

Make stepping movements when feet are touched to floor ✓

### ONE YEAR OR THEREABOUTS

Pull self to standing position with help of furniture ✓

Walk with help ✓    Creep actively and rapidly ✓

Comprehend simple verbal commands and commissions ✓

May cooperate in dressing and undressing ✓

May climb steps_____ Hold and drink from cup_____

Pile one block on another when shown_____

Say two or three words indicating want_____

Play "pat-a-cake" or similar demonstrable game_____

Pick up small object with finger and thumb ✓

Show preference for one hand in reaching_____

Make rhythm movements to music ✓

Indicate need of toilet_____

Dear Folks: Don't worry if I don't do ALL of these things at the ages specified. If I do about half of them at the proper time, I'm doing all right.

(signed)_____

[ 21 ]

KEB501953















## IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,    )
        )
       *Plaintiff,*    )
        )
v.        )      **Case No. 6:04-CR-00115-JHP-SPS**
        )
KENNETH EUGENE BARRETT,    )
        )
       *Defendant.*    )

---

## EXHIBIT 98

---

## DECLARATION OF MARK DOTSON

I, Mark Dotson, declare the following:

I am Kenneth Barrett's maternal uncle. Kenny's mother, Gelene Dotson, is my sister; I am 23 years younger than she is. I am a podiatrist with a private practice in Fort Smith, Arkansas. My wife, who is a dentist, and I have three wonderful children who are doing well. My daughter is 20 years old and in college, and my two boys, who are 16 and 11, attend public schools. Our home is in Vian, Oklahoma, on land passed down by my parents.

I recognize that we are fortunate to have healthy children who enjoy and appreciate their lives, do well in school, and are not disadvantaged by problems that affect my extended family. My wife and I have not had to deal with depression, alcoholism, and attention deficits that have affected many members of the Dotson family. My children do not appear to have been bitten by the Dotson bug.

Two of my sisters, Ruth and Phyllis, have been relatively mentally healthy, but two of them, Gelene and Carolyn, have struggled with serious impairments. Gelene, Kenny's mother, is a heavy drinker with dramatic mood swings. Some days she is pleasant, and some days she is rough. She is so unpredictable and unpleasant that I try to keep my distance from her. Kenny was very hyper as a kid. He was not a normal child. Kenny often stayed to himself. Most of us went to the movies or out to eat, but as far as I can recall I do not remember his ever doing those things.

All three of Gelene's sons had problems. Richie is not quite right mentally and no longer works. He is odd. Steve was extremely hyper, the most hyper child I have ever

*MRD*

Page 1 of 4

seen. Grandpa used to say, "If there was a knob they would turn it." I thought Steve was retarded, but he turned out not to be and is now a principal. A difference between Kenny and Steve was that Kenny would get things and tear them up, which Steve would not.

Kenny had difficulty figuring out social situations. I used to watch the Andy Griffith show; I still enjoy it. A running gag of the show is that Andy pretends that Barney was a good deputy, although Andy knew that Barney was really bumbling and afraid. It would make me laugh, but it would frustrate and confuse Kenny that Barney believed he was good when he was incompetent. Kenny could not see the humor.

Gelene was constantly bickering with Kenny, which must have been humiliating for him. He stayed away from the house a lot just to stay away from Gelene. My dad said sometimes when Gelene would get going he would put a hand over her mouth to shut her up. She was the worst with Kenny.

Kenny's home life was his mother drinking a lot and having men in and out. Gelene clashed with Kenny and took her frustrations with life and with Ernie out on Kenny. She put him down over insignificant things. Gelene was always lit up from alcohol. When she got going and her face got red, you had better watch out. It was extremely unpleasant, especially because she always targeted Kenny. Kenny was the best shade tree mechanic you can find, but you would never know it from Gelene.

Phyllis's children also suffered with ADD. My nephew, Travis Crawford who is Phyllis's son, had attention deficit disorder as a child that was not treated. He is nervous to an extreme. He was raised in an extremely lenient home that set no boundaries. This did not serve Travis well and nourished his problems. As a kid, we got a kick out of

*MKO*

he had a better family life and got the help he needed, I can't help but believe things would not have turned out this way. A year before the incident, Ruth went over to speak to Kenny and tried to tell him that his lifestyle needed changing.

A lot of us had backed off from Kenny, but not Ruth. I wish now that I had talked to him. I and my family let him down. The truth is our family's failure to help Kenny begins at the core of Gelene. What I mean by that is he either lived next door to Gelene or with her, and Gelene being who she was made us want to stay away. It is not a very good excuse for the family not stepping in to help Kenny, but there you have it.

I gave this information to a man who recently came to talk to me and said he was an investigator working on Kenny's case. He asked me if I would read this declaration to see if it was an accurate account of what I told him, and if it was if I would sign it as part of Kenny's case. I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 4 page declaration is true and correct.

Executed by me this _8th_ day of March 2009, in ___Sequoyah___ County, Oklahoma.

_____
Mark Dotson

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,       )
                                )
                    *Plaintiff,*  )
                                )
v.                              )       **Case No. 6:04-CR-00115-JHP-SPS**
                                )
KENNETH EUGENE BARRETT,         )
                                )
                    *Defendant.*  )

—————————————————————————

**EXHIBIT 99**

—————————————————————————

## Declaration of Steve Barrett

I, Steve Barrett, declare the following:

I am Kenneth Barrett's youngest brother; I was born on January 1, 1969, when Kenny was seven years old. Because of the seven-year gap in our ages, we were exposed to vastly different environments and experiences during our formative years that help explain how I was able to overcome many of the challenges I faced and how those challenges affected Kenny.

The biggest factor missing in Kenny's life that was present in mine is I benefitted from the guidance, support, and structure of an extended family that Kenny never experienced in his developmental period. Kenny's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children. Even though I love my parents very much and recognize they did not understand the damage they did to their children, I have had to come to terms with the impact of alcoholism, mental illness, and family instability on my own life.

The primary difference in our upbringing is that I was raised by a village and lived in an extended support structure, something Kenny never had. My mother moved to the country to live on family land amidst her relatives when I was an adolescent. We moved in to the same trailer in which my mother now lives, where I was literally surrounded by aunts, uncles, cousins, and most importantly for me, my maternal grandparents, Hugh and Hattie Dotson.

Another critical factor is that our father walked out and abandoned Kenny when Kenny most needed him. Kenny idolized Ernie, while I barely knew him. My parents

1

divorced when I was two, and my two brothers and I stayed with our mother. I could tell when Ernie visited how much Kenny missed him, that Kenny was enamored. Kenny made sure to stay in close proximity, while I would wander off. Ernie was a god to Kenny. I have no recollections of being close to my father in childhood, although as a teenager and young adult I was able to develop a relationship with him, long after Kenny had become an adult. My father's absence in my childhood and adolescence was replaced by attentive older men and women relatives who rooted me in their love and guidance.

Finally, while I was able to succeed academically, Kenny had great difficulty with his education. Kenny failed in school, but I was one of those lucky students who was always good at school and a decent athlete. High school athletes in my small town were just about the only ones who got noticed. We got sort of pampered treatment.

School became the focal point for me. In some ways, it replaced the value system that I never got at home. I would often stay at friends' houses to avoid the high stress environment at home. My mother's ability to parent was very limited, not just by alcoholism, but by her extreme mood swings and unpredictability. She had a hard enough time dealing with her own needs, let alone having to deal with Kenny's hyperactivity and mood swings.

One of my first memories of Kenny doing something bizarre, was when I was about five years old. Gelene whipped Kenny for something. Kenny had built these intricate scale models of cars—Mustangs and Chevelles—that were perfect. Kenny became so upset he smashed them all.

Gelene whipped us boys with a strap, but I was able to stay out of trouble pretty much. Kenny was constantly on the go, though, and Mom was pretty harsh with him,

2

verbally and physically.  Kenny hated being whipped.  We had a German shepherd that Ernie had given Kenny.  The dog was very protective of Kenny and when Mom would try to beat him, Kenny would hide behind the dog and the dog would growl at Mom and not let her near him.  The dog was run over by a car.

Mom did not have regular discipline or rules for the house; she went from one extreme to the next.  When she lost control of herself, she whipped us, but there was no real parenting.  Sometimes she came into my room after she had been drinking, when she thought I was sleeping, and she would cry about things she had and had not done.  She went in and out of being a Jehovah's Witness, but we did not regularly attend church.  We never discussed education, how we were doing in school, or how to prepare for the future.  We mostly just raised ourselves as best we could.

After we moved to the country, I often ate breakfast with Hattie and Hugh, my maternal grandparents. They were real grandparents. Friends and relatives took an active part in my and each others' lives. Janice and Tom Sanders taught me how to play cards. I hung out with my cousins Rodger, Jr. (Podgy), Travis and my Uncle Mark.  It made all the difference in the world to have that support structure. It was a pivotal part of my life. I had positive experiences and influences that Kenny never had. Aunt Phyllis gave me girlfriend advice. Phyllis and Rodger were instrumental in helping me. Uncle Mark was like an older brother who showed me how to do stuff, who spent time with me. I fed cows and hunted and fished with Podgy and Jeff Sanders on the Real property, which was just north of the Dotson section. I went with Podgy Travis, Mark, and Hugh to get alfalfa for winter animal feed. I loved the outdoors.

My own family was always dysfunctional.  My mother was never able to have

3

meaningful conversations about day-to-day problems, to figure out how to solve normal problems that arise in the course of everyday life, or to tolerate the routine activity of growing boys. She did everything to the extreme, whether it was drinking excessively or becoming a devout member of a religious group. I once found some diary-type notes of hers when I was young; her notes were very depressive and full of blackness and darkness. If I were to find the same kind of writing today, I would know to get that person professional mental health treatment.

Life wore my mother down. She certainly did not know how to respond to Kenny's special needs as a youngster with profound psychological problems. She was not able to meet my fairly normal needs. In my junior and senior years in high school, I started in every (varsity) football game and she only came to two. I ran track in 40 or 50 meets, in conference championships, and she saw me one time.

It seems like much of my childhood was a real blur. It was weird in some ways; I was an observer. I saw things that children should not see. My mom always drank and had men around, but when she married her second husband, Paul Dudley, her life spiraled totally out of control, and I witnessed it. Paul was an amazing alcoholic, who was around from about 1982-1986. I remember Mom having a gun put to her head by Paul, when he was drunker than Cotton Brown, until she talked him down. I remember mom in the kitchen drunk with a knife in her hand, threatening to stab Paul who ended up leaving her.

Kenny left home and tried to make it on his own, but he never succeeded. He married young, had a son, and worked hard, trying to bury his problems under constant work and activity. Sometimes Kenny and I worked together. We once packed stalls at the racetrack; it was hard labor. We had a great time. We loved it. We kicked some butt, the

4

amount of work we accomplished. I have a genuine fondness for Kenny. Kenny and I were close; we understood each other. We were pedal to the metal kinds of kids.

As troubled as Kenny was, he worked all the time. In a terrible episode of depression, he tried to kill himself. I was home with Monty and Podgy in the living room watching Carl Sagan kind of stuff on television. Kenny came in to borrow my 12-gauge that Dad had lent me. It was loaded with 00 shot. I looked out and I saw Kenny leaning against the truck, but I didn't see the shotgun. I don't remember hearing the actual shot, but I must have. Mom and Paul were in bed sleeping. I woke them up and told them to call an ambulance, and then I went outside. You couldn't see the hole all the way through because of the wadding. Phyllis came over and was so freaked out she rolled in the grass. Paul wanted to drive Kenny to the hospital, but Phyllis' friend was there—a nurse—and she would not let him. She covered Kenny with a blanket and said not to give him any liquids. Kenny was in and out of it, mumbling, making no sense. Kenny was in ICU in Sparks Medical Center in Fort Smith for 11 days.

After Kenny and his wife divorced, he moved back home, next door to Mom and built a little shack. I visited it once when Kenny was constructing it. Kenny was showing me how he was building it. I was intrigued even though I have an inherent belief in quality. The shack was almost Waldenish in its own way. Kenny lived life with great determination; he got it down to the essential stuff.

While I benefitted from coming along later in mother's life when she was surrounded by family, I still had to overcome considerable problems. I had a rough go from ages 17 to 19. I was involved with drugs, including crank, marijuana and psilocybin. I had a job at the local racetrack and had been using crank for several

5

consecutive days when I overdosed and was hospitalized at Sallisaw General for two days. It was the turning point in my life.

My grandfather Hugh Dotson let me borrow his beat up car in which I could see the road through the floor and I went to the old Liberty Grade School that was by then an adult school, a general educational college of sorts, where I studied algebra. Right after that I moved away from Sallisaw in an attempt to escape the constant family drama. I moved in with my dad and his wife, Doris, and worked at Kerr Glass, where my father worked. They provided stability at that point in my life. Education was a lifesaver for me. I went to Tulsa Junior College for 18 months, while still living with my father. Ernie paid my tuition, which was about $1100 a year. I went on to Oklahoma University where I received a B.A. and a Masters in Education, majoring in physical sciences.

I have a career in education that has allowed me to help youngsters like Kenny who have multiple impediments to learning. I have taught chemistry, physics, and physical science and have coached football. I also have served as a sergeant in the National Guard for 11 years but had to withdraw when it interfered significantly with my coaching responsibilities. As an NCO I was randomly drug tested, which was a deterrent to using drugs. I am currently a principal in a junior high school, where I routinely see students in all stages of crises, many from stressful homes with alcoholic, mentally ill, and abusive parents. In our district, we consider these children emotionally disturbed (E.D.), which is a catchall phrase for distressed students who may develop prolonged or chronic mental illness the way Kenny did. We take care not to label students unless they have prolonged or chronic mental issues. I see such a parallel with some of my students and Kenny. They are students from low socio-economic backgrounds in high stress

6

get it before the jury for their consideration.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 8-page declaration is true and correct. Executed by me this 5th day of March, 2009, in

Cleveland County, Oklahoma.

Steve Barrett

8