**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**EXHIBIT 100**

_____

## DECLARATION OF WARREN DOTSON

I, Warren Dotson, declare as follows:

I am Hugh Dotson's youngest brother, which makes me Gelene Dotson's uncle and Kenneth Barrett's maternal great uncle. An investigator for Kenny asked me to tell him about myself and the family. He wrote this declaration of what I told him. I have read it carefully and it says what I told the investigator during our meeting.

I am an ordained evangelical minister in the First Baptist Church in Kellyville, but I do not believe in denominations. I was saved when I was 34 years old.

I live with my daughter Nona in Kellyville, Oklahoma, about 25 miles outside of Tulsa, in a house my wife and moved into in 1965. Another daughter, Linda Rogers, lives several miles away. Linda is my only daughter to have married just once. She married Rodger Dan Rogers. The family refers to him as "Rodger Dan the Mountain Man," because" Dan is something of a recluse who likes to hunt and trap. My family is very fond of Dan. Nona has been married five times, but is single now, and after my wife died two years ago, Nona moved in with me. I have four daughters, who are all good women, but too often pick the wrong men to marry.

I have been married twice. My first marriage was to Lela Warren whose father was a U.S. Marshall. The Dotsons and Morgans are mentioned in a book, "The Outlaws of Cooks and Hill." Lela divorced me around 1939 or 1940, when I

-1-

sheriff had come to the house looking for stolen bridles, that Dad knew nothing about them and none was found. Dad later found them hidden in his barn and turned them in to the Feds. Mama always thought he was killed over the bridles and that he knew more about those bridles than he told.

Dad's death left Mama with six children to raise alone. She gave four of them to Dwight Mission School to raise: Hugh, Elnora who later married Gene Masterson, John E. who later married Jackie Morgan, and then Christine who married Carl Cook. Mama kept me and my sister Lela, but she was not able to keep us long. I was only four years old and Lela was two. Mama had to give me to her sister, Francis Stites who was married to Andrew Payne. They lived in Muskogee. When I was fourteen, I went out on my own. Lela was first given to welfare people and then to Uncle George Dotson, my dad's brother who was married to Nancy Kennedy. Lela was married at 15 to Jack Combs and then later to Thomas McClendon.

I was never mad at my mother. What choice did she have? If I had to forgive her, that would be a wrong way of thinking. It hurts to lose your family. I remember crying when I saw her so many years later because she was a stranger.

I have worked my whole life. I was a welder and a factory repairman and learned never to stay at a job for more than a few years. If I found a company that would pay me more, I went there. If management insulted me, I would move on even if it was for less money. I worked as a helper for four years in Muskogee

-3-

for seventy-five cents an hour. I then hired on as an acetylene welder and later worked welding gas and steam lines. I also have done heavy maintenance work that involved welding. I went where I could make better—nobody paid overtime.

My brother Hugh was a shy man who liked to hunt and fish. I was at Hugh's bedside when he died. Hugh worked all his life so he could buy land and have something to leave to his children. They live on land he left them.

Kenny, Hugh's grandson, lived out there on Hugh's land. Kenny was a good worker, too, and was never disrespectful. My daughters took care of him after he got out of the mental hospital.

The law did not have to go to Kenny's place in the middle of the night to arrest him. Our people live all around Kenny's place and know that he was not dangerous. It breaks my heart what happened out there that night.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this ___6___ day of March 2009, in ___Creek___ County, Oklahoma.

*Warren Dotson*

Warren Dotson

–4–

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 101**

## DECLARATION OF NONA REICH

I, Nona Reich, declare as follows:

I am Kenneth Barrett's maternal second cousin. My father, Warren Dotson, and Kenny's maternal grandfather, Hugh Dotson, were brothers. Kenny's mother, Gelene Dotson, is my paternal aunt.

Marriages are easy to get into; they can get you a lot screwed up and they are hard to straighten out. I have been married five times, some more successful than others, but probably my best marriage was to my second husband. I first married when I was only 16. I divorced two years later because my husband did not want children. I had my only two children, both sons, with my second husband, and we were married for 13 years. My youngest son, Marty, has had a difficult time with life and spent 11 years in prison for crimes related to methamphetamine. He has been out of prison two years but life as an ex convict is hard. I was married to my third husband seven years. My fourth husband was in the penitentiary when I married him in 1988; he was an alcoholic. Our marriage lasted two years. My fifth marriage lasted seven years. I have been single since 1999. When the preacher's wife wanted to introduce me to a man recently, I told her I was not interested. I must have stupid written across my forehead. Even if a man had "God sent me to you" tattooed on his forehead, I would question it. My greatest regret is not staying with my second husband and making our marriage work.

Gelene and Ernie had a terrible marriage and she got no affection from him. Gelene was hard on Kenny. Something about him reminded her of Ernie and she took it

–1–

NR

said, "See how beautiful that is." He agreed but asked me "Why can't we see God?" I tried to explain to him that the Bible says that if we worship God in spirit that we will see His truth. I explained God was just like the wind. We can see the leaves blowing in the wind but we cannot see the wind. God is the same thing as the wind in those leaves. Kenny told me that no one had ever explained it that way to him before, in a way that he could understand it. He thanked me.

I feel bad about what has happened. I have beaten myself up a hundred thousand times for letting Kenny down at a time when he was asking for help, wondering what I could have done, knowing that I should have done more. My only excuse is that my mother was dying at the time. I feel like the whole family failed him. I know I have. I feel it in my heart. I really do love Kenny. The pity of all this is I know Kenny and he was not a violent person, troubled but not violent.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct.

Executed by me this ___5___ day of March 2009, in ___Creek___ County, Oklahoma.

Nona Reich

Nona Reich

-3-

NR

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| **v.** ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| ) | |
| **KENNETH EUGENE BARRETT,** ) | |
| ) | |
| *Defendant.* ) | |

**EXHIBIT 102**

## Declaration of Carl Cook

I, Carl Cook, declare the following:

I married into the Dotson family on December 31, 1939, when Christine Dotson became my bride. We were married 61 years before her death March 31, 2001. Christine was Hugh Dotson's sister, and Hugh was Gelene Dotson's father, so that makes me Gelene Dotson's uncle and Kenny Barrett's great uncle. Through the years, I learned the Dotson family history.

The Dotson family history was passed down through the generations orally. I was naturally interested in history so I paid attention to it. I am telling it now because an investigator who is working for the attorneys on Kenneth Barrett's behalf asked me to tell what I knew of the family history. I should start with something of my own history, however, as it explains how I came to meet and marry Christine.

I was born on October 8, 1918 in Sequoyah County, Oklahoma. My mother was a Latimer, and my father was a Cook. One of my mother's ancestors was a colonel in the Revolutionary War. Some of her family fought for the Confederacy in the Civil War. After the Civil War, they were allotted land. My father, Lewis Cook, died in 1928. He was gassed in World War I, got TB and went to Arizona to recuperate where he died. I followed the military tradition of my family and served in World War II. I fought under General Patton in Czechoslovakia and liberated several concentration camps. The most horrible thing I ever saw was a flat car piled high with dead bodies. I was saved by Jesus in Le Havre, France, during the war, and credit Jesus with my long life. I do not look down on people who are not saved but I cannot help but feel sorry for those who have not found salvation.

1

The Dotson family history also goes back to the Civil War. The Dotsons moved from North Carolina to Arkansas, south of Huntsville, in 1835. Their old grandma at that time claimed to have been a friend of Davey Crockett's. They loaned the town, now Huntsville, the money to incorporate. According to family lore, the Dotsons were moneyed slaveholders. The head of the Dotson clan and his two sons fought for the Confederacy, leaving the youngest boy at home with his mother. Towards the end of the war, a gang of scalawags showed up at the Dotsons to rob the defenseless woman. She had buried the family savings but told the scalawags she was penniless. They hung her two different times, but still she denied having any money. Then they drug her behind a horse through the creek and her son begged her to tell them where the money was hidden. She relented and they took the entire Dotson fortune.

The Dotsons came to Oklahoma in 1900—I imagine they were poor. They moved to Marble City. It was wild territory back then, "still Indian." The area was riddled with bank robbers and it was a profession many took to. Even I had an uncle who did 10 years for bank robbery—Monroe Cook, from Muldrow. The Dotsons were tenant farmers. Christine and Hugh's dad, Abe, was killed in 1925. He was shot by a man in a fight over a woman they both Minnie seeing even though both of the men were married.

Abe's wife, Minnie, could not raise her six children alone. There was no welfare back then. Minnie put four of her children, including Hugh and Christine, in the Dwight Mission School, a Presbyterian School established by missionaries in 1820 in Indian Territory. I think the school went up to the eighth grade. People at the school told Minnie not to visit her children once she left them at the Mission because it would make them want to come home. The four children were Hugh, Christine, John E. and Eleanor.

2

Mattie kept the other two children: Warren and a girl. Minnie never came around to the school. It turned the children against Minnie because they felt in the back of their minds that Mattie deserted them.

Eventually all the siblings connected up. I liked all of them. John E was an alcoholic, and Hugh drank quite a bit when he was young. Hugh raised his four kids; one of them, Gelene, is Kenny's mother. They were dirt poor and had to work in the fields all the way out to California and back. Hugh had a fairly close family, and we visited quite a bit. Hugh loved to tease and so did I. We got along good. You could depend on what he said. He told the truth, quite an attribute; now you don't know what people are thinking.

When Hugh first brought his family back, they bought a farm as I recall, but the farm didn't support the family. Hugh had some cattle like everybody did. People farmed everywhere then. Most of it was arable, even the mountains. Someone told me that it was a fact that there was more corn raised in Sequoyah County in 1920 than in any county in the United States, although I have never checked it out. Hugh was forced by finances to get a job as a laborer in a creosote plant in Sallisaw. He kept that job until they closed the plant in the early 1990s.

I think what got Kenny, what affected him more than anything, was their mother. I don't think Gelene knew how to raise a child. And as far as I know, Ernie wasn't a father. I blame him for a lot of it. I know Gelene was a drinker. It is hard on children not to have a father, but when their mother is a drinker too, it takes a toll on them.

After I told the investigator working on Kenny's case about my family, he came back to me with this declaration. I have read this declaration over carefully and it says what I told the investigator during our meetings. I would have testified to these things in

Kenny's trial if anyone had asked me to,

I declare, under penalty of perjury, that this 4-page declaration is true and

correct.

Executed by me this __7__ day of March 2009, in _Sequoyah_

County, Oklahoma.

_Carl Cook_

**Carl Cook**

4

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 103**

### DECLARATION OF ABBY STITES

I, Abby Stites, declare the following:

I was nine days short of 16 when I married Kenneth Barrett and was two months pregnant with my only child, Toby. Kenny was only 18 and married me because he felt sorry for me. My father did not speak to me throughout my pregnancy. I was one of ten, seven girls and three boys. My mom had her first baby when she was sixteen, so there was not much my mother could say.

Gelene was not a good mother to Kenny; when she wasn't working, she was partying. Kenny and I stayed with Gelene after Toby was born. I had my new baby, and Gelene brought in people from work and everyone was partying with crack and pot. Gelene made Kenny get up from bed and party with them. She was always bringing men home when the children were still living with her. Stevie was still a child. She wasn't there for her kids. She was always running around. She didn't know what her kids were doing.

Gelene was always cussing Kenny and had a terrible relationship with him. I never saw Gelene treat her other sons the way she treated Kenny. Gelene had a good side to her, even if she did not show it to Kenny much. She did not have to take me in when I was pregnant. It was just that her morals and mine were different.

Ernie, Kenny's father, was not much of a father or husband, either. He gave Kenny things and then took them back. Ernie was always running around. After the divorce, Ernie would come by the children's house to show off his new Corvette and the kids did not even have shoes, several family members told me. Ernie was for Ernie. I



think he paid Gelene some child support for all three kids but he made a lot of money. He was a big deal in the glass company where he worked.

I learned in my marriage to Kenny that Kenny had mental problems. He would do bad things and then have remorse. He did things on impulse and then regretted them. During one of his remorseful periods, I convinced him to go to Willis mental health facility in Sallisaw, and Mike Fry had him picked up by the sheriff and taken to Eastern State Hospital in Vinita, Oklahoma, an inpatient facility. They could have kept him a month and it might have done him some good, but Gelene came and got him out after two weeks when Kenny asked her to.

Kenny was like a manic depressive, hot one minute and depressed and even immobile the next. He would work hard and then sleep all the time. I don't know if he was doing drugs then, but I think he did the drugs to make himself feel better, because otherwise he would just sleep. Kenny did not act the way normal people act. Kenny took good care of his own stuff, but then he would destroy it too when he just got swept away in his emotions. He went out with other women and then came home, expecting me to forgive him. Kenny would hit me, and I hit back.

I always thought he was mentally ill. The whole 14 years we were together, I was always trying to help Kenny. I felt like we were more like brother-sister than wife and husband because I was always bailing him out of trouble and taking care of him. He was never able to take care of me. I spent 14 years trying to keep up with his mood swings. There were times he could be good, but every time I got a new car he would tear it up; every time I got new furniture he would tear it up. He would get very upset over any little



thing, but then he would try so hard to be good. He would mow the lawn and take care of things and fix things and it would last for two months. Then he would start running around with women and be gone for two months.

I got the stay-away orders, not to just keep him from trying to come back, but to keep me from going back. He would come back crying, begging me to take him back, so remorseful. He could be good as he could be—he would go the extra mile, trim the tree if it meant my taking him back, but he could not keep it up. This was from the beginning of our marriage. He came home one time and accused me of having an affair with somebody I worked with, and cracked my nose and left bruises on me. I had to call the police and go to the emergency room. Kenny came back, crying, very sincere, and could not believe he had done all that. He went out of his way to make up, to be good-hearted. I knew he had mental issues.

He was always doing crazy things on motorcycles. He never wore a helmet. Once when Toby was about eighteen-months-old we were living in Elk City, Oklahoma, where Kenny worked oilrigs. I was watching him dirt biking in a field and he didn't see the barbed-wire fence. He went smack over it and landed on his head, He was unconscious for a while. It really scared me. He had a bunch of cuts and scratches, too.

Kenny was a hard worker but it would not last long. He would get real depressed and sleep all the time. He smoked a lot of pot, but without it he never got motivated. He turned to drugs to make himself feel better.

I was the only stable thing he ever had in his life. I kept him together. Without me, he could not function. I did not care for his drugs when he started into that, but I

Page 3 of 4



tried to keep him from falling off the deep end. Kenny needed more than I could give. I have two sisters like Kenny; that's why I tried to help him.

Mr. Hilfiger and Mr. Smith were interested in my stay-away orders and in my marriage, but not in the underlying issues of Kenny's mental health, at least not from anything they ever talked to me about. They did not ask me anything about his family history either. Even though I wasn't happy about testifying at the trial, I did, and I would have testified about the things in this declaration if they had asked me about it.

I recently gave this information to a man who told me he was an investigator working on Kenny's case. I did not write the declaration myself. When the investigator came back and asked me if I would provide this declaration for Kenny's case, I read it carefully. It says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this ___9___ day of March 2009, in ___Seq.___ County, Arkansas.

_Abby Stites_

Abby Stites



**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 104**

## Declaration of Richard Barrett

I, Richard (Richie) Barrett, declare the following:

Kenneth (Kenny) Barrett is my older brother by a few days short of three years.

An investigator who told me that he works for lawyers representing Kenny recently asked me if I had seen my brother and Cindy Crawford in any kind of altercation. Cindy Crawford is married to our cousin Travis Crawford.

I told the investigator that I had once seen Kenny dress Cindy down. Cindy was sitting in a car at the time on my brother's property and Kenny was standing next to it. I heard him say something like, "Who the fuck do you think you are?"

The investigator then asked me if anything else took place. I had no idea what he was getting at. Then he asked me if I ever saw my brother point a gun, a shotgun or any weapon at Cindy Crawford.

I told him that I never saw my brother point any kind of weapon at her.

He then asked me if I had ever seen Kenny put a gun, shotgun or any weapon against her leg. I told him that I had never seen anything like that, that I had never seen Kenny put a gun, shotgun or anyway weapon against her leg or any part of her body, and that anybody who said that I saw that is a flat out liar.

The investigator who asked me these questions asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed by me this _____ day of March, 2009, in _____ County, Oklahoma.

_____
Richard Barrett

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 105**

## Declaration of Doris Barrett

I, Doris Barrett, declare the following:

I am married to Ernie Barrett, Kenneth Eugene Barrett's father. I was married to Ernie Barrett before and at the time of Kenny's state trials in Sequoyah County, and during his federal trial in the Eastern District of Oklahoma. I followed Kenny's case closely, in both state and federal court. I went to every hearing and every day of both state trials and the federal trial, except I missed just one state hearing that was held in Stilwell.

In Kenny's federal trial, I noticed a bulge around Kenny's waist. It was there every day. I asked Kenny's lawyer what it was. He told me it was a shock belt, there to shock Kenny if he tried to escape or hurt someone. If it was obvious to me, it must have been obvious to others.

Kenny wore nothing like that in the state trials.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself, but I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 1-page declaration is true and correct.

Executed by me this 5th day of March 2009, in _Cherokee_ County, Oklahoma.

_Doris Barrett_

Doris Barrett

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 106**

---

# Sequoyah County Democrat

SEQUOYAH COUNTY DEMOCRAT VOL. XIX. NO. 28    SALLISAW, OKLAHOMA, JULY 10, 1925.    STAR-GAZETTE, VOL. 31, NO. 28

## THE OFFICIAL COUNTY PAPER—THE PAPER THAT IS READ

# SEQUOYAH COUNTY LEADS AT TAHLEQUAH NORMAL

## Enrollment Records Show This County Far Ahead

## Abe Dotson, Well Known Marble City Farmer, Shot to Death

### Killed at Home of John Wallace, a Near Neighbor

*(The dense body columns of this newspaper page are substantially illegible at this resolution; the headlines and masthead above represent the clearly legible content.)*

KEB401082

# The Vian American

VOLUME I                    VIAN, SEQUOYAH COUNTY, OKLAHOMA, JULY 10, 1928.                    NUMBER 3

## OB TOWRY KILLED BY TRUCK

### River Falls to Observe Crossing Stop Law and Throws Five Men Off.

The entire community was shocked and grieved last Friday morning when the news was wired from Sand Springs that R. L. Towry, brother of N. H. Towry of this city had been thrown from a truck and instantly killed while going to work that morning.

Mr. Towry with six other men were on a truck going out to work and in attempting to make a railroad crossing on a sharp curve, going at high speed, the driver failed to obey the crossing stop law and as the crossing was a rough one, the truck was partly overturned to the extent that five of the men were thrown off. Mr. Towry struck the rail or a tie in such a manner as to crush the skull, from which he died instantly. One other occupant suffered a broken leg and the other three men escaped with slight bruises.

The driver of the truck, whose name we failed to get, was arrested immediately after the accident on a charge of man-slaughter and was confined in the Tulsa jail.

Mr. and Mrs. E. S. Towry of Sallisaw, accompanied by D. E. Towry of Stilwell and H. N. Towry of Vian, left immediately upon receipt of the tragic news, going by auto to Sand Springs, where funeral services were held and the body interred in the home cemetery on Saturday, July 4th.

The deceased was 51 years of age and was well known to a large number of our citizens, having resided and engaged in business here several years ago, and established here, as well as at other places where he has lived, a reputation for honesty, reliability and good citizenship. He is the first death among the children of his family, and leaves to mourn his death the mother, Mrs. O. C. Towry and five brothers and three sisters, viz: Brothers— J. J. and D. O. Towry of Stilwell, J. W. Towry of Sulphur, H. N. Towry of Vian and E. S. Towry of Sallisaw. Sisters— Mrs. J. R. Plunkett of Charleston, Arkansas, Mrs. Ed Craven of Scranton, Arkansas and Mrs. Jas. Stephens of Okmulgee, Oklahoma.

The American wishes to join the many friends of this estimable family in their expressions of sympathy.

George McCoy of Muskogee was in town Wednesday of this week looking after business matters.

## ACCIDENT AT GANS WELL

Monday morning about eleven o'clock the boys working at test well Gans, Gans let the bit wheel get away which cut off same to explode and tear down the rig, destroy several hundred feet of the cable and tore up many parts of the machinery.

Three who were at the scene at the time say it was wonder that no one was hurt.

The rig fell to the ground and was practically demolished.

Contractor Robert Dooley has already begun the erection of the rig and will be back at work in record time we understand.

## CHEERS FOR H. B. 4

The Tulsa World rejoices that the referendum on H. B. No. 4 lost.

The opinion of the attorney-general that presidential electors are state officials puts an end to the demagogic attempt to refer H. B. 4 to a vote of the people. If it had been so referred, even a reasonable campaign of education would have resulted in the overwhelming adoption for the late legislature enacted no more constructive beneficial law. Factional politics and demagogic pretense done bottomed the attempt to make of that law something injurious to the public and its interests.

It may be the matter will yet go to represent the state in the electoral college which exists for the purpose of electing a chief executive of the nation composed of various states. And very specifically the constitution provides for the election of a chief executive by the states and not by the people directly.

As a matter of absolute fact, there are but two elective officials in the entire scheme of government that are not state officials. These are the president and vice-president. The remainder of elected officials are state officers, selected by the states for the purpose of constituting the proper state representation in the conduct of the federal government.

## FISHING ON THE ILLINOIS

C. M. Gay, George Barker and Chas. O. Frye spent the 4th on the Illinois river fishing.

By special arrangements they met a party from Tulsa composed of county and district officers of that place and Messrs. Gay and Barker furnished the fish for the crowd. Sunday, Messrs. Gay and Barker joined a Vian crowd and had a great fish fry which was enjoyed by all.

## ABE DOTSON KILLED
### BY HENRY EDWARDS

#### Home of John Wallace Scene of Tragedy Wednesday Morning

A wire was received at the sheriff's office Wednesday morning calling Sheriff John E. Johnston to Marble City with the information that Henry Edwards had shot and killed Abe Dotson, both of that place.

Within an hour Sheriff Johnston and County Attorney Pitchford were at the home of John Wallace, the scene of the killing, which had occurred about 9:00 o'clock, and Edwards was placed under arrest.

The full details of the tragedy could not be ascertained at the time we go to press with this issue more than that Edwards had fired two loads of "B. B." shot into Dotson using a double-barrel shotgun, one load entering the body through the right shoulder and the other going into the head and the left ear.

It seems that Ben Crawford, deputy sheriff at Marble City was within 300 yards of the Wallace home at the time of the shooting and met Edwards and another boy coming that way, but did not know of the tragedy until he arrived at the Wallace gate where he found Dotson dying.

Dotson was forty-five years of age and is survived by his wife and five children. His body was removed to his home, about four miles northwest of this city.

Edwards was taken to Sallisaw and lodged in the county jail to await preliminary.

## MARKETING EXPERT VISITS SEQUOYAH COUNTY

On Wednesday of this week J. Robt. Wiley of the Chamber of Commerce of Tulsa county and who is employed by this body to assist in the marketing of eggs from the Eastern Oklahoma counties and who is an expert along this line, spent the day here working with our county agent in explaining the plan of marketing the eggs, and while here put on some demonstrations in this work with some of our poultry men of the county, explaining to them the methods employed by the government in classing and grading eggs and under which eggs are being marketed at this time.

For some time Oklahoma eggs have been penalized by being dumped on the Eastern market on account of not being properly classed and graded, by which this state, being one of the leading states in poultry production has lost and is losing at this time, millions of dollars each year on this account.

Mr. Wiley explained, while putting on the demonstration that the government grades of eggs were all made in three classes as follows: Extras, Standards and Trades, with the following qualifications that is required under each grade.

Extras must weigh at least 24 ounces to the dozen, be fresh, clean strong and infertile. Standards— Clear, strong, fresh, can be fertile if properly handled and must be uniform. Trades—includes culls, must be fresh, dark yolks, cracks can go in this class if not leaking, and must not show any sign of blood rings or clots.

While in the county, Mr. Wiley stressed the importance of pushing the work of exalting the rooster campaign, which has been started in this and other parts of the state so that more infertile eggs can be produced. The demand is such for this high class of eggs that is impossible, at this time, to get the supply of eggs to fill the demand, which is coming in at this time, for eggs of this class.

While in Sallisaw, the egg market was investigated, and found that some of the produce men were still

## take until they take advantage of this opportunity being afforded them in this egg marketing deal.

While here Mr. Wiley was well pleased with the poultry development he found, on his short stay in the county, and assured our County Agent he would be glad to return to this county and assist him in developing the poultry, as it should be, not only from a quality and production standpoint, but go into the marketing game and assist in the sale of eggs and poultry so that this line of farming can be placed on a more profitable basis here.

## TWO DAYS' OUTING

A two days' outing on the Illinois river was enjoyed July 4th and 5th by several families of Vian consisting of A. D. Benher and family, Ed Whiteside and family, W. P. Davis and wife, Irwin Lay and family, Gould Moore and family, C. C. Howard and family, S. A. Fee and family and were later joined by R. W. Armstrong and family, W. T. Wilson and family.

Everyone had a most wonderful time both days, the light showers of rain not affecting the pleasure of the trip any bit and the few mosquito bites helped each one to realize they were out on the river in a camp and get at home in a comfortable bed.

Sunday morning several of the party decided they would return home for Sunday School, but as the time drew near some one suggested that they held Sunday School on the creek, which they did with everyone taking part.

Some of the more thoughtful took with them their Sunday School quarterlies and in one big class the lesson for the day was read and studied by all.

C. M. Gay and George Barker furnished the fish for a great fish fry which was held at the noon hour Sunday with about ten visitors from Tulsa joining in with the Vian party.

## O. G. & E. APPLIES FOR REDUCTION IN POWER RATE

### Household Appliances Would Be Installed Where New Tate Would Be Effective

Oklahoma City, July 3.—Application for permission to apply a reduced rate on current for electrical heating and power appliances was filed today with the state corporation commission by the Oklahoma Gas & Electric company. The new rate affects sixty-two Oklahoma towns, and if granted would become effective as of July 1.

The application was filed with B. P. Stockwell, gas and electric engineer for the commission. Stockwell said he would submit it with his recommendations to the commission within the next few days.

The rate would be 3.15 cents net per kilowatt hour for all current over eight kilowatts used in a household during a month, according to the application. While the primary rate for the first four kilowatts in a month varies in the different towns it averages about ten cents a kilowatt.

A charge of 7.2 cents per kilowatt would be made for the next four kilowatts used and the flat rate of 3.15 cents would apply for all additional current.

Current for all household purposes would be supplied through one meter instead of the rate would be allowed in both cases in which appliance using a capacity of at least three kilowatt hours per month have been installed. Electric refrigerating machines, range water heaters and all motor driven appliances of less than one horsepower are included in this classification. Stockwell

Ed Lee of near Gore was in Sallisaw Monday of this week where he was looking after this interest of a road which he and his neighbors want made a state highway. Ed is a very public spirited man.

## REAGER FRYE MOTOR COMPANY, NEW FIRM AT SALLISAW, OKLA.

We wish to call the attention of readers of the American to an announcement advertisement of Reager-Frye Motor Company of Sallisaw. This new firm succeeds Max Reager as authorized dealers of Ford products in Sallisaw. The new firm will rebuild the interior of the present plant, enlarging the floor space and add additional equipment to the garage department, that will equal any Ford agency in cities the size of Sallisaw. The owners of the plant at Sallisaw are well known to Vian people. Chas. O. Frye, the new member was formerly active head of the Sequoyah County Democrat, a newspaper at Sallisaw, during the past ten years. He is a splendid business man and will have charge of the plant, while Mr. Reager will head the sales and service department. He is considered one of the best automobile dealers in Oklahoma and is one of the oldest dealers in point of service in the state, having been the Ford dealer at Sallisaw during the past fifteen years.

## TAKES OATH OF OFFICE

Monday of this week was a very busy day at the county seat because some changes were made in the county officials on that date. Those that were elected at the last general election on last November and had not taken their oath of office did so on that date. Those who took their places as officers to act for the welfare of all concerned were:

County Superintendent—Fred Merchan.

Commissioners—Bud Horn, District No. 1, A. Taylor, District No. 3, and ford, District No. 1.

An interesting little fact, there is always a later condition of parking space about several miles from the place you intend to stop.

---

## Our Motto:
# "Safety First"
# Men and Money
## Make This Bank Secure

There are two ways of measuring the strength and standing of a bank. In the first place money resources—capital and surplus—give it financial strength.

In the second place—and perhaps even more important—are the men, the officers and directors. They give the bank character, determine and execute its policies.

This is a strong bank, a helpful bank because

---



## RIDE 'IM, COWBOY

An animated tornado on four legs, 1,200 pounds of living dynamite is the "outlaw" bronk, whose will provide the chief thrills of the Chicago Roundup and World's Championship Rodeo, to be held for nine days, beginning August 18. Wild and daring cowboys, risking painful injury—such is the buckaroo, standard type of the men who will fight it out with the "bad" horses in the Chicago Contests.

Broncho busting calls forth all the courage that is mobilized in the western ranges and a great part of the $50,000 in prizes appropriated by the Chicago Association of Commerce, under whose auspices the rodeo will be presented, will go to the men who will fight to stay for a few seconds on the hurricane decks of the "sunfishing," "skyscraping," squealing, kicking broncs. When the courage of the buckaroo clashes with the fighting spirit of the

# The Vian American

VOLUME I                    VIAN, SEQUOYAH COUNTY, OKLAHOMA, JULY 10, 1923.                    NUMBER 3

## OB TOWRY KILLED BY TRUCK

Driver Fails to Observe Crossing Stop Law and Throws Five Men Off.

The entire community was shocked and grieved last Friday morning when the news was wired from Sun springs that R. L. Towry, brother of N. H. Towry of this city had been thrown from a truck and instantly killed while going to work that morning.

Mr. Towry with six other men were on a truck going out to work and in attempting to make a railroad crossing on a sharp curve, going at high speed, the driver failed to obey the crossing stop law and as the crossing was a rough one, the truck was partly overturned to the extent that five of the men were thrown off. Mr. Towry struck the rail or a tie in such a manner as to crush the skull, from which he died instantly. One other occupant suffered a broken leg and the other three men escaped with slight bruises.

The driver of the truck, whose name we failed to get, was arrested immediately after the accident on a charge of manslaughter and was confined in the Tulsa jail.

Mr. and Mrs. E. S. Towry of Sallisaw, accompanied by D. E. Towry of Stilwell and H. N. Towry of Vian, left immediately upon receipt of the tragic news, goin to the data to Sand Springs, where for a real while with and the body interred in the city cemetery on Saturday, July 4th.

The deceased was 51 years of age and was well known to a large number of our citizens, having resided and engaged in business here several years ago, had established here, as well as at other places where he has lived, a reputation for honesty, reliability and good citizenship. He is the first death among the children of his family, and leaves to mourn his death the mother, Mrs. G. C. Towry and five brothers and three sisters, viz: Brothers—J. J. and D. E. Towry of Stilwell, J. W. Towry of Sulphur, H. N. Towry of Vian and E. S. Towry of Sallisaw. Sisters—Mrs. J. R. Plunkett of Charleston, Arkansas; Mrs. Ed Cravens of Scranton, Arkansas and Mrs. Jno Stephens of Okmulgee, Oklahoma.

The American wishes to join the many friends of this estimable family in their expressions of sympathy.

George McCoy of Muskogee was in town Wednesday of this week looking after business matters.

## ACCIDENT AT GANS WELL

Monday morning about eleven o'clock two boys working at test well at Gans got the bus wheel got away which caused same to explode and tear down the rig, destroy several hundred feet of the cable and tear up many parts of the machinery.

Those who were at the scene at the time say it was wonder that no one was hurt.

The rig fell to the ground and was practically demolished.

Contractor Robert Dooley has already begun the erection of the rig and will be back at work in second time we understand.

## CHEERS FOR H. B. 4

The Tulsa World rejoices that the referendum on H. B. No. 4 lost.

The opinion of the attorney-general that presidential electors are state officials puts an end to the demagogic attempt to refer H. B. 4 to a vote of the people. If it had been referred, even a reasonable campaign of education would have resulted in its overwhelming adoption for the better legislature enacted no more constructive beneficial law. Factional politics and shenanigans predicate some bottomed the attempt to make of that law something in favor of the public and its interests.

It may be the matter will come to remove the data in the state college, which exists for the purpose of electing a chief executive of the union composed of various states. And very specifically the constitution provides for the election of a chief executive by the states and not by the people directly.

As a matter of absolute fact, there are but two elective officials in the entire scheme of government that are not state officials. These are the president and vice-president. The remainder of elected officials are state officers, selected by the states for the purpose of constituting the proper state representation in the conduct of the federal government.

## FISHING ON THE ILLINOIS

C. M. Gay, George Barker and Chas. O. Frye spent the 4th on the Illinois river fishing.

By special arrangements they met a party from Tulsa composed of county and district officers of that place and Messrs. Gay and Barker furnished the fish for the crowd.

Sunday, Messrs. Gay and Barker joined a Vian crowd and had a great fish fry which was enjoyed by all.

## AGE DOTSON KILLED BY HENRY EDWARDS

Home of John Wallace Scene of Tragedy Wednesday Morning

A wire was received at the sheriff's office Wednesday morning calling Sheriff John E. Johnston to Marble City with the information that Henry Edwards had shot and killed Abe Dotson, both of that place.

Within an hour Sheriff Johnston and County Attorney Pitchford were at the home of John Wallace, the scene of the killing, which had occurred about 9:00 o'clock, and Edwards was placed under arrest.

The full details of the tragedy could not be ascertained at the time we go to press with this issue more than that Edwards had fired two loads of "B. B." shot into Dotson using a double-barrel shotgun, one load entering the body through the right shoulder and the other going into the head and the left ear.

It seems that Ben Crawford, deputy sheriff at Marble City was within 300 yards of the Wallace home at the time of the shooting and met Edwards and another boy coming that way, but did not know of the tragedy until he arrived at the Wallace gate where he found Dotson dying.

Dotson was forty-five years of age and is survived by his wife and five children. His body was removed about four miles southwest of this city.

Edwards was taken to Sallisaw and lodged in the county jail to await preliminary.

## MARKETING EXPERT VISITS SEQUOYAH COUNTY

On Wednesday of this week J. Robt. Wiley of the Chamber of Commerce of Tulsa county and who is employed by this body to assist in the marketing of eggs from the Eastern Oklahoma counties and who is an expert along this line, spent the day here working with our county agent in explaining the plan of marketing the eggs, and while here put on some demonstrations in this work with some of our poultry men of the county, explaining to them the methods employed by the government in classing and grading eggs and under which eggs are being marketed at this time.

For some time Oklahoma egg have been penalized by being dumped on the Eastern market on account of not being properly classed and graded, by which this state, being one of the leading states in poultry production has lost and is losing at this time, millions of dollars each year on this account.

Mr. Wiley explained, while putting on the demonstration that the government grades of eggs were divided into three classes as follows: Extras, Standards and Trades, with the following qualifications that is required under each grade.

Extras must weigh at least 24 ounces to the dozen; be fresh, clean strong and infertile. Standards—Clear, strong, fresh, can be fertile if properly handled and must be uniform. Trades—includes culls, must be fresh, dark yolks, cracks can go in this class if not leaking, and must not show any signs of blood rings or clots.

While in the county, Mr. Wiley stressed the importance of pushing the work of swatting the rooster campaign, which has been started in this and other parts of the state so that more infertile eggs can be produced. The demand is such for this high class of eggs that is impossible, at this time, to get the supply of eggs to fill the demand which is coming in at this time, for eggs of this class.

While in Sallisaw, the egg market was investigated, and found that some of the produce men were out of the egg market on account of not

## Fake until they take advantage of this opportunity being afforded them in this egg marketing deal.

While here Mr. Wiley was well pleased with the poultry development he found, on his short stay in the county, and assured our County Agent he would be glad to return to this county and assist him in developing the poultry, as it should be, not only from a quality and production standpoint, but go into the marketing game and assist in the sale of eggs and poultry so that this line of farming can be placed on a more profitable basis here.

## TWO DAYS' OUTING

A two days' outing on the Illinois river was enjoyed July 4th and 5th by several families of Vian consisting of A. D. Bonher and family, Ed Whiteside and family, W. P. Davis and wife, Irwin Lay and family, Gould Moore and family, C. C. Howard and family, S. A. Foe and family, and were later joined by R. W. Armstrong and family, W. T. Wilson and family.

Everyone had a most wonderful time both days, the light showers of rain not affecting the pleasure of the trip; one bit and the few mosquito bites helped each one to realize they were out on the river in a camp and not at home in a comfortable bed.

Sunday morning several of the party decided they would return home for Sunday School, but as the time drew near some one suggested that they hold Sunday School on the creek, which they did with everyone taking part.

Some of the more thoughtful took with them their Sunday School quarterlies and in one big class the lesson for the day was read and studied by all.

C. M. Gay and George Barker furnished the fish for a great fish fry which was held at the noon hour Sunday with about ten visitors from Tulsa joining in with the Vian party.

## O. G. & E. APPLIES FOR REDUCTION IN POWER RATE

Household Appliances Would Be Installed Where New Tare Would Be Effective

Oklahoma City, July 3.—Application for permission to apply a reduced rate on current for electrical heating and power appliances was filed to day with the state corporation commission by the Oklahoma Gas & Electric company. The new rate affects sixty-two Oklahoma towns, and if granted would become effective as of July 1.

The application was filed with B. P. Stockwell, gas and electric engineer for the commission. Stockwell said he would submit it with his recommendations to the commission within the next few days.

The rate would be 3.15 cents net per kilowatt hour for all current over eight kilowatts used in a household during a month, according to the application. While the primary rate for the first four kilowatts in a month varies in the different towns it averages about ten cents a kilowatt.

A charge of 7.2 cents per kilowatt would be made for the next four kilowatts used and the flat rate of 3.15 cents would apply for all additional current.

Current for all household purposes would be supplied through one meter instead of the two would be allowed in households in which appliances hating a capacity of at least three kilowatt (1½ per month) have been installed. Electric refrigerating machines, range water heaters and all motor driven appliances of less than one horsepower are included in this classification. Stockwell

Ed Lee of near Gore was in Sallisaw Monday of this week where he was looking after the interest of a road which he and his neighbors want made a state highway. Ed is a very public spirited man.

## REAGER FRYE MOTOR COMPANY NEW FIRM AT SALLISAW, OKLA.

We wish to call the attention of readers of the American to announcement advertisement of Reager-Frye Motor Company of Sallisaw. This new firm succeeds Max Reager as authorized dealers of Ford products in Sallisaw. The new firm will rebuild the interior of the present plant, enlarging the floor space and add additional equipment to the garage department, that will equal any Ford agency in cities the size of Sallisaw. The owners of the plant at Sallisaw are well known to Vian people. Chas. O. Frye, the new member was formerly active head of the Sequoyah County Democrat, a newspaper at Sallisaw, during the past ten years. He is a splendid business man and will have charge of the plant, while Mr. Reager will head the sales and service department. He is considered one of the best automobile dealers in Oklahoma and is one of the oldest dealers in point of service in the state, having been the Ford dealer at Sallisaw during the past fifteen years.

## TAKES OATH OF OFFICE

Monday of this week was a very busy day at the county seat because some changes were made in the county officials on that date. Those that were elected at the last general election on last November, and had not taken their oath of office did so on that date. Those who took their places as officers to act for the welfare of all concerned were:
County Superintendent—Fred Morrison.
Commissioners—Bud Horn, District No. 2; A. Taylor, District No. 3; J. A. Stafford, District No. 1.

As a matter of cold fact, there is a large abundance of parking space about seven miles from the place you intend to stop.

---

## Our Motto:

# "Safety First"

## Men and Money

### Make This Bank Secure

There are two ways of measuring the strength and standing of a bank. In the first place money resources—capital and surplus—give it financial strength.

In the second place—and perhaps even more important—are the men, the officers and directors. They give the bank character, determine and execute its policies.

This is a strong bank, a helpful bank because



## RIDE 'IM, COWBOY

(Copyright by N. B. Doubleday)

An animated tornado on four legs, 1,200 pounds of living dynamite—such is the "outlaw" bronk, scores of which will provide the chief thrills of the Chicago Roundup and World's Championship Rodeo, to be held for nine days, beginning August 18. Wild and daring, coolest when facing almost certain injury—such is the buckaroo, standard type of the men who will fight it out with the "bad" horses in the Chicago contests.

Broncho busting calls forth all the courage that is traditional on the western ranges and a great part of the $80,000 in prizes appropriated by the Chicago Association of Commerce, under whose auspices the rodeo will be presented, will go to the men who will fight to stay for a few seconds on the hurricane decks of the "sunfishing," "skyscraping," squealing, fighting cayuses. When the courage of the buckaroo clashes with the lawless spirit of the broncho, the ride is always a sensational finish. Tex Austin, famous broncho...

KEB401084

# ...oyah County Democrat

Published every Friday at Sallisaw, Oklahoma
RAY O. WEEMS, Editor and Publisher



## A Democratic Newspaper

...the postoffice at Vian, Sequoyah county, Oklahoma, under ... 2nd, 1897, as second class matter.
...second class matter, August 21st, 1914, at the postoffice at ...an, under the act of March 3rd, 1897.
...nty ........$1.50    One year out of county ........$2.00

### GUBERNATORIAL POSSIBILITIES

...has one year to elapse before the state primary, talk is ...grocery and in the columns of the state press as to who ...for Governor, and this talk and press comment has brought ...

### CAREFUL DRIVING

...of one of the new laws which became effective last week, ...vehicles must come to a dead stop at railroad crossings tracks.

### WANTS TO ...DAYS 7 P. M.

...erchants of the ...d an agreement ...es to close their ...n Saturdays dur-y and August, fu...n heretofore to ...but during July ...

## CADDIES TOURNAMENT
### AROUSING GREAT INTEREST

A great deal of interest is being aroused by the caddies of the Sallisaw Country Club in their annual tournament now being held at the golf links west of Sallisaw.

### MARBLE CITY CITIZEN DIES

The many friends of the family of John Cole were shocked last Sunday when it became known, that he had been called in death on Saturday, July 4. He had been ill but ten days and many friends did not know that he was seriously ill. He lived about three miles northwest of Marble City, and was one of the most highly respected citizens in that community. He left surviving him a wife, two sons, Londie Cole and Wiley Cole of Marble City, and two daughters, Mrs. Maude Stubbs of Pershing and Mrs. Lizzie Burrow who lives in Arizona.

## WOUNDED PRISONER BELIEVED TO BE FUGITIVE

The belief prevails with Sheriff John E. Johnston and his force of deputies that F. T. Daley who was wounded last week in a gun battle near Gans with Robert Rumell, special agent for the K. C. S. railroad, may be a fugitive from justice.

### BROTHER OF E. S. TOWRY DIES AT SAND SPRINGS

E. S. Towry of this city, accompanied by Mrs. Towry, D. E. Towry of Stilwell and H. N. Towry of Vian, were called to Sand Springs last Friday following receipt of a message that R. L. Towry, a brother, had been instantly killed in a serious auto accident on that day. The party made the trip overland, returning Sunday.

### PRESBYTERIAN CHURCH

A. E. Arnfield, pastor

Sunday school 9:45. Our closing assembly will be utilized as a Junior church service.

## WOUNDED PRISONER (Cont. from pg. 1)

...was released in such spectacular fashion. The Dotson family is a large one and is well known in this county.

## COMMISSIONERS PROCEEDINGS

### July 6, 1925

The board of county commissioners met pursuant to recess with all members present and transacted the following business, to-wit:

3015 Claimant Harry D. Pitchford; traveling expenses; claimed $15.25; allowed. Fund Gen.
3016 Claimant J. T. Botting; mileage to county charge; claimed $1.50; allowed. Fund Gen.
3017 Claimant Lee J. Lewis; stamps; claimed $2.00; allowed. Fund Gen.
3018 Claimant American Natl. Bank; juror fees; claimed $9.20; allowed. Fund Gen.

(Continued on back page)



The man who wakes up famous hasn't been asleep.

A BANK ACCOUNT IS A PACIFYING THING

The experience of those who keep a bank account bears testimony to this statement.

No man ever regretted anything about his account in a good bank except that the account was not larger. And when a man has an account at a good bank there is an incentive to make it grow, that he otherwise would not have.

"Ask the man who has one."



YOUR BANK CAN HELP YOU

## FIRST NATIONAL BANK IN SALLISAW

1901    1925

## To My Patrons

I am back at my old stand east of First National Bank and am prepared to take care of your flat tires. I vulcanize tubes.
Phone 384

### Frank Weaver

## Don't Endure Foot Troubles

Don't let tired, aching feet, callouses, corns, bunions, weak and broken down arches mar your comfort and happiness. Come to our Foot Comfort Department today and let our Foot Comfort Expert show you how quickly and easily you can secure your Foot Comfort through the proper fitting of shoes and Dr. Scholl's Foot Comfort Appliances.

No charge for this service.

### McDonald & Matthews
"We Sell Everything"

## SUPPORT
The Legion Endowment Drive
IT IS WORTHY
Adv. No. 671

## THE NEW PICTORIAL REVIEW SIMPLIFIED PRINTED PATTERNS

are perforated, notched and cut and ready to sew. They represent real value to you.

## Cherry & Winter
"We Appreciate your Business"
SALLISAW, OKLA.
—Oak Street—

# SOCIETY
and Local Happenings

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 107**

ACCIDENT DESCRIPTION NARRATIVE

| MONTH | DAY | YEAR | 24 HOUR TIME | COUNTY | | SHEET 1 OF 1 SHEETS |
|---|---|---|---|---|---|---|
| 9 | 29 | 99 | 1230 | SEQUOYAH | INCIDENT NUMBER | ADMINISTRATIVE |

ON 9.29.99 AT ABOUT 1230 HRS GARY PHILPOT, SALLISAW POLICE CHIEF & MYSELF GLEN SMITHSON WERE AT THE SALLISAW CITY JAIL WATCHING SHERIFF JOHNNY PHILPOT DRESS THE GUNSHOT WOUNDS ON KENNETH BARRET THE SHOOTING SUSPECT OF TROOPER ROCKY EALES. GARY MADE THE STATEMENT TO ME THAT TROOPER EALES AFTER HE WAS KILLED LEFT A LITTLE BOY & A WIFE. I SAID YES HE HAD A LITTLE 2YR OLD BOY & A SIX YEAR OLD GIRL, & THEY WILL NEVER REMEMBER THEIR DADDY WHEN THEY GROW UP. AT THIS TIME KENNETH BARRET SPOKE UP & SAID AS I RECALL, YEA THE WRONG PERSON GOT KILLED I WISH IT HAD OF BEEN ME. I SAID TO HIM THAT YOU ARE THE ONE THAT PULLED THE TRIGGER & PICKED YOUR TARGET HE SAID YEA BUT THEY SHOT FIRST.

END OF STATEMENT

TROOPER M. SMITH 408

GLEN SMITHSON

TROOP C

MUSKOGEE OK 7(4/0)

INVESTIGATOR'S SIGNATURE & BADGE NO                                    DATE

ACCIDENT DESCRIPTION NARRATIVE SHOULD CONSIST OF THE FOLLOWING PARTS:
1. SYNOPSIS
2. NOTIFICATION AND ARRIVAL
3. LOCATION DESCRIPTION
4. ARRIVAL AT SCENE
5. DRIVER IDENTIFIER
6. VEHICLE IDENTIFIER
7. PASSENGER STATEMENT(S)
8. WITNESS STATEMENT(S)
9. INVESTIGATION AT SCENE
10. OFFICER'S OPINION/CONCLUSION

DPS 010-04

12

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 108**

5

files on our confidential informants and keep track of the money that's paid to them.

Q    How would you, for instance --

A    In the form of a receipt with a -- a signed receipt with a thumb print on it in a confidential file.

Q    Each and every payment would have such a --

A    Yes.

Q    -- receipt?  Without identifying any person by name, do you know whether or not the confidential informant that was the basis for the issuance of the search warrant used to raid Mr. Barrett's home was ever paid money through your office?

A    No.  Whoever it was was not ours, no sheriff's department informant.

Q    Do you have any knowledge of the identity of that person?

A    No, sir, I do not.  I never did.

Q    Has anyone since the time of the trial asked you if you could provide information about a particular individual, whether he be reliable or whatnot, anything of that kind?

A    In reference to this particular informant?

Q    Yes.

A    No.

Q    Now, back in our -- all of the stuff that we've received in this case, there's a reference to a time when one or more people from your office went out to Mr. Barrett's

00002403

KEB312947

6

home and inspected some weapons.

A    Uh-huh.

Q    Do you recall, generally, a reference to that?

A    I remember one specific incident where I went out.  After the officers had already been there, I arrived there.

Q    Fill me in on that instance.

A    I think the call was he was supposedly shooting out there; and if I remember right, a deputy by the name of Shelton Fare was the first officer there.  And when I got there I think another one had arrived and I don't remember who it was.  They had some firearms they were inspecting when I arrived.  Kenny was in the house and they were running the serial numbers and, in effect, looking at the guns.

Q    And was there a AR15-type weapon that was being looked at then?

A    Not that I remember, no.  I believe the one they had actually looking at when I got there was a -- I think it was an SKS or it looked like it.  I didn't inspect it.  I just saw it.

Q    Did you have any dealing with Mr. Barrett at that time?

A    Yes.  I walked up to the porch and talked to him.

Q    What do you recall about your conversation?

A    Mostly about -- some of it was about shooting.  I guess about shooting.

00002404

KEB312948

7

Q    You were kind of telling him to calm down, that kind of thing?

A    Did I tell him to calm down?

Q    No, I don't mean calm down.  I mean but to tell him to behave himself a little better as a neighbor?

A    Yeah, shooting in general around a residential area.  You had to be careful and all of this stuff, and then I called his attention to a misdemeanor warrant that was outstanding on him.

Q    And what did you tell him about the misdemeanor warrant?

A    I told him there was one.  And he said he was planning on going in and appearing on that and taking care of it or doing whatever.  He promised me that he would.

Q    Did Mr. Barrett threaten you when you were out there?

A    No.

Q    Prior to the time that this search warrant was executed out at his place, did anybody ask you for advice concerning whether or not there might have been a different way of proceeding?

A    In the execution of the warrant?

Q    Yeah.  When the task force obtained this no-knock warrant and brought in the tact team, did anybody talk with you about whether it was necessary to bring in the tact team in order to deal with Mr. Barrett?

A    It was discussed at one point before the warrant -- way

00002405

KEB312949

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 109**

---

# Forensic Training & Consulting, LLC

| | |
|---|---|
| 1544 Valley Creek Rd. | Ph: 940-383-8668 |
| Denton, Texas 76205 | E-mail: xprtwit@aol.com |

March 10, 2009

David Autry
1021 NW 16th Street
Oklahoma City, OK 73106

**Re** *United States of America vs. Kenneth Barrett* (FT&C Case # 03-5767) – Review of Testimony by Terrence Higgs and Iris Dalley

## Introduction

I was requested to review transcripts of trial testimony by Terrence Higgs and Iris Dalley in United States vs. Kenneth Barrett. I was provided both transcripts, along with a directory of court exhibits and 4 CDs containing demonstrative exhibits used by Iris Dalley, videos of the scene and images of the scale model used at trial. This is the report of my findings concerning that review.

## Higgs testimony

My review of the testimony given by Terrence Higgs revealed some issues of minor concern, but nothing of substantive concern in my opinion. The specific issues that I would categorize as being of only minor concern are as follows:

1. In his testimony concerning the number of shots that might have been fired by the officers' H&K MP5 9mm submachine gun, Mr. Higgs failed to point out that the MP5, according to H&K, should not be loaded to full magazine capacity due to the potential for jamming. Thus, basing the number of shots potentially fired on starting with a fully loaded magazine is unreliable unless it can be confirmed that the OSBI does not follow the H&K recommendation.
2. In his testimony concerning ejection characteristics for fired casings, Mr. Higgs failed to mention that, from time to time, anomalous ejection paths do result. That means a weapon that typically ejects to the right, all else being equal, may occasionally eject to the left and so on.

In his testimony concerning bullet spin, Mr. Higgs gave a flawed explanation that opined that, for a time, bullet spin overcomes the effects of gravity during its flight. In response to that, I would point to the classic ballistics question: "If a bullet is fired from a weapon held parallel to the ground and at the moment that the bullet exits the muzzle, a similar bullet is dropped to the ground from the same height the gun barrel is above the ground, which bullet would hit the ground first?" The answer, of course, is that they would hit the ground at the same time

since gravity acts on them equally and neither the horizontal velocity nor the spin stabilization of the fired bullet has any effect of the force of gravity.

4. Mr. Higgs testified that he "would expect a ricochet" for bullet impact angles of 60 degrees or less. The reality is more like 20 degrees or less.

5. Mr. Higgs expressed the opinion that many examiners have historically had in regard to the production of photographs as demonstrative exhibits in firearms examinations of fired bullet and cartridge case markings (i.e. photomicrographs). I would point out, however, that many firearms examiners do produce such photographs in court contrary to the old argument that "beauty lies in the eye of the beholder".

As already stated, I consider all these statements to be of only minor concern. The majority of Mr. Higgs' testimony is very credible and forthright. I am unable to assess the validity of any of the actual comparisons of bullets/fragments and cartridge cases on the basis of this verbal testimony alone. To do so would require my access to both the bench notes of Mr. Higgs and the photographs he states he took of his comparisons, at the least, and possibly the evidence itself.

**Dalley testimony**

Based upon my review of the testimony given by Iris Dalley, there are, in my opinion, some minor issues as well as some substantive issues of concern. My specific concerns are as follows:

Minor issues

Ms. Dalley repeatedly uses terminology that is inappropriate both with regard to vehicular descriptions and firearms components. Specifically, these are the terms that were inappropriately used:

1. The term "front quarter panel" is used to refer to the front fender.
2. The terms "left" and "right" are used when "driver side" and "passenger side" are appropriate.
3. The term "side wall", which is a term for part of the anatomy of a tire, is used several times to describe an inner body panel on the Ford Bronco.
4. The term "projectile", typically misused by non-firearms trained individuals, is applied to anything and everything presumably responsible for impacts/perforations rather than the appropriate terms "bullet", "bullet fragment", "bullet jacket", "jacket fragment", "bullet core" and "bullet core fragment".
5. Ms/ Dalley's explanation of bullet fragmentation upon impact with glass is flawed. She states that the bullet impacts the glass, perforating it and then exiting it whereupon it fragments. The reality is fragmentation begins upon impact.
6. Ms. Dalley, by her own admission, is not a firearms examiner, but states she seeks out the assistance of firearms examiners when she has a "ballistics" question. Arguably, one can reconstruct a shooting incident without being a firearms examiner, but a basic understanding of firearms and ammunition components is

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

2

essential to being able to recognize what one is viewing at a shooting scene. This lack of understanding/familiarity was exemplified when she stated that there might be some caliber similar to a 223 that could have made some of the bullet holes in the Bronco but when asked by the defense attorney for an example she could not name one.

The use of inappropriate terminology and ambiguous statements in testimony makes it difficult for anyone to understand, but particularly so for lay individuals. This is no doubt reflective of the fact that Ms. Dalley is not a trained firearms examiner and is also apparently not very well versed in vehicle component terminology. The use of incorrect terminology constitutes only a minor concern in my opinion, however.

Substantive issues

There are, in my opinion, a number of substantive issues with regard to both Ms. Dalley's approach to shooting incident reconstruction in general and this reconstruction in particular. These concerns are as follows:

1. From her various responses to questions from both the prosecution and the defense, it appears that Ms. Dalley did not follow widely accepted protocol used in shooting incident reconstruction. This protocol includes the following:

   a. The dimensions of the Bronco were not determined. Standard protocol involves determining, at a minimum, length, width and height of vehicles involved in shootings. Similarly, there was a question as to how wide one of the Bronco's doors was open for several shots but no measurements were taken and the explanation "the door was curved so it could not be measured" was given.

   b. Prior to inserting trajectory rods into bullet holes (or otherwise altering them), one is well advised to examine the hole margins, interior surfaces and area surrounding them for trace evidence. Ms. Dalley was specifically asked about gunshot residue around some of the bullets holes at the scene but stated "she did not see any" (pg 3399). A legitimate evaluation of areas around bullet holes for trace evidence requires close inspection with a hand lens and/or making a lift for lab testing. Likewise, the presence of blood, tissue, hair, fibers, etc. should be looked for in and around bullet holes.

   c. Whenever bullet holes appear to be symmetrical and devoid of significant distortion, the length and width of the holes should be determined using a pair of dial calipers. The width can be related to the maximum caliber in inelastic substrates and the minimum caliber in elastic substrates. Ms. Dalley testified that she could not determine the caliber of any of the responsible bullets striking the Bronco (pg 3298). Measurement of some of the holes, based upon the photographs included in the materials received, appears to have been something that could have been reliably carried out.

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

3

d.  The proper placement of trajectory rods in bullet holes in order to reliably approximate the responsible bullet trajectories requires an understanding of the characteristics of bullet penetration/perforation in a variety of substrates. This is particularly true with bullets that fragment, such as the 223 bullets in this incident. It is equally important to have sufficient experience to know when calculation of trajectories, rather than use of trajectory rods, is preferable and to know when the use of alternate means are appropriate. For trajectory rods to be a feasible method for reliably representing bullet trajectories, one needs to have a secondary impact that has not resulted from initial impact deflection and/or fragmentation. Ms. Dalley attempted to establish bullet trajectories utilizing fragment impacts into secondary targets based upon the presumption that the core (or a large fragment thereof) travels in a straight path. She correctly testified (pg 3466) that there was no way to determine the "exact path" of each bullet fragment and yet proposes that her trajectories, as represented, are "accurate".

e.  Ms. Dalley repeatedly testified that bullets passing through the "partially open" Bronco door would go "straight through" and that bullet core fragments would do likewise (it is presumed that only fragments were recovered because Ms. Dalley testified that "No, I didn't find any [fragments] consistent with being parts of a single bullet." – pg 3298). One need only recall the "magic bullet" path in the John F. Kennedy assassination to recognize the fallacy of proposing that bullets pass through intermediary target undeterred ("straight through"). The situation for bullets that fragment upon impact is even more unpredictable. In order to attempt to make her theory of bullet trajectories being unimpeded by intermediary targets fit the evidence, Ms. Dalley proposed that the door moved to various positions to account for the incongruity of the different trajectories through it (pg 3314). While such movement cannot be excluded, it is more likely that bullet deflections/fragmentation account for the trajectory variations in the door. When bullets impact surfaces with irregular contours (i.e. other than flat surfaces) deflection can and does occur with frequency.

f.  Bullet holes in vehicles and other inanimate objects and the trajectory rods placed in those bullet holes are generally referenced by two sets of coordinates (2 linear and 2 angular) in order to establish reproducible data for creating diagrams, animations, etc. that accurately represent the true trajectories (within the limits of measuring uncertainty). Ms. Dalley stated, rather amazingly, that she did not determine any of the angles because she "did not have the necessary equipment" (pg 3275). All that is required is a $30 zero base protractor and a $5 plumb bob. The primary reason for obtaining such linear and angular measurements is to be able to accurately create diagrams and animations, such as the ones Ms. Dalley prepared in this incident. Given her testimony that she took no such measurements and that she could not establish "exact paths" using

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

4

trajectory rods alone, it is unclear how the diagrams and animation she produced can be perceived as having any reliability.

g. Ms. Dalley testified that the terrain at the shooting scene could be described as "hilly" but apparently did nothing to establish the exact grade or assess the potential impact any such grade might have on the perceived trajectories of bullets striking the Bronco. At the very least, determining bullet impact angles relative to a common point of reference (plumb line) is the accepted standard.

h. When there are holes of questionable origin, proper procedure calls for on-scene chemical testing for the presence of copper and lead to confirm that they were produced by bullets. Ms. Dalley testified to having knowledge of that type testing but did not testify that she, in fact, conducted any of it.

i. Ms. Dalley testified that she had "no means of sequencing any of the shots" at the scene. The sequencing of shots, while certainly not always possible, can sometimes be accomplished through a combination of the fracture patterns associated with glass impacts/perforations and the presence of trace evidence on recovered bullets/fragments (glass, fibers, hair, paint, etc.). There was no testimony that would indicate that any of this type examination/testing was ever done, either on-scene or off-scene.

j. In an incident involving a moving vehicle, as with the Bronco in this case, a reenactment would include physically placing the Bronco in various positions and making a determination (typically projecting a laser beam from each bullet hole of interest, where possible) as to the feasibility of the each shot coming a particular position or positions. Of particular importance in this incident are the shots that occurred after the Bronco came to a stop. While Ms. Dalley testified that the Bronco had been moved to another position prior to her arrival, she also testified that there were tire impressions and a fluid deposit in the soil in front of the cabin that could have been used to reestablish the position before moving.

2. Ms. Dalley's approach to establishing the trajectory of bullet holes through the cabin window glass, blinds and curtain ("towel") and the Bronco windows was inappropriate. She testified that her results were unreliable for the cabin window part of her analysis (pg 3389).

a. She had someone hold the trajectory rod rather than set up a tripod and place the laser on the tripod.

b. She took no measurements of the hole locations.

Her methodology, as she testified to it, of placing a hand-held laser into bullet holes in the Bronco window glass is equally flawed since it presumes no deflection resulted from either the impacts or the fragmentation.

3. Ms. Dalley testified that she concluded that, not "seeing" any evidence of gunshot residue on the cabin window that was shot through, that the distance of the muzzle would have been "greater than 3 feet" from the glass because that distance has been reported in forensic literature. That testimony was an apparent reference to a general rule of thumb that varies considerably from weapon to weapon and is also dependent upon the particular ammunition used. The correct evaluation of maximum muzzle to target distance would require test firing into glass like that at

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

5

the scene using the incident weapon and ammunition like that used to produce the bullet holes in question.

4. Ms. Dalley testified that she did not attempt to locate any bullets/fragments in the soil. A metal detector should have been used to attempt to locate any bullets/fragments in the soil.

5. Ms. Dalley testified that she did not attempt to collect all of the bullets/fragments inside the Bronco. According to generally accepted protocol in shooting incident reconstruction, all shots need to be accounted for when possible. The location and recovery of bullets/fragments is an essential aspect of that endeavor.

6. Ms. Dalley testified that she concluded that the bullet wound to Trooper Eales' right arm had to take place after he exited the Bronco because of "the absence of tissue inside the Bronco" and the fact that tissue appeared to be missing in the area of the arm wound. She did not, however, testify to finding any tissue outside the Bronco. She did not indicate that she ever attempted to locate tissue outside the Bronco. One way to test for it would have involved spraying luminol on the ground in the area around the Bronco. That apparently was not done. Furthermore, one of the cornerstones of forensic science is "Absence of evidence is not evidence of absence." That refers to the fact that not finding evidence cannot be used to conclude anything other than that no evidence was found. That statement is attributed to one of Ms. Dalley's own colleagues, well-known bloodstain pattern analyst Herbert Leon MacDonnel of Corning, New York.

In summary, Ms. Dalley's testimony indicates that she did not follow accepted protocol in the evaluations she conducted at the shooting scene. Consequently, her findings cannot be regarded as being generally reliable for purposes of reconstructing the events associated with the shooting under investigation. In order to confirm this apparent failure to follow appropriate protocol, it would be necessary to have access to Ms. Dalley's field notes, photographs and other supporting documents in this matter.

These opinions are based upon my 35 years experience as a firearms examiner and shooting reconstruction expert, my independent research in the area of shooting incident reconstruction and specialized training that I have received in firearms, firearms-related issues and shooting incident reconstruction as reflected in my attached curriculum vitae.


Edward E. Hueske
Consulting Forensic Scientist

*Note: The opinions expressed herein are based upon the information that was available at the time of this writing. Should new or different information be forthcoming, the right to modify these opinions accordingly is hereby reserved.*

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

6

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 110**

## CURRICULUM VITAE

**Phone: (940) 383-8668**     Edward E. Hueske          **Fax: (940) 383-8668**
**E-mail:** xprtwit@aol.com                              **www.edhueske.com**

Present Positions:

- Director, Forensic Training & Consulting, LLC since 1997
- Lecturer/Criminalistics Program Coordinator, University of North Texas, since 1999

Former Positions:

- Instructor of Chemistry, Blinn College, Brenham, Texas 1970-1974
- Assistant Laboratory Director, Fort Worth Police Department, 1974-1983
- Adjunct Instructor of Chemistry, Weatherford College, Weatherford, Texas 1976-1980
- Adjunct Instructor of Criminal Justice, University of Texas at Arlington, 1980-1983
- Supervising Criminalist, Arizona Department of Public Safety, 1983-1996 (retired)
- Adjunct Instructor of Police Science, Northern Arizona University, 1984-1994
- Firearms Examiner, Tulsa Police Department, Tulsa, Oklahoma 1996-1997
- Adjunct Instructor of Police Science, Tulsa Community College, 1997
- Laboratory Manager, Weckerling Scientific Laboratories, Carrollton, Texas 1997-1998
- Criminalist, Forensic Consultant Services, Fort Worth, Texas, 1998-1999

Formal Education:

- B.S., Chemistry, Sam Houston State University, 1968
- M.A., Chemistry, Sam Houston State University, 1971

Special Courses Attended:

- *DEA Forensic Chemist Seminar,* McLean, Virginia, 1975 (40 hrs)
- *FBI Glass Analysis Course,* Quantico, Virginia, 1976 (40 hrs)
- *Applied Molecular Spectroscopy,* Arizona State University, Tempe, Arizona, 1977 (40 hrs)
- *ATF Arson Residue Analysis Course,* Rockville, Maryland, 1980 (40 hrs)
- *FBI Gunshot Residue Analysis Course,* Quantico, Virginia, 1981 (40 hrs)
- *Ballistics and Handloading Course,* Trinidad State College, Trinidad, Colorado, 1982 (40 hrs)
- *Polarized Light Microscopy,* McCrone Institute, Austin, Texas, 1982 (40 hrs)
- *FBI Instrumental Analysis of Paints and Polymers Course,* Quantico, Virginia, 1983 (40 hrs)
- *FBI Symposium on Footwear and Tire Tread Examination,* Quantico, Virginia, 1984 (40 hrs)
- *X-Ray Fluorescence Class,* Tracor Corporation, Flagstaff, Arizona, 1985 (8 hrs)
- *FBI Specialized Techniques in Firearms Identification Course,* Quantico, Virginia, 1987 (40 hrs)
- *Ruger Police Armorer's Course,* Phoenix Police Academy, Phoenix, Arizona, 1987 (40 hrs)
- *Crime Scene Reconstruction Class,* Dr. Henry Lee, Scottsdale, Arizona, 1988 (8 hrs)
- *AFTE Glock Armorer's Class,* Virginia Beach, Virginia, 1989 (8 hrs)
- *AFTE Remington 1100 Service Class,* Houston, Texas, 1991 (8 hrs)
- *Photomicrography Class,* Leitz Corporation, Phoenix, Arizona, 1991 (8 hrs)
- *Crime Scene Photography,* Flagstaff, Arizona 1992 (8 hrs)
- *Wound Ballistics Class,* Dr. Martin Fackler, Glendale, Arizona, 1992 (8 hrs)
- *Blood Spatter Interpretation and Crime Scene Reconstruction,* Scottsdale, Arizona, 1993 (16 hrs)
- *FBI Footwear and Tire Tread Examination Seminar* (presenter), Quantico, Virginia, 1994 (40 hrs)
- *SWAFS Shooting Reconstruction Class,* Colorado Springs, Colorado, 1995 (8 hrs)
- *SWAFS Lamp Bulb Examination Class,* Colorado Springs, Colorado, 1995 (8 hrs)

1

- *Accident Reconstruction and Low-Speed Crash Evaluation,* Texas A&M University, 1996 (16 hrs)
- *Bloodstain Pattern Analysis in Violent Crimes,* University of North Texas, 2000 (40 hrs)
- *Recovery of Buried Remains,* University of North Texas, 2001 (16 hrs)
- *Bloodstain Pattern Analysis in Crimes of Violence – Pt. II,* University of North Texas, 2002 (40 hrs)
- *Blood Wipes, Swipes & Other Patterns,* IAI Training Seminar, Boston, MA, 2006 (2 hrs)
- *Preparation of Demonstrative Exhibits for Bloodstain Pattern Analysis,* IAI Training Seminar, Boston, MA, 2006 (10 hrs)
- *Microscopical Approach to Trace Evidence in Shootings,* AAFS, Denver, CO, 2009 (8 hrs)

Professional Affiliations:

- Fellow of the American Academy of Forensic Sciences
- Distinguished Member of the Association of Firearm and Tool Mark Examiners
- Emeritus Member of the Southwestern Association of Forensic Scientists
- Emeritus Member of the American Society of Crime Laboratory Directors
- Member of the International Association of Bloodstain Pattern Analysts

Papers Presented :

- "Developing Regional Lab-User Agency Communication," Southern and Southwestern Assns. of Forensic Scientists, Baton Rouge , Louisiana, 1986
- "Mikrosil Casting in Firearms Examinations," Assn. of Firearm and Tool Mark Examiners, Houston, Texas, 1991
- "The Jennifer Wilson Homicide: A Study in Trace Evidence," SW Assn. of Forensic Scientists, Tucson, Arizona, 1991
- "The Use of Videomicroscopy in Footwear Comparisons," Southern and Southwestern Assns. of Forensic Scientists, Shreveport, Louisiana, 1992
- "The Reconstruction of a Double Homicide near Ashfork, Arizona," SW Assn. of Forensic Scientists, South Padre Island, Texas, 1993
- "Gunshot Residue Testing of Blood Stained Garments," SW Assn. of Forensic Scientists, South Padre Island, Texas, 1993
- "The Use of Hand-Held Laser Pointers in the Reconstruction of Events at Crime Scenes," Southern and Southwestern Assns. of Forensic Scientists, Little Rock, Arkansas, 1994
- "The Application of Videomicroscopy to Footwear Identification," International Symposium on Footwear/Tire Tread Identification, FBI Academy, Quantico, Virginia, 1994
- "Footwear/Tire Tread Identification-The Northern Arizona Perspective," International Association for Identification, Phoenix, Arizona, 1994
- "The Application of Videomicroscopy to Footwear Identification," International Association for Identification, Phoenix, Arizona, 1994
- "A Bizarre Homicide," SW Assn. of Forensic Scientists, Houston, Texas, 1995
- "The Portable Scopeman-A Powerful New Crime Scene Tool," SW Assn. of Forensic Scientists, Fort Worth, Texas, 1996
- "Defense Experts- The Good, The Bad, and The Ugly," Texas Criminal Defense Lawyers Assn., El Paso, Texas, 1998
- "Forensic Science for the Prosecution and the Defense," University of Texas Law School, 2000
- "The Defense of Shawn Berry," Louisiana Criminal Defense Lawyers Association, Lafayette, Louisiana, 2000
- "The Defense of Shawn Berry," University of Texas Law School, 2000
- "Private Forensic Labs – The Good, The Bad and The Ugly," International Conference of the American Society for Industrial Security, 2001
- "Bloodstain Pattern Interpretation," Oklahoma City University Law School, 2002
- "Crime Scene Deconstruction-Reconstruction," Oklahoma City University Law School, 2002
- "Re-Examination of Physical Evidence – A Defense Perspective," American Academy of Forensic Science Annual Conference, Dallas, Texas, 2004
- "Shooting Incident Reconstruction," 8th Annual Public Defender Retreat, Las Vegas, NV, 2008

2

Specialized Forensic Classes Taught:

(List of classes taught from 1984-1998 is available upon request)

- *Shooting Reconstruction,* El Paso Police Department, 1999 (40 hrs)
- *Shooting Reconstruction,* Prince William County Police Training Center, Nokesville, Va.,1999 (40 hrs)
- *Shooting Reconstruction,* Florida Dept. of Law Enforcement, Pensacola, Fla., 1999 (24 hrs)
- *Shooting Reconstruction,* Salt Lake Co. Sheriff's Training Center, Salt Lake City, Ut., 1999 (24 hrs)
- *Shooting Reconstruction,* Tri-County Police Training Center, Fergus Falls, Minn., 1999 (24 hrs)
- *Clandestine Drug Lab Investigation,* Tarrant Co. (TX) Drug Task Force, Cleburne, Tx., 1999 (24 hrs)
- *Blood Spatter Interpretation,* Arlington Police Training Center, Arlington, Texas, 1999 (24 hrs)
- *Advanced Homicide Investigation,* Turkish National Police, Ankara, Turkey, 1999 (40 hrs)
- *Advanced Homicide Investigation,* Turkish National Police, Istanbul, Turkey, 1999 (40 hrs)
- *Shooting Reconstruction,* Gastonia Police Training Center, Gastonia, N.C., 1999 (24 hrs)
- *Shooting Reconstruction,* Tallahassee Police Department, Tallahassee, Florida, 1999 (24 hrs)
- *Shooting Reconstruction,* Tri-Cities Police Academy, Richardson, Texas, 1999 (24 hrs)
- *Shooting Reconstruction,* West Palm Beach Co. Sheriff, West Palm Beach, FL, 2000 (24 hrs)
- *Crime Scene Investigation,* Office of the Attorney General , Guatemala City, Guatemala, 2000  (40 hrs)
- *Officer –Involved Shooting Incidents,* University of North Texas, Denton, Texas, 2000 (16 hrs)
- *Advanced Shooting Reconstruction,* University of North Texas, Denton, Texas, 2000 (24 hrs)
- *Shooting Reconstruction,* Las Vegas Metro Police Department, Las Vegas, Nevada, 2000 (24 hrs)
- *Advanced Shooting Reconstruction,* West Palm Beach Police Department, Florida, 2000 (24 hrs)
- *Shooting Reconstruction,* East Texas Police Academy, Kilgore, Texas 2000 (24 hrs)
- *Shooting Reconstruction/Adv. Shooting Reconstruction,* NYPD, New York City, New York, 2000 (48 hrs)
- *Shooting Reconstruction,* Grossmont College, San Diego, California, 2000 (24 hrs)
- *Advanced Crime Scene Investigation/Reconstruction,* University of North Texas, Denton, Texas, 2000 (40hrs)
- *Shooting Reconstruction,* Suffolk County Crime Lab, Hauppauge, New York, 2000 (40 hrs)
- *Shooting Reconstruction,* Missouri State Police Academy, Columbia, Missouri, 2001 (24 hrs)
- *Shooting Reconstruction,* Bannock County Sheriff's Office, Pocatello, Idaho, 2001 (40 hrs)
- *Shooting Reconstruction,* Syracuse Police Department, Syracuse, New York, 2001 (40 hrs)
- *Shooting Reconstruction,* Federal Bureau of Investigation, Dallas, Texas 2001 (40 hrs)
- *Shooting Reconstruction,* Washington Metropolitan Police, Washington, D.C., 2001 (24 hrs)
- *Shooting Reconstruction,* Special Investigations Unit, Mississauga, Ontario, Canada, 2001 (24 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Northwestern University, Chicago, 2001 (40 hrs)
- *Footwear/Tire Tread Evidence,* Metropolitan Police Department, Washington, D.C., 2001 (24 hrs)
- *Officer-Involved Shootings,* Baton Rouge Police Department, Baton Rouge, Louisiana, 2001 (16 hrs)
- *Officer-Involved Shootings,* East Texas Police Academy, Kilgore, Texas, 2001 (16 hrs)
- *Bio-Terrorism,* Kimberly-Clark Corporation, Dallas, Texas, 2001 (4 hrs)
- *Advanced Shooting Reconstruction,* East Texas Police Academy, Kilgore, Texas, 2001 (24 hrs)
- *Shooting Reconstruction,* Santa Barbara County Sheriff's Office, Santa Barbara, California, 2002 (24 hrs)
- *Bio-Terrorism,* Solutions 2000, Austin, Texas, 2002 (8 hrs)
- *Gunpowder and Primer Residues,* University of North Texas, Denton, Texas, 2002 (40 hrs)
- *Advanced Shooting Reconstruction,* University of North Texas, Denton, Texas, 2002 (24 hrs)
- *Shooting Reconstruction,* Metropolitan Police Department, Washington, D.C., 2002 (total of 72 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Northwestern University, Chicago, 2002 (40 hrs)
- *Shooting Reconstruction,* Special Investigations Unit, Mississauga, Ontario, Canada, 2002 (24 hrs)
- *Shooting Reconstruction,* Federal Bureau of Investigation, Dallas, Texas 2002 (40 hrs)
- *Shooting Reconstruction,* El Paso Police Department, El Paso, Texas 2002 (40 hrs)
- *Tool Mark Comparison,* Centre of Forensic Science, Toronto, Ontario, Canada, 2002 (40 hrs)
- *Shooting Reconstruction,* Sioux Falls Police Department, Sioux Falls, South Dakota, 2002 (40 hrs)

3

Specialized Classes Taught (continued):

- *Footwear/Tire Tread Evidence,* East Texas Police Academy, Kilgore, Texas, 2002 (24 hours)
- *Crime Scene Analysis/Reconstruction,* East Texas Police Academy, Kilgore, Texas, 2002 (24 hours)
- *Shooting Incident Analysis/Reconstruction,* Las Vegas Metro Police, Las Vegas, NV, 2003 (48 hours)
- *Shooting Incident Reconstruction,* St. Louis County Police Academy, St. Louis, MO, 2003 (24 hours)
- *Crime Scene Analysis/Reconstruction,* NYPD, New York, New York, 2003 (24 hours)
- *Bloodstain Pattern Analysis in Crimes of Violence,* NYPD, New York, New York, 2003 (24 Hours)
- *Advanced Trajectory Analysis,* Special Investigations Unit, Mississauga, Ontario, Canada, 2003 (24 hours)
- *The Abuse and Sexual Assault of Children,* East Texas Police Academy, Kilgore Texas, 2003 (16 hours)
- *Advanced Trajectory Analysis,* Federal Bureau of Investigation, Dallas, Texas, 2003 (40 hours)
- *Gunpowder & Primer Residues in Distance Determination,* Denton County Sheriff's Training Center, Denton, Texas, 2003 (40 hours)
- *The Analysis/Reconstruction of Crimes of Violence,* UNT Police Academy, Denton, Texas, 2003 (24 hours)
- *Advanced Trajectory Analysis,* UNT Police Academy, Denton, Texas, 2003 (24 hours)
- *Shooting Incident Reconstruction,* Charlotte-Mecklenburg Regional Police Training Center, Charlotte, NC, 2003, (40 hours)
- *Shooting Incident Reconstruction,* Nashville Metro Police Academy, Nashville, Tennessee, 2003 (40 hours)
- *The Investigation of Officer-Involved Shootings,* Drug Enforcement Administration Academy, Quantico, Virginia, 2003 (40 hours)
- *Gunpowder & Primer Residues in Distance Determination,* San Diego Police Department, San Diego, CA, 2003 (40 hours)
- *Crime Scene Analysis/Reconstruction,* Florida Public Defenders Association, Ft. Lauderdale, FL, 2003 (16 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* St. Louis Cty. P.A., St. Louis, MO, 2004 (40 hrs)
- *The Investigation of Officer Involved Shootings,* Drug Enforcement Administration Academy, Quantico, Virginia, 2004 (24 hours)
- *Gunpowder & Primer Residues in Distance Determination,* NYPD New York, New York, 2004 (40 hours)
- *Crime Scene Photography,* St. Louis County Police Academy, St. Louis, MO, 2004 (24 hours)
- *Advanced Trajectory Analysis,* St. Louis County Police Academy, St. Louis, MO, 2004 (24 hours)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2004 (40 hours)
- *Shooting Reconstruction Techniques,* Texas Rangers Annual Conference, Cypress, Texas, 2004 (4 hours)
- *Advanced Trajectory Analysis,* Federal Bureau of Investigation, Dallas, Texas, 2004 (40 hours)
- *Forensic Photography,* East Texas Police Academy, Kilgore, Texas, 2004 (24 hours)
- *Crime Scene Analysis/Reconstruction,* Special Investigations Unit, Mississauga, Ontario, Canada, 2004 (24 hours)
- *The Investigation of Officer Involved Shootings,* Drug Enforcement Administration Academy, Quantico, Virginia, 2004 (24 hours)
- *Shooting Reconstruction/Officer-Involved Shootings,* Sioux Falls Police Dept. , Sioux Falls, SD, 2004 (40 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Lewis & Clark Co. S.O., Helena, MT, 2004 (40 hrs)
- *Analysis/Reconstruction of Violent Crimes,* St. Louis Co. Reg. Police Academy, St. Louis, MO, 2005 (40 hrs)
- *Investigating Officer-Involved Shootings,* Natick Police Department, Natick, MA, 2005 (16 hrs)
- *Advanced Shooting Incident Reconstruction,* Suffolk Co. Crime Lab, Hauppague, NY, 2005 (24 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2005 (40 hours)
- *Sexually-Related Violent Crime,* Texas Rangers Annual Conference, Spring, Texas, 2005 (4 hrs)
- *Introduction to Shooting Reconstruction,* Texas DPS Training Academy, Austin, Texas, 2005 (24 hrs)
- *Advanced Trajectory Analysis,* Federal Bureau of Investigation, Dallas, Texas, 2005 (40 hours)
- *Introduction to Shooting Reconstruction,* Minneapolis Police Dept., Minneapolis, WI, 2005 (40 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Mississippi State Crime Lab, Jackson, MS 2005 (40 hrs)
- *Processing Violent Crime Scenes,* Federal Bureau of Investigation, Dallas, Texas, 2005 (8 hours)

4

- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Texas DPS Training Academy, Austin, Texas, 2005 (40 hrs)
- *Introduction to Shooting Reconstruction,* Charlottesville PD, Charlottesville, Virginia, 2005 (24 hrs)
- *Homicide Investigation,* Texas DPS Training Academy, Austin, Texas, 2005 (8 hours)
- *Introduction to Shooting Reconstruction,* Las Vegas Metro Police, Las Vegas, NV, 2006 (24 hrs)
- *Advanced Shooting Reconstruction,* Las Vegas Metro Police, Las Vegas, NV, 2006 (24 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings ,* St. Louis Co. Police Academy, St. Louis, MO, 2006 (40 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Austin Police Academy, Austin, TX, 2006 (40 hrs)
- *Footwear/Tire Tread Evidence, ,* Austin Police Academy, Austin, TX, 2006 (24 hrs)
- *The Analysis & Reconstruction of Violent Crimes,* Austin Police Academy, Austin, TX, 2006 (24 hrs)
- *Introduction to Bloodstain Pattern Analysis,* Dallas Police Academy, Dallas, TX, 2006 (24 hrs)
- *Advanced Shooting Reconstruction,* East Texas Police Academy, Kilgore, TX, 2006 (24 hrs)
- *Special Topics in Shooting Reconstruction,* Texas Rangers In-Service Training Conference, Austin, TX, 2006 (4 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2006 (40 hours)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Garland PD, Garland, TX, 2007 (40 hrs)
- *Special Topics in Shooting Reconstruction,* NYPD, Jamaica, Queens, NY, 2007 (24 hours)
- *The Analysis & Reconstruction of Violent Crimes,* NYPD, Jamaica, Queens, NY, 2007 (24 hours)
- *Shooting Incident Reconstruction,* Madison PD, Madison, WI, 2007 (24 hrs)
- *Shooting Incident Reconstruction,* Chatauqua County Sheriff's Office, Mayville, NY, 2007 (40 hrs)
- *Shooting Incident Reconstruction,* Texas DPS Training Academy, Austin, TX, 2007 (40 hours)
- *Advanced Shooting Reconstruction,* Texas DPS Training Academy, Austin, TX, 2007 (40 hours)
- *Shooting Reconstruction/Officer-Involved Shootings ,* St. Louis Co. Police Academy, St. Louis, MO, 2007 (40 hrs)
- *Advanced Shooting Reconstruction,* St. Louis Co. Police Academy, St. Louis, MO, 2007 (24 hrs)
- *Fracture Match Identification,* St. Louis Co. Police Academy, St. Louis, MO, 2007 (16 hrs)
- *Advanced Shooting Incident Reconstruction,* Vancouver P.D., Vancouver, WA, 2008 (40 hrs)
- *Advanced Shooting Incident Reconstruction,* Texas Tech Univ. Inst. of Forensic Sci., 2008 (24 hrs)
- *Crime Scene Analysis & Reconstruction,* East Texas Police Academy, Kilgore TX, 2008 (24 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2008 (40 hours)
- *Introduction to Crime Scene photography, ,* East Texas Police Academy, Kilgore TX, 2008 (16 hrs)
- *Shooting Incident Reconstruction,* New Hampshire State Police, Concord, NH, 2008 (40 hrs)
- *Advanced Shooting Incident Reconstruction, ,* New Hampshire State Police, Concord, NH, 2008 (24 hrs)
- *Shooting Incident Reconstruction,* Clackamus Co. Sheriff's Office, Oregon City OR, 2008 (40 hrs)
- *Crime Scene Analysis & Reconstruction,* St. Louis Co. Police Academy, St. Louis, MO, 2008 (24 hrs)
- *Fracture Match Identification,* St. Louis Co. Police Academy, St. Louis, MO, 2008 (16 hrs)
- *Shooting Incident Reconstruction,* Texas DPS Training Academy, Austin, TX, 2008 (24 hrs)
- *Advanced Shooting Reconstruction,* Texas DPS Training Academy, Austin, TX, 2008 (24 hrs)
- *Officer-Involved Shooting Investigation,* Minneapolis Police Dept., Minneapolis, MN, 2008 (24 hrs)

Academic classes:

I am a full time faculty member of the department of criminal justice at the University of North Texas and regularly teach the following undergraduate classes and coordinate the criminalistics certificate program at the university:

- CJUS 3330 – Introduction to Criminalistics
- CJUS 4360 – Criminal Investigation
- CJUS 4370 – Advanced Criminalistics I

5

- CJUS 4380 – Advanced Criminalistics II
- CJUS 4390 – Crime Scene Investigation

Additionally, I teach the following graduate classes on a rotating basis, each year:

- CJUS 5800 – Crime Scene Reconstruction
- CJUS 5800 – Bloodstain Pattern Analysis
- CJUS 5800 – Shooting Incident Reconstruction
- CJUS 5900 – Directed Studies (graduate research projects conducted under my supervision)

Publications:

- "Reaction of Azobenzene with Triphenylphosphine," co-authored with R.E. Humphrey, *Journal of Organic Chemistry*, 1971
- "A Procedure for the Isolation and Identification of LSD in a Single Dosage Unit (The Microdot Tablet)," *Microgram*, 1976
- "A Comparison of Decomposition Products from Selected Burned Materials with Common Arson Accelerants," co-authored with R.W. Clodfelter, *Journal of Forensic Sciences*, 1977
- "An Examination of Selected Automobile Rubber Bumper Guards," co-authored with R.W. Clodfelter, *Journal of Forensic Sciences*, 1977
- "Techniques for Extraction of Spermatozoa from Stained Clothing: A Critical Review," *Journal of Forensic Sciences*, 1977
- "Tannic Acid as a Field Test for Caffeine," *Microgram*, 1982
- "Toy Store Bomb Paraphernalia," *AFTE Journal*, 1984
- "Forensic Aspects of Shotshell Buffers," *AFTE Journal*, 1984
- "Enhancement of Footwear Impressions on Glass," co-authored with R.A. Erfert, *SWAFS Journal*, 1985
- "Stripping of Lead Bullets in a Browning High Power Pistol," *AFTE Journal*, 1988
- "The Browning of Firearms Serial Numbering System," *AFTE Journal*, 1988
- "An Anti-Splashback Lid for Water Traps," *AFTE Journal*, 1988
- "A Preliminary Report on the Application of Fiber-Optic Videomicroscopy to Firearm and Tool Mark Examination," *AFTE Journal*, 1990
- "Class Characteristics of Mossberg C-Lect-Choke Barrels with Factory Porting," *AFTE Journal*, 1990
- "The Examination of Goodyear Neolite Cowboy Walking Boot Heels," *SWAFS Journal*, 1992
- "The Application of Fiber-Optic Videomicroscopy to Firearm and Tool Mark Examination- A Further Look," *AFTE Journal*, 1993
- "Calculation of Trajectory Angles Using an Inexpensive Angle Gauge," *AFTE Journal*, 1993
- "Gunshot Residue Testing of Blood Stained Garments," *AFTE Journal*, 1993
- "Gunshot Residue Testing of Blood Stained Garments," *SWAFS Journal*, 1994
- "The Use of Hand-Held Laser Pointers in the Reconstruction of Events at Crime Scenes," co-authored with B.M. Courtney, *SWAFS Journal*, 1994
- "The Portable Scopeman- A Powerful New Crime Scene Tool," *SWAFS Journal*, 1996
- "Some Observations on Blood Back-Spatter," *SWAFS Journal*, 1997
- "A New and Economical Forensic Light Source for Crime Scene and Laboratory Use," *SWAFS Journal*, 2003
- "Recognition and Documentation of Bullet Ricochet Characteristics and Predicting Directionalities," *SWAFS Journal*, 2003
- "A Compact Laser Protractor and its Use in Shooting Reconstruction," *SWAFS Journal*, 2004
- "Estimation of Caliber for Distorted Bullets," *SWAFS Journal*, 2004
- "Determination of Lateral Angles for Bullet Holes in Windshields," *SWAFS Journal*, 2005
- "Making Knife Blade Test Impressions," *SWAFS Journal*, 2007
- "A Simplistic Approach to Demonstrative Evidence in Complex Shootings", *SWAFS Journal*, 2008
- "Pseudo-HVIS: An Empirical Study", *SWAFS Journal*, publication pending
- "A Comparison of Some Selected 00 Buckshot Pellet Patterns", *AFTE Journal*, publication pending
- "Some Thoughts on Accreditation, Certification and Bad Behavior in Crime Labs", *SWAFS Journal*, publication pending

Books Contributed To/Written:

- Mozyani, A. and Noziglia, C., "The Forensic Laboratory Handbook" (chapter on Firearm/Tool Mark identification), Humana Press: New Jersey, 2005 (revised 2009)
- Hueske, E.E., "The Analysis and Reconstruction of Shooting Incidents", CRC Press/Taylor & Francis: Boca Raton, 2006
- Hueske, E.E., "Fingerprints and Firearms", Essentials of Forensic Science Series, Facts on File: New York, 2009

Training Videos Written/Produced (Through the Law Enforcement Training Network of Carrollton, Texas, 2002-03):

- "Bloodstain Pattern Analysis I"
- "Bloodstain Pattern Analysis II"
- "Blood Spatter in Shooting Incidents"
- "Bloodstain Evidence Documentation"
- "The Proper Use of Trajectory Rods"
- "Bullet Ricochet Phenomena I"
- "Bullet Ricochet Phenomena II"
- "Finding Invisible Footwear Impressions at Crime Scenes"
- "Photographing & Casting Impression Evidence"
- "Tire Tread Evidence Deductions"
- "Producing Test or Elimination Impressions"
- "The Use of Gunshot Residue in Distance Determinations"
- "Cartridge Case Ejection Pattern Testing"

Professional Offices Held:

Association of Firearm and Tool Mark Examiners:

- Reviewer for *AFTE Journal*, 1989-present

Southwestern Association of Forensic Scientists:

- Program Chairman, 1984
- Member, Board of Directors, 1986-1988
- Chair of Professional Development, 1988-1990
- *SWAFS Journal* Editor, 1988-1992
- President, 1993-1994
- Chairman, Board of Directors, 1994-1995
- Fall Meeting Workshop Chair, 1993

American Society of Crime Lab Directors:

- Member, Board of Directors, 1986-1989
- Chair, Publication Committee, 1986-1987
- Chair, Membership Committee, 1987-1989
- Laboratory Accreditation Inspector, 1987-1995
- Laboratory Accreditation Board Member, 1996
- Forensic Science Operations and Program Committee, 1988-1991
- Member, Management Committee, 1992-1994
- Chair, Crime Scene Investigation Standards Committee, 1996

Advisory Board Membership

- 2004 served as a member of the NYPD Laboratory Accreditation Advisory Board
- 2006-2007 served as a member of the Crime Laboratory Review Board for the Houston Police Department

Awards/Honors:

- "Distinguished Member Award," AFTE, 1988
- "James Zotter Award," SW Assn. of Forensic Scientists, 1991, ("For Outstanding Dedication and Contributions to the SW Association of Forensic Scientists and Forensic Science.")
- "Best Technical Paper," Southern and SW Assns. of Forensic Scientists, 1992, "The Use of Videomicroscopy in Footwear Comparisons"
- "Best Technical Paper," SW Assn. of Forensic Scientists, 1993, "The Reconstruction of a Double Homicide near Ashfork, Arizona"
- "Best Technical Paper," Southern and SW Associations of Forensic Scientists Joint Conference, 1994, "The Use of Hand-Held Laser Pointers in the Reconstruction of Events at Crime Scenes," co-authored with Max Courtney
- Awarded Emeritus status in the American Society of Crime Laboratory Directors, 1996
- Awarded Emeritus status in the Southwestern Association of Forensic Scientists, 1996
- Co-recipient of the annual MLK Award for Community service in 2007 for work done on the Houston Crime Lab project
- Co-recipient of award for "Top 10 Books for Youth" for 2009 for "Fingerprints & Firearms"

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 111**

---

## DECLARATION OF STEVE LEEDY

I, Steve Leedy, declare as follows:

I am an investigator with the Capital Trial Division of the Oklahoma Indigent Defense System, Sapulpa office. I was one of the investigators assigned to assist John Echols and other defense counsel in the state trials of Kenneth Eugene Barrett. I was assisted by investigator Jack Stringer, also of this office. Before Mr. Barrett's first state trial, Mr. Echols had an "outside" mitigation investigator named Roseann Schaye. It is my understanding that she did mitigation work-up, and exhausted the funds that had been made available to her by OIDS. Ms. Schaye requested additional funding to continue her investigation, but it was not approved. I retrieved her work product, which included life history documents such as school, medical, psychiatric, employment, birth, marriage, and divorce records.

Mr. Stringer and I are former law enforcement officers. I'm not a mitigation expert. Before and during Mr. Barrett's first and second state trials, his attorneys and Mr. Stringer and I investigated guilt/innocence issues. I am generally aware that a proper mitigation investigations entails compiling a complete social and background history on the defendant and his family. I reviewed documents and reports in the file Ms. Schaye provided. I conducted some interviews for the purpose of mitigation.

I am familiar with the fact that John Echols, who was lead counsel for Mr. Barrett in his state case, was appointed to represent him in federal court.

1

At some point, Mr. Echols withdrew. At the OIDS Sapulpa office, we possessed the investigative file that had been compiled with respect to Mr. Barrett's state case. This included, among other things, reports of interviews I did, reports of interviews Mr. Stringer conducted, the reports that had been done by mitigation investigator Roseann Schaye, as wells as records she retrieved, including from Eastern State Hospital, the Bill Willis Community Health Center, and Wagoner Community Hospital concerning Mr. Barrett. I had learned that Roger Hilfiger became lead counsel. During the time Mr. Hilfiger represented Mr. Barrett in federal court, I don't recall being contacted by him. The OIDS investigative file I referred to above remained at the OIDS office, and was not picked up by either Mr. Hilfiger or his staff who worked on Mr. Barrett's federal case. This file was retrieved in I believe 2008 by David Autry, one of Mr. Barrett's current lawyers.

OIDS Capital trial investigators are salaried employees and as a part of our employment do not work on federal trial cases and did not work on Mr. Barrett's 2005 federal trial. I don't recall statements from individuals to the effect that Mr. Barrett had stated repeatedly, or even stated, that he would "go out in a blaze of glory" if the police tried to raid his property. If that statement was made we would have confronted such witnesses at Mr. Barrett's state trial, and a thorough investigation into the records, character, background and reputations of each such witness.

2

The information detailed in the preceding paragraph was related by me to one of Mr. Barrett's current attorneys and an investigator currently working on Mr. Barrett's federal case. I have carefully reviewed the contents of this declaration.

I declare under penalty of perjury that the foregoing declaration is to the best of my recollection true and correct.

Executed by me this _12_ day of March, 2009, in ____*Creek*____ County, Oklahoma.

Steve Veedy

3

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:04-CR-00115-JHP-SPS |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 112**

Declaration of LAUREN COHEN BELL, Ph.D., regarding sentencing dynamics in federal death penalty cases.

1. I am currently Associate Professor of Political Science and Associate Dean of the College at Randolph-Macon College in Ashland, Virginia, where I have been a faculty member since September 1999. Among the subjects I teach are public policy, judicial process, constitutional law, and research methodology.

2. In my research, I regularly perform quantitative analysis of data and rely on the Statistical Package for the Social Sciences (SPSS) to organize and analyze such data. The use of quantitative analysis in social science and the use of SPSS in particular is an integral part of the research methodology course I teach. I have authored or coauthored a total of 21 books, book chapters, and peer-reviewed articles and have presented nearly 30 academic papers at scholarly meetings. I am a member of the editorial board of *Justice System Journal* and a regular manuscript reviewer for *American Politics Research,* Routledge Publishers, *Journal of Politics*, Congressional Quarterly Press, Longman Publishers, Cambridge University Press, *Law and Society Review, American Journal of Political Science, Justice System Journal, Judicature, Political Studies Quarterly,* and *PS: Political Science and Politics.*

3. Between August 2006 and August 2007, I served as one of four United States Supreme Court Fellows. I was posted at the U.S. Sentencing Commission where I worked closely with the Office of Research and Data on the design and implementation of the Commission's 2007 study of the effect of minor offenses on the calculation of offenders' criminal history scores.

4. I hold Masters and Ph.D. degrees in political science from the University of Oklahoma's Carl Albert Congressional Research and Studies Center. A copy of my *curriculum vitae* is attached.

5. I have been asked to conduct an analysis of federal capital prosecutions focusing on the dynamics of death sentencing in cases involving white victims in comparison with the dynamics of death sentencing in cases not involving white victims.

6. In order to conduct these analyses, I was provided with data maintained by Kevin McNally on behalf of the Federal Death Penalty Resource Counsel Project. I used SPSS to create a database of 403 cases authorized and completed as capital prosecutions by the U.S. Department of Justice between 1989 and August 2008. For purposes of analyzing sentencing dynamics, I excluded from the analysis six cases: one in which the charged offense was treason and there were no identified victims; and five in which there were mass numbers of victims. (These were large-scale terrorist attacks: the Oklahoma City bombing, the September 11 attack, and the bombing of two U.S. embassies in Africa.) The cases were excluded because where there is either no victim or where there are mass casualties it is not possible to isolate a white victim effect on sentencing. This is consistent with the way other researchers have addressed issues of race and gender in sentencing. This left 397 authorized capital prosecutions for analysis.

7. I used statistical procedures generally applied in the analysis of quantitative data to assess whether the death penalty was imposed differently in cases involving defendants who killed white victims as opposed to victims of other races: descriptive statistics provide a "snapshot" of the characteristics of the data; crosstabulations show how two variables interact with one another; and chi-square analysis provides an indicator of whether an

2

observed relationship occurs by chance or because of a systematic interaction between the two variables.

8. My analysis, as reflected in the charts below, demonstrates that defendants who kill white victims receive the death penalty at a substantially higher rate than defendants whose victims are not white and that this correlation between white victims and death sentencing is highly statistically significant, systematic, and not the result of chance.

9. The data used in the analysis have the following characteristics:

| Condition of Interest | Number of Cases |
|---|---|
| All Authorized Cases | 403 |
| Authorized Cases Involving Victim | 402 (see paragraph 6, above) |
| Authorized Cases Excluding Mass Killings | 397 (see paragraph 6, above) |
| Death Penalty Imposed | 60 |
| Death Penalty Not Imposed | 337 |
| White Victim (WV) | 146 |
| No WV | 251 |
| Sentencing Trial Completed | 182 |
| Sentencing Trial Involving WV | 75 |
| Sentencing Trial, No WV | 107 |
| Death Penalty Imposed, WV | 37 |
| Death Penalty Imposed, No WV | 23 |

10. The results of the chi-square analysis for cases involving a white victim are as follows: Table 1 summarizes the analysis of death sentences among the set of 397 authorized federal capital cases. As explained in paragraph 6, this includes all but six authorized prosecutions. Table 1 indicates that defendants in cases involving a white victim were

3

sentenced to death 25.3 percent of the time (in 37 of 146 cases). Defendants in cases not involving a white victim were sentenced to death 9.2 percent of the time (in 23 of 251) cases. Thus, a defendant charged with killing a white victim was nearly three times (2.75) more likely to be sentenced to death than a defendant charged with killing a victim who was not white. These results are statistically significant at the $p<.001$ level, indicating that the probability that this relationship has been observed by chance is essentially zero.

**Table 1: Relationship between the Presence of White Victim (WV) and the Imposition of a Death Sentence – All Authorized Cases Except Mass Casualties (N=397)**

| Data Source | Condition (N) | Percent (Formula) |
|---|---|---|
| Set of All Cases (N =146) with White Victim | Death-Sentenced (37) | 25.3 (37 of 146) |
| | Non-Death Sentenced (109) | 74.7 (109 of 146) |
| Set of All Cases (N=251) with no White Victim | Death-Sentenced (23) | 9.2 (23 of 251) |
| | Non-Death-Sentenced (228) | 90.8 (228 of 251) |
| Set of All Cases (N=60) Involving a Death Sentence | Cases with White Victim (37) | 61.7 (37 of 60) |
| | Cases with no White Victim (23) | 38.3 (23 of 60) |
| Set of All Cases (N=337) Not Involving a Death Sentence | Cases with White Victim (109) | 32.3 (109 of 337) |
| | Cases with no WV (228) | 67.7 (228 of 337) |

11. Table 2 looks at the smaller set of authorized capital cases that proceeded through to a capital sentencing trial. It indicates that among those for whom life or death decisions were made by judges or juries, defendants in cases involving a white victim received a death sentence 49.3 percent of the time (in 37 of 75 cases). Defendants in cases where there was no white victim were sentenced to death 21.5 percent of the time (in 23 of 107

4

cases). A defendant in a federal capital trial thus was almost two-and-one-third (2.29) more likely to be sentenced to death in a case involving a white victim than a defendant in a case in which there was no white victim. These results are also statistically significant at the p<.001 level, indicating the probability that this relationship has been observed by chance is essentially zero.

**Table 2: Relationship between the Presence of White Victim (WV) and the Imposition of a Death Sentence – Sentencing Trial Cases Only (N=182)**

| Data Source | Condition (N) | Percent (Formula) |
|---|---|---|
| Set of All Cases (N =75) with White Victim | Death-Sentenced (37) | 49.3 (37 of 75) |
| | Non-Death Sentenced (38) | 50.7 (38 of 75) |
| Set of All Cases (N=107) with no White Victim | Death-Sentenced (23) | 21.5 (23 of 107) |
| | Non-Death-Sentenced (84) | 78.5 (84 of 107) |
| Set of All Cases (N=60) Involving a Death Sentence | Cases with White Victim (37) | 61.7 (37 of 60) |
| | Cases with no White Victim (23) | 38.3 (23 of 60) |
| Set of All Cases (N=122) Not Involving a Death Sentence | Cases with White Victim (38) | 31.1 (38 of 122) |
| | Cases with no WV (84) | 68.9 (84 of 122) |

12. After reviewing the results of these analyses, it is clear that there is a robust correlation between the presence of a white victim and the imposition of a death sentence. Social scientists consider a result to be robust when changing the assumptions undergirding an analysis would be unlikely to affect its results, which is the case here. Cases in which there is white victim represent 36.7 percent of all authorized prosecutions (146 of 397) and 41.2 percent of authorized prosecutions completing a penalty phase trial (75 of 182);

however they represent 61.7 percent of death sentences (37 of 60). These results are highly statistically significant. The generally accepted standard for statistical significance in political science research is $p<.05$, meaning the probability that the results occurred by chance is less than five percent. In the case of these analyses, the findings are statistically significant at a higher level of $p<.001$, meaning the probability they occurred by chance is less than one-tenth of one percent, or one in one thousand. Given the robust quality of these findings, it is my opinion to a reasonable degree of scientific certainty that this correlation of more severe sentencing outcomes and white victims is unlikely to disappear even in the presence of other potentially explanatory variables.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 3rd day of October, 2008.

Lauren Cohen Bell

6

Appendix: SPSS Output Used to Generate the Foregoing Analysis

**Case Processing Summary**

| | Cases | | | | | |
|---|---|---|---|---|---|---|
| | Valid | | Missing | | Total | |
| | N | Percent | N | Percent | N | Percent |
| Death Penalty Imposed * race2 | 397 | 100.0% | 0 | .0% | 397 | 100.0% |

**Death Penalty Imposed * race2 Crosstabulation**

| | | | White Victim | | Total |
|---|---|---|---|---|---|
| | | | No | Yes | |
| Death Penalty Imposed | No | Count | 228 | 109 | 337 |
| | | % within Death Penalty Imposed | 67.7% | 32.3% | 100.0% |
| | | % within race2 | 90.8% | 74.7% | 84.9% |
| | Yes | Count | 23 | 37 | 60 |
| | | % within Death Penalty Imposed | 38.3% | 61.7% | 100.0% |
| | | % within race2 | 9.2% | 25.3% | 15.1% |
| Total | | Count | 251 | 146 | 397 |
| | | % within Death Penalty Imposed | 63.2% | 36.8% | 100.0% |
| | | % within race2 | 100.0% | 100.0% | 100.0% |

**Chi-Square Tests**

| | Value | df | Asymp. Sig. (2-sided) | Exact Sig. (2-sided) | Exact Sig. (1-sided) |
|---|---|---|---|---|---|
| Pearson Chi-Square | 18.834[b] | 1 | .000 | | |
| Continuity Correction[a] | 17.594 | 1 | .000 | | |
| Likelihood Ratio | 18.134 | 1 | .000 | | |
| Fisher's Exact Test | | | | .000 | .000 |
| Linear-by-Linear Association | 18.787 | 1 | .000 | | |
| N of Valid Cases | 397 | | | | |

a. Computed only for a 2x2 table

b. 0 cells (.0%) have expected count less than 5. Minimum expected count is 22.07.

7

**Case Processing Summary**

| | Cases | | | | | |
|---|---|---|---|---|---|---|
| | Valid | | Missing | | Total | |
| | N | Percent | N | Percent | N | Percent |
| Death Penalty Imposed * race2 | 182 | 100.0% | 0 | .0% | 182 | 100.0% |

**Death Penalty Imposed * race2 Crosstabulation**

| | | | White Victim | | |
|---|---|---|---|---|---|
| | | | No | Yes | Total |
| Death Penalty Imposed | No | Count | 84 | 38 | 122 |
| | | % within Death Penalty Imposed | 68.9% | 31.1% | 100.0% |
| | | % within race2 | 78.5% | 50.7% | 67.0% |
| | Yes | Count | 23 | 37 | 60 |
| | | % within Death Penalty Imposed | 38.3% | 61.7% | 100.0% |
| | | % within race2 | 21.5% | 49.3% | 33.0% |
| Total | | Count | 107 | 75 | 182 |
| | | % within Death Penalty Imposed | 58.8% | 41.2% | 100.0% |
| | | % within race2 | 100.0% | 100.0% | 100.0% |

**Chi-Square Tests**

| | Value | df | Asymp. Sig. (2-sided) | Exact Sig. (2-sided) | Exact Sig. (1-sided) |
|---|---|---|---|---|---|
| Pearson Chi-Square | 15.463[b] | 1 | .000 | | |
| Continuity Correction[a] | 14.229 | 1 | .000 | | |
| Likelihood Ratio | 15.422 | 1 | .000 | | |
| Fisher's Exact Test | | | | .000 | .000 |
| Linear-by-Linear Association | 15.378 | 1 | .000 | | |
| N of Valid Cases | 182 | | | | |

a. Computed only for a 2x2 table

b. 0 cells (.0%) have expected count less than 5. Minimum expected count is 24.73.

8

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 113**

## DECLARATION OF KEVIN McNALLY REGARDING TESTIMONY
## IN *UNITED STATES V. TAYLOR* (E.D. TN No. 1:04-CR-00160-1)

1. I currently serve as the Director of the Federal Death Penalty Resource Counsel Project [FDPRC]. I have served as a Resource Counsel since the inception of the Resource Counsel Project in January, 1992. The Project is funded and administered under the Criminal Justice Act by the Office of Defender Services of the Administrative Office of the United States Courts. We assist court-appointed and defender attorneys charged with the defense of capital cases in the federal courts.[1]

2. My responsibilities as Federal Death Penalty Resource Counsel include the monitoring of federal capital prosecutions throughout the United States in order to help ensure the delivery of adequate defense services to indigent capital defendants in such cases. This effort, in turn, includes the collection of data on a wide variety of topics regarding federal capital cases, including decisions by the Attorney General to seek or not seek the death penalty and decisions by juries or judges whether to impose the death penalty. This includes the factual scenario, allegations and evidence, the number of homicide victims, the race or ethnic background of the defendant and the victim(s) and the statutory and non-statutory aggravating and mitigating circumstances alleged and found by the jury.

3. In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information regarding Department of Justice allegations in these

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in the report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMEN-DATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ..." *Id.* at 50.

cases. I accomplish this by reviewing dockets and downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, by reviewing transcripts, reviewing media accounts of trials, reviewing DOJ press releases and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated, and is checked for accuracy with defense counsel. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. I have been asked by appointed counsel for Rejon Taylor to testify before the jury regarding the federal death penalty and issues of race and fairness, including statistics regarding the race of the defendant and victim, the facts and circumstances, the allegations of statutory and non-statutory aggravating circumstances, the jury findings and the results in other federal death penalty cases.

5. Since 1988, the Attorney General has authorized a capital prosecution against 403 defendants as to whom the capital prosecution has been completed, to the extent that a decision imposing or rejecting the death penalty has been made by the Attorney General and/or a jury or a judge. FDPRC has determined the race and gender of the defendants and victims as to each of these 403 "authorized" capital defendants. Additionally, FDPRC has determined the number of homicide victims attributable to each defendant. This information is captured in a report previously filed with the Court [Docket Entry 701, Exhibit B], along with the defendant's name, the district and the indictment number. FDPRC has obtained and reviewed the Notice of Intent to seek the Death Penalty and the jury findings regarding aggravating and mitigating circumstances in these cases.

6. Each of these 403 defendants is categorized in the report by a descriptive name relating to the disposition of the case. The categories, which FDPRC uses in our database, are as follows: "Acquittal," "Authorization withdrawn," "Awaiting resentencing or retrial," "Clemency," "Death Row," "Death Sen Vac & AW," "Dismissal after notice by judge," "Executed," "Guilty plea," "Incompetent after authorization," "Innocent," "Killed or died after authorization," "Lesser included conviction" and "Life sentence."

7. "Acquittal" means that the jury found the defendant not guilty of the capital charge.

8. "Authorization withdrawn" means that the Attorney General withdrew the request for the death penalty either before or during trial.

9. "Awaiting resentencing or retrial" means that the defendant received a sentence of death, but an appellate court has ordered a retrial or resentencing which has not yet occurred.

10. "Clemency" means that the President granted clemency to an individual who was sentenced to death.

11. "Death Row" means that a person is under a sentence of death and is awaiting appellate or post-conviction review.

12. "Death Sentence Vacated and Authorization Withdrawn" (Death Sen Vac & AW) means that a death sentence was reversed by an appellate court and the Attorney General withdrew the request for the death penalty.

13. "Dismissal after notice by Judge" means that a Judge has declined to permit the government to seek the death penalty, due to a legal reason.

14. "Executed" means that the sentence of death was carried out.

15. "Guilty plea" means that a plea agreement involving a non-death sentence (usually life)

- 3 -

was approved by the Attorney General and accepted by the Court, either before or during trial.

16. "Incompetent after authorization" means that the Court found the defendant incompetent, after the Attorney General authorized a capital prosecution.

17. "Innocent" means that the government moved to dismiss the capital count and either prosecuted another individual or the prosecutor admitted he/she was unable to prove the capital charge.

18. "Killed or died after authorization" means that the individual was killed or committed suicide after the Attorney General had authorized a capital prosecution before or during a trial.

19. "Lesser included conviction" means that the jury did not find a statutorily required aggravating circumstance or the required mental state threshold.

20. "Life sentence" means that the jury, or in two cases a judge, sentenced the defendant to life in prison.

21. 110 of the 403 individuals reached a plea agreement with the government that was accepted by the Court. The Attorney General withdrew the request for the death penalty as to an additional 57 individuals for various reasons.

22. 188 of the 403 individuals were tried by a jury or judge.

23. The numerical distribution of these cases is as follows:

| | |
|---|---|
| Acquittals | 13 |
| Authorization withdrawn | 48 |
| Authorization withdrawn at trial | 9 |
| Death sentence | 61 |
| Dismissal of notice by judge | 24 |
| Guilty pleas | 110 |
| Incompetent | 2 |
| Innocent | 3 |
| Killed/Died | 3 |
| Lesser included | 3 |

– 4 –

Life sentence        <u>127</u>
**Total**        **403**

24. One defendant of the 403 "authorized" defendants described above was charged with espionage and there was no homicide victim.

25. Five of the 403 defendants were accused of acts of mass murder/terrorism/bombing and were tried by a jury. These individuals were Timothy McVeigh and Terry Nichols (the Oklahoma City bombing), Mohamed Rashed Al'Owhali and Khalfan Khamis Mohamed (the African Embassy bombings) and Zacarias Moussaoui (convicted of participation in the September 11, 2001 attack on the World Trade Center in New York).

26. In cases with multiple murders, if one homicide victim is white, the case is coded as involving a white victim.

27. In the attached report, "M" means male, "F" means female, "W" means white, "H" means Hispanic, "B" means African-American, "A" means Asian, "NA" means Native American, "I" means Indian and "O" means other.

28. I provided the attached data set to Lauren Cohen Bell, Ph.D., and requested that she provide an expert opinion as to whether the race of the victim(s), in particular white victims, in federal capital cases has a statistically significant effect on the death sentencing rate. Her analysis is attached. It indicates that defendants who kill a white victim or victim(s) are nearly three times as likely than other capital defendants to be sentenced to death, that the race of the victim is "highly statistically significant" and that the likelihood that this occurs by chance is "essentially zero."

29. I am able to testify regarding the facts and circumstances of the following cases: *United States v. Anthony Jones* (D. MD CR No. WMN-96-0458); *United States v. Terry Lynn Nichols* (D. CO No. 96-CR-68-M); *United States v. Khalfan Khamis Mohamed and Mohamed Rashed Daoul*

– 5 –

*Al'Owhali* (S.D. NY No. S6 98 CR 1023); *United States v. Mariano Martinez* (C.D. CA No. 99-83-(A)-DT); *United States v. William and Rudy Sablan* (D. CO No. 00-CR-531); *United States v. Zacarias Moussaoui* (E.D. VA No. 01-CR-455); *United States v. Michael* O'Driscoll (M.D. PA No. 4-CR-01-277); *United States v. Barry Byron Mills, Tyler Davis Bingham, Wayne Bridgewater and Henry Michael Houston* (C.D. CA No. 02-00938-GHK); *United States v. Kenneth McGriff* (E.D. NY No. 04-966 (ERK)) and *United States v. Ellis Mosher* (E.D. TX No. 1:06 CR 00101-TH). I would testify that each of these individuals were sentenced by a jury to life in prison without release and that all are housed at ADX Florence, the so-called federal "Supermax" prison. This information was obtained from the Bureau of Prisons website. http://www.bop.gov/iloc2/LocateInmate.jsp (last viewed on October 3, 2008).

30. *United States v. Anthony Jones* (D. MD CR No. WMN-96-0458) involved multiple (six) killings: one in '94, four in '96, one in '97. Authorization was granted to seek the death penalty for three murders, including an allegation that Jones ordered his step-brother killed from jail because he feared he was about to become a government witness. Jones also ordered the murder, by the victim's own bodyguards, of a rival Baltimore drug dealer who had earlier attempted to arrange the murder of Mr. Jones. Numerous other homicides, attributed to Jones, were alleged in aggravation. Murder for hire was alleged as an aggravating circumstance. Jones was convicted in 1998, sentenced to life without release. Eight co-conspirators were involved in multiple murders but did not face the death penalty. Jones was sent to the "Control Unit" at "super-max," ADX in Florence, Colorado, where he is under severe communication restrictions for 10 years. The defendants and victims were black.

31. *United States v. Terry Lynn Nichols* (D. CO No. 96-CR-68-M) involved Timothy McVeigh's co-defendant in the Oklahoma City bombing case. He was sentenced in 1998 to life imprisonment in federal court and faced the death penalty in state court where he was also sentenced to life in prison. McVeigh was executed.

32. *United States v. Khalfan Khamis Mohamed and Mohamed Rashed Daoul Al'Owhali* (S.D. NY No. S6 98 CR 1023) involved foreign national accomplices of Usama bin Ladin, the organizer of two bombings of American embassies in Africa. The August 7, 1998 bombings in Kenya and Tanzania killed 224 people, including 12 Americans. More than 5,000 people were injured. Al-'Owhali is a Saudi citizen who was arrested in Nairobi after the bombing. Mohamed and Al'Owhali are members of al-Qaida, an international terrorist organization, led by bin Laden, who has repeatedly issued various "fatwahs" against the United States. A co-defendant stabbed a jail guard in the eye and caused brain damage during an escape attempt.

33. *United States v. Mariano Martinez* (C.D. CA No. 99-83-(A)-DT) involved defendants in one of three related multiple murder Mexican Mafia prosecutions. "Chuy" Martinez, 41, was a "drug kingpin," the head of a narcotics organization. There were a total of four murders and 13 conspiracies to commit murder charged. Three men, one a drug dealer and two innocent bystanders, all Hispanic, were killed in a Monticello autobody shop. Martinez orchestrated the killings using a walkie-talkie. Max Torvisco, once Martinez's right hand man, obtained a plea agreement. He admitted ordering 140 murders. Wiretaps show Martinez ordering numerous murders.

34. *United States v. William and Rudy Sablan* (D. CO No. 00-CR-531) involved an inmate killing - an evisceration stabbing of cellmate (in their cell). The aftermath of the murder was recorded on videotape. The letter "S" was written on the cell wall in the victim's blood and his organs

- 7 -

removed and held up for the guards to see. The defendants are foreign nationals, Pacific Islanders, "Chmorran", from Saipan. The victim is Hispanic. The defendants, cousins, were doing federal time for a hostage-taking in Guam. William had a 20 year history of violent crime.

35. *United States v. Zacarias Moussaoui* (E.D. VA No. 01-CR-455) involved a foreign national and co-conspirator in the September 11, 2001 terrorist attack on the World Trade Center and Pentagon which killed over 3,000 and resulted in four airline crashes in New York, Pennsyvlania and Washington, D.C. Moussaoui is French of Moroccan descent and is a member of al-Qaida. He was in jail on September 11 after suspicious actions at a Minnesota flight school. There were victims of many nationalities and races.

36. *United States v. Michael* O'Driscoll (M.D. PA No. 4-CR-01-277) the stabbing and killing of an inmate at USP - Allenwood in 1997. There were half a dozen correctional officers who witnessed the end of the stabbing. Both the defendant and victim are white.

37. *United States v. Barry Byron Mills, Tyler Davis Bingham, Wayne Bridgewater and Henry Michael Houston* (C.D. CA No. 02-00938-GHK) were charged in a racketeering indictment of 40 members and associates of the Aryan Brotherhood [AB] for a string of murders and violent attacks allegedly designed to expand the power of the white racist prison gang, which was founded at San Quentin state prison in 1964. Authorities say the gang has about 100 members. In 1980, the federal faction of the AB formed a three-man "Commission" to oversee AB members in federal prisons, and, in 1993, the Federal Commission formed a "Council" to oversee the day-to-day activities of the federal faction. 17 murders were alleged. Multiple (at least six) murders occurred since 1996. Twenty-seven defendants initially were eligible for the death penalty. Mills and Bingham made all major decisions involving the criminal activities of the federal faction. Mills was

also charged with personally committing one murder and involvement in numerous murders. AB members who were selected to face the death penalty were: McIntosh, Knorr, Sahakian, McElhiney, Littrell, Bridgewater, Terflinger, Schwyhart, Houston, Griffin, Chance, Stinson, Mills and Bingham. Mills and Bingham were sentenced to life in prison in 2006, as were Bridgewater and Houston at a separate trial in 2007. The Attorney General dropped the remaining capital prosecutions against the Aryan Brotherhood.

38. *United States v. Kenneth McGriff* (E.D. NY No. 04-966 (ERK)) involved Kenneth "Supreme" McGriff, the leader of a notorious Queens-based drug gang, "The Supreme Team," that operated in the 1980's. He went to prison after pleading to a Continuing Criminal Enterprise and receiving a 12-year sentence. Upon his release, he resumed drug trafficking. McGriff and co-defendants were charged with two VICAR murders that took place in 2001. All involved are African-American.

39. *United States v. Ellis Mosher* (E.D. TX No. 1:06 CR 00101-TH) involved a 1998 inmate killing at Beaumont FCI.

40. I am also able to testify as to the facts and circumstances of other cases involving the murder of a government informant or witness which have resulted in a life sentence after trial. I previously listed these cases in a declaration filed of record [DE 701, Ex. A, paragraph 7]. Descriptions of the facts and circumstances of these cases have also been previously filed of record [DE 701, Ex. C].

41. I am able to produce the Notice of Intent to Seek the Death Penalty (which contains the Government's allegation of statutory and non-statutory aggravating circumstances) and the jury

findings of statutory and non-statutory aggravating circumstances and statutory and non-statutory mitigating circumstances in all these cases.

42. I am able to testify as to the race of all of these capital defendants and their victims, the number and nature of aggravating and mitigating circumstances and the number of homicide victims in all of these cases.

43. Rejon Taylor's date of birth is September 15, 1984 and the date of the capital offense is August 6, 2003. Therefore, Mr. Taylor was 18 years old at the time of the homicide. If the capital crime had occurred 11 months earlier, Mr. Taylor would not have been eligible for the death penalty. 18 U.S.C. §3591(a). *See Roper v. Simmons,* 543 U.S. 551 (2005).

44. No federal capital defendant who was 18 at the time of the capital offense has been sentenced to death for a single homicide.

45. No federal capital defendant has been sentenced to death in a prosecution involving a struggle for a gun leading to a shooting or a factual scenario similar to that.

46. The information detailed herein is maintained in the ordinary course of business of the Federal Death Penalty Resource Counsel Project and is accurate to the best of my knowledge, ability and belief.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of October, 2008.

_____
Kevin McNally
Federal Death Penalty Resource Counsel

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 114**

## DECLARATION OF RODNEY FLOYD

I, Rodney Floyd, declare the following:

I am one of the investigators currently working for the defense in Kenneth Eugene Barrett's case. On February 21, 2008, I interviewed former Sequoyah County Sheriff John Philpot. Mr. Philpot told me that less than a month before the incident in which Oklahoma State Highway Patrol Trooper David "Rocky" Eales was shot and killed, he and three other law enforcement officers went to Mr. Barrett's residence. They did not serve an arrest warrant on Mr. Barrett, or take him into custody. They encountered no violence from Mr. Barrett, and were not harmed or assaulted.

I did not draft this declaration. The information detailed above is based on what I told one of Mr. Barrett's lawyers, David Autry, based on my investigation. I have read this declaration carefully, and it accurately states what I told Mr. Autry.

I declare under penalty of perjury that the foregoing 1 page declaration is true and correct.

Executed by me this <u>11</u> day of <u>March</u>, 2009, in <u>Lincoln</u> County, Oklahoma.

<u>Rodney Floyd</u>
Rodney Floyd

# EXHIBIT 115

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 115**

---

June 11, 2001

To:     The Honorable Russell D. Feingold, Committee on the Judiciary, U. S. Senate, 716 Hart Senate Office Building, Washington D.C. 20510-4904

From:   David C. Baldus, Joseph B. Tye Distinguished Professor of Law, College of Law, University of Iowa

Re:     DOJ report on the Federal Death Penalty System (June 6, 2001)

I have read U.S. Department of Justice, The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review (June 6, 2001) ("the report"), which supplements the DOJ report of September 12, 2000. The following comments explain why in the face of the findings and data in the DOJ September 2000 report, the latest DOJ report utterly fails to convince me that there is no significant risk of racial unfairness and geographic arbitrariness in the administration of the federal death penalty. I believe there is still the just as much reason to be concerned about these issues as there was when the September 2000 report was issued.

1. The report completely overlooks the evidence of race-of-victim discrimination documented in the September 12, 2000 report.

A main theme of the latest report (p. 10) is that the death penalty authorization rate is higher for whites (.38) than it is for blacks (.25) and Hispanics (.20). These are the same figures that appeared in the September 2000 report. The latest report's emphasis on these statistics appears to suggest that white defendants are actually treated more punitively than minority defendants.

A more plausible explanation for the higher authorization rates for the white defendants is plainly documented in the September report – (1) white defendants are more likely to have killed whites[1] and (2) the U.S. Attorney charging and DOJ authorization rates are much higher in white-victim cases than they are in minority-victim cases. For example, data in the September 2000

---

[1] For the cases for which both race-of-defendant and race-of-victim data are available, 92% (109/119) of the white

1

report indicate that the Attorney General (AG) authorization rate for capital prosecutions is .37 (61/167) in white-victim cases and .21(81/383) in minority-victim cases -- a 16 percentage point difference that is statistically significant at the .001 level.  The more punitive treatment of *white-victim cases* is a plausible alternative explanation for the higher authorization rates in *white-defendant cases* that the new DOJ report does not even recognize, let alone dispel.

The September 2000 report also documents race-of-victim disparities in the actual imposition of death sentences in the federal system.  Among all death-eligible offenders, those data indicate that the death-sentencing rate from 1995 to 2000 is twice as high in white victim cases as it is in minority victim cases.  Nationwide, the rates are .05 (10/198) for the white-victim cases versus .02 (10/446) for the minority-victim cases; in the eleven states in which death sentences were actually imposed, the rate in the white-victim cases was .17 (10/59) versus .08 (10/119) in the minority-victim cases -- a nine percentage-point difference.[2]

These are the same kinds of race-of-victim disparities documented in *McCleskey v. Kemp*[3].  The latest report simply ignores the data on race-of-victim disparities in the charging and authorization process, *and* in the actual imposition of federal death sentences.

---

defendant cases involved a white victim.

[2] The race-of-victim disparity nationwide is significant at the .06 level while the disparity in the states in which death sentences have been imposed is significant at the .09 level.   The states in which death sentences were imposed between 1995 and 2000 are Arkansas, Georgia, Illinois, Kansas, Louisiana, Missouri, North Carolina, Oklahoma, Pennsylvania, Texas, and Virginia.

Of particular relevance are the race-of-victim disparities in case involving black defendants. Nationwide, in black defendant/*white victim* cases, the death-sentencing rate was .11 (6/55) while in the black defendant/*minority victim* cases, the rate was .03 (7/253), an 8 percentage-point difference significant at the .01 level.  In the eleven death-sentencing states, the death-sentencing rate in the black defendant/*white victim* cases was .24 (6/25) while in the black defendant/*minority victim* cases, the rate was .07 (7/95), a 17 percentage-point difference significant at the .02 level.

[3] 481 U.S. 279 (1987).

2. The report confounds the issue of "regional disparities" in the administration of the federal death penalty with the issue of racial disparities in the distribution of death eligible cases.

The report argues that we should not expect the proportions of black, white, and Hispanic offenders among death-eligible cases that are *accepted* for federal prosecution to correspond to "the racial and ethnic proportions in the general population." (p.13) Perhaps, but that is not the question. The real issue in this regard is the racial composition of the pool of death-eligible cases that are *not accepted* for federal prosecution. The report offers no data on that question. As a result, we do not know to what extent the death-eligible cases that were prosecuted in federal court are representative of all homicides that could have been charged as federal capital crimes, in the districts that are discussed in the report (pp.14-18) and in the country as a whole.

More importantly, the report seeks to equate its arguments concerning geographic disparities in the *racial distribution of death-eligible cases* with an explanation for clearly documented geographic and regional disparities in the *administration of the death penalty*. (Pp. 17-18) This is extremely misleading. The patterns that need to be studied are differences between regions in the rates at which death sentences are (a) *sought* by United State's Attorneys, (b) *approved* by the Attorney General, and (c) *imposed* by juries.

The September 2000 report clearly shows that in practice the federal death sentencing system is largely a Southern program. Twelve of the 19 men on federal death row as of September were sentenced in the South, including 6 from Texas and 4 from Virginia. The new report focuses on *regional differences* in the *racial composition of the pools* of potential capital cases that the districts have generated (p. 17). This has nothing to do with regional disparities in the rates at which death eligible defendants in the system are capitally charged and sentenced to death.

3. The report presents no data or other compelling reasons to dispel concerns about the exercise of discretion by U.S. Attorneys in the post-authorization stage of the process.

3

One the most striking findings of the September 2000 report is that in the period after the AG has approved a capital prosecution, 48% of white defendants avoid the risk of a death penalty by entering a plea agreement to a non-capital charge, while the rates that blacks and Hispanics enter such agreements are 25% and 28% respectively. (p.19)  The department is obviously concerned about this issue because it plans to limit the power of U.S. Attorneys to enter such agreements without AG approval. (p. 22)

The report seeks to dispel concerns created by these data by pointing out first that it "takes two to make a plea agreement" and the data do not reflect racial differences in the rates at which the government offered post-authorization plea agreements.  This argument raises an empirical question about the 62 cases (as of the September 2000 report) in which a post-authorization plea agreement was *not* reached.  Was a plea bargain offered by the prosecution in these cases and rejected by the defense, or was none offered?  It would have been easy for the DOJ to ask its own prosecutors whether they offered plea agreements in these cases.  Apparently, it was not done.

The report further argues that even if differential acceptance rates by white and minority defendants did not explain the race disparities in the post-authorization guilty pleas, the September 2000 report's findings on this issue "would not be suggestive of bias by the U.S. Attorney's offices." (p. 20) The argument is that the detection of discrimination by U.S. Attorneys must rest on an analysis of "what happens in the process as a whole" and that decisions taken "at the final plea stage are uninformative as possible indications of bias by the U.S. Attorney offices." (p.20) Certainly it is important to view the system as a whole, but prior research demonstrates that race disparities may operate at discrete stages in a decision making process that overall appears to be evenhanded. There is serious cause for worry here, and the report makes no attempt to address it.[4]

---

[4] The report's argument also overlooks the fact that many of the post-authorization plea agreements are made in cases in which the U.S. Attorney's initial recommendation to waive the death penalty was overruled by the AG, a circumstance that needs to be factored into any analysis of the post-authorization decisions.

4

The claim that no differential treatment exists in the post-authorization plea stage is a mere assertion with no evidence whatever to support it.  Without data on the comparative culpability of the offenders (and the race of the victims) in the cases affected by these post-authorization pleas bargaining decisions, one has no idea the extent to which similarly situated defendants were in fact treated comparably.

4.  <u>The report provides no compelling reason for the DOJ's failure to authorize a comprehensive state of the art study of fairness in the administration of the federal death penalty system.</u>

The report notes a meeting of  "researchers and practitioners on January 10, 2001" in Washington D.C. to consider the feasibility of conducting a comprehensive empirical study and evaluation of fairness in the administration of the federal system. (p.11)  I was one of the researchers at that meeting.

The report correctly states that there was general agreement at the January meeting that the conduct of such a study would entail a "multi-year research initiative."  Two years would be the likely time line.  In the meantime, half a year has passed since that meeting, and nine months since the release of the initial report, and neither the NIJ nor any other agency of the Department of Justice has taken any visible step to begin to make such a study possible.  Quite the opposite. Attorney General Ashcroft's testimony last week suggested that he believes that the idea should be abandoned.

The report also states that "discussion" at the January 10 meeting "indicated," that such a study "could not be expected to yield definitive answers concerning the reasons for disparities in federal death penalty cases."  This was certainly not the consensus of the researchers at the January 10 meeting.  On the contrary, the consensus was that such a study would provide the best possible evidence on the question.  Certainly the results of such a study would yield far more definitive answers to the issue of racial fairness in the system than the arguments presented in the department's latest report.

The new report offers no reason at all why such a study should not be conducted even if it would require up to two years to complete.  It also offers no reason why the DOJ appears unwilling to identify by defendant name and docket number the more than 700 death-eligible cases that make up the database for its latest study.  With this information independent researchers could collect data on the cases in the DOJ database and conduct the kind of study that would provide the best evidence available on the question of fairness in the federal death sentencing system.

5.  <u>The report misconceives the nature of race discrimination in the administration of the federal death penalty.</u>

A main theme of the report is that the core issue of racial fairness is whether U.S. Attorneys are consciously engaged in "favoritism towards White defendants." (p. 11)  In other words, are their decisions based on "invidious" racial reasons (p.12) or motivated by "bias" (p. 20) or a "particular desire to secure the death penalty for minority defendants." (p. 17)  This states the issue far too crudely.  No one with an understanding of the system suggests that it is  driven by such a conscious and blatant animus against minority defendants or defendants whose victims are white.

The concern about racial unfairness in the system is whether defendants with similar levels of criminal culpability and deathworthiness are treated comparably or differently because of their race or the race of their victims.  The reasons for differential treatment by U.S. Attorneys - and by agents of the FBI, the DEA and other are federal law enforcement agencies - are almost certainly nonconscious.  More importantly, the reasons for the differential treatment of similarly situated offenders on the basis of their race or the race of the victim are irrelevant.  It is the fact that differential treatment cannot be explained by legitimate case characteristics that makes it morally and legally objectionable, when it exists.  Without a systematic study based on full information concerning the criminal culpability and the race of the victims of all of the death eligible offenders,

6

we will remain in the dark about whether unexplained differential treatment based on the race of

the defendant and victim exists in the federal death penalty system, and if so, what causes it.

7

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 116**

### DECLARATION OF KEVIN McNALLY REGARDING THE GENDER AND RACE OF VICTIMS IN FEDERAL CAPITAL PROSECUTIONS SINCE 2000

1. I currently serve as the Director of the Federal Death Penalty Resource Counsel Project [FDPRC], assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts. I have served as Resource Counsel since the inception of the Resource Counsel Project in January, 1992. The Project is funded and administered under the Criminal Justice Act by the Office of Defender Services of the Administrative Office of the United States Courts.

2. The responsibilities of the FDPRC include the monitoring of federal capital prosecutions throughout the United States, in order to ensure the delivery of cost-effective and adequate defense services to indigent capital defendants in such cases.[1] This includes the collection of data on the utilization of the federal death penalty, both as to prosecutions brought under the 1988 so-called "Drug Kingpin" death penalty statute, 21 U.S.C. § 848(e) *et seq.,* and those brought pursuant to the "Federal Death Penalty Act of 1994." 18 U.S.C. §3591 *et seq.*

3. In order to carry out our responsibilities, the FDPRC maintains a comprehensive list of all federal death penalty prosecutions and information regarding each defendant. FDPRC accomplish this by reviewing dockets and downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated, and is checked for accuracy whenever possible against any

---

[1] In May 1998, the role of the Federal Death Penalty Resource Counsel Project was described, at pp. 28-30, in a report prepared by a Judicial Conference Subcommittee on Federal Death Penalty Cases. That report (commonly called the Spencer Committee Report) "urge[d] the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project . . . which has become essential to the delivery of high quality, cost-effective representation in death penalty cases . . . ." *See "*Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation," (May 1998), at p. 50. The Report is available online at http://www.uscourts.gov/dpenalty/. The Report's recommendations were later adopted by the Judicial Conference of the United States.

1

available United States government information regarding federal capital prosecutions and/or with defense counsel in those cases. The Project's information regarding practices in federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4.   Attorney General Gonzales reviewed 409 potential capital defendants.  In those cases, there were 19 prosecutions involving white female victims.  Of those 19 cases, 10 defendants (53%) were "authorized" or selected by the Attorney General to face the death penalty.  Of those 409 defendants, there were 67 cases involving white male victims.  Of those 67 cases, 19 defendants (28%), were chosen to face the death penalty.  Of those 409 defendants, there were 323 cases involving non-white victims.  Of those 323 cases, 52 defendants (16%) were authorized to face the death penalty.

5.   Attorney General Ashcroft reviewed 626 potential capital defendants.  However, three cases involved no homicide victims, as espionage or large scale drug trafficking was alleged.  Of those 623 cases, there were 59 cases involving white female victims.  Of those 59, 34 (58%) defendants were selected for a death penalty prosecution.  Of those 623 cases, there were 105 prosecutions involving white male victims.  Of those 105 prosecutions, 18 defendants (17%) were authorized.  Of those 623 cases, there were 459 prosecutions involving non-white victims.  Of those 459 prosecutions, 86 defendants (19%) were chosen to face the death penalty.

6. Eighty-seven defendants "authorized" to face the death penalty by Attorney General Ashcroft have completed trial.  Of those 87 defendants, 25 prosecutions involved white female homicide victims.  15 of those 25 (60%) white female victim prosecutions have resulted in a death sentence.  30% (3 of 10) white male victims cases have resulted in a death sentence.  51 non-white victim prosecutions have completed trial.  Five (10%) of these 51 non-white victims have resulted in a death sentence.

7.  Thirty-one defendants "authorized" to face the death penalty by Attorney General Gonzales have

2

completed trial.  Of those, 5 prosecutions involved white female victims.  Juries have sentenced 4 of those 5 defendants to death.  Seven prosecutions have involved white male victims.  Two (29%) of those 7 defendants have been sentenced to a death sentence.  19 non-white victim cases have completed trial.  Three (16%) of those 19 defendants have been sentenced to death.

8.  The totals for Attorney General Ashcroft and Attorney General Gonzales are as follows:

Gonzales authorized - 81
52      Black, Hispanic and other victims
19      White male victims
10      White female victims

Gonzales not authorized - 328
271     Black, Hispanic and other victims
48      White male victims
9       White female victims

Ashcroft Authorized - 139
86      Black, Hispanic and other victims
18      White male victims
34      White female victims
1       No victim

Ashcroft not authorized - 487
373     Black, Hispanic and other victims
87      White male victims
25      White female victims
2       No victim

9.  I attach three graphs depicting this information.

10.  The victim gender data has not been available before.

11.  The information detailed herein is maintained in the ordinary course of business of the Federal Death Penalty Resource Counsel Project and is accurate to the best of my knowledge, ability and belief.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 5th day of December, 2007.

 /s/ Kevin McNally
Kevin McNally

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 117**

**DECLARATION OF GEORGE W. WOODS, JR., M.D.**

I, George W. Woods, M.D., declare as follows:

1.    I am a licensed physician specializing in psychiatry and neuropsychiatry. I currently maintain a private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations.

2.    I am a Fellow of the American Psychiatric Association, and a member of the California Psychiatric Association and the Northern California Psychiatric Association. I am also a member of the American Neuropsychiatric Association, the American Psychological Association, the American Society of Addiction Medicine and the Black Psychiatrists of America.

3.    I am Secretary General-Elect of the International Academy of Law and Mental Health, where I am a member of the Scientific and Executive Committees.  I also serve on the Advisory Board of the Center for African Peace and Conflict Resolution, California State University, Sacramento, California; and the Global Advisory Board for Humiliation and Dignity Studies, Trondheim University, Norway, and Columbia University, New York, New York.

4.    I received my bachelor's degree from Westminster College in Salt Lake City, Utah, in 1969; and was awarded my medical degree from the University of Utah in 1977.  I then completed a rotating medical internship at Alameda County Medical Center (Highland Hospital), in Oakland, California, which included internal medicine, surgery, orthopedic surgery, Emergency Medicine, and Obstetrics/Gynecology.  In 1981, I completed my psychiatric residency at the Pacific Medical Center in San Francisco, California, where I served as Chief Resident my senior year.  During my psychiatric residency, I pursued specialized neurological

1

electives at Kaiser Permanente Hospital, Oakland, California. These electives consisted of extended, three month clerkships, in which I was assigned to the Neurology department, conducting neurological examinations and diagnosing neurological disorders, including movement disorders, headache disorders and central nervous dysfunctions, among others.

5.    In 1982, I then participated in a National Institute of Mental Health/American Psychiatric Association Fellowship, during which I developed the first medical/psychiatric unit at Pacific Presbyterian Hospital. This unit administered to patients with either medical illnesses that had psychiatric manifestations or psychiatric patients with severe medical illness that could not be treated effectively on regular medical units. The focus of my Fellowship was Geriatric Psychopharmacology, the study of medication use with elderly populations. Geriatric Psychopharmacology, however, is an extremely valuable approach to the study of psychopharmacology in general. The medical/psychiatric/neurological/pharmacological training and experience I gained during this period proved relevant to other patient populations, particularly forensic populations, who experience a higher incidence and greater interaction of drug, mental and neurocognitive problems than the general population. Following the completion of my Fellowship, I become the Director of Outpatient Geriatric Services for the San Francisco Family Services Agency. In that capacity, I conducted home visits with elderly patients who manifested psychiatric symptoms. Medical examinations and neurological intervention were frequently required.

6.    From 1983 through 1990, I provided neuropsychiatric care at Crestwood Manor, Vallejo, California, a long-term psychiatric facility, dedicated to treating severely ill patients. Many of these patients came from state hospitals with atypical presentations and the diagnosis of

mental retardation. Atypical presentation of psychiatric symptoms is common among forensic populations as well, particularly in areas that may lack community mental health services and or widespread availability of intensive treatment.  Many of these patients Many of Crestwood's clients also had multiple, co-occurring disorders that required an understanding of pharmacology, neurology, and psychiatry, as noted by the American Neuropsychiatric Association.

7.    From 1989 to 1994, I served as Clinical Director of the New Beginnings Chemical Dependency Program, an inpatient substance abuse detoxification and rehabilitation center housed at Doctors Hospital in Pinole, California.  In 1994, I was appointed as Senior Consulting Addictionologist by Doctors Hospital, and oversaw complex withdrawals and detoxifications, and developed research protocols for the use of new medications for opiate withdrawals and sedation in the intensive care units.  During my tenure, New Beginnings evolved into program that treated patients with what are called co-occurring disorders, meaning persons who have multiple psychiatric disorders – which is the norm, rather than unusual. Many persons with neuropsychiatric disorders attempt to self-medicate their symptoms.

8.    The clinical facilities at Doctors Hospital afforded access to a Single Photon Emission Computerized Tomography (SPECT), which was utilized to determine brain function. My neuroimaging experience also includes the study of Magnetic Resonance Imagining (MRI) and Cathode Scans (CT), focusing on the different uses of structural imaging and functional imaging, like the SPECT and the Positive Emission Tomography (PET).  From 1990 through 1995, I also served as the Coordinator and Psychiatric Consultant to the Insomnia Division of the Doctors Hospital Sleep Disorders Center.  The assessment of sleep disorders, the evaluation of disorders in the architecture of sleep, is a seminal component of diagnosing medical illness and

psychiatric disorders, and formulating appropriate pharmacological interventions. Sleep disruption is frequently the first overt symptom of an underlying medical, neurological, or psychiatric disorder.  Disruption of sleep can be found in almost all psychiatric disorders. Impairment of normal sleep patterns is also often a contributing cause of and exacerbated by substance abuse.

9.    In 1991, I was retained by Neurocare Corporation, a treatment facility in Concord, California, specializing in head-injury and neurological disorders, to work with neurologically impaired individuals who had psychiatric manifestations of their cognitive impairments.  The facility was a multidisciplinary environment in which the treatment team consisted of neurologists, neuropsychiatrists, neuropsychologists, and social workers.  Treating physicians required an intimate knowledge of brain/behavior relationships in order to avoid misdiagnosis of atypical symptom presentations.

10.    In 1992, I received my board certification in psychiatry by the American Board of Psychiatry and Neurology.  I joined the faculty of the University of California, Davis, Medical School, Department of Psychiatry, in 1996. For the next four years, I taught Forensic Psychiatry and Criminal Responsibility to psychiatrists in the Postgraduate Forensic Fellowship.

11.    In 1998, at the request of Kenyan and Tanzanian Medical Societies, I assisted their nations in developing mental health delivery services after the Kenyan/Tanzanian Embassy bombings. The initial focus of the project centered on the acute trauma suffered by survivors and families of those killed and injured in the bombing. Appropriate diagnosis and treatment for trauma survivors required assessment of and treatment for pre-existing psychiatric and neurologic disorders and an appreciation of the consequences of chronic exposure to trauma that

4

predated the bombings.

12.    I am currently an Adjunct Professor on the faculty of Morehouse School of Medicine, Department of Psychiatry, in Atlanta, Georgia, where I teach courses in Clinical Aspects of Forensic Psychiatry to third and fourth year residents.  I am also on the Faculty of the Department of Educational Leadership and Public Policy, California State University, Sacramento, California.

13.    My clinical private practice is based in Oakland, California.  I have been qualified and testified as an expert in numerous civil and criminal cases in state and federal courts.

14.    At the request of counsel currently representing Kenneth Barrett, I have performed a neuropsychiatric evaluation to determine whether Mr. Barrett suffers from any mental disease or defect and, if so, what functional impact his condition may have had before, during and after the commission of his current commitment offense.   In order to complete this assessment, I evaluated Mr. Barrett, including conducting a structured clinical interview, at the federal prison in Terre Haute, Indiana, over the course of two full days on February 17 and 18, 2009.  I also reviewed and considered the declaration of neuropsychologist, Myla Young, PhD; Mr. Barrett's institutional records, to include available academic, medical and custodial records; declarations and/or medical and social records of various family members, including his father, Ernie Barrett; his mother, Gelene Dotson; and his former wife, Abby Stites.  These are the types of data customarily relied upon by qualified mental health professionals to perform an accurate and reliable neuropsychiatric assessment.

**Clinical Presentation**

15.    Clinical observation of Mr. Barrett over the course of lengthy interviews revealed

5

signs of significant neurologically impaired cognitive and psychosocial functioning, including severe depression, mania, psychotic ambivalence, adhedonia, sleep disturbance, suicidality, hypervigilance, avoidant behavior, withdrawal, constricted emotional range, and inability to sustain lasting relationships secondary to his severe mental illness.

16.    Kenneth Barrett presented as an appropriately groomed White male who appeared to be his stated age of 47 years. His movements were fluid, although his gait was somewhat halting. Mr. Barrett noted he had difficulty with his legs since he had been shot multiple times during the police action that resulted in his arrest and conviction.

17.    Speech was spontaneous and coherent, although he repeated questions often, even after the questions had been answered. He evidenced pressured speech. His ability to utilize complex words or grammatical structures was limited.

18.    Mr. Barrett's thought form was extremely concrete, and his ability to abstract limited.  There was no evidence of prosody or alexithymia, poverty of thought.  On the contrary, Mr. Barrett had significant flight of ideas. He was paranoid and guarded, particularly in discussing the painful memories of separation from his father and the inattention of his mother, due to her own mental illness, during his formative years.  His thinking was also grandiose, manifesting cognitive disinhibition, reflecting neurodevelopmental and/or acquired brain dysfunction.  There was no evidence of perceptual disorders, hallucinations, or delusions.

19.    He was most animated and fluent in describing his attempts to redress perceived injustices (e.g., disrespect and unfair enforcement of rules by prison staff; the misappropriation of his property after his arrest).  His description of his responses in such situations indicated a significant lack of inhibition and age-appropriate defenses and coping skills.

20.     Mr. Barrett's mood was elevated. His affect was often inappropriate to the content of our examination. The affective content of his presentation was incongruent with self-description of his life and current situation.  Mr. Barrett is invested in appearing to be a high-functioning individual, without significant past or present impairment, and who is in control of his life.

21.     Insight and judgment were impaired by his severe mood disorder and executive functioning deficits. His conceptual dysfunction also limited his ability to develop a larger picture, further impinging his insight and judgment.

**Background and Developmental Impact**

22.     Kenneth Barrett was born on June 29, 1961, in Joliet, Illinois.  He is the oldest of three sons born to Ernie Barrett and Gelene Barrett (nee Dotson).  Both father's and mother's sides of Mr. Barrett's family were burdened by multi-generational neurological impairments and affective mood disorders, as well as patterns of substance abuse and parental neglect consistent with an affective-laden family.  Mr. Barrett's young parents were apparently ill-equipped cognitively, emotionally or financially to rear children.  Mr. Barrett's developmental years were characterized by parental neglect, lack of appropriate boundaries, domestic discord, inter-parental violence and physical abuse.  These factors likely potentiated Mr. Barrett's genetic predisposition for the development of mental disorders and chemical dependency, as well as exposing him to risk of increased compromise of his neurocognitive development and functioning.

23.     Significant risk factors for, and the symptomatic presentation of multiple types of mental disorders and neurologic impairments existed in both the maternal and paternal lines of Mr. Barrett's antecedents.  In particular, Mr. Barrett has high genetic loading (risk) for bipolar

disorder and other affective disorders. He has multiple multigenerational and first-degree relatives with confirmed diagnoses of such mental illness. Mr. Barrett's extensive family history of bipolar and associated neuropsychiatric disorders is rare, and presents a clinical profile which, consistent with research protocols of the National Institute of Mental Health's collaborative Genetic Linkage Study of Schizophrenia and Bipolar Disorder, identifies his family as likely genetically predisposed to develop the disorders.

24.     Mr. Barrett's mother, Gelene Dotson, his maternal aunt, Carolyn Joseph, and maternal cousin, Gwendolyn Crawford, satisfy diagnostic criteria for various significant brain disorders including bipolar mood disorder, depression and anxiety disorders. Gwendolyn's daughter, Brandy Hill, suffers with major depression punctuated by episodes of "high euphoria," and is noncompliant with her prescribed medication regimen. Gwendolyn's 26-year-old son, Brandon, suffers from developmental disabilities that prevent him from speaking or being able to live independently. Another of Mr. Barrett's first cousins, Travis Crawford, is being treated for anxiety, has a history of depression, and experiences significant cognitive impairment. Mr. Crawford's oldest daughter has been diagnosed with bipolar disorder, and one of his sons exhibits significantly impaired neurocognitive functioning. At least two other of Mr. Barrett's cousins each has a son who suffers from diagnosed bipolar disorder.

25.     Medical indications of the incidence of major mood disorders, and related impairments in functioning, can be found in Mr. Barrett's maternal family back to at least the generation of his grandmother, Hattie Gertrude Dotson. Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the twentieth century. Wallace Dotson, a first cousin of Mr. Barrett's maternal grandfather, was involuntarily committed to a state psychiatric hospital by

8

his father, Tom Dotson. The record of admission documents the senior Dotson's description of his son as being "completely out of his mind," suffering from "some kind of spells" and not having slept for "three days and nights," a neurovegetative sign of mood disorders.

26. Mr. Barrett's paternal family presents a comparable degree of genetic loading for major mood disorders and associated neurocognitive substrates. At least one paternal aunt, Linda Riley, suffers from depression, and both of her adult daughters have been diagnosed with bipolar disorder. One of Ms. Riley's grandsons has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder. Another paternal aunt, Elnora Long, currently meets diagnostic criteria for bipolar disorders and requires treatment with high doses of medication.

27. The paternal pedigree, neuropsychiatrically indicative of mental illness in Mr. Barrett's family extends back at least four generations. A Certificate of Lunacy for Mr. Barrett's great-great-grandfather, A.J. (Jack) Barrett, documents his 1918 commitment to a psychiatric hospital in Sequoyah County. Mr. Barrett's great grandfather, Isaac Clifford Barrett, despite achieving prominence in his social and professional community, manifested a loss of pleasure, called anhedonia, eventually committing suicide. His oldest son, Mr. Barrett's grandfather, Andrew Jackson Barrett, manifested severe mood imbalances and disordered thinking, which resulted in violent physical and sexual assaults against his wife and children, including the forcible rapes and consequent impregnations of one of his daughters and his 13-year-old sister-in-law; and rampages in public while under the influence of alcohol. His occupational functioning was severely impaired. Psychiatric symptoms documented in his Certificate of Lunacy, contemporaneously with his commitment to a state psychiatric hospital, include auditory hallucinations, persecutory delusions and paranoid ideation, which were, in turn, exacerbated by

9

neuropsychological deficits that impaired his intellectual functioning, judgment and reasoning. He suffered severe mood swings, and attempted to self-medicate his psychiatric distress with excessive amounts of alcohol. When he was sober, his family described him as "a decent guy." When he consumed alcohol, as he did on frequent occasions, he became unpredictable and violent.

28.    A.J. Barrett's disinhibition, affective dysregulation and violent behaviors, including assaults against his wife, traumatized his own son, Ernie Barrett (Kenneth Barrett's father), and impaired Ernie's neurodevelopment and cognitive functioning. As an adolescent, Ernie Barrett exhibited signs of traumatic stress, becoming emotionally constricted, exhibiting psychic numbing and replicating his father's aggressive behaviors against his own siblings and classmates. As an adult, Ernie Barrett exhibited a neuropsychiatrically diagnostic symptom cluster of bipolar-related behaviors, including hypersexuality, grandiosity and substance abuse.

29.    Howard Maxwell, the brother of one of Mr. Barrett's paternal great grandmothers, Mary Ellen Maxwell, was colloquially described as exhibiting psychiatric symptoms, and his son, Billy Dean, had a history of Schizophrenia, and also committed suicide.

30.    Kenneth Barrett's own genetically based potential for developing a mental illness was significantly increased by the circumstances of his upbringing, especially his parents' chemical dependency. Mood disorders have an incidence in the United States of approximately 8 percent of the population. When there is a genetic loading of mood disorders in a family, the incidence increases exponentially.

31.    Early onset BD appears to have strong polygenetic inheritances, with strong expression in the children of affected parents, and has a higher incidence than reported in the

10

offspring of parents with other types of mood or affective disorders. Children with one parent with BD have a 25% incident of inheriting BD; for children whose parents both have BD, the incidence rises to 50% to 75%. (Faust et al, *Diagnosis and Management of Childhood Bipolar Disorder in the Primary Care Setting*, Primary Pediatrics, November 2006, page 802.)

32.     Based on the research regarding the genetics of schizophrenia and bipolar disorder, it is medically reasonable to conclude that the prevalence and severity of substance dependency in Mr. Barrett's family is largely genetically determined.  His parents' dependency and their different, unpredictable behaviors while intoxicated, further compromised Mr. Barrett's ability to perceive and incorporate a sense of appropriate boundaries, and develop an adequate perception of social cues and interpersonal interactions.  Ernie Barrett was frequently physically absent for days at a time as a result of extramarital affairs, and Gelene Barrett was rendered emotionally distant and neglectful by her intoxication.  These behaviors left Mr. Barrett's parents ill equipped to develop the primary attachments or provide the basic physical and emotional nurturing necessary for a young child's normal, healthy neurocognitive development.

33.     *From Neurons to Neighborhoods*, a study of early childhood development by the National Research Council and the Institute of Medicine, documented sensory stimulation, and social interactions as conditions that affect the developing brain. They also determined that chronic stress is detrimental to the normal development of the brain. (Shonkoff and Phillips, *From Neurons to Neighborhoods: The Science of Early Childhood Development*, National Academy of Science Press, 2001, page 199.)

34.     Parental neglect of the type suffered by Mr. Barrett has been found to constitute as significant a risk factor for childhood trauma as physical abuse, and one which has some of the

11

longest term and most pernicious effects of all such early traumatic experiences.

35.     The brain is only starting to grow, mature, and differentiate at the time of birth. Within the newborn brain there are certain structures that develop only if stimulated, and there are other structures that atrophy if not stimulated.  The newborn child's interpersonal and environmental experiences determine the rate and quality of development for domains that regulate definition of person and comprehension of one's place in his or her environment.  The absence of necessary caretaking or experiences that promote attachment between parent and child can alter both the structure and function of the child's developing brain. Mr. Barrett's reactivity rather than responsiveness is directly related to the lack of parental training of appropriate coping mechanism, in addition to his genetically-derived mood disorder.

36.     Emotional development can be seen as the literal acquisition of emotions. Children must develop the capacity to recognize and use emotions appropriately. Children must also become successful in a complex maturation process that entails learning to become emotionally responsive rather than emotionally reactive to internal experiences of emotion.  In addition, children must learn to use their emotional repertoire to handle the inherent anxiety and stresses that are universal to the human condition. Emotional maturity can be understood as the acquisition of coping defenses in infancy and childhood. (Sadock and Sadock, Comprehensive Textbook of Psychiatry, Eight Edition, Lippincott, Wilkins, and Williams, 2005, page 3029.)

37.     Mr. Barrett was also exposed to neurological insults to his fragile central nervous system *in utero* due to his mother's alcohol use, and during his formative years from his mother's unpredictable beatings and his parents frequent domestic disputes, that were known to end in violence.  E.g., Mr. Barrett's mother describes the "pretty bad fights" she and her husband had

12

whenever she confronted him about his infidelity, and reports that "he gave [her] two black eyes and split [her] lip."

38.     As a child, Mr. Barrett exhibited signs of impaired neurological growth, failing to meet developmental milestones expected of healthy infants.   During his first year, Mr. Barrett exhibited increasing delays in areas associated with creating interpersonal relations and emotional development.  Among other delays, at age three months, he did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand"; at nine months, he did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave 'bye-bye' or play 'peek-a-boo' instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say 'ma-ma' or 'da-da' or equivalent"; at one year, Mr. Barrett's mother noticed that he "had trouble learning to walk," and could not  "drink from cup, put one block on another when shown, say two or three words indicating want, play 'pat-a-cake,'" or "show preference for one hand in reaching."

39.     Mr. Barrett failed reading in the first grade, was required to repeat the eighth grade and was eventually referred to special education classes before he dropped out of school in the ninth grade.  By pre-adolescence his hyperactivity, irritability, isolation, and impaired academic functioning introduced the prodromal symptoms associated with major mood disorder. He became more hyperactive, intrusive, and emotional labile, extremely sensitive, and a tendency to emotionally decompensate without apparent provocation.

40.     Initial presentation of childhood or adolescent bipolar disorder typically involves moodiness, frequent or aggressive oppositional behavior, anger that does not resolve in 15

minutes, sadness and easy crying, inattention, and impulsiveness. When the illness begins before or soon after puberty, it is often characterized by a pattern of continuous rapid-cycling, irritable or mixed symptoms that may co-occur with disruptive behavior disorders such as ADHD or CDs (conduct disorders), or may have symptoms of these disorders as presenting features. (Faust et al, Diagnosis and management of childhood bipolar disorder in the primary care setting, Primary Pediatrics, November 2006, page 801.)

41.     As he approached adolescence and continuing through young adulthood, Mr. Barrett experienced potential neurological insults outside his home that posed further risks of cognitive impairment and traumatogenic sequelae. In a playground accident that occurred when Mr. Barrett was eight or nine, he was struck in the head by what he describes as a "steel ball," with indicated loss of consciousness. He recalls only "waking up" as he was being lifted off the ground after being struck. At age 17, Mr. Barrett reportedly suffered an assault by one or more police officers. Mr. Barrett reportedly declined to pursue an investigation of the officers' actions, but his mother reports that while one officer restrained Mr. Barrett, another one beat him around the face, head and neck, inflicting injuries that included a broken jaw and collar bone, facial contusions and a bloodied nose. When he was approximately 22, and again at age 23, Mr. Barrett was involved in motorcycle accidents, again with apparent loss of consciousness. Mr. Barrett, witness accounts and medical records confirm that at the age of 24, he apparently attempted suicide by shooting himself in the chest with a shotgun; and Mr. Barrett reports that he has made several other unsuccessful attempts to take his life by driving his car or motorcycle off the road at high speeds. In connection with Mr. Barrett's arrest for the commitment offense, he suffered several gunshot wounds to his legs, facial contusions and abrasions, and superficial

blunt trauma to his head.

42.    Mr. Barrett reports that his regular use of alcohol, tobacco and other drugs, including marijuana, started around the age of eleven or twelve, a period when the development of his frontal lobes, the seat of neurological executive functioning, is first beginning.

43.    Executive functioning is the ability to organize, think, reason, problem solve, initiate actions, monitor actions and change actions as needed based on information received. More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation.  Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders.  The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.( Young declaration, page 13)

44.    In an environment in which "mom drank, grandpa drank," Mr. Barrett had easy access to alcohol and soon began drinking "more regular."  In the seventh grade he regularly abused marijuana on a weekly or bi-weekly basis, and increased to more frequent use as he gained greater access to the drug once his use became more widely known among peers, and other users were willing "to turn [him] on."  From late adolescence through early adulthood he reports episodic use of Valium, Lithium, LSD, PCP, psilocybin mushrooms, methamphetamine, cocaine, Quaaludes and Placidyl; and frequent abuse of barbiturates.  By his 30's, Mr. Barrett primarily abused cocaine, methamphetamine and Tuenol.  Mr. Barrett's chemical dependency

15

history is consistent with the high incidence of substance use secondary to the increased neurovegetative symptoms of eating and sleep disorders, adhedonia and mania found in bipolar disorder. Mr. Barrett's combination of traumatic stress and bipolar disorder predisposed him to chemical dependency. PTSD and bipolar disorder each have a co-occurring incidence with chemical dependence greater than 40% in the clinical literature.

45.     Mr. Barrett was unable to acquire the skills and means necessary to live independently, and manifested significantly impaired social, relational and occupational functioning throughout his adulthood.  He married at the age of 19, and his son, the couple's only child, was born shortly afterward.  The union was severely strained by the effects of Mr. Barrett's mental instability, which was apparent to lay observers.  Mr. Barrett experienced periods of severe depression, in which he exhibited signs of catatonia, followed by mania and racing thoughts.  Mr. Barrett was unable to maintain a consistent work schedule, and the couple frequently had to live with Mr. Barrett's mother, Gelene Dotson.

46.     Mr. Barrett's former wife reports that during the periods they lived with Ms. Dotson, the effects of Mr. Barrett's attempts to ameliorate symptoms by self-medicating with illicit drugs were exacerbated by his mother's habit of making him "get up from bed and party with crack and pot."

47.     Mr. Barrett and his wife experienced frequent separations followed by unsuccessful attempts at reconciliation.  Mr. Barrett was unable to live independently and resided with his mother or father when living apart from his wife.  Mr. Barrett's efforts at pursuing gainful employment were defeated by feelings of irritability, agitation and dysthymia, and impulsive, unconsidered abandonment of his job.

48.     Mr. Barrett reported to me that he would become so paranoid over time when interacting with others, he would be forced to leave successful attempts at working, often leaving at the point he was experiencing his direst moment. He left Fort Smith, Arkansas, working with his father, overwhelmed with racing thoughts and paranoid ideation

49.     Mr. Barrett's documented suicide attempt in 1986 was followed by psychiatric intervention and treatment with Elavil and Ascendin, antidepressants well known to exacerbate mania. Many antidepressants force a neurological "switch" to occur in bipolar disorder, inducing mania.

50.     Mr. Barrett's bipolar disorder's pattern can best be described as a "mixed phase" disorder, with depressive mood and affect combined with racing thoughts, irritability, paranoia, and disinhibition. Treated most often with antidepressants due to his depressive presentation, the medication regimen had the potential to increase Mr. Barrett's symptomatology, rather than ameliorate it.

51.     Mr. Barrett was medication noncompliant and his condition deteriorated, necessitating involuntary commitment to Eastern State Hospital in October 1986. At admission, he presented as emotionally labile with impaired insight and judgment, and was provisionally diagnosed as suffering "depressive neurosis with suicidal potential extremely high." Upon discharge, Mr. Barrett was again unable to live independently, and stayed with relatives. The results of a Social Security Administration determination of eligibility found that Mr. Barrett was "moderately depressed" and periodically unable to "think clearly." He required frequent admissions to hospital emergency rooms after reportedly falling down stairs, sustaining a contusion to his right periorbital region of his head; being involved in a motor vehicle accident,

in which he experienced rib and chest pain; and suffering a rash "all over." Mr. Barrett's disclosure, during clinical evaluation, of described suicide attempts using motor vehicles indicates that documented motorcycle and automobile accidents may have been unsuccessful suicide attempts, increasing the psychologically traumatic component of such incidents in addition to creating a risk of further neurological insults.

52.    Following a final separation from his wife after being unable to live independently in Fort Smith, Arkansas, Mr. Barrett psychiatrically decompensated and was hospitalized in January 1995. He reported to hospital staff that he was "losing [his] mind," and noted to be extremely agitated, sleep-deprived, unable to concentrate and experiencing racing thoughts. He was diagnosed with bipolar mood disorder and started on a regimen of 10mg. of Haldol, to be injected intramuscularly ("IM"). The requirement of intramuscular administration of psychotropic medication indicates that Mr. Barrett lacked the insight to recognize his medical predicament and that involuntary treatment with neuroleptics was medically necessary. However, Mr. Barrett's symptoms also called for mood stabilizing and cognitive enhancing medication, and Haldol, although an excellent antipsychotic, does neither. Again, Mr. Barrett's symptoms, although identified, were not appropriately or adequately treated, leaving him to become increasingly paranoid and cognitively impaired.

53.    When he was discharged from the psychiatric hospital, Mr. Barrett returned to his mother's property, where he constructed what family members describe as a small "shack," with approximately $150 worth of building supplies and scraps of materials. The structure lacked running water, a toilet or electricity. Mr. Barrett's mother allowed him to run an electrical cord from her house trailer to his shack, to use her bathroom and shower, and eventually to eat in her

kitchen. Mr. Barrett's family and former wife recognized that he could never "live on his own," and his mother allowed him to remain on her property, where he earned a marginal income repairing cars for friends and neighbors.

54.    In the years and months preceding the commitment offense, Mr. Barrett expressed increasingly paranoid thoughts, experienced intolerable irritation at perceived surveillance and harassment by law enforcement authorities and felt threatened by illicit drug users and dealers, some of whom he suspected of being police informants. He disclosed to others his belief that he was being monitored by satellites and became increasingly withdrawn until he stopped leaving his mother's property. He relied on others to shop and run errands in the nearby town for him. At other times, he believed the unidentified aircraft "hovering" over his property were "dirigibles," similar to "the ones the U.N. uses," and reinforced with "steel plates on their bottoms." He described shooting at one and causing it to flee.

55.    In the weeks or days before the commitment offense, Mr. Barrett reportedly displayed a sign on the roadway leading onto his mother's property that warned: "Keep out. I don't give a shit who you are, if you cross my gate or come on my property, I'll shoot." There was some dispute whether the message was directed at law enforcement, drug dealers or both.

56.    Mr. Barrett's description of the events leading to his arrest indicates that he did not leave his shack before he was shot by the police. Responding to the sound of his son's voice calling his name, Mr. Barrett rushed to the front porch and observed an unidentified Ford Bronco driving toward his son. Mr. Barrett retrieved a handgun from inside the shack and placed it in the waistband of his trousers, and began to return to the porch to investigate. He was struck by a bullet he believes was fired through a window of the shack as the Bronco "hit the front of the

19

house." Mr. Barrett says "I didn't know what was going on except someone was there to kill me." At the sight of the Bronco striking his residence, Mr. Barrett "went to firing." The next recollection he has is of a law enforcement officer ordering him to stand up. Mr. Barrett has no memory of having fallen, but he does recall he could not stand up due to bullet injuries to his legs.

## Neuropsychological Assessment

57.    The neuropsychological assessment performed by Dr. Myla Young measured impairments in cognitive performance associated with significant dysfunction in the dorsolateral and orbital portions of the prefrontal lobes of Mr. Barrett's brain. The measured deficits compromise Mr. Barrett's ability to inhibit cognitive and emotional stimuli, and seriously disrupt executive function including planning (the ability to inhibit short-term goals for long-term objectives), and engaging in reasoned, purposeful, self-regulating goal-directed behavior. The frontal lobes are also responsible for the integration of motoric and cognitive functioning, including mediation of impulses from the regions of the amygdala and hippocampus. The amygdala is associated with primordial "fight/flight" responses, as wells as the positive/negative emotional responses of happiness and sadness. When the amygdala sends an impulse, it is modulated by the orbital frontal lobe before activating striatal responses. Frontal lobe integration of working memory with limbic impulses enables the brain to contextualize new information, including external stimuli, and make an appropriate response selection.

58.    The prefrontal cortex, the area of most severe damage for Mr. Barrett, is the site of executive functions. As Dr. Young has indicated, the processes grouped under the label of executive functions can be thought of as multiple processing modules collected together to direct

cognitive activity, including mental functions associated with the ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior.  These modules perform functions related to overseeing the use of other cognitive processes.  As noted by Dr. Young, this array of brain functions include those that are central to integrated reasoning and thoughtful judgment, such as the processes necessary to inhibiting reflexive responding, interrupting, and returning to ongoing activity; interacting with and selectively directing attentional processes, screening out interference and sustaining attention; shifting cognitive resources to focus on new demands or respond to new conditions or information; directing the efficient use of, and alternation between, pattern and detail processing; monitoring and regulating speed of information processing; monitoring task performance for accuracy and efficiency; overseeing the selection of verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering performance based on feedback; directing the efficient use of fluid reasoning resources; directing the use of working memory resources; directing the efficient and fluent production of language when highly specific production demands are made; directing the integration of multiple abilities to produce oral or written responses or products that reflect the level of capacity of the component abilities involved; directing the efficient placement of information in long-term storage; directing the retrieval of information from long-term storage; regulating social behavior; regulating emotional control; enabling self-observation and self-analysis; and making use of hindsight and foresight in the direction of current processing.  Mr. Barrett suffers significantly impaired functioning in all these domains.

59.    In addition to having problems with focusing and sustained attention, manic patients have difficulties shifting attention. Manic patients resemble patients with frontal lobe

21

damage on attentional shifting task such as the Wisconsin Card Sorting Test. Both groups of patients perseverate in that they continue to select stimuli in accordance with a previously enforced rule that has been changed by the examiner and thus become incorrect. (Goldberg et al, Cognitive Dysfunction in Bipolar Disorder, American Psychiatric Publishing, 2009, page 29)

60.    Mr. Barrett's difficulty in integrating multiple inputs, for example, his inability to integrate multiple environmental occurrences into a coherent picture, is based upon the neurocognitive deficits objectively identified by Dr. Young. These types of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

**Malingering**

61.    The Diagnostic and Statistical Manual of the American Psychiatric Association, Fourth Edition, Text-Revised (DSM-IV-TR™) explains that "[t]he essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as . . . evading criminal prosecution, or obtaining drugs." Mr. Barrett does not "produce" or exaggerate symptoms, rather he minimizes the severity of his symptoms and attempts to present as high functioning, despite acknowledgement of signs of his mental illness. There is no marked discrepancy between Mr. Barrett's acknowledged symptoms and the objective findings (Malingering criterion #2). Reliable, congruent clinical evidence – including lay witness observations predating Mr. Barrett's arrest, prior psychiatric diagnoses and treatment, and objective neuropsychological testing results – shows that he meets diagnostic criteria for mental illness and suffers cognitive deficits.

62.     In particular, neuropsychological testing offers a reliable method for the delineation of cognitive strengths and weaknesses. The clinical batteries administered by Dr. Young included methods for validating findings of deficits within individual test protocols and across the battery of tests. When administered across a broad variety of testing instruments, congruent results further confirm the accuracy and reliability of test results.  The successful manipulation of test data to exaggerate measures of neurological impairment in a manner that eluded detection by imbedded validity scales would have required Mr. Barrett to have specific knowledge and mastery of neuroanatomy and test construction.

**Etiology and Onset**

63.     Although the severity of damage to the frontal and temporal lobes of Mr. Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult.  The consistent pattern of impaired cognitive functioning observed since Mr. Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

64.     The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

65.     Mr. Barrett's family history, the consistency of emotional dysregulation beginning

early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

## Clinical Impressions

66.    Mr. Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.  He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex.  Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

67.    Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983).  Lezak emphasized the fluid nature of executive functioning and how dependent the cognitive and emotional aspects of functioning were on the "executive." Baddeley grouped these behaviors into cognitive domains that included problems in planning,organizing behaviors, disinhibition, perseveration, reduced fluency, and initiation (Baddeley 1986). Baddeley coined the term "dysexecutive syndrome." Each component of executive functioning has added to the array of cognitive processes, which include maintaining a problem-solving set for goal-directed

behavior, interference control, flexibility, strategic planning ability, and the ability to anticipate and engage in goal-directed activity (Denckla 1994). The definition of executive function is encompassed by actions fueled by conceptualizations, such as the ability to filter interference, engage in goal-directed behaviors, anticipate the consequences of one's actions, and the adaptive concept of mental flexibility (Luria 1969; Luria 1980; Stuss and Benson 1986; Denckla 1996; Goldberg 2001). The concept of morality, ethical behaviors, self-awareness, and the idea of the frontal lobes as manager and programmer of the human psyche are also included." (Ardila et al, Executive Function, Medlink Neurology, 2009)

68.    Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial.

**Medicolegal Findings**

69.     Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms, none of which was addressed, either legally or psychiatrically. First, Mr. Barrett was suffering profound neurocognitive deficits that impaired his ability to rationally assist his attorney in the preparation of his defense.

70.    Mr. Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings, rendering him unable to rationally assist his attorneys. He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

71.    Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life, he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

72.    He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

73.    Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

74.    Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

75.    Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

76.    Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He

26

was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

77.    Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

78.    My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions

27

before they occurred.

79.     Mr. Barrett's reactivated Post Traumatic Stress Disorder had built-in reminders, namely the bullet fragments that continued to cause him significant pain and the reactive immunological reaction he has had to the bullet fragments in his body. Consequently, it is clinically consistent that his constellation of PTSD symptoms would continue through his trial and, to some extent, exist today.

80.     He described symptoms of racing thoughts during his trial, which prevented him from being able to effectively track the proceedings. Mr. Barrett's thoughts were also ruminative, and he was "unable to get unstuck."  He would get his mind on an issue during the trial, and not be able to move to other aspects of the trial.

81.     Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial. His triad of neuropsychiatric impairments, his PTSD, Bipolar Disorder, and Dysexecutive Syndrome; were not bound, as they are today, in a structured environment without the overwhelming stress Mr. Barrett was facing at the time of trial.

82.     I hold the foregoing opinions to a reasonable degree of medical certainty, and if called as a witness, I would and could testify truthfully to the information set forth above.

I declare under the penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct and was executed on March 14, 2009.

/s/ George W. Woods
George W. Woods, Jr., M.D.

28

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 118**

<u>DECLARATION OF ROSEANN SCHAYE</u>

I, ROSEANN SCHAYE, declare under penalty of perjury as follows:

1.  I am a Licensed Professional Counselor and maintain a private practice in Tucson, Arizona.  I received my undergraduate degree, Bachelor of Arts, with a major in sociology in 1978 at the University of Arizona and my Masters in Education also from the University of Arizona in 1981.

2.  In July of 2000, I was self-employed as a Mitigation Specialist providing assistance to court-appointed and retained counsel in capital trials and post conviction proceedings.  In that capacity I routinely investigated and developed evidence relevant to the questions to be decided in the penalty phase of capital cases.  As of July 2000, I had extensive experience in assisting capital defense counsel in formulating and implementing a mitigation investigation consistent with the standards of professional practice prevailing at that time.  I had an understanding of the presumptive scope of the investigation that was necessary to discharge defense counsel's obligation to obtain all reasonably available mitigation evidence necessary for the preparation and presentation of a penalty phase defense.  Based on my training and practical experience, I was also aware of the tasks, hours and expenses that were reasonably necessary to develop the evidence required for a professionally adequate presentation of penalty phase mitigation evidence, including investigation of the client's social and medical history, and the consideration and presentation of potential mental health evidence and mitigation themes.

3.  Based on my training and experience, I knew that the timely investigation and preparation of a potential penalty phase defense had to commence in conjunction with the preparation of the guilt phase.  Development of an effective penalty phase presentation

required counsel to have a coherent theory of the case as a whole, and that strategic and tactical decisions made in the guilt phase be informed by counsel's awareness of the evidence that would be presented in mitigation in the event the case proceeded to a penalty phase, or second stage.  It was my experience, and that of other qualified mitigation specialists, that preparation of an effective case in mitigation required a command of the guilt phase evidence, including the circumstances of the crime; and that timely investigation of mitigation evidence, such as a client's mental state, could reveal the basis for a guilt phase defense.

4. In July 2000, I was retained by counsel for Kenneth Barrett to conduct an investigation of potential mitigating factors that would be relevant to guilt phase as well as the penalty phase of his trial, in the event the case proceeded to a second stage.  The organizing focus of my investigation was the development of information necessary to produce a social and medical history documenting the significant events and factors that shaped Mr. Barrett's development, functioning and behavior over the course of his life, including at the time of the charged offense.  The preparation of a social history is recognized by capital litigators as a prerequisite to identifying potential stand-alone mitigation based on a client's frailties and privations, as well as an essential component of a reliable and accurate evaluation of the client's mitigating mental states.  In conducting my investigation of Mr. Barrett's social history and other potentially mitigating factors, I followed the professional standards recognized by the American Bar Association for the function of defense counsel in capital cases, as well as observing protocols followed by competent mental health and medical professionals who would be relying on the data I collected to reach their expert opinions.

5.  As of December 2001, I had performed the following tasks:

a)    Completed one non-confidential interview with Mr. Barrett and two confidential interviews to obtain his perception of his social history, including a history of possible mental impairments and history of childhood mistreatment.

b)    Conducted many witness interviews, including with members of Mr. Barrett's biological family who had personal knowledge of the parental abuse of Mr. Barrett, his parents' very frequent separations and regular abandonment by his father, his family's very frequent moves, and poverty of the family when the father left.

c)    Identified and begun to obtain medical, educational, social service and employment records for Mr. Barrett, and those family members who I had interviewed who had a significant role in his life.  The relevant records were necessary both to determine and document family patterns of behavior, as well as to determine genetic predisposition to medical and psychiatric disorders, including chemical dependencies.

6.    My preliminary investigation revealed a constellation of factors that likely had affected Mr. Barrett's development, functioning and behavior; and reasonably indicated the need for further, in-depth investigation that was likely to uncover and document:

a)    The nature and extent of physical and psychological trauma Mr. Barrett experienced during his childhood at the hands of his parents and, later, other adults;

3

b)          The long term consequences of the trauma, including psychiatric symptoms and disease;

c)    His family's substantial, multi-generational history of mental impairments including a significant prevalence of neurological impairments, mood disorders and chemical dependency;

d)          Mr. Barrett's probable inability to perceive the world around him accurately or to inhibit his trauma-related behavior as a result of brain damage in addition to cognitive deprivation and familial cultural factors.

7.      The standard of care in capital cases in state and federal cases required that a thorough investigation be conducted in Mr. Barrett's case to develop a reliable social and medical history for him.  The contents of records obtained as a result of my preliminary investigation indicated that no such comprehensive history has been conducted on Mr. Barrett's behalf for any purpose.  Developing a social history is the crucial first step in determining the range of mitigation evidence that counsel can offer at penalty phase.  A social history also serves the purpose of allowing counsel to rebut, defeat, or mitigate evidence offered by the prosecution as aggravation.  Finally, the completion of a competent and confidential mental health evaluation by psychiatrists, neurologists, psychologists, or social workers to reliably determine the presence, severity and effect of mental disorders that affected Mr. Barrett's behavior during the course of his life required them to be provided with reliable and independently documented data about Mr. Barrett's social history.

8.      It was also crucial to determine the psychiatric and medical history of Mr. Barrett's biological family, including that of his parents' and grandparents' generations in

order to determine and document the existence of a genetic vulnerability to the development of the types of mental disorders that became apparent during the course of the preliminary investigation. It was therefore important to gather appropriate institutional records about other family members who had mental disabilities or histories, which may have affected Mr. Barrett' behavior or functioning. Based on the voluminous social records I initially obtained or identified for Mr. Barrett and his family members, it was evident that the completion of an adequate social history would require the defense to obtain additional records, including:

a)    All school records, including transcripts, health records, standardized testing, attendance, special education testing and/or classes, disciplinary action for every school attended;

b)    Employment records, including applications, attendance, job assignments and performance evaluations, medical and psychological evaluations, relocations, pay records, Social Security tax records;

c)    Family and individual social service records, including Food Stamps, AFDC, WIC, welfare, counseling records, referrals, and medical and mental health treatment. Again, these records are necessary both to determine family patterns of behavior, as well as to determine genetic predisposition to medical and psychiatric disease, including chemical dependency;

d)    Medical records, including private physicians, clinics and hospitals;

e)    Youth agency and juvenile criminal justice records, including defense counsel's files, pre-trial intervention, community service records, juvenile

detention records, and all related medical, educational and intelligence evaluations, treatment plans, field and progress notes, referrals and court files;

f)    Adult criminal records, including police, sheriff and FBI records, jail records including psychological, educational and medical evaluations and notes, daily progress notes, disciplinary reports, work assignments, classification reports, religious reports and visitation logs; all court records; all public defender and prosecution files;

g)    Psychological and psychiatric records, including community mental health clinics, private doctors and counselors, hospitals and substance abuse facilities, to include intake evaluations, treatment interventions, medication logs, physician and nurse progress notes, referrals, and discharge reports.

h)    All military records for significant family members of Mr. Barrett.

There were also potentially significant witnesses who resided in Norman and Oklahoma City, Oklahoma; and the State of Iowa, who needed to be interviewed.

9.    Based on my discussions with Mr. Barrett's attorney, my experience investigating numerous cases at the stage in the legal proceedings that Mr. Barrett's case was at that time, and my consultations with an experienced mitigation expert, it was my professional judgment that the investigation into mitigation for Mr. Barrett's penalty proceeding was still inadequate and incomplete. In my opinion, a competent and reliable investigation of mitigation evidence to be presented at the penalty phase in Mr. Barrett's case would have required an additional minimum of eight to ten months.

10.    The preliminary results of my investigation also made it evident to me that once the social history investigation had been completed, a clinical assessment, including

6

neuropsychological evaluation would have to be conducted. Based on my interviews with Mr. Barrett, it was my opinion that he would have cooperated fully with the indicated evaluation. Throughout the course of my interviews with him, he remained willing to disclose and discuss uncomfortable, sensitive information and cooperated fully in describing experiences that were clearly painful for him to share with me. I explained my purpose in delving into such stressful memories of his life and upbringing, and Mr. Barrett did not in any way restrict the scope of my inquiries or indicate that he would object to the use of any information in the preparation of his mitigation case.

11.     I was not authorized by Mr. Barrett's counsel to perform the additional tasks described above, and my involvement in Mr. Barrett's case was terminated in December 2001.

I declare under penalty of perjury that the foregoing is true and correct.


                                        /s/ Roseann Schaye
                                        Roseann Schaye


7