<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 19, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

---

UNITED STATES OF AMERICA,

　　Plaintiff - Appellee,

v.

KENNETH EUGENE BARRETT,

　　Defendant - Appellant.

No. 12-7086

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. Nos. 6:09-CV-00105-JHP and 6:04-CR-00115-JHP-1)**

---

David B. Autry, Oklahoma City, Oklahoma, (Heather E. Williams, Federal Defender, Joan M. Fisher and Tivon Schardl, Assistant Federal Defenders, Sacramento, California, with him on the briefs) for Defendant - Appellant.

Jeffrey B. Kahan, Trial Attorney, United States Department of Justice, Washington, D.C., (David A. O'Neil, Acting Assistant Attorney General, Washington, D.C., Mark F. Green, United States Attorney, and Christopher J. Wilson, Assistant United States Attorney, Muskogee, Oklahoma, with him on the brief) for Plaintiff - Appellee.

---

Before **KELLY**, **HARTZ**, and **MATHESON**, Circuit Judges.

---

**HARTZ,** Circuit Judge.

Defendant Kenneth Barrett was sentenced to death after being convicted in federal court on two counts of felony murder and one count of intentionally killing a state law-enforcement officer. We affirmed on direct appeal. *See United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007). Defendant then filed a motion for relief under 28 U.S.C. § 2255, which the district court denied. *See Barrett v. United States*, No. 6:09-civ-105-JHP, 2012 WL 3542609 (E.D. Okla. Aug. 16, 2012) (unpublished). We granted a certificate of appealability (COA) enabling him to appeal on several of his claims of ineffective assistance of counsel. *See* 28 U.S.C. § 2253(c)(1)(B) (requiring COA to appeal denial of § 2255 motion). Exercising jurisdiction under 28 U.S.C. § 2255(d), we now consider the merits of those claims and affirm on all but one. Because Defendant may be entitled to relief on his contention that his trial attorneys were ineffective by failing to investigate and present evidence of his background and mental health for the trial's penalty phase, we reverse and remand for an evidentiary hearing on this issue.

## I.    BACKGROUND

### A.    The Offenses

In January 1999 a warrant was issued for Defendant's arrest for failure to appear at a state criminal trial on drug charges. That September an agent for Oklahoma's District 27 Drug Task Force learned from a confidential informant that Defendant had methamphetamine at his residence. The confidential informant also told the agent that Defendant had promised to kill any officer who came to arrest him and that he was

2

operating his drug business at night because of his belief that law enforcement could not execute a search warrant at night. The agent obtained a no-knock, day-or-night search warrant for Defendant's residence. Viewing the execution of the two warrants as high-risk, he obtained assistance from the Oklahoma Highway Patrol Tactical Team (the Tact Team).

On the evening of September 23 three troopers surveilled Defendant's residence in a white, unmarked Ford Bronco. Travis Crawford, Defendant's cousin, was with him at the time. According to Crawford, Defendant saw a white vehicle pass by and recognized it as belonging to law enforcement, but he said that he did not care and that he "was going out in a blaze of glory." R., Vol. 5 pt. 1 at 629.

The Tact Team devised its plan to secure Defendant's residence: Two white Broncos and a marked patrol car with its emergency lights activated, each containing two troopers, would approach Defendant's residence single-file from the east while three troopers in another patrol car would approach the fence south of Defendant's residence. A fifth vehicle would drive to a trailer occupied by Defendant's mother, which was west of the house, to provide security and protect her. The six troopers approaching from the east would enter and secure the residence. Of the three troopers approaching from the south, one would stay at the fence to provide sniper cover and the other two would apprehend anyone fleeing west from the residence.

Shortly after midnight on September 24 the Tact Team met with members of the Task Force, who planned to follow two minutes after the Tact Team. The Tact Team

then began to execute its plan. The lead Bronco approaching from the east was driven by Trooper John Hamilton with Trooper David "Rocky" Eales as passenger. Its emergency lights were not on. The second Bronco and patrol car followed closely behind. The patrol car and perhaps the second Bronco had emergency lights on. As the vehicles drove toward the residence, the lead Bronco began receiving gunfire at "approximately head level, middle of the windshield." *Id.* at 700. The gunfire intensified as the vehicle drew closer. Hamilton was struck in the face with glass or bullet fragments.

Meanwhile, the troopers coming from the south arrived at the fence. Two of them scaled it and headed toward the residence. They saw Defendant's son, Toby Barrett, outside the residence and ordered him to get on the ground. Toby eventually complied. The gunfire erupted either shortly before or while they were shouting at Toby. After Toby was handcuffed he yelled for his father.

The lead Bronco continued to receive gunfire until it reached the residence. The driver, Hamilton, ducked between the bucket seats. The passenger, Eales, exited and was shot three times while attempting to get behind the Bronco. Hamilton threw a "flash-bang" stun grenade out the window, which temporarily stopped the gunfire. *Id.* at 707. He exited the Bronco and was shot in the shoulder as he moved toward Eales, who was lying face-down. Trooper Ricky Manion joined him behind the vehicle. Hamilton saw Defendant standing in his doorway holding a rifle, and Manion saw him entering the house. Hamilton fired two shots at Defendant that missed, but Manion shot him through a window and hit his legs. Defendant was dragged out to the front yard. He tried to

move his hand toward the front of his body, where he had a pistol in his waistband, but he was subdued and the gun removed.

Eales was fatally wounded. An autopsy indicated that one of the three bullets entered his upper back, broke four ribs, and perforated his left lung and aorta.

Later investigation showed that 18 bullets struck the lead Bronco and that Defendant probably fired 19 shots from a Colt Sporter .223 rifle (there were 72 rounds remaining in a set of three magazines taped together to hold 90 rounds, and one could have been in the chamber to start). A search of the premises revealed several firearms, including two that were loaded, and various items used to manufacture methamphetamine. A later search of Defendant's clothes at a police laboratory revealed $2120.10 in cash and plastic bags holding red phosphorus, an ingredient for manufacturing methamphetamine.

### B.     Procedural History

The same day as the shootings, Defendant was charged by information in Oklahoma state court with one count of first-degree murder and three counts of shooting with intent to kill. After several amendments the final information charged him with one count of first-degree murder (for Eales's death), one count of shooting with intent to kill (for shooting Hamilton), and two counts of discharging a firearm with intent to kill (for shots fired at two other troopers). His first state trial resulted in a hung jury. In 2004 he was retried and found not guilty on the two counts of discharging a firearm with intent to kill but guilty on two lesser-included offenses—namely, manslaughter, instead of first-

degree murder, and assault and battery with a dangerous weapon, instead of shooting with intent to kill.  He was sentenced to 30 years in prison.

On September 23, 2004, Defendant was charged with various federal drug and murder offenses in the United States District Court for the Eastern District of Oklahoma. A superseding indictment charged him with three offenses:  (1) causing Eales's death in the course of using a firearm in furtherance of a drug-trafficking offense, *see* 18 U.S.C. § 924(c)(1)(A), (j); (2) causing Eales's death in the course of using a firearm in furtherance of a crime of violence, *see id.*; and (3) intentionally killing Eales during a federal drug offense while Eales was engaged in, and on account of, the performance of his official duties, *see* 21 U.S.C. § 848(e)(1)(B).  The government sought the death penalty on each count.  On November 4, 2005, a jury found him guilty on all three counts, and thereafter recommended life imprisonment on the first two and death on the third.  The judge imposed the recommended sentence.  On direct appeal we affirmed the convictions and sentence.  *See Barrett*, 496 F.3d 1079.  The Supreme Court denied Defendant's petition for certiorari.  *See Barrett v. United States*, 552 U.S. 1260 (2008).

Defendant then moved for relief under 28 U.S.C. § 2255.  The district court denied the motion and declined to issue a COA.  *See Barrett*, 2012 WL 3542609, at *94. Defendant then sought a COA from this court.  We granted a COA on seven issues related to ineffective assistance of counsel:

> 1. "Whether trial counsel provided ineffective assistance in the guilt phase by failing to present an expert as to whether the police tactics employed

during the search warrant's execution would have identified the police as
law-enforcement personnel";

2. "Whether trial counsel provided ineffective assistance in the guilt phase
by failing to present a crime-scene expert";

3. "Whether trial counsel provided ineffective assistance in the guilt phase
by failing to investigate and present mental-health evidence";

4. "Whether trial counsel provided ineffective assistance in the guilt phase
by failing to seek an instruction concerning the credibility of drug-addict
witnesses";

5. "Whether trial counsel provided ineffective assistance in the guilt phase
by failing to seek an instruction on the defense's theory of the case";

6. "Whether appellate counsel provided ineffective assistance by not
raising the trial court's refusal to give a lesser-included-offense
instruction"; and

7. "Whether trial counsel provided ineffective assistance in the penalty
phase by failing to develop mitigation evidence."

Case Mgmt. Order at 1–2, *United States v. Barrett*, No. 12-7086 (10th Cir. May 2, 2013).

## II.    DISCUSSION

### A.    Standard of Review

On appeal from the denial of a § 2255 motion, ordinarily "we review the district

court's findings of fact for clear error and its conclusions of law de novo." *United States

v. Rushin*, 642 F.3d 1299, 1302 (10th Cir. 2011). "[W]here, as here, the district court

does not hold an evidentiary hearing, but rather denies the motion as a matter of law upon

an uncontested trial record, our review is strictly de novo." *Id.* We review claims of

ineffective assistance of counsel according to the two-pronged test in *Strickland v.

Washington*, 466 U.S. 668 (1984). First, a movant must show that counsel's performance

was deficient, meaning it "fell below an objective standard of reasonableness as

measured by prevailing professional norms." *Rushin*, 642 F.3d at 1302 (internal

quotation marks omitted). This is a demanding standard, requiring a showing that the performance was "outside the wide range of professionally competent assistance." *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011) (internal quotation marks omitted). The performance "must have been completely unreasonable, not merely wrong." *Id.* (internal quotation marks omitted). Next, a movant must show prejudice, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Rushin*, 642 F.3d at 1302 (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial . . . ." *Byrd*, 645 F.3d at 1168 (internal quotation marks omitted). "Courts are free to address these two prongs in any order, and failure under either is dispositive." *Id.*

## B.    Police-Tactics Expert

Defendant first contends that his trial attorneys were ineffective by choosing the wrong expert on police tactics. He asserts that criminologist George Kirkham (whom the court had authorized the defense to retain as an expert) could have established that the Tact Team's raid was ill-conceived in that it prevented him from knowing that it was law-enforcement officers, rather than drug dealers or other trespassers, who had invaded his property. Instead of using Kirkham, Defendant's trial attorneys called as an expert witness Cloyce Van Choney, a former FBI SWAT-team leader who had testified for the prosecution in the two state trials. Defendant contends that this was an inexplicable mistake because his attorneys knew that Choney was extremely hostile and would

8

inevitably change his testimony in the federal trial to the defense's detriment. We disagree.

"[T]he decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney." *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008). And "[t]he selection of an expert witness is a paradigmatic example of the type of strategic choice that, when made after thorough investigation of the law and facts, is virtually unchallengeable." *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (per curiam) (brackets and internal quotation marks omitted). We are satisfied that the decision to call Choney was a strategic choice within the bounds of professionally reasonable conduct. Even though Defendant's trial attorneys did not contact Kirkham, they had good reason to use Choney instead. As they said to the trial court at the ex parte hearing to establish a trial budget, Choney's testimony on cross-examination at the first state trial was extremely helpful to the defense in establishing that the methods used by the Tact Team were contrary to best practices. *See* R., Vol. 3 at 98–101. At the second state trial, he apparently refused to testify for the defense. But when the defense said it would read to the jury his testimony from the first trial, the prosecution called him and his testimony was, as acknowledged in Defendant's opening brief on appeal, a "debacle" for the prosecution. Aplt. Br. at 19.

Although Defendant contends that, given Choney's hostility, he would inevitably change his testimony in the federal trial, he had not done so between the two state trials. Defendant's trial attorneys could have reasonably believed his testimony would be much

the same the third time around.  "[F]or counsel to repeat a winning strategy in a later trial for the same type of crime, involving the same defendant, strikes us as eminently reasonable."  *Laws v. Armontrout*, 863 F.2d 1377, 1393 (8th Cir. 1988) (en banc).  To the contrary, had they departed from that strategy, Defendant may well have argued that it was ineffective to do that instead.  *See Guerrero v. United States*, 84 F. App'x 933, 934–35 (9th Cir. 2003) (remanding for § 2255 hearing on ineffectiveness claim when attorney departed from strategy that led to hung jury in first trial); *cf. Putman v. Head*, 268 F.3d 1223, 1229, 1244–45 (11th Cir. 2001) (rejecting habeas applicant's argument that trial counsel in second trial should have followed the same strategy used in first trial).  Although Defendant contends that his trial attorneys could have avoided the risk of Choney's testimony going awry by calling Kirkham instead, there is no guarantee that Kirkham's testimony would have survived cross-examination.  *See Boyle*, 544 F.3d at 1138–39 (medical experts if called may have made damaging concessions on cross-examination).  They could have rationally concluded that it was preferable to use Choney—a known commodity who had testified favorably twice in the past—rather than a new expert.

Defendant's claim thus fails *Strickland*'s first prong because the decision to call Choney was within "the wide range of professionally competent assistance."  *Byrd*, 645 F.3d at 1168 (internal quotation marks omitted).

### C.    Crime-Scene Reconstruction Expert

Defendant contends that his trial attorneys were ineffective by failing to counter

the government's crime-scene reconstruction expert, Iris Dalley.  He says they could have

called or at least consulted with Edward Hueske, a ballistics and crime-scene

reconstruction expert who had been retained in the state-court proceedings and for whom

the district court had authorized funding.  Instead, they decided to rely solely on cross-

examining Dalley.  According to Defendant, that was an ineffective strategy:  His trial

attorneys should have objected to Dalley's testimony in the first place; called Hueske as a

witness; and prepared adequately for Dalley's testimony by consulting with Hueske and

reviewing all Dalley's state-court transcripts.[1]  Defendant states that Dalley's testimony

was damaging for two reasons.  First, it placed him standing outside his residence when

shooting, which countered his defense that he shot from a prone position inside his

residence where he could not see any emergency lights on the vehicles behind the lead

Bronco and thus did not know that the intruders were law-enforcement officers.  Second,

Dalley's testimony established that Eales was shot after he exited the Bronco, which, he

---

[1] The government argues that the first and third of these arguments are outside the bounds of the COA, which provides for argument only on "[w]hether trial counsel provided ineffective assistance in the guilt phase by failing to present a crime-scene expert."  Case Mgmt. Order at 1, *Barrett*, No. 12-7086.  Defendant responds that his request for a COA on this issue encompassed all the challenges he now raises on appeal.  We need not decide whether Defendant's claims exceed the scope of the COA because they fail regardless.

says, again tended to negate Defendant's defense that he was unaware he was firing on law-enforcement officers.

Central to all of Defendant's complaints is the contention that his trial attorneys could not have made an informed strategic choice to forgo Hueske and rely solely on cross-examination of Dalley because they never consulted with Hueske about Dalley's testimony, did not have transcripts of her testimony from the second state trial, and spent little time preparing for her cross-examination. The government does not appear to contest that Defendant's trial attorneys consulted no expert and concedes that they were without the second-trial transcripts. Nevertheless, the government argues that an informed strategic choice was made. It points to an affidavit executed during the § 2255 proceedings by one of Defendant's trial attorneys, Roger Hilfiger, which states:

> The State Court transcripts caused me to be aware that during the pendency of Mr. Barrett's Sequoyah County prosecution, the presiding judge had considered striking Iris Dalley's testimony. I felt that during the federal trial, the defense could rely on the same plan for cross-examination that Mr. Barrett's lawyers had successfully employed in the county case. I did not think that employing a defense expert on crime scene reconstruction would make a difference in our ability to confront Ms. Dalley's testimony.

Aplee. Br. at 26 (internal quotation marks omitted). And it contends that Dalley's testimony from the *first* state trial included a critical concession that Defendant's trial attorneys knew would negate her impact: a concession that Defendant may have fired every shot from inside his residence.

As was true for the decision to call Choney, we cannot condemn the decision to rely solely on cross-examination of Dalley when that strategy apparently worked well in

the state trials.  According to one of Defendant's previous lawyers, "[H]er testimony was, quite frankly, I think kind of embarrassing for the Government down there, because she contradicted her written reports with her testimony in court, and her creation of [a] computer model had numerous flaws that were pointed out to the jurors in both trials." R., Vol. 3 at 218.  Although consultation with an expert to prepare for cross-examination, or calling a rebuttal expert in addition to cross-examination, may have been a better choice, we cannot say that failure to do so was deficient performance.  "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.  When a strategy produced such favorable results at a prior trial on essentially the same charges, a reasonably competent attorney could decide that it would be foolhardy to experiment with a different approach absent a good reason to believe that some new factor would alter the equation.

Defendant also contends that his trial attorneys were ineffective for failing to consult with Hueske on whether the bullet fragments found in Eales's body came from Defendant's rifle.  A government expert testified that they matched Defendant's weapon. But Defendant has not shown that Hueske would have testified to the contrary.  All he proffers is a letter from Hueske stating that he was "unable to assess the validity" of the government's bullet-fragment analysis without access to that analysis and the evidence. R., Vol. 1a pt. 1 at 1221.  This is not enough.  To establish the prejudice prong of

13

*Strickland*, Defendant was required to go a step farther, showing that Hueske would have contradicted the government's expert if he had obtained access to the fragments.

### D.     Guilt-Phase Mental-Health Evidence

Defendant argues that his trial attorneys were ineffective because they failed to present evidence of his mental defects during the guilt phase of the trial. Defendant's theory is that this evidence would have borne "directly on what he perceived and what his (diminished) intent was in the midst of an unannounced raid led by an unmarked vehicle." Aplt. Br. at 41–42. We need not decide whether Defendant's trial attorneys should have investigated Defendant's mental health more vigorously during the guilt phase of his trial because Defendant has failed to show prejudice.

Our analysis is guided by *United States v. Brown*, 326 F.3d 1143 (10th Cir. 2003). That opinion noted that "psychological or psychiatric evidence that negates the essential element of specific intent can be admissible," but "[t]he admission of such evidence will depend upon whether the defendant clearly demonstrates how such evidence would negate intent rather than merely present a dangerously confusing theory of defense more akin to justification and excuse." *Id.* at 1147 (internal quotation marks omitted). A court must "carefully scrutinize proposed psychiatric evidence to determine whether the evidence rests upon a legally acceptable theory for negating intent." *Id.* This requires screening out invalid legal theories, such as those that show only "impaired volitional control or inability to reflect on the consequences of . . . conduct." *Id.* The "proper focus" is on whether the evidence shows a "link or relationship between the specific

14

psychiatric evidence offered and the *mens rea* at issue in the case." *Id.* at 1148 (internal

quotation marks omitted).  Yet Defendant points to no available expert testimony that he

could not form the intent to shoot the victims (or any other relevant *mens rea*).  We reject

this claim of error.

### E.    Jury Instructions

Defendant's next issues relate to the failure to give various jury instructions.  Most

of these omitted jury instructions would supplement the jury instructions given by the

court on Defendant's three charged offenses, so we set out the relevant portions of those

instructions.  Count One, charging a drug-trafficking felony-murder violation of

18 U.S.C. § 924(c)(1)(A) and (j), required the jury to find the following elements:

> *First:* The defendant committed at least one of the drug trafficking
> crimes charged in Count One of the superseding indictment;
> *Second:* During and in relation to the commission of one of those
> drug trafficking crimes, the defendant knowingly used or carried a firearm,
> or possessed a firearm in furtherance of such drug trafficking crime;
> *Third:* The firearm played an integral part in one or more of the drug
> trafficking crimes charged in Count One; that is, the firearm increased its
> likelihood of success; and
> *Fourth:* During the commission of one or more of the drug
> trafficking crimes charged in Count One of the superseding indictment, the
> defendant directly caused the death of David Eales through the use of a
> firearm.

R., Vol. 1 pt. 1 at 1398–99.  Count Two, charging a crime-of-violence felony-murder

violation of 18 U.S.C. § 924(c)(1)(A) and (j), required the jury to find the following

elements:

> *First:* The defendant committed a crime of violence, the killing of a
> state law enforcement officer engaged in or on account of the performance

of such officer's official duties, as charged in Count Two of the superseding indictment;

   *Second:* During and in relation to the commission of such crime of violence, the defendant knowingly used or carried, or in furtherance of such crime of violence possessed a firearm;

   *Third:* The firearm played an integral part in the crime of violence charged in Count Two; that is, the firearm increased its likelihood of success; and

   *Fourth:* During the commission of such crime of violence as charged in Count Two, the defendant directly caused the death of David Eales through the use of a firearm.

*Id.* at 1399–1400. And Count Three, charging the killing of a state law-enforcement officer in violation of 21 U.S.C. § 848(e)(1)(B), required the jury to find the following elements:

1. During the commission of, or in furtherance of, or while attempting to avoid apprehension, prosecution, or service of a prison sentence for, a felony drug violation;
2. The defendant, Kenneth Eugene Barrett, intentionally killed and/or counseled, commanded, induced, procured and/or caused the intentional killing of David Eales;
3. That David Eales was a State law enforcement officer;
4. That the defendant, Kenneth Eugene Barrett, knew or had reason to know David Eales was a law enforcement officer; and
5. David Eales was killed while engaging in and on account of the performance of his official duties.

*Id.* at 1411. We address in turn each of Defendant's arguments related to omitted jury instructions.

### 1.     Self-Defense

   Defendant contends that his trial attorneys were ineffective for failing to request a jury instruction on self-defense and defense of another. "A person may resort to self-defense if he reasonably believes that he is in imminent danger of death or great bodily

harm, thus necessitating an in-kind response." *United States v. Toledo*, 739 F.3d 562,

567 (10th Cir. 2014). A defendant's "burden of production to warrant a self-defense

instruction is not onerous." *Id.* at 568 (internal quotation marks omitted). It requires only

that there be "evidence sufficient for a reasonable jury to find in his favor." *Id.* at 567.

Because the government must disprove a defense of self-defense beyond a reasonable

doubt, *see United States v. Corrigan*, 548 F.2d 879, 883 (10th Cir. 1977), it follows that

the defendant need only produce enough evidence to persuade the jury to have a

reasonable doubt about whether the defendant acted in self-defense. *See Toledo*, 739

F.3d at 568 ("a defendant is entitled to an instruction if the evidence viewed in his favor

could support the defense"). In other words, a self-defense instruction would have been

warranted if the jury could have had a reasonable doubt about whether Defendant

reasonably believed he was "in imminent danger of death or great bodily harm, thus

necessitating an in-kind response." *Id.* at 567.

Perhaps a self-defense instruction was warranted and Defendant's trial attorneys

should have requested one. Even so, however, Defendant has failed to show the requisite

prejudice. To convict on Count Three (and by extension, Count Two) the jury had to find

that Defendant "knew or had reason to know David Eales was a law enforcement

officer." R., Vol. 1 pt. 1 at 1411. Thus, the jury must have found that Defendant knew,

or that "a reasonable person who possessed the information possessed by [Defendant]

would have the requisite knowledge," that Eales was a law-enforcement officer. *United*

*States v. Williamson*, 746 F.3d 987, 994 (10th Cir. 2014) (defining *having reason to know*).

In light of that jury finding beyond a reasonable doubt, we think it exceedingly unlikely that the jury, on the evidence before it, could have had a reasonable doubt that Defendant reasonably believed that he needed to use deadly force to defend himself (or anyone else). Nothing in the record would support the view that Defendant had reason to believe that law enforcement (who he had reason to know were the "intruders") had come to his home to kill him (or anyone else). The possibility that a self-defense instruction would have resulted in acquittal is far too slim to undermine our confidence in the verdict.

### 2.    Identity of Victim

Defendant contends that his trial attorneys were ineffective by failing to request an instruction that the jury should acquit him if it found that he did not know that the vehicles approaching his residence contained law-enforcement officers. But the one-sentence "argument" in his brief, which cites no authority, is woefully inadequate to preserve this highly questionable proposition for review. *See, e.g.*, *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1204 n.4 (10th Cir. 2008) (argument in one-sentence footnote insufficient to invoke appellate review).

### 3.    Drug Manufacturing

Defendant argues that his trial attorneys were ineffective for failing to request an instruction that he was not engaging in drug manufacturing or distribution when the raid

took place.  We are not persuaded.  Count 1 charged a violation of 18 U.S.C.

§ 924(c)(1)(A) and (j), which requires that the defendant "[1] during and in relation to

any . . . drug trafficking crime . . . , uses or carries a firearm, or . . . [2] in furtherance of

any such crime, possesses a firearm."  *Id.* § 924(c)(1)(A).  Count 3 charged a violation of

21 U.S.C. § 848(e)(1)(B), which punishes anyone who intentionally kills a law-

enforcement officer "during the commission of, in furtherance of, or while attempting to

avoid apprehension . . . for . . . a felony violation of [the drug laws in 21 U.S.C. §§ 801–

971]."  Neither statute required Defendant to be manufacturing or distributing drugs at

the time of the shooting.  Rather, the jury needed to find only that Defendant possessed a

controlled substance with intent to manufacture or distribute, *see* 21 U.S.C. § 841(a)(1),

possessed any equipment or chemical intending to use it to manufacture a controlled

substance, *see id.* § 843(a)(6), or maintained a place for the manufacture or distribution of

drugs, *see id.* § 856(a).  Since Defendant's suggested instruction was not warranted under

the law, his trial attorneys could not have been ineffective for failing to propose it.  *See*

*Hawkins v. Hannigan*, 185 F.3d 1146, 1158 (10th Cir. 1999) ("Because this claim is

meritless, [defense] counsel was not ineffective for failing to raise it."); *see also*

*Williamson*, 746 F.3d at 990 ("[O]f course, the court can reject an instruction that

misstates the law.").

### 4.    Drug-Addicted Witnesses

Defendant argues that his trial attorneys were ineffective for failing to seek an

instruction cautioning the jury to assess the testimony of drug-addicted witnesses with

extra care.  Such an instruction should be given when warranted.  *See United States v. Smith*, 692 F.2d 658, 661 (10th Cir. 1982).  But the failure to give a drug-addict instruction is rendered harmless when vigorous cross-examination and other jury instructions alert the jury to view with skepticism a drug addict's testimony.  *See United States v. Nicholson*, 983 F.2d 983, 991–92 (10th Cir. 1993); *United States v. Cook*, 949 F.2d 289, 295 (10th Cir. 1991); *Smith*, 692 F.2d at 661.  The failure was harmless here.  The government called seven witnesses with a history of drug use, and defense counsel cross-examined each of them about that issue.  Also, the jury was instructed on evaluating the credibility of witnesses in general and to treat with caution the testimony of witnesses who have given inconsistent statements, who have been discredited or impeached by prior criminal convictions, or who have been promised an advantage for testifying.  Defendant's claim that his trial attorneys were ineffective for failing to request a drug-addict jury instruction fails the prejudice prong of the *Strickland* test.

### 5.    Lesser-Included Offenses

Finally, Defendant argues that his attorneys on direct appeal were ineffective for failing to raise the trial court's denial of a lesser-included-offense instruction.  During the trial both the defense and the prosecution requested an instruction on voluntary manslaughter on the theory that it was a lesser-included offense of the crimes charged.

But the district court rejected the idea, stating its view that the evidence could not support

that offense and "[i]t's either murder or it's nothing." R., Vol. 5 pt. 2 at 2951.[2]

Our analysis begins with the constitutional requirement established in *Beck v.*

*Alabama*, 447 U.S. 625 (1980). *Beck* holds that a court must not leave the jury with an

"all-or-nothing" choice between a capital conviction and acquittal when a lesser-included

offense is available, *Hooks v. Ward*, 184 F.3d 1206, 1224 (10th Cir. 1999) (internal

quotation marks omitted), even when the jury can sentence the defendant on the capital

charge to something less than death, *see id.* at 1227. Whether one offense is a lesser-

included offense of another is determined by the law of the jurisdiction prosecuting the

offense. *See Hopkins v. Reeves*, 524 U.S. 88, 94–98 (1998) (because Nebraska law holds

that second-degree murder and manslaughter are not lesser-included offenses of felony

murder, defendant charged with capital offense of felony murder was not entitled to

instructions on those two offenses). Under federal law an offense is not a lesser-included

offense of another offense "unless the elements of the lesser offense are a subset of the

elements of the charged offense. Where the lesser offense requires an element not

required for the greater offense, no [lesser-included-offense] instruction is to be given

. . . ." *Schmuck v. United States*, 489 U.S. 705, 716 (1989).

---

[2] The government argues that Defendant defaulted on the claim by failing to raise it on appeal. The claim, however, is not that the district court failed to instruct but that appellate counsel should have raised the failure on appeal. This claim of ineffective appellate counsel obviously could not have been raised until this § 2255 motion.

We examine whether voluntary manslaughter was an available lesser-included offense for any of Defendant's three counts. Because we decide that it was not available, Defendant's appellate counsel was not inadequate for failing to raise it. *See Hooks*, 184 F.3d at 1221 ("If the omitted issue is without merit, [appellate] counsel's failure to raise it does not constitute constitutionally ineffective assistance of counsel." (internal quotation marks omitted)).

### a.    Counts One and Two

Counts One and Two charged Defendant with felony-murder violations of 18 U.S.C. § 924(c)(1)(A) and (j). To determine whether a lesser-included offense was available, we must first review the statutory scheme underlying these charges. Subparagraph (c)(1)(A) provides: "[A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall" be guilty of an offense. *See Abbott v. United States*, 562 U.S. 8, 12 (2010) (describing § 924(c)(1)(A) as an offense). Subsection (j) expands on the offense, treating it as a more serious offense (with harsher punishment) when someone is killed as a result. It states:

> (j) A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall—
>> (1) if the killing is a murder (as defined in [18 U.S.C.] section 1111), be punished by death or by imprisonment for any term of years or for life; and
>> (2) if the killing is manslaughter (as defined in [18 U.S.C.] section 1112), be punished as provided in that section.

22

18 U.S.C. § 924(j).  In turn, 18 U.S.C. § 1111(a) states that "[m]urder is the unlawful

killing of a human being with malice aforethought."  It then sets forth four varieties of

first-degree murder and one variety of second-degree murder:

> *Every murder* [1] perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or [2] *committed in the perpetration of,* or attempt to perpetrate, *any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery*; or [3] perpetrated as part of a pattern or practice of assault or torture against a child or children; or [4] perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, *is murder in the first degree*.
>
> Any other murder is murder in the second degree.

*Id.* § 1111(a) (emphasis added).

As the jury was instructed, Counts One and Two incorporated only the second

variety of first-degree murder.  This provision—"[e]very murder . . . committed in the

perpetration of, or attempt to perpetrate, [various crimes]"—is a felony-murder provision,

with the listed crimes as the available predicate felonies.[3]

What is not obvious from the language of §1111, but is settled law in this circuit,

is that the meaning of *malice aforethought*, which is required for all murder, is not the

---

[3] In his reply brief Defendant mentions in passing that the predicate felonies charged in Counts One and Two—drug trafficking and the killing of a law-enforcement officer, respectively—are not among the crimes listed in § 1111's felony-murder provision.  This mention is not adequate to present the issue for review.  And we typically do not consider issues first raised in a reply brief, *see United States v. Smith*, 606 F.3d 1270, 1284 n.5 (10th Cir. 2010), especially when the appellant fails to invoke plain error, as is the case here, *see United States v. MacKay*, 715 F.3d 807, 834 (10th Cir. 2013).

same for felony murder as it is for the other varieties of murder. *See United States v. Chanthadara*, 230 F.3d 1237, 1258 (10th Cir. 2000) (although "'malice aforethought' is an element of every type of murder" under § 1111(a), its meaning "differs with respect to each kind of murder" (internal quotation marks omitted)). For felony murder, "malice aforethought is proved by commission of the felony, [and] there is no actual intent requirement." *Id.* In contrast, the "malice aforethought" requirement of § 1111(a)'s second-degree murder provision requires proof of "(1) intent-to-kill without the added ingredients of premeditation and deliberation; (2) intent to do serious bodily injury; (3) a depraved-heart; or (4) commission of a felony when the crime does not fall under the first-degree murder paragraph of § 1111(a)." *Id.* (internal quotation marks omitted). Because § 1111 felony murder does not require proof of any of these four alternatives, second-degree murder is not a lesser-included offense of felony murder. We so held in *Chanthadara*:

> Unlike second-degree murder, conviction for felony murder under 18 U.S.C. § 1111 requires the commission of an enumerated felony with the requisite mens rea for the underlying offense. Obversely, second-degree murder requires proof that defendant acted with malice aforethought, whereas under a felony murder charge the commission of the underlying offense substitutes for malice aforethought. Therefore, the elements of second-degree murder are not a subset of the elements of first-degree felony murder, for each offense requires proof of an element that the other does not.

*Id.* at 1259 (internal quotation marks omitted).

Likewise, voluntary manslaughter (Defendant makes no argument regarding involuntary manslaughter) is not a lesser-included offense of felony murder. Voluntary

manslaughter is defined in 18 U.S.C. § 1112(a) as "the unlawful killing of a human being

without malice" and "[u]pon a sudden quarrel or heat of passion." We have held:

> [V]oluntary manslaughter encompasses all of the elements of murder:  it
> requires proof of the physical act of unlawfully causing the death of
> another, and of the mental state that *would* constitute malice, but for the
> fact that the killing was committed in adequately provoked heat of passion
> or provocation.  Thus, the only difference between second degree murder
> and voluntary manslaughter in the homicide hierarchy is that voluntary
> manslaughter is committed in the heat of passion, and the presence of this
> mitigating factor negates the malice that would otherwise attach given an
> intentional or reckless mental state.

*United States v. Serawop*, 410 F.3d 656, 665 (10th Cir. 2005) (citation and internal

quotation marks omitted).  As we concluded, "Voluntary manslaughter requires proof

beyond a reasonable doubt that the defendant acted, while in the heat of passion or upon a

sudden quarrel, with a mental state that would otherwise constitute second degree

murder—either a general intent to kill, intent to do serious bodily injury, or with

depraved heart recklessness." *Id.* at 666.  Because felony murder does not require this

mental state (it requires only commission of the predicate felony, not "a mental state that

would otherwise constitute second-degree murder," *id.*) the elements of voluntary

manslaughter are not a subset of the elements of felony murder, and therefore voluntary

manslaughter is not a lesser-included offense of felony murder.  *See United States v.

Miguel*, 338 F.3d 995, 1005 (9th Cir. 2003) ("neither [§ 1112] voluntary nor involuntary

manslaughter is a lesser included offense of [§ 1111] felony murder").

### b.     Count Three

Count Three charged Defendant with a violation of 21 U.S.C. § 848(e)(1)(B), which provides:

> [A]ny person, during the commission of, [or] in furtherance of, . . . a felony violation of [the drug laws in 21 U.S.C. §§ 801–971] who intentionally kills . . . any Federal, State, or local law enforcement officer engaged in, or on account of, the performance of such officer's official duties . . . shall be sentenced . . . up to life imprisonment, or . . . to death.

Defendant contends that he was entitled to an instruction on voluntary manslaughter as a lesser-included offense of this offense. The problem with that contention is that Defendant has not identified any federal voluntary-manslaughter statute whose elements are a subset of those for this offense. Section 848(e)(1)(B) defines no other offense, much less a lesser-included voluntary-manslaughter offense; and, unlike 18 U.S.C. § 924(j), it does not incorporate or cross-reference 18 U.S.C. § 1112. Defendant seems to suggest that § 1112 can still apply, but it defines a voluntary-manslaughter offense only "[w]ithin the special maritime and territorial jurisdiction of the United States," *id.* § 1112(b), which is quite narrowly defined by 18 U.S.C. § 7 and does not include the area around Defendant's property where the offense occurred.

As a result, Defendant's only contention could be that *Beck* requires the courts to create a lesser-included offense for this case. That contention would fail. In *Hopkins*, 524 U.S. at 96–97, the Supreme Court held that *Beck* does not compel a state court to instruct on a noncapital offense that was not a lesser-included offense under the state's law. To do so, the Court reasoned, would "require[] in effect that States create lesser included offenses to all capital crimes, by requiring that an instruction be given on some

*other* offense—what could be called a 'lesser related offense'—when no lesser included offense exists." *Id.* at 97. That would be both "unprecedented" and "unworkable" because "[u]nder such a scheme, there would be no basis for determining the offenses for which instructions are warranted." *Id.* That same reasoning would also apply to judicial creation of a federal criminal offense (which is barred in any case, *see United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812)).

### c.    Ineffective Assistance

The above analysis reflects our view that there was no available lesser-included offense of voluntary manslaughter for the charges against Defendant. Perhaps we have missed something. But even so, in light of that analysis we can hardly say that Defendant's counsel on direct appeal was ineffective for failing to make the argument we reject. A reasonable, even a highly competent, attorney could examine the issue and decide that raising a lesser-included-offense issue would do little more than detract from the strength of other issues to be presented on appeal. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal"); *accord Cargle v. Mullin*, 317 F.3d 1196, 1201 (10th Cir. 2003). We therefore reject this claim of ineffective assistance of counsel on appeal.

### F.    Penalty-Phase Mental-Health Evidence

Defendant's final argument is that his trial attorneys were ineffective by failing to properly investigate his background and mental health in preparation for the penalty

phase of his case. We evaluate trial counsel's penalty-phase performance "under the prevailing professional norms at the time of . . . trial [September 2005 in this case]." *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam). We must bear in mind that "[b]eyond the general requirement of reasonableness, specific guidelines are not appropriate," and "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1406 (2011) (internal quotation marks omitted). Still, the Supreme Court has emphasized that as a general rule counsel has a duty to pursue leads indicating a defendant's troubled background and diminished mental capacity. *See Wiggins v. Smith*, 539 U.S. 510, 523–525 (2003); *see also Hooks v. Workman*, 689 F.3d 1148, 1201 (10th Cir. 2012) ("Counsel has a duty to conduct a thorough investigation—in particular, of mental health evidence—in preparation for the sentencing phase of a capital trial." (internal quotation marks omitted)). That standard is supported (though not mandated, *see Bobby v. Van Hook*, 558 U.S. 4, 7–9 (2009)) by the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. 2003) (ABA Guidelines), which state that a capital defense team should include a "mitigation specialist" and someone "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." ABA Guidelines 4.1.A.1 to .2.

The issue before us is whether Defendant's trial attorneys prepared a mitigation case that measures up to professional norms and, if not, whether that made a difference. In our view, the record before us is inadequate to resolve the issue. Defendant has presented considerable evidence supporting his claims. But other evidence may counter it. Rule 8(a) of the Rules Governing Section 2255 Proceedings requires the district court to review the record "to determine whether an evidentiary hearing is warranted." That decision turns on "whether such a hearing could enable [the movant] to prove the [motion's] factual allegations, which, if true, would entitle the [movant] to . . . relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (stating standard in § 2254 cases). We hold that an evidentiary hearing is necessary to enable the district court to make the findings needed to determine whether Defendant has a valid claim. We therefore reverse and remand for further proceedings on the issue.

### 1.    Deficient Performance

We begin with an overview of the penalty-phase defense that was presented. Defendant's trial attorneys called his mother, father, stepmother, brother, ex-wife, uncle, and cousin to testify that Defendant was a loved family member and good person who was sorry for killing Eales. The defense also called a state-court clerk to testify about Defendant's state-court proceedings and his lack of prior felonies, several state-prison employees to testify that Defendant was a well-behaved prisoner, two neighbors to testify that Defendant was a good mechanic and a nonviolent person, and a bondsman to testify that he had no concerns about Defendant's being a danger while his bench warrant was

outstanding. None of the witnesses discussed Defendant's mental health or troubled background in any significant detail, and Defendant's closing argument included only one mention of his commitment to a hospital almost 20 years earlier "for drug abuse and other treatment," and that was in the context of describing his "rocky" marriage. R., Vol. 5 pt. 2 at 4108.

The defense that was presented apparently helped to some extent. The jury did not find unanimously that the government had proved beyond a reasonable doubt that Defendant would pose a continuing and serious danger to others in prison, and unanimously found that he was a father and a loved son and stepson, and that his death would have an impact on his family and friends. Seven jurors found that he was a good neighbor and friend; five found that he had accepted responsibility for Eales's death from his state-court conviction and that he had been convicted and punished for the killing; and two found that he would not be a danger to society if imprisoned for life without parole.

What was missing from the presentation was evidence of Defendant's mental condition that could have been persuasive to the jury. In his § 2255 proceedings Defendant has presented a case that his defense team did little to investigate his background and mental condition. First, it may never have hired a mitigation expert or a mental-health professional to assess Defendant's mental capacity. The district court pointed to one of the defense attorneys' expense vouchers and attached documentation that said that they had retained the services of psychologist Jeanne Russell for "mitigation and assistance on mental health questions" at least in part because "she [had been]

consulted during the State trials as the mitigation expert." *Barrett*, 2012 WL 3542609, at

\*72 (internal quotation marks omitted).  There is evidence, however, that Dr. Russell's

work was restricted to an assessment of Defendant's future dangerousness.  According to

her declaration in these § 2255 proceedings, she "did not evaluate [Defendant's]

neuropsychological functioning or focus on his psychological make-up, as the referral

request was specific to risk assessment."  Am. Mot. for Collateral Relief, to Vacate, Set

Aside, or Correct Sentence & for a New Trial, Ex. 56 at 1–2, *Barrett*, No. 6:09-civ-105-

JHP (Sept. 25, 2009).  She states that in mid-August 2005, about a month before the

federal trial began, she was approached by Bret Smith, one of Defendant's trial attorneys,

to be a mitigation investigator.  She declined, stating that she was unqualified to perform

such an investigation and there was not time to do so.  She updated her risk assessment

on Defendant and submitted it to Defendant's trial attorneys on September 15.  On

October 12 she visited Defendant in prison but this was after she had already submitted

her updated report.

Additional evidence further supports Defendant's assertion of a lack of effort to

retain mitigation expertise.  According to the declaration of Julia O'Connell, Federal

Defender for the Northern and Eastern Districts of Oklahoma, defense attorney Hilfiger

called her office less than three months before the start of trial to ask if her mitigation

specialist would be willing to meet sometime in the future.  O'Connell referred him to

Dick Burr, a federal death-penalty resource attorney.  Burr declares that he never heard

from Hilfiger or Smith on anything of substance.  Similarly, the firm that was approved

by the court for mitigation services, Inquisitor, Inc., was contacted only once by John

Echols (an attorney for Defendant who withdrew and was replaced by Smith) and was

never asked to perform any mitigation work.

Defendant's trial attorneys also apparently did little to investigate his background

or mental health through his family.  According to the declarations of the family

members who testified during the sentencing phase, the trial attorneys' preparation for

their testimony consisted more or less of five-minute interviews before going on the

stand, and none were asked about Defendant's background, mental health, or family

history.

Typically, this kind of superficial investigation would constitute deficient

performance.  *See Hooper v. Mullin*, 314 F.3d 1162, 1171 (10th Cir. 2002) ("A decision

not to undertake substantial pretrial investigation and instead to 'investigate' the case

*during* the trial is not only uninformed, it is patently unreasonable." (brackets and internal

quotation marks omitted)); *see also Sears v. Upton*, 561 U.S. 945, 952 (2010) (per

curiam) (quoting, with apparent approval, the postconviction state-court determination

that "the cursory nature of counsel's investigation into mitigation evidence—limited to

one day or less, talking to witnesses selected by [the defendant's] mother—was on its

face constitutionally inadequate") (ellipsis and internal quotation marks omitted)).  The

government nevertheless offers three reasons why trial counsel's efforts were not

deficient:  first, they had no indications that Defendant suffered from a mental

impairment, so there was no reason to pursue that line of inquiry; second, Defendant

opposed a mitigation strategy based on personal sympathy or his childhood; and third,

they already had a reasonable mitigation strategy. Each is questionable on this record.

To support the first argument, the government directs us to the declarations of

Hilfiger and Smith. They state that nothing in Defendant's behavior during the federal

case, nor in what his family members reported to them during interviews, nor in what

Dr. Russell said to them indicated that Defendant had a significant mental impairment. In

essence, according to the government, there were no "red flags" indicating a need to go

further. *Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (internal quotation marks omitted);

*see Strickland*, 466 U.S. at 690–91 ("strategic choices made after less than complete

investigation are reasonable precisely to the extent that reasonable professional

judgments support the limitations on investigation"). What the trial attorneys'

declarations fail to address, however, is whether they ever *asked* about Defendant's

mental health, background, or family history. *Cf. Cole v. Trammell*, 755 F.3d 1142, 1161

(10th Cir. 2014) ("[b]ecause 'family and social history' is one of the crucial areas of

investigation emphasized in the ABA Guidelines," court assumes that a failure to contact

family members was constitutionally deficient performance).

Also, the record suggests that Defendant's trial attorneys had indications that

Defendant's mental health and background merited further investigation. According to

Echols, Defendant's previous attorney:

> At the time I withdrew from the case, I advised Mr. Hilfiger that he needed
> to immediately undertake extensive investigation and preparation for a
> possible penalty phase. I explained to him that the work performed by

> Roseann Schaye, the mitigation investigator in the state case, was very preliminary in nature and far from complete. Ms. Schaye's investigation, and preliminary consultation with mental health experts prior to the state court trial had identified, but not developed, several potentially fruitful areas to pursue, including Mr. Barrett's mental illness and prior suicide attempt. In particular, the expert advice included seeking assessment of neurological damage and conducting an investigation of family illness.

R., Vol. 1a pt. 1 at 547. Hilfiger does not recall this conversation, but factual disputes should be resolved in an evidentiary hearing. Further, it is undisputed that six months before trial Echols and Hilfiger requested funding from the court for an expert on diagnosing organic brain disorders resulting from Defendant's drug use and significant head injuries, and that even earlier Echols copied Hilfiger on a letter to the court discussing the use of Schaye's mitigation-investigation services during the state proceedings and stating that she and another psychologist "disagreed completely concerning Mr. Barrett's mental well being." *Id.* at 967. In addition, Hilfiger admits that Echols gave him Defendant's medical, educational, and mental-health records. Those records reveal that Defendant developed at a delayed pace as an infant, struggled in school, attempted suicide with a shotgun in January 1986, was subjected to a mental-health proceeding in October 1986 and committed to a hospital after complaints from his mother and ex-wife that he was violent and very suicidal, and was hospitalized for three days in 1995 after arriving in the emergency room complaining of "losing his mind." *Id.*, Vol. 2d pt. 8 at 358. During his hospital stay in October 1986 he was diagnosed with substance abuse and mixed personality disorder, and during his hospital stay in 1995 he was diagnosed with substance abuse and organic affective disorder. Also, the report

34

prepared by Dr. Russell and given to Hilfiger and Smith includes a list of records she

relied upon, which included records noting Defendant's suicide attempt in January 1986,

hospital stays in October 1986 and in 1995, and a psychological evaluation completed in

2002 by psychologist William Sharp, who found that Defendant was paranoid and had a

family history of depression and mental illness, and who said that his behavior warranted

investigation for organic brain damage.  Defendant's trial attorneys never contacted

Dr. Sharp.

This is evidence that counsel failed to make an effort "to discover all reasonably

available mitigating evidence" despite ample indication of potential mental-health

problems.  *Wiggins*, 539 U.S. at 524 (emphasis and internal quotation marks omitted).

The government's second argument is that Defendant's trial attorneys were

constrained from conducting a mental-health investigation by their client, who did not

want a mitigation strategy based on personal pity or embarrassment of his family.  The

government again cites the declarations of Hilfiger and Smith, which both state in

identical words:

> Mr. Barrett did not want the defense to "beg for his life" during the penalty
> phase of the trial.  He did not want the outcome of the case to hinge on
> personal sympathy for him.

> Mr. Barrett did not want the mitigation case to dwell on his childhood.  He
> also wanted to minimize the amount of testimony elicited from his
> relatives, particularly his son, mother and ex-wife, though he understood
> that decision could work to his detriment.

35

R., Vol. 2d pt. 8 at 346 (paragraph numbering omitted); *see also id.* at 349 (same).  The

government also directs us to Defendant's outburst during the prosecution's closing

argument in the guilt phase.  After United States Attorney Sheldon Sperling mentioned

Defendant's mother, Defendant exclaimed, "Get off my family, Sperling.  This is about

murder, not my family. . . .  I've heard enough of him talking about my family.  Take me

out of the courtroom.  Take me out." *Id.*, Vol. 5 pt. 2 at 4151.

This evidence, however, does not establish an unambiguous command to refrain

from investigating or presenting evidence of Defendant's personal history or mental

health.  Defendant has presented evidence that his trial attorneys were not so constrained.

Echols stated in a declaration that during state-trial preparation Defendant willingly

submitted to a mental-health examination, provided information about his background,

and placed no restrictions on mitigation investigation.  Smith stated in his declaration that

Defendant "impressed me as among the most cooperative criminal defense clients I have

ever had." *Id.*, Vol. 2d pt. 8 at 345.  Most strongly indicating Defendant's cooperative

attitude is his undated letter to Hilfiger apologizing for his changes of mind and

expressing his willingness (at least at that moment) to allow his attorneys to do their best

to win the case:

> [A]t this time I don't know what I'm doing or going to do.  Or should
> do. . . .  One day I feel one way and the next I feel another.  I guess I have
> no choice now than to let you do your best. . . .  Just try your hardest to beat
> this to w[h]ere I can go home. . . .  I've got alot of thangs that are good for
> this case.  So hopefully now that there is no-other means for me but to beat
> this we can put this behind us and start over and do this right and win.  I'll
> try my best to act right.

*Id.*, Vol. 1a pt. 1 at 555.

As for Defendant's outburst during closing argument (which both his trial attorneys say was an exceptional event), Hilfiger suggests in his declaration that it was not a reaction to the presentation of mitigation evidence, but to argument about Defendant's family:

> Mr. Barrett's outburst during the prosecution's penalty phase argument was a very unusual and unanticipated event. That outburst must be placed in a perspective that this was toward the end of a very contentious trial. At this stage the U.S. Attorney was arguing about the defendant's mother or step-mother, as she related to the case, and Mr. Barrett's outburst was to inform the prosecutor that he was the one on trial and his mother or step-mother should not be subjected to that kind of examination.

*Id.*, Vol. 2d pt. 8 at 349.

The government nonetheless contends that the Supreme Court's opinion in *Schriro* forecloses an evidentiary hearing. We are not persuaded. *Schriro* involved a challenge under 28 U.S.C. § 2254 to a state death sentence. *See* 550 U.S. 465. At the sentencing hearing the defendant in *Schriro* confirmed to the judge that he had told his counsel not to present mitigating evidence and then repeatedly interrupted his counsel's efforts to do so, often by interjecting incriminating details. *See id.* at 469–70. The record in this case (at least as it currently stands) is hardly as definitive as *Schriro*'s. Defendant's one ambiguous outburst during closing argument is not the same as repeatedly interrupting at sentencing to strengthen the case against oneself. And the conclusory descriptions of Defendant's wishes in the declarations of Hilfiger and Smith are a far cry from the *Schriro* defendant's statement to the judge at the close of the sentencing hearing, "I think

if you want to give me the death penalty, just bring it right on. I'm ready for it." *Id.* at 470. Perhaps most importantly, the Court in *Schriro* was applying § 2254's deferential standard of review, which permits setting aside the state-court finding of waiver only if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Given that standard, a federal-court evidentiary hearing on waiver was unnecessary.

Because of the evidence that Defendant (1) changed his mind from time to time on how he wished the case to be tried, (2) at least at some times deferred to the best judgment of his lawyers, and (3) may not have made a fully informed decision (because his attorneys inadequately investigated his background and mental health), we cannot say that the unelaborated statements by his attorneys necessarily establish that those attorneys were barred by Defendant from pursuing a defense to the death penalty based on his background or mental health. We express no opinion on the issue; an evidentiary hearing can resolve the matter.

Finally, the government suggests that the actions of Defendant's trial attorneys were justifiable because they were able to present an alternative yet still effective portrayal of Defendant as a beloved family member. But an uninformed choice is not a reasonable tactical decision: "[A] decision to focus on one potentially reasonable trial strategy [cannot be] justified by a tactical decision when counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." *Sears*, 561 U.S. at 954 (citation and internal quotation marks omitted); *see also Littlejohn v.*

38

*Trammell*, 704 F.3d 817, 867 (10th Cir. 2013) (*Sears* and *Rompilla* "emphasized the need

for courts to consider the prejudicial effect of counsel's failure to investigate a viable

mitigation theory *even in the face* of an otherwise reasonable mitigation defense");

*Brecheen v. Reynolds*, 41 F.3d 1343, 1368 (10th Cir. 1994) ("If . . . the decision is not

tactical, and counsel's performance is therefore deficient, then the first prong of

*Strickland* is satisfied."). Defendant's trial attorneys had an obligation to investigate

carefully before setting out on a course of action, and there is evidence that they did not

do so.

### 2.     Prejudice

To obtain relief, Defendant must also establish that the alleged deficient

performance of counsel caused him prejudice. His burden is to show that "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Rushin*, 642 F.3d at 1302 (internal quotation

marks omitted). "To assess that probability, we consider the totality of the available

mitigation evidence—both that adduced at trial, and the evidence adduced in the [§ 2255]

proceeding—and reweigh it against the evidence in aggravation." *Porter*, 130 S. Ct. at

453–54 (brackets and internal quotation marks omitted). This is a "probing and fact-

specific analysis," which "will necessarily require a court to 'speculate' as to the effect of

the new evidence." *Sears*, 561 U.S. at 955–56. But we need not be certain that the

omitted evidence would have changed the outcome of the proceeding: it is sufficient if

confidence in the outcome has been undermined. *See Byrd*, 645 F.3d at 1168.

Taking Defendant's proffered mitigation evidence as true, it is sufficient to require an evidentiary hearing.  It includes documents and declarations and the assessments of three experts:  Dr. Bill Sharp, who examined Defendant in 2002; Dr. Myla Young, a clinical neuropsychologist who examined Defendant in 2009 and reviewed his records; and Dr. George Woods, a psychiatrist who also reviewed Defendant's records and examined him in 2009.  The evidence supports the following:

Defendant's family has a long history of mental-health problems, alcoholism, and abuse.  On Defendant's maternal side, several members of his extended family suffer from mental-health problems and relatives of his grandparents committed suicide or were involuntarily committed for psychiatric treatment.  On his paternal side, several members of the extended family have mental-health problems, his great-great-grandfather was once committed to a psychiatric hospital, his great-grandfather committed suicide, and his grandfather was an alcoholic who spent time in a mental hospital under a Certificate of Lunacy and who chronically abused his family members, including Defendant's father.

Defendant's childhood was less than ideal.  His father supported the family financially but was largely absent.  Throughout Defendant's childhood and adolescence his father drank, fought constantly with Defendant's mother and others, and engaged in numerous extramarital affairs.  He once had a violent altercation with Defendant's mother.  He also punched Defendant once when Defendant was in ninth grade.  Defendant's parents separated when he was 10 or 11 years old.  His mother drank constantly and subjected him to physical and emotional abuse and neglect.  Such

40

evidence of childhood abuse, neglect, and instability can play a significant role in mitigation. *See Sears*, 561 U.S. at 948 (emotionally abused by parents, who fought physically and divorced, and sexually abused by cousin); *Wiggins*, 539 U.S. at 516–17 (neglected and abused by birth mother and abused physically and sexually in foster care); *Williams v. Taylor*, 529 U.S. 362, 395 (2000) ("nightmarish childhood" of abuse and neglect by parents and foster home); *see also, e.g.*, *Hooks*, 689 F.3d at 1203 (defendant's "premature birth, . . . abusive father, frequent moves, educational handicaps, and personal family tragedies" constituted "a life story worth telling"). Also, Dr. Woods said that Defendant's genetic history and poor upbringing increased his risk for developing mental disorders and chemical dependency.

Defendant's own history suggests mental illness. His mother drank alcohol while pregnant with him, he was developmentally delayed as an infant, repeated a grade in school, and dropped out after being referred to special-education classes. He suffered various incidents of head trauma while growing up and as a young man. He began consuming alcohol, tobacco, and other drugs between the ages of 11 and 14, when the brain's frontal lobes are first beginning to develop. In January 1986, at the age of 24, he attempted suicide by shooting himself in the chest with a shotgun, after which he received psychiatric intervention and was prescribed antidepressants. Later that year he was involuntarily committed to a hospital after complaints from his mother and ex-wife that he was violent and suicidal; he was diagnosed as suffering from substance abuse and mixed personality disorder. In 1995 he was again hospitalized for three days after

41

arriving in the emergency room complaining of "losing his mind." R., Vol. 2d pt. 8 at 358. He was discharged with diagnoses of substance abuse and organic affective disorder. According to Dr. Woods, throughout Defendant's life he has had a significantly impaired ability to function normally and live independently and has suffered from irritability, racing thoughts, paranoia, and cognitive impairment.

Drs. Young, Woods, and Sharp concluded that Defendant labors under substantial mental impairment. Dr. Woods diagnosed Defendant with bipolar disorder and posttraumatic stress disorder. Dr. Sharp's evaluation from 2002 (during the state-court proceedings) found that Defendant had avoidant personality disorder, long-term memory problems, a tremor in his hands, and buzzing in his ears.

Most important are the findings relating to Defendant's judgment. Dr. Young said (1) that Defendant's history suggests he has sustained brain damage that inhibits his ability to process new information and (2) that tests she administered likewise indicated that Defendant's executive functioning—which involves the ability to reason, anticipate consequences to actions, and respond to new information and act accordingly—was significantly impaired. She stated that Defendant's "brain dysfunction . . . would particularly impair his abilities to organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment. His disabilities would be further exacerbated under conditions of complexity and/or highly stressful situations." R., Vol. 1a pt. 1 at 1105. Dr. Woods concurred with Dr. Young's findings. He determined that Defendant suffers from brain

42

damage sustained early in his life, which impairs his inhibition, reasoning, and judgment. He opined that Defendant's "frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder." *Id.* at 1297. Dr. Sharp's 2002 evaluation found Defendant to be fearful and paranoid, and he agreed with Dr. Young's findings and Dr. Wood's diagnosis.

We have said that evidence of mental impairments "is exactly the sort of evidence that garners the most sympathy from jurors," *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004), and that this is especially true of evidence of organic brain damage, *see Littlejohn*, 704 F.3d at 864 ("Evidence of organic mental deficits ranks among the most powerful types of mitigation evidence available."). Organic brain damage is so compelling, according to one of our decisions, because "the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action." *Hooks*, 689 F.3d at 1205. This evidence goes beyond the generalized mental conditions we have determined to be unhelpful in mitigation. *See Grant v. Trammell*, 727 F.3d 1006, 1020–21 (10th Cir. 2013) (generalized personality disorders, borderline personality disorder, bipolar disorder, compulsive personality disorder, and severe emotional distress). It enables counsel to "explain to the jury why [the] defendant may have acted as he did[,] . . . connect[ing] the dots between, on the one hand, [his] mental problems, life circumstances, and personal history and, on the other, his commission of the crime in question." *Hooks*, 689 F.3d at 1204. Little of this evidence was presented to the jury.

On the other hand, "we do not consider omitted mitigation evidence in a vacuum." *Wilson v. Trammell*, 706 F.3d 1286, 1305 (10th Cir. 2013). "[W]e must consider not just the mitigation evidence that Defendant claims was wrongfully omitted, but also what the prosecution's response to that evidence would have been." *Id.* at 1306; *cf. Burger v. Kemp*, 483 U.S. 776, 788–95 (1987) (reasonable for counsel not to present evidence of defendant's background in mitigation because it would have revealed defendant's violent tendencies).

That response would have surely called into question Defendant's diagnoses of various mental defects and suggested he was simply a dangerous drug addict. The government directs us to evidence that when Defendant was involuntarily committed for psychiatric treatment in 1986, his then-wife executed a sworn statement describing Defendant as "a very dangerous person to himself and others" and stating that he was abusing drugs and had sexually abused her, had kidnapped their son, had destroyed and burned her possessions, and had threatened to kill her and to take away their son. R., Vol. 2d pt. 8 at 350. A medical history sheet completed at that time stated that he had no symptoms of neurological problems and that he denied having suffered any head injuries. Although his discharge summary from that stay diagnosed him with a "[m]ixed personality disorder," it also described him as a drug abuser who had failed to continue taking his medication after his suicide attempt. Also, it offered a prognosis of "[g]uarded, because of the unpredictability of his behavior, depending on the circumstances and depending on whether or not he is taking drugs at the time." *Id.* at

353. A few months after his release from the hospital, Defendant had a claim denied by the Social Security Administration. The denial letter stated that "[m]edical reports show that you are moderately depressed but there are no signs of a severe mental illness. Most of the time you are able to think clearly and to carry out your normal activities." *Id.* at 362. As for Defendant's 1995 hospitalization, the government points out that a physician's evaluation found him to be calm, normal, and free of any paranoia, delusions, hallucinations, or homicidal ideation, but still addicted to drugs. And finally, the government could have introduced evidence that Defendant had amphetamines and marijuana in his system on the night of the shooting.

Perhaps the evidence of spousal abuse and drug involvement would not have surprised the jury and presented little downside risk to Defendant's offering evidence of his mental condition. *See Smith*, 379 F.3d at 943 & n.11 (when aggravating aspects of defendant's mental illness had already been presented to jury, little risk to presenting the mitigating aspects as explanation for defendant's behavior). After all, the jury heard extensive testimony of Defendant's abuse of his ex-wife, including her requests for and his violations of multiple protective orders, an incident in which he destroyed her furniture and other items, and his threat after their separation to "blow off her head." *Id.*, Vol. 5 pt. 2 at 3486. Their divorce was granted, the jury learned, on grounds of physical abuse. The jury was also presented with significant evidence of Defendant's drug use, including the testimony of a drug addict that he took methamphetamine with Defendant, and the testimony of a state prison employee that Defendant self-reported first using

alcohol at age 12, cocaine and heroin at age 14, and methamphetamine at age 20, and had been using marijuana, methamphetamine, heroin, tranquilizers, and other drugs up until the time of the shooting. And, of course, there was the guilt-phase evidence of Defendant's outstanding warrant for failure to appear in state court on drug charges and the drug paraphernalia found on Defendant's person and property after the shooting.

But additional *current* mental-health evidence could have been offered by the government once Defendant opened the door to such evidence. In particular, the government could have called Dr. Randall Price in rebuttal. Dr. Price conducted a psychological evaluation of Defendant on behalf of the government, and he may have testified that Defendant was a psychopath and would be at a high risk of committing violent offenses if freed. Such expert testimony can be devastating. *See Wilson*, 706 F.3d at 1298–99, 1307–08. We hesitate, however, to rely on Dr. Price's evaluation to establish lack of prejudice. Although the district court noted the report and apparently relied on it to some extent, it is not clear how much of the report was disclosed to Defendant, which may explain why the government's appellate brief does not discuss it.

In short, we believe that Defendant presented sufficient evidence of deficient performance and prejudice to entitle him to an evidentiary hearing. Based on the evidence presented at a hearing, the district court can make findings on disputed facts and render its decision, both on performance and prejudice.

## III.     CONCLUSION

We REVERSE and REMAND Defendant's death sentence for the district court to hold an evidentiary hearing on whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health and whether Defendant suffered prejudice from any deficiency during the penalty phase of his trial.  In all other respects we AFFIRM.  Also, we DENY Defendant's Motion for Certificate of Appealability in Light of *Carter v. Bigelow*.