**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT/MOVANT'S SECOND SECTION 2255 MOTION TO VACATE, SET ASIDE, OR CORRECT HIS CONVICTIONS AND SENTENCES**

DAVID AUTRY, OBA #11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
Eastern District of California
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, Third Floor
Sacramento, CA 95814
(916) 498-5700
(916) 498-5710 [fax]
joan_fisher@fd.org
Attorneys for Petitioner, Kenneth Eugene Barrett

**TABLE OF CONTENTS**

I. COURSE OF PROCEEDINGS .................................................................................5

II. RELEVANT FACTUAL BACKGROUND. ..........................................................17

III. CLAIM I: NEWLY DISCOVERED EVIDENCE OF PROSECUTORIAL MISCONDUCT IS A CONSTITUTIONALLY INTOLERABLE VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE OF DUE PROCESS, WHICH WHEN PROVEN IN AN EVIDENTIARY HEARING AND VIEWED IN THE LIGHT OF OTHER NEWLY DISCOVERED EVIDENCE AND THE EVIDENCE AS A WHOLE, WILL BE SUFFICIENT TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THAT NO REASONABLE FACTFINDER WOULD HAVE FOUND MR. BARRETT GUILTY OF THE OFFENSE(S) CHARGED, UNDER  28 U.S.C. §2255(H)(1) ..........................................................................................................22

A. THE PRE-RAID EVIDENCE. ...................................................................22

1. The Warrants Served by the Oklahoma Highway Patrol Were Constitutionally Defective..............................................................................................................22

2. The Bench Warrant for Failure to Appear for a Jury Trial for an Alleged Delivery of a Controlled Substance was Unconstitutional......................................23

a. The Delivery of Methamphetamine Charge is founded on Perjury...............23

b. The Record Demonstrates The Erroneous Issuance Of The Bench Warrant For Failure To Appear. ........................................................................................26

3. The No-Knock, Nighttime Search warrant was unconstitutional under *Franks v. Delaware,* 438 U.S. 154 (1978)...........................................................................28

a. The Defense Should have been Advised of DTF Frank Lloyd's Bad Reputation...........................................................................................................29

b. The Government Knew that DTF Agent Johnson was Dishonest and a Criminal and had a Duty to so Inform the Defense..............................................34

4. OHP Reliance on DTF Agents Lloyd and Johnson was in Bad Faith and Undermines Mr. Barret's Convictions. ..................................................................37

5. The Government's Attorney Michael Littlefield Actively Conspired With Johnson to Deprive Mr. Barrett of his Constitutional and Civil Rights....................38

a. Charles Sanders was well-known to be untrustworthy and has an extensive criminal history...................................................................................................40

b. Charles Sanders was a Critical Witness for the Government. ......................43

c. Newly Discovered Evidence Makes Clear the Prosecution and DTF Officer Johnson were Well Aware of the Incredibility of Sanders, and Conspired with Sanders to Concoct his Testimony. .....................................................................46

i

d.     Newly Discovered Evidence Shows that Michael Littlefield Used Threats and Intimidation to Bully People.............................................................49

IV.  The newly discovered evidence concerning Clint Johnson undermines the sufficienCy of the Drug Evidence against Mr. Barrett......................................................51

A.     Mr. Barrett was beaten upon arrest.........................................................58

B.     The EMT attending Mr. Barrtt was harassed. .......................................60

C.     The Troopers tried to intimidate people at the trial...............................62

D.     Trooper Paul Gordon, Internal Affairs Investigator..............................64

1.     Trooper by trooper, they lied and misled the jury............................66

2.     The Destruction of Evidence in a Capital Case................................70

a.     The Recorded Statement of Trooper Rick Manion......................70

b.     Failure to Preserve the Crime Scene ..........................................72

3.     Newly Discovered Evidence Reveals the Government's Evidence that Mr. Barrett Shot Trooper Eales is Outside the Parameters of Good Science. .................79

4.     Federal Trial Testimony was Significantly Exaggerated from his state court testimony. ......................................................................................80

5.     The Chain of Custody of the bullet fragment raises due process questions.....83

6.     Mr. Barrett has been diligent and timely in the discovery of the egregious prosecutorial misconduct.......................................................................87

7.     The newly discovered evidence, viewed in light of the whole record, establishes Mr. Barrett's innocence..........................................................88

# TABLE OF AUTHORITIES

**Federal Cases**

*Ariz. v. Youngblood*, 488 U.S. 51 (1988) .......................................................... 78

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................... 29, 45

*Case v. Hatch*, 731 F.3d 1015 (10th Cir. 2013) ............................................. 4

*Franks v. Delaware*, 438 U.S. 154 (1978) ................................................ *passim*

*Giglio v. United States*, 405 U.S. 150 (1972) ...................................... 5

*Hinton v. Alabama*, 134 S. Ct. 1081 (2014) ................................................ 79

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) ................................... 16

*Johnson v. Cabana*, 818 F.2d 333 (5th Cir. 1987) ................................ 79, 81

*Napue v. Illinois*, 360 U.S. 264 (1959) ....................................... *passim*

*Preston v. Ferrer*, 552 U.S. 346 (Mar. 17, 2008) ..................................... 7

*U.S. v. Shareef*, 100 F.2d 1491 (10th Cir. 1991) ....................................... 3, 38

*United States v. Barrett*, 496 U.S. 1079 (2007) ......................................... 6, 7

*United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007) ......................... 22, 45

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015) ....................... 17, 21, 81, 82, 85

*United States v. Bohl*, 25 F.3d 904 (10th Cir. 1994) ...................................... 78

*United States v. Gillette*, 245 F.3d 1032 (8th Cir. 2001) .......................... 3, 23, 24, 25, 26

*United States v. Sparks*, 291 F.3d 683 (10th Cir. 2002) ........................... 39, 41

*United States v. Williams*, 790 F.3d 1059 (10th Cir. 2015) ............................ 2

**Federal Statutes and Rules**

18 U.S.C. § 924(c)(1)(A) ..................................................................... 5

18 U.S.C. § 2255 ......................................................................... 14, 15

18 U.S.C. § 3005, 3006A ................................................................. 7, 9

18 U.S.C. § 3006A .......................................................................... 7, 9

21 U.S.C. § 848 ................................................................................. 5

21 U.S.C. § 848(e)(1)(B) ................................................................... 5

21 U.S.C. § 2255 ........................................................................... 7

28 U.S.C. § 2 ................................................................................. 26

28 U.S.C. § 24 ................................................................................. 43

28 U.S.C. § 924(c)(1)(A) ................................................................... 5

28 U.S.C. § 1067 ........................................................................................... 32

28 U.S.C. § 1070 ........................................................................................... 32

28 U.S.C. § 1081 ............................................................................... 32, 35, 36

28 U.S.C. § 1085 ........................................................................................... 32

28 U.S.C. § 2255 ..................................................................................... *passim*

28 U.S.C. § 2255(h)(1) ............................................................................... 4, 22

28 U.S.C. § 2255(h)(2) ................................................................................... 95

28 U.S.C. § 2511 ........................................................................................... 43

28 U.S.C. § 2514 ........................................................................................... 43

28 U.S.C. § 2515 ........................................................................................... 43

28 U.S.C. § 2543 ........................................................................................... 43

28 U.S.C. § 2631 ........................................................................................... 44

Fed. R. App. P. 22 ........................................................................................... 1

Fed. R. Civ. P. 26 ......................................................................................... 93

## State Cases

*Dunkle v. State*, 139 P.3d 228 (Okla. Crim. App. 2006) .................................................. 86

## State Statutes and Constitutional Provisions

Okla. Const. art. II, § 20 ................................................................................. 26

Okla. Stat. Ann. tit. 21, § 388 (West 2016) ............................................................. *passim*

Okla. Stat. Ann. tit. 22, § 812.1(B) (West 2016) ........................................................ 26

Okla. Stat. Ann. tit. 59, §§ 1332, 1336 (West 2016) ..................................................... 27

**INDEX TO EXHIBITS**

1       Declaration of Leonard Post regarding Juan Beal

2       Declaration of John Garrett

3a      Information - March 24, 1997

3b      Blount Affidavit of March 18, 1997

3c      Kevin Ottwell Report - January 27, 1997

3d      OSBI Lab Report of April 30, 1997

3e      Stephen Barnes Letter re Suspended Sentence

3f      Preliminary Hearing Transcript - August 27, 1997

3g      Subpoena of Frank Loyd

3h      Sequoyah County Docket – Judges

3i      Sequoyah County Docket Case No. 97-86

3j      Warrant Signed by Amanda Woody – January 28, 1999

4       Declaration of Larry Blount

5       Declaration of A.J. Henshaw

6       Declaration of Vicki Beatty

7       Declaration of John Philpot

8       Declaration of Gary Philpot

9       Frank Loyd Interview by Ben Rosser

10      DeWayne Burgess Interview by Dennis Franchini

11      Kevin Ottwell Interview by Dennis Franchini

12      Declaration of Courtney Bates

13      Declaration of J.C. Chennault

14      Declaration of Richard Gray

15      Supplemental Declaration of Richard Gray

16      Declaration of Michael Reese

17      Declaration of Leonard Post regarding Earl Beaver

18      Declaration of Paul Gordon

19      Declaration of Paul Mann

20      Court Documents of Thomas Gann and Karen Real

21      Declaration of Charles Sanders

22      Docket of Karen Real

23      Declaration of Dennis Sprouse

24      USDC Docket Excerpt re Charles Sanders Witness Transportation

25      Declaration of Lacy Littlefield

26      Incident Report - Littlefield

27      Declaration of Lisa Cooper

28      Declaration of Leonard Post regarding Casey Borders

29      Declaration of Leonard Post regarding C. Rhor

30       Kenneth Barrett statement to George Randolph

31      Kennth Barrett Booking Photo

32      Declaration of Jimmy Sutton

33      Declaration of Dale Barnhardt

34      Declaration of J.C. Hurley

35      Crime scene logs

36      Declaration of Roy Coleman

37      Excerpts of Testimony – John Hamilton & Kerry Pettingill

38      OSBI Report Excerpt

39    Ryan Porter Testimony Excerpt

40    Iris Dalley Testimony excerpt

41    OSBI Interview of Bryan Swim

42    Crime Scene Sketch

43    Article regarding 2nd State Trial Verdict – 04/20/2004

44    Declaration of Geoffrey Standing Bear

45    Declaration of Jack Stringer

46    John Hamilton – Paul Gordon Interview

47    John Hamilton – Ben Rosser Interview

48    Robert Greninger – Ben Rosser interview

49    Steve Hash – Ben Rosser interview

50    Steve Hash – Paul Gordon interview

51    Mark Woods, Clerk - Permission to Destroy

52    Declaration of Ron Sullivan

53    Declaration of Jack Gordon

54    Declaration of Leonard Post regarding Martin Daggs

55    Declaration of William Tobin

56    OSBI Interview of Bill Poe

57    Testimony of Darren Lane, November 9, 2004

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFEN DANT'S/MOVANT'S SECOND SECTION 2255 MOTION TO VACATE, SET ASIDE AND CORRECT HIS CONVICTIONS AND SENTENCES**

KENNETH EUGENE BARRETT, Defendant/Movant herein, by and through his undersigned counsel, pursuant to 28 U.S.C. §§ 2255(h)(1), and Federal Rules of Appellate Procedure Rule 22, files this Second Section 2255 Motion to Vacate, Set Aside and Correct his Convictions and Sentences. There exists newly discovered evidence laid out below that, when considered in light of the record as a whole, will establish by clear and convincing evidence that no rational juror would have convicted him of the offenses for which he now stands convicted.

This Motion is filed conditioned upon consideration and grant by the Tenth Circuit Court of Appeals of Mr. Barrett's Application for Authority to File a Successive Section

1

2255 Motion to Vacate under 28 U.S.C. §2255, filed this date.  *Kenneth Eugene Barret v. United States of America,* Case No. 16-_____.

## PREFACE

This motion is based on newly discovered evidence, which is discussed in detail as it relates to the prior proceedings and as it impacts the evidence in the record as a whole. *See U.S. v. Williams,* 790 F.3d 1059, 1077 (10th Cir. 2015).  The newly discovered evidence shows, among other things, that evidence submitted against Mr. Barrett was perjurious and known to be so by the government; that much of the evidence given by the government's witnesses was not true or given in a manner to hide the truth of Trooper Eales' tragic death; and that the law enforcement officers at Mr. Barrett's home in the deadly confrontation were there illegally attempting to execute a constitutionally flawed warrant in bad faith.

New and additional evidence also shows that bench warrant was not issued or executed in compliance with the law.  Without valid warrants, the trooper killed was not in the lawful discharge of his duties.  Newly discovered evidence also shows that the government suborned the perjury of at least two witnesses.  The first is the purported confidential informant, Charles "Monk" Sanders, who was identified as the person supplying critical information in support of the search warrant affidavit, and now admits he did not supply that information and that he testified falsely against Mr. Barrett.  The second is Clint Johnson, the Drug Task Force ("DTF") Agent, the affiant on that warrant, who committed perjury in the affidavit and at trial.  Newly discovered evidence shows that the government's ballistics expert changed his testimony from state court  when he

2

testified in the federal trial that his testing showed that the bullet fragment that killed the trooper was shot by Mr. Barrett's Colt Sporter .223 to the exclusion of all other weapons in the world. Newly discovered evidence also shows that the evidence admitted at trial to show that Mr. Barrett shot Trooper Eales is forensically flawed.

Newly discovered evidence also shows that the law enforcement officers involved in the issuance and execution of the search warrant were known throughout the law enforcement and criminal justice community to have very poor reputations for truth and veracity, to engage in questionable conduct in relation to the use of drug informants and to engage in illegal and sometimes criminal behavior. Their bad reputations were well known and the Oklahoma Highway Patrol ("OHP") Tac Team and their DEA liason were familiar enough with those reputations that they could not in good faith rely on information and/or conclusions offered by either officer, Clint Johnson or Frank Lloyd. The members of the DTF, OHP, and DEA worked in the local drug crimes investigation as a team, imputing the bad faith of one to the other. *See U.S. v. Shareef,* 100 F.2d 1491 (10th Cir. 1991). Beyond that to preserve the constitutional imperative of *Franks v. Delaware*, 438 U.S. 154 (1978), the bad faith of Johnson and Lloyd or the bad faith of the OHP and/or DEA in relying on reputed liars and criminals must be imputed one to the other. *U.S. v. Gillette,* 245 F. 3d 1032 (8th Cir. 2001).

The newly discovered evidence shows that the prosecutor, Assistant United States Attorney Michael Littlefield, suborned perjury, intimidated and tampered with witnesses. AUSA Littlefield's frequent intimidation of witnesses was but another manifestation of the criminal bullying, alcohol-fueled and violent behavior he practiced at home.

3

In this case, Monk Sanders was a material witness against Mr. Barrett.  Sanders now admits he lied.  His reason for lying is that he was threatened by Assistant United States Attorney, Michael Littlefield.  The newly discovered evidence when viewed in light of the record as whole shows Mr. Littlefield's conduct was unethical and illegal. The cumulative impact of the evidence, newly discovered, when viewed with the evidence  in Mr. Barrett's criminal cases and his original § 2255 Motion, shows by clear and convincing evidence that Mr. Barrett is actually innocent of the crimes for which he has been convicted and no rational juror would have convicted him had they known the extent and level of governmental misconduct, and the depth of the misrepresentation and lies, including but not limited to perjury and the subornation thereof, alteration and fabrication of evidence and deliberate corruption of the crime scene.

Mr. Barrett makes below a prima facie showing of newly discovered evidence under 28 U.S.C. § 2255(h)(1) and has submitted the same to the United States Court of Appeals for the Tenth Circuit, seeking authority to file the same herein.  *See Case v. Hatch*, 731 F.3d 1015, 1028-29 (10th Cir. 2013) (prima facie showing constitutes a simple showing of possible merit to warrant fuller exploration by district court). Such newly discovered evidence includes *inter alia* a May 11, 2015 declaration of critical witness and confidential informant Charles Monk Sanders, recanting his materially false trial testimony; evidence affecting the credibility of Sanders and witness Clint Johnson that was previously non-disclosed; and evidence of prosecutor Michael Littlefield's subornation of perjury from multiple witnesses and his presentation of materially false

4

testimony that was used to secure Mr. Barrett's convictions and death verdict. *Napue v. Illinois*, 360 U.S. 264; *Giglio v. United States*, 405 U.S. 150 (1972).

## I.    COURSE OF PROCEEDINGS

1.  Mr. Barrett, Prisoner No. 04342-063, is currently confined on death row at the United States Penitentiary in Terre Haute, Indiana, a maximum security institution, and has been so held following his sentences in December 2005.

2.  Following a plea of not guilty, Mr. Barrett was convicted by a jury of "Use and carry a Firearm During and in Relation to Drug Trafficking Crimes and Possess a Firearm in Furtherance of Such Drug Trafficking Offenses Resulting in Death in violation of 18 U.S.C. § 924(c)(1)(A) and (j);  Use and Carry a Firearm During and Relation to a Crime of Violence and Possess a Firearm in Furtherance of Such Crime of Violence in violation of 28 U.S.C. § 924(c)(1)(A) and (j) and one count of Intentionally Killing, During the Commission of a Drug Trafficking Crime, a State Law Enforcement Officer, Engaged in the Performance of His Official Duties in violation of 21 U.S.C. §848(e)(1)(B).  He was sentenced by the same jury to Life without possibility of release on the 924 (c), (j) convictions and to Death on the § 848 conviction.

3.   A Judgment and Sentence was entered in the United States District Court of the Eastern District of Oklahoma, Case No. CR-04-00115-001-P, Hon. James H. Payne, presiding.

4.  Mr. Barrett timely appealed his convictions to the United States Court of Appeals for the Tenth Circuit.  The grounds raised on appeal were:

Proposition I: The Trial Court Erred In Denying The Motion To Suppress The Drug Search Warrant;

Proposition II: The Indictment Was Insufficient, Improperly Charged Multiple Crimes And Improperly Joined Offenses;

Proposition III: Improper Victim Impact Evidence Denied Mr. Barrett Of His Constitutional Rights Under The 5th And 8th Amendments;

Proposition IV: Juror Misconduct Violated Rights Guaranteed Under The 5th, 6th, And 8th Amendments;

Proposition V: The District Court Committed Prejudicial Error In Permitting The Government To Exercise A Peremptory Challenge Based Upon The Race Of The Juror;

Proposition VI: The District Court Erred By Failing To Declare The Federal Death Penalty Act Unconstitutional;

Proposition VII: Inclusion Of The "Intent To Kill" Eligibility Factor In Weighing The Aggravators Against The Mitigation In Second Stage Resulted In An Improper Weighing Scheme, Violating The Fifth, Sixth And Eighth Amendments.

5.  On July 25, 2007, after briefing and argument, Mr. Barrett's convictions and sentences were affirmed. *United States v. Barrett,* 496 U.S. 1079 (10th Cir. 2007).

6.  On October 12, 2007, Mr. Barrett filed a petition for certiorari in the United States Supreme Court, which was denied on March 17, 2008.  S. Ct. No. 07-7066.

The Questions Presented were:

   1.   Did inclusion of the "intent to kill" eligibility factor in weighing the aggravating factors against the mitigating factors in second stage, pursuant to the statute which required aggravating factors to substantially outweigh the mitigating factors, result in an improper weighing scheme, violating the Fifth, Sixth and Eighth Amendments.

   2.   Did the trial court commit reversible error in denying the motion to suppress the drug search warrant?

6

3. Was Victim Impact Evidence so unduly prejudicial as to deny petitioner his constitutional rights under the 5th and 8th Amendments?

*Id.,* Petition for Certiorari, at *(i).* The petition was denied. *Barrett v. United States,* 552 U.S. 359 (March 17, 2008).

7. On March 16, 2009, Mr. Barrett timely filed his first and only Motion to Vacate, Set Aside or Correct Convictions and Sentences under 28 U.S.C. § 2255 ["§ 2255 Motion"] in the United States District Court of the Eastern District of Oklahoma, Hon. James H. Payne, presiding. United States v. Kenneth Eugene Barrett, Case No. 04-CR-00115, Doc 403 (and filed under Eastern District of Oklahoma Case No. 09-cv-00105, Doc 1) Hon. James H. Payne, presiding.

8. The § 2255 Motion was corrected (Doc 2), later amended (Doc 70) and finally submitted on the pro se form no. AO 243, pursuant to Court Order. Doc 95.[1] The Motion raised the following claims:

Claim 1.    Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel;

Claim 2.    Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United States Constitution;

---

[1] Counsel is aware of the Rules Governing § 2255 Proceedings, Forms, 28 U.S.C. following § 2255 Motion to Vacate, Set Aside or Correct a Sentence By a Person in Federal Custody and includes in this Motion all of the information requested therein, though in a format more conducive to traditional motions filed by counsel rather than *pro se* prisoners.

7

A.    Unreasonable Acts and Omissions Affecting the First and Second Stages of Trial, including:

1.    Failure to professionally re-urge the motion to suppress under *Franks v. Delaware,* 438 U.S. 154 (1978);

2.    Failure to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense;

3.    The failure to retain expert assistance, allowed Mr. Barrett to be tried while incompetent;

4.    But for trial counsel's ineffectiveness, it is reasonably probable that the jury would have rejected the testimony of the Government's eleventh hour "snitch" witnesses (namely: Travis Crawford; Cindy Crawford; Charles "Monk" Sanders; Randy Weaver; Brandie Zane Price; Karen Real; and, Randy Turman) and, like the two juries before them, refused to convict Mr. Barrett of premeditated Murder;

5.    Failure to make appropriate and timely objections to improper hearsay evidence of other bad acts;

6.    Due to the failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence;

7.    Failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death;

8.    Failure to impeach law enforcement witnesses with prior inconsistent statements from the state trials;

9.    Failure to introduce readily available evidence, including the testimony of Toby Barrett and Alvin Hahn, that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on.  This evidence

8

would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers;

10. Failure to investigate, develop and introduce evidence of Mr. Barrett's lack of notice or knowledge of the Bench Warrant issued for failure to appear for a jury trial and his prior cooperation with the police, that contrary to the Government's argument Mr. Barrett was unaware he was subject to an active felony arrest warrant at the time of the shooting incident, was not "hiding out" on his property in anticipation of a police raid, and was not prepared to meet any police presence with violence;

11. Failure to contest the admission of lengthy "expert" testimony by Jim Horn which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies of the fact witnesses' testimony. Counsel also unreasonably failed to seek an adequate remedy for this improper testimony;

12. The verdicts reached at both stages of trial are unreliable due to failure to seek appropriate instructions;

13. The outcomes of the trial and appeal are unreliable due to trial counsel's unreasonable failure to preserve a record of error, resulting in numerous meritorious claims on direct appeal being evaluated under the onerous plain error standard;

14. Failure to object to numerous instances of prosecutorial misconduct in closing argument in the penalty phase of trial;

B. Regarding the second stage of trial: Failure to interview witnesses, gather documentary evidence, consult with experts, counter the Government's case, and argue for a sentence less than death because of Mr. Barrett's history of mental illness, brain damage, and severe paranoia;

Claim 3. Denial of Mr. Barrett's Rights to Due Process and Equal Protection of the Laws, and his Right to Transcripts, Expert and Investigative Assistance under 18 U.S.C. §§ 3005 & 3006A;

Claim 4. Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated by the Use of

False Information in Obtaining the No-Knock Warrant for his Arrest.  The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was Invalid under *Franks v. Delaware,* 438 U.S. 154 (1978).  Appellate Counsel Were Ineffective for Failing to Raise the Issue on Direct Appeal;

Claim 5.    Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Convictions and Sentences Based on Newly Discovered Evidence;

  A.    Suppressed Exculpatory Evidence, Evidence of Knowing use of Perjured Testimony, and Newly Discovered Evidence:

    1.  That the perjurious testimony of  informant witnesses Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Zane Price, Karen Real and Randy Turman entitles Mr. Barrett to relief from his convictions and sentences;

    2.  Failure of the government to reveal exculpatory evidence of witness, Janesse Thomas, who failed to corroborate Charles Sanders

  B.    The Judgments of Conviction and Sentence Should be Vacated Based on the Discovery of New Evidence Undermining the Credibility of Key Law Enforcement Personnel regarding evidence of Clint Johnson's illicit activities; David Michael Littlefield's illicit activities and Sheriff John Philpot's prior contact with Mr. Barrett.

  C.    Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Interference with Defense Counsel's Investigation of Key Witnesses;

  D.    Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses;

Claim 6.    Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements;

Claim 7.      Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were Violated when the Trial Court Permitted the Marshals to Restrain Him with a Shock Belt Without Justification;

Claim 8.      Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution;

Claim 9.      Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense.  Direct Appeal Counsel Were Ineffective for Failing to Raise this Issue;

Claim 10.     Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as Mitigating Factors;

Claim 11.     Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option.  Appellate Counsel Were Ineffective for Failing to Raise this Issue on Direct Appeal;

Claim 12.     The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue;

Claim 13.     Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective;

Claim 14.     Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact;

11

Claim 15.    Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal;

Claim 16.    Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth  Amendments to the United States Constitution;

Claim 17.    Due to Mr. Barrett's Chronic and Severe Mental Illness and Organic Brain Impairments, His Execution Would Violate the Eighth Amendment;

Claim 18.    The Failure of Counsel to Raise or Effectively Argue on Appeal Claims Which Are of Record Violated Mr. Barrett's Due Process Right to Assistance of Appellate Counsel.

      A.    Appellate Counsel's Failure to Raise Specific Issues Constituted Ineffective Assistance of Counsel;

          1.    Appellate Counsel Unreasonably Failed to Recognize the Due Process Violations Resulting from the Court's Partiality and Ex Parte Communications with the Government;

          2.    Appellate Counsel Unreasonably Failed to Raise in Direct Appeal Issues that Arose under 438 U.S. 154 (1978);

          3.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Government's Inappropriate Use of Hearsay Evidence used to Show Propensity or Character;

          4.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Jury's Exposure to Phony Expert Jim Horn;

          5.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Restrictions on the Use of Mr. Barrett's Statements;

          6.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Use of a Shock Belt on Mr. Barrett during Trial;

12

7. Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Denial of a Jury Instruction on Lesser Included Offenses;

8. Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Refusal to Give an Instruction Permitting Jurors to Weigh Residual Doubts about the Way the Shooting Occurred;

9. Appellate Counsel Unreasonably Failed to Raise on Direct Appeal the Trial Court's Unconstitutional Dismissal of Juror 62;

10. Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Failure to Require Proof Beyond a Reasonable Doubt as to the Weighing Factor Necessary to Impose a Death Sentence;

11. Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Removal of Mr. Barrett from the Courtroom;

12. Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Racial Bias in the Administration of the Federal Death Penalty;

13. Appellate Counsel Unreasonably Failed to Raise on Appeal Unconstitutional Deficiencies in the Indictment;

B. A New Trial is Reasonably Probable Based upon the Cumulative Effect of the Errors Appellate Counsel Unreasonably Failed to Raise;

Claim 19. Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case;

13

9.  Though requested, CV-105 Docs 186, 150, Mr. Barrett was granted neither discovery nor an evidentiary hearing on his claims.[2]

10.  On August 16, 2012, the district court denied Mr. Barrett's § 2255 Motion and denied a Certificate of Appealability ["COA"] on the same.  CV-105 Docs. 214, 215 (SEALED), 216.

11.  On December 26, 2012, Mr. Barrett timely filed his Notice of Appeal. CV-105 Doc 222.  In his Docketing Statement, Mr. Barrett gave notice of his appeal of each and every claim denied below.  *United States v. Barrett,* 10th Cir. No. 12-7086 Doc No. 01018981365 (Jan. 10, 2013).  On March 22, 2013, Mr. Barrett filed his Statement of Issues and moved for a COA from this Court on the following claims:

> 1. Were trial counsel ineffective in both stages of trial?
>
> 2. Did the district court err in denying Mr. Barrett's motion to supplement the amended petition with facts which related back to the pending petition?
>
> 3. Did the government suppress exculpatory evidence and knowingly rely on false evidence to secure convictions and a death sentence?
>
> 4. Did the nighttime, no-knock search warrant for Mr. Barrett's cabin and property violate *Franks v. Delaware,* 438 U.S. 154 (1978), and were trial and appellate counsel ineffective for failing to properly raise this issue?
>
> 5. Did the trial court engage in an improper *ex parte* conference with the prosecutors in violation of due process and the Sixth

---

[2]  Under this Court's remand, however, Mr. Barrett is now entitled to an evidentiary hearing on his claim of ineffective assistance of counsel at sentencing.  *See United States v. Barrett,* 797F.3d 1207, 1210 (10th Cir.2015).

Amendment, and otherwise improperly interfere with the defense in its funding and appointment policies?

6. Did the district court wrongly deny an evidentiary hearing?

7. Did the district court wrongly deny discovery?

8. Were Petitioner's constitutional rights violated when he was compelled to wear a "stun belt" at trial?

9. Were Mr. Barrett's Due Process and Eighth Amendment rights denied when the trial court refused to instruct on lesser included offenses, residual doubt and the burden of proof in weighing the aggravating and mitigating factors?

10. Did the district court wrongly deny Mr. Barrett's motion that it recuse and disqualify itself in these § 2255 proceedings?

11. Will the Execution of Kenneth Barrett Violate the Eighth Amendment because he is mentally ill?

12. Was appellate counsel ineffective for failing to raise meritorious issues?

13. Does cumulative error invalidate the convictions, or at a minimum, Mr. Barrett's death sentence?

*Id.* Doc. No 01019024041 (3/22/2013).

12.     Following a Case Management hearing, a COA was issued on the following issues:

a) Whether trial counsel provided ineffective assistance in the guilt phase by failing to investigate and present mental-health evidence;

b) Whether trial counsel provided ineffective assistance in the guilt phase by failing to seek an instruction concerning the credibility of drug-addicted witnesses;

c) Whether trial counsel provided ineffective assistance in the guilt phase by failing to seek an instruction on the defense's theory of the case;

15

d) Whether trial counsel provided ineffective assistance in the guilt phase by failing to present a crime-scene expert;

e) Whether trial counsel provided ineffective assistance in the guilt phase by failing to present an expert as to whether the police tactics employed during the search warrant's execution would have identified the police as law-enforcement personnel;

f) Whether trial counsel provided ineffective assistance in the penalty phase by failing to develop mitigation evidence; and

g) Whether appellate counsel provided ineffective assistance by not raising the trial court's refusal to give a lesser-included-offense instruction.

Because the consideration of multiple instances of ineffective assistance necessarily requires consideration of cumulative prejudice, no COA is necessary on cumulative error in this case. *Hooks v. Workman*, 689 F.3d 1148, 1187-88, 1194 n.24 (10th Cir. 2012).

Case No. 12-7086, Doc no. 01019047087 (May 2, 2013).

13.    Pending appeal, Mr. Barrett discovered chilling new evidence, a recantation by the alleged confidential informant in his case, Charles Monk Sanders.  Mr. Sanders now admits by sworn declaration that he had not been at Mr. Barrett's home in the days prior to the search warrant's issuance and that he had not told the search warrant affiant, Drug Task Force Agent Clint Johnson that he had been there.  He further averred that the Assistant United States Attorney had threatened and intimidated Mr. Sanders, and knowingly suborned perjury in Mr. Barrett's trial.  On July 6, 2015, Mr. Barrett filed a Motion to Remand for Further Proceedings on Newly Discovered Evidence of Prosecutorial Misconduct.  Doc. 01019454880.  The Government opposed the motion, Doc 01019462256.  This Court denied the Motion to Remand on July 29, 2015.  Doc 01019467458.

16

14.     Following briefing and argument, this Court affirmed in part and reversed in part, vacating the death sentence and remanding the same to the district court for an evidentiary hearing "on whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health and whether Defendant suffered prejudice from any deficiency during the penalty phase of his trial." *United States v. Barrett,* 797 F. 3d 1207, 1231 (10th Cir. 2015).

15.     In the same opinion, the Court denied Mr. Barrett's Motion for a Certificate of Appealability in Light of *Carter v. Bigelow. Id.*

16.     Mr. Barrett timely filed a Petition for Certiorari raising two questions:

> 1.     Was trial counsel's failure to request a self-defense instruction ineffective assistance of counsel under the Sixth Amendment under *Strickland v. Washington*?
>
> 2.     Did the failure to raise the denial of a voluntary manslaughter instruction on appeal violate the Due Process Clause of the Fifth Amendment under *Evitts v. Lucey* and the Eighth Amendment prohibition of cruel and unusual punishment under *Beck v. Alabama*?

*Barrett v. United States,* S. Ct. No. 15-8565 (March 14, 2016)

## II.   RELEVANT FACTUAL BACKGROUND.

On September 20, 1999, District 27 DTF Officer Clint Johnson applied for a no-knock, nighttime search warrant to be served on Kenneth Barrett's residence and property.  The application was supported by DTF Johnson's sworn affidavit that on September 18, 1999, six days before the raid on Mr. Barrett's property, the informant contacted DTF Johnson and advised that:

17

. . . .within the past seventy-two (72) hours, they were in the [Barrett] residence and observed [Mr. Barrett] present a quantity of a white powder substance and represent it as being "methamphetemine."

The CI went on to state that while in the above described residence they observed Kenny Barrett divide and exchange a portion of the white powder substance for a quantity of money.

* * * *

The CI went on to state that while in the above described residence they overheard Kenny Barrett state "if the cops try to raid me they will regret it because I'm going to kill the first cop through the door."

The government refused to identify the informant until well into the federal proceedings, nearly five (5) years after the execution of the warrant.

Shortly after the issuance of the warrant, DTF Agents Johnson and Lloyd requested the assistance of the OHP East Tactical Team. DTF agents Johnson and Lloyd, with other district law enforcement officers, including DEA Agent Danny Oliver set out to serve and execute the warrant in the midnight hour of September 23, 1999, a few hours earlier than planned. Because of the sudden change in time of execution, DEA Agent Juan Beal and the other member of the Hazmat team were unable to join them in time to be of any use. Exhibit 1 Declaration of Leonard Post re Juan Beal. According to plan, the OHP Tact Team would secure the premises, after which the local Drug Task Force and DEA agents would conduct the search. According to OHP troopers all of the information they had on Mr. Barrett came from Drug Task Force members Clint Johnson and Frank Lloyd. 1st St. Trial, Tr V. 8, p. 1303, 1339, V. 9, 1490-91, 1666.

18

At approximately 12:30 a.m., a caravan of vehicles carrying Clint Johnson, Frank Lloyd and six deputies, together with local public officials and other law enforcement personnel, met the OHP Tact Team at the intersection of Interstate 40 and Dwight Mission Road,  approximately four (4) miles from Mr. Barrett's shack.  The OHP requested that the others follow two minutes behind them to give OHP time to secure the premises.  A total of five OHP vehicles, the first two unmarked, moved ahead to secure Mr. Barrett's premises.

At the time of the raid, Mr. Barrett and his sixteen-year-old son, Toby, who unbeknownst to Johnson, Lloyd and the OHP, had been living with his father for weeks, had just finished working on a car. Mr. Barrett went into his house, a very small hand-built cabin that had no running water or drain. Toby was about to step on the porch from its west side when the first OHP vehicle entered the east side of the property.  He yelled to his father, who ran onto the porch, looked to see what was happening and then went back into his house to retrieve weapons.  A gun battle believed to have been initiated by automatic gunfire broke out. Shots were fired by at least Troopers John Hamilton and Rick Manion, and Mr. Barrett. The gunfire lasted an estimated ten to thirty seconds and ended in the death of Trooper Eales, non-life-threatening gunshot wounds to Trooper Buddy Hamilton, and four gunshot wounds to Mr. Barrett's legs and hip.  No drugs or drug lab were found on Mr. Barrett's property.  Mr. Barrett was searched twice while in the custody of the OHP troopers and, but for a handgun in his waistband, no contraband was discovered.

19

Mr. Barrett was first charged and tried for capital murder in the Oklahoma state courts. The state refused to identify the confidential informant but was required by the presiding judge to write the informant's name on a piece of paper and place it in a sealed envelope to be kept in the court file. Exhibit 2 Declaration of John Garrett. Mr. Barrett raised self-defense and the lesser included offense of voluntary manslaughter. His state juries were instructed on both. The first state trial ended in a hung jury. The second state trial resulted in a verdict of first degree manslaughter and aggravated assault, for which Mr. Barrett was sentenced by the jury to twenty and ten years, respectively. Mr. Barrett did not appeal.

Days before the statute of limitations ran on any potential drug trafficking charges, Mr. Barrett was charged by federal indictment with three counts of capital murder. CR 115, Doc# 9. In federal court, Mr. Barrett, represented by his state court counsel, John Echols, once again moved for disclosure of the informant relied upon to secure the search warrant. The government opposed the request and the district court denied the motion. Five years after the fact and two trials later, after *voir dire* had begun in the federal trial, when John Echols no longer represented Mr. Barrett, the government disclosed the name of the informant on the search warrant. He is Charles "Monk" Sanders, a declarant herein. Cr 115 Doc 339, vol. 11, p. 2548.

Sanders testified against Mr. Barrett, claiming to have been at his residence a "couple of days" before the issuance of the search warrant and to have observed a drug transaction. The informant testified he did not know that he was the informant on the search warrant at the time it was procured by Clint Johnson, but learned of it later. Cr 115

20

Doc#340, vol. 12, p. 2596.  On cross-examination, Mr. Sanders testified that when he went out to Mr. Barrett's house shortly before the raid, he saw guns but did not do or see any drugs other than a joint that he, his nephew and Mr. Barrett smoked. He testified that he had told DTF Agent Johnson.  See CR 115 Doc#340, vol 12, p. 2623.  After a break called by the AUSA Michael Littlefield, *id.,* at 2631, Sanders reversed course on re-direct and said that he was uncertain of the times he had been to Mr. Barrett's and that he had observed drug activity.  *See* CR 115 Doc#340, vol. 12, p. 2633. 2637.  He admitted, when questioned, that Agent Johnson was more likely than he to know the dates. Mr. Sanders admitted that Mr. Littlefield had talked with him during the break about the dates he was at Mr. Barrett's.  *Id.* at p. 2640-41. He testified, however, that they did not discuss the nature of his testimony.

Though six other drug informant witnesses testified against Mr. Barrett, none of them testified to having observed any drug activity by him in the days immediately preceding the issuance of the warrant.  *See generally,* CR 115 Doc#324, Testimony of Randy Turman, vol. 2, pp. 363-392;  Doc#325, Testimony of Travis Crawford, vol. 3, pp. 450-488; Doc#336, Testimony of Randall Weaver, vol. 8, pp. 1834-1850; Doc#341, Testimony of Cindy Crawford, vol. 13, pp. 3058-3079; Doc#341, Testimony of Karen Real, vol. 13, pp. 3079 through Doc#342, vol. 14, p. 3136, and; Doc#343, Testimony of Brandie Price, vol. 15, pp. 3485-3511. Mr. Sanders, the prosecution's sole proponent of this fiction, now admits to having perjured himself under duress when testifying about this fact.

Though Mr. Barrett raised self-defense at trial, trial counsel did not ask for and thus did not get a self-defense instruction. A jointly requested manslaughter instruction was denied.  Mr. Barrett was convicted on all three counts. They were his first felony convictions.  He was sentenced to death on Count 3, and life without possibility of release on Counts 1 and 2. This Court affirmed the convictions and sentences on direct appeal. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007).

**III.    CLAIM I:  NEWLY DISCOVERED EVIDENCE OF PROSECUTORIAL MISCONDUCT IS A CONSTITUTIONALLY INTOLERABLE VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE OF DUE PROCESS, WHICH WHEN PROVEN IN AN EVIDENTIARY HEARING AND VIEWED IN THE LIGHT OF OTHER NEWLY DISCOVERED EVIDENCE AND THE EVIDENCE AS A WHOLE, WILL BE SUFFICIENT TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THAT NO REASONABLE FACTFINDER WOULD HAVE FOUND MR. BARRETT GUILTY OF THE OFFENSE(S) CHARGED, UNDER  28 U.S.C.  §2255(H)(1)**

The facts supporting this claim, including newly discovered evidence not reasonably available to Mr. Barrett prior to the expiration of the statute of limitations on the filing of his initial 2255 Motion, are:

**A. THE PRE-RAID EVIDENCE.**

    **1.  The Warrants Served by the Oklahoma Highway Patrol Were Constitutionally Defective.**

Behind the fatal events of September 24, 1999, lay two warrants that the Oklahoma Highway Patrol set out to serve on Mr. Barrett shortly after 12:30 a.m.  The first was an arrest warrant purportedly issued as a result of Mr. Barrett's failure to appear at a jury trial set in a pending case for delivery of a controlled substance.  The second was a search warrant issued at the request and on the sworn declaration of Drug Task Force

22

Agent Clint Johnson.  Both warrants were legally and constitutionally defective, a circumstance that was and is legally imputed to the OHP East Tac Team, District Drug Task Force agents and numerous prosecuting attorneys. *Cf.  U.S. v. Gillette,* 245 F. 3d 1032 (8th Cir. 2001); *see also, U.S. v. Shareef,* 100 F.3e 191 (10th Cir. 1991).

### 2. The Bench Warrant for Failure to Appear for a Jury Trial for an Alleged Delivery of a Controlled Substance was Unconstitutional.

*a. The Delivery of Methamphetamine Charge is founded on Perjury.*

On March 24, 1997, Mr. Barrett was charged by Information with Unlawful Delivery and Distribution of Methamphetamine that allegedly occurred on December 19, 1996.  *State v. Barrett,* Sequoyah County Case No. CF 97-86, Exhibit 3a. (1997 03 24 Information).  A warrant issued that day.  The only affiant to the factual basis for the charge was Detective Larry Blount.  Det. Blount swore that he knew the contents of the Information to be true and correct."  Exhibit 3b (Blount Affidavit 1997 03 18).  In the affidavit, Detective Blount specifically avers:  "Surveillance during the buy was made by this officer and another agent of OBN." [3] Detective Blount now makes clear under oath that the affidavit in support of the Information was untrue.  Exhibit 4 (Declaration of Larry Blount.)  Detective Blount now swears that he did not know that the delivery alleged had occurred as he did not observe it.  Rather his "knowledge" of it was based solely on his "firm belief that this drug transaction was completed in the manner described by Agent Ottwell because [Blount] had worked with Agent Ottwell on other

---

[3]  The affidavit completely omits reference to Drug Task Force Agent Frank Lloyd whom Det. Blount now admits was with him in the failed attempt to surveil the buy.  Compare Exhibit 3a, p. 1 ("Witnesses notation") with Exhibit 4.

occasions and found him to be a truthful and credible person" and had [o]ver the years come to trust [Ottwell]."  Exhibit 4, p. 2, ¶10.

Oklahoma Bureau of Narcotics [OBN] Agent Ottwell's report was not written until January 27, 1998, more than a month after the alleged incident.  The report states that "Surveillance *during the buy* was provided by OBN agent Robert Jerome and Sallisaw Police Detective Larry Blount."  Exhibit 3c, p. 2. The report leaves out mention of Drug Task Force Officer Lloyd.  Later confirming surveillance, Ottwell notes "This agent spoke with Agent Jerome and Sallisaw detective Blount whose surveillance observations noted nothing additional to this violation."  *Id.* at 3.

Det. Blount perjured himself in the affidavit.  Agent Ottwell told a deliberate lie and made other misleading representations in his report and testimony.  The drugs that were allegedly purchased were not submitted for analysis until more than a month after the claimed December 19th purchase date, on January 27, 1997; Exhibit 3c, p. 3.  The lab received the package from Ottwell on January 29 by certified mail.  The drugs were not analyzed until April 30, 1997. The results were a net wt. of .15 gram of methamphetamine, less than the ¼ gram sale alleged. Exhibit 3d Lab report of April 30, 1997.

A warrant issued on March 24, 1997. Mr. Barrett appeared to answer to the charge of Delivery of Controlled Substances case on April 3, 1997, well before the powder from the alleged sale was tested. On July 2, 1997, the state Assistant District Attorney Stephen Barnes offered Mr. Barrett no jail time with a 15-year suspended sentence and $1000.00 fine plus court costs.  Exhibit 3e.

24

The preliminary hearing on the alleged 1996 buy was held on August 27, 1997. Exhibit 3(f). Preliminary Hearing Transcript of August 27, 1997. OBN Agent Ottwell was the only witness called to testify at the hearing despite the defense's subpoena of Drug Task Force Agent Frank Lloyd, Exhibit 3(g), who allegedly had accompanied Blount in the failed surveillance.  Exhibit 3(b), p. 3. According to Ottwell's testimony, it was Lloyd who made arrangements for Ottwell to meet with the purported CI who accompanied Agent Ottwell to Mr. Barrett's house and was present at the sale. Exhibit 3 (f), p. 6. While a close reading of Agent Ottwell's testimony avoids the actual perjury committed by Detective Blount, the overall effect of the testimony unquestionably imply that Detectives Lloyd and Blount conducted surveillance of the buy, when they had not. Exhibit 3(f), p. 20, *l* 12 to p. 21, *l* 2.  Asked where Officer Blount and Investigator Lloyd were, Agent Ottwell said "I had given my State vehicle to them and they were conducting surveillance from vantage points out and from a distance." Exhibit 3 (f).  At the hearing, Agent Ottwell admitted that Frank Lloyd intended to approach Mr. Barrett about becoming a cooperating individual. *Id.* at p. 29.  Mr. Barrett's defense counsel made clear that an offer to "be free" had been made by agent Lloyd if Mr. Barrett would "cooperate" in setting up (informing on), three others.  *Id.* at 31.  Agent Ottwell was unable to describe the inside of Mr. Barrett's house – where the buy was said to have occurred. *Id.*at 33.  Disregarding the defense's attempt to enforce the subpoena of Drug Task Force Agent Lloyd, the court terminated the preliminary hearing.  He gave authority to the parties to take depositions of any witnesses they cared to depose.  *Id.* at 34.  Mr. Barrett was bound over and the matter was set for a district court appearance ["DCA"] before the

25

Honorable Judge Garrett. *Id.* Because Mr. Barrett was "out on bond and ha[d] appeared each and every time the court has directed him to appear" the Court allowed him to "remain free on that present bond." *Id.* at 34.

### b. *The Record Demonstrates The Erroneous Issuance Of The Bench Warrant For Failure To Appear.*

On September 2, 1997, Mr. Barrett's counsel Bill Ed Rogers was advised that the matter was on Judge Garrett's September Jury Docket. Exhibit 3(h). An offer of no time was made. Exhibit 3(e). Mr. Barrett appeared with his counsel Bill Ed Rogers on October 9, 1997 and entered a plea of not guilty. Exhibit 3(i) (Docket Sheet).

Nearly a year later, on September 11, 1998, Mr. Barrett's attorney moved to withdraw and set the matter for a hearing on September 24, 1998. Exhibit 3(i). The docket sheet does not show an Order permitting Mr. Rogers to withdraw, a jury trial setting, appointment of counsel to Mr. Barrett, or any notice of a jury trial made to anyone. *Id.* On December 14, 1998 Mr. Barrett asked for a court-appointed attorney, paying the required $40.00 application fee. *Id.* No attorney was appointed. There is no indication on the docket that Mr. Barrett was notified of any trial date, nor is there evidence in the docket, or in attorney Rodger's file that such notice was mistakenly given to him. Exhibit 3(i). There is no waiver of speedy trial. On January 28, 1999, nearly 21 months after his arrest and bond,[4] a bench warrant signed by a clerk was issued. Exhibit

---

[4] Oklahoma Constitution art. 2 §20 (West 2016) guarantees "a speedy and public trial in all criminal prosecutions." Okla. Const. art. II, §20. If any person charged with a felony crime who is held to answer on an appearance bond is not brought to trial within eighteen (18) months after arrest, the court shall set the case for immediate review as provided by Section 2 of this act to determine if the right of the accused to a speedy trial is being

3(j). There is no indication on the docket sheet or in the court file that Mr. Barrett was given notice of the Bench Warrant. Exhibit 3(i). Despite the assignment of the case to Judge Garrett, and Judge Garrett's presence in Court according to the purported jury trial date, Mr. Barrett's case was assigned to Judge Henshaw. Exhibit 3(h). Judge Henshaw admits by declaration that the case was assigned to Judge Garrett and though he caused the Clerk to issue the bench warrant, it would have been a ministerial act only based on the assumption the Mr. Barrett had notice of the jury trial. Exhibit 5 Declaration of A.J. Henshaw. No jurors were called to the courthouse for the entire month of January, to and including the date of Mr. Barrett's alleged failure to appear. Exhibit 6 Declaration of Vicki Beatty.

The bondsman who wrote Mr. Barrett's bond recalled the Bench Warrant had issued on "a regular disposition docket day," a day on which a defendant would appear to work out a plea bargain and enter a plea," rather than a jury trial day. RT vol 25 at 5011. Barrett's failure to appear that day did not give the bail bondsman any concern and he did not give Mr. Barrett notice of the warrant because neither he personally nor his office were notified or otherwise aware of it. Had the clerk given the bail bondsman notice by sending him an order and judgment of forfeiture as required by law,[5] the bail bondsman would "have contacted Kenny, talking to him about the situation and brought him back to court." *Id.* at 5012. The lack of notice to both the bail bondsman and Mr. Barrett portends in the making, perhaps, a takedown of Mr. Barrett to set an example to others

protected." Okla. Stat. Ann. Tit. 22 §812.1(B)(West 2016). No such review was ever made.
[5] Okla. Stat. tit. 59, §§1332, 1336.

for his failure to cooperate as an informant with agent Lloyd. Otherwise, it makes no sense.

As Mr. Marty Daggs, a bail bondsman who posted Mr. Barrett's bail, suggests was the practice in Sequoyah County at that time,

> [I]t presented an ideal situation for law enforcement. They revoke but don't notify the bonding company, (which is against the law). Now they have an arrest warrant hanging over a defendant –the threat is out there- they can bring him in anytime they want. They have the defendant on a string and can lean on him or her to roll or become a "C.I." (Confidential Informant). . . . [T]the situation is not uncommon in Sequoyah County.

Exhibit 54 (Declaration of Leonard Post re Interview with Marty Daggs).

The record shows that Mr. Barrett attended every court hearing, kept in contact with the court after his attorney withdrew, and was at all times ready and willing to answer the charges. His bond was not forfeited; his whereabouts were well known and notice of the jury trial was non-existent.

### 3. The No-Knock, Nighttime Search warrant was unconstitutional under *Franks v. Delaware,* 438 U.S. 154 (1978)

Newly discovered evidence makes clear that reliance on charges and warrants instigated or supported in any way by DTF Agents Lloyd and Johnson, known in the law enforcement and criminal justice community to be dishonest, was in bad faith, with the specific intent to violate Mr. Barrett's right to be free of illegal searches and seizures. Both Lloyd and Johnson played integral roles in the violation of Mr. Barrett's rights over a course of years. This is particularly true in the roles they played in setting into motion the military-style raid on Mr. Barrett's house in the middle of the night.

28

The state and federal governments were obligated to disclose the agents' reputations for dishonesty and corruption to the defense.  They did not, thereby denying. Mr. Barrett's his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963).  Had Mr. Barrett's counsel had the information only now disclosed by local law enforcement and Judge Garrett, Mr. Barrett would have been able to prevail in his challenge to the warrant.  The lack of disclosure destroys any notion of fairness in the trial.  The integrity of the verdict suffers for it.

           a.    The Defense Should have been Advised of DTF Frank Lloyd's Bad Reputation.

DTF Agent Frank Lloyd tried to force Mr. Barrett to become a "cooperating individual," more commonly known as a "snitch," to avoid fabricated felony drug charges and stiff penalties.  The second DTF Agent, Clint Johnson was also well known to local law enforcement to be corrupt and to use illegal means to arrest and intimidate citizens.  Reliance on warrants that arose out of the conduct and/or rested on the credibility of either, by a law enforcement community well acquainted with both, eviscerates any claim of the good faith lawful discharge of the duties of the OHP in the service of those warrants on September 24, 1999.

It was not until long after the filing of Mr. Barrett's original Section 2255 Motion to Vacate was filed, indeed pending appeal of the district court's denial of the motion, that members of the law enforcement community confided in Mr. Barrett's investigator, Leonard Post, that Agents Lloyd and Johnson had bad reputations for honesty and professional ethics.

Recently retired Sallisaw Detective Larry Blount now swears that:

> Sallisaw is a very corrupt town. Though there certainly were honest cops there, there are many who were untrustworthy and unprincipled in their drug enforcement activities. Among them are Clint Johnson and Frank Lloyd.
>
> * * * *
>
> When you are a drug enforcement officer working the streets, all you have is your integrity. I kept mine. Clint Johnson and Frank Lloyd did not.
>
> Johnson's reputation preceded his hiring by the Drug Task Force. In his prior job with Sequoyah County, he already had [a] reputation for not doing things by the book, for stretching the truth.
>
> Although I actively supported Frank Lloyd's hire and advancement, he too, turned out not to be a trustworthy law enforcement officer.
>
> My experience and observations made clear that I could not and therefore did not trust either Clint Johnson or Frank Lloyd. They had reputations for dishonesty and for being over-zealous in their law enforcement activities. Many of their arrests that utilized confidential informants were questionable. For example I always searched my confidential informants for drugs before allowing them to make a buy. They did not. If one of my informants got busted for doing something on their own, I did not come to their rescue. Johnson and Lloyd protected their informants even when they went rogue or were known to be dishonest.
>
> Because of the information I possess and the reputations of both Johnson and Lloyd, I never passed on information to either one of them.

Exhibit 4, pp. 3-4.

Mr. Barrett may have been paranoid and avoiding contact with the police, but he was not a fugitive – or hiding out in a place where he could not be easily found and arrested. As retired Sequoyah County District Judge, Hon. John Garrett recalled, Sheriff

30

Johnny Philpot "had been out to Mr. Barrett's home the week before the September, 1999 raid and talked to Mr. Barrett." Exhibit 2, p. 2 ¶ 12. Judge Garrett observes that "the warrant which served as a basis for the nighttime raid was already issued and [Judge Garrett] has "no doubt that had Sheriff Philpot advised Mr. Barrett of the warrant, Mr. Barrett would have voluntarily gone with the sheriff." *Id.*¶ 13.

Former Sheriff John Philpot does not disagree. In a recent declaration, he admits that he had been out there just weeks before the incident "and checked the serial numbers on Barrett's rifles. Barrett was cooperative. At the time he had an outstanding warrant but I did not arrest him. I told Ken to take care of it, and he said he would." Exhibit 7 ¶2. *But see,* cv -105, Dkt. # 174-2 (wherein Johnny Philpot acknowledges only a visit to Mr. Barrett's home in 1998, raising the question of the government's motives in filing the declaration. Whether written by the government in a manner to mislead or, in fact, perjurious, the denial by the government of material factual averment by Mr. Barrett known to be true by the government taints the integrity of the § 2255 proceedings.)

It is unclear if Judge Garrett and the former sheriff are discussing the same warrant, a question best addressed at an evidentiary hearing. What is clear is that Mr. Barrett, who had never been convicted of a felony, had never failed to appear to answer the delivery charges. His attorney had apparently withdrawn;[6] Mr. Barrett had contacted the court for a court-appointed attorney, paid the requested fee and heard nothing else from the court. Exhibit 3(i).

---

[6] Though he moved to withdraw and a hearing was set and presumably granted, the grant is not a matter of record

It is also clear that shortly before the fatal midnight onslaught, the sheriff had been in contact with Mr. Barrett at a time and place whereby the lawful discharge of his duty, in arresting a cooperative person for whom he knows there is an outstanding warrant, would have avoided the tragic consequences set in motion by hyperbolic tales of DTF Agents Lloyd and Johnson. Indeed had the law been followed and Mr. Barrett's bail forfeited, the bail bondsman would have brought Mr. Barrett in without force. As the bondsman testified at the federal sentencing, the Bench Warrant did not result in the legally required bond forfeiture, or Mr. Barrett's arrest, despite the fact that Mr. Barrett's whereabouts were well known to local law enforcement.

Similarly, Lloyd was a critical participant in the execution of the no-knock anytime search warrant. It was Lloyd who knew and made possible contact with the DEA liaison and former OHP Tac Team Commander, Danny Oliver .[7] (Testimony of Frank Lloyd, 1st St. Trial, TR vol. 6, p. 1065-1066). Lloyd took part in the flyover with Troopers Hamilton and Greninger, both of whom were known to Lloyd. *Id.* at 1067. Lloyd claimed to be familiar with Barrett's residence and gave OHP the location and a model of it, *Id.* at 1067. Lloyd was with Johnson and the OHP Tac Team at Camp Gruber (though he recalled being at Greenleaf) and gave them "information that might be usable." *Id.* at 1070. It was Lloyd who *warned* Troopers Hamilton and Greninger that there might be gunfire. *Id.* at 1081.despite a lack of any history whatsoever of Mr. Barrett's use of armed resistance to law enforcement. It was Lloyd who conveyed to

---

[7] Lloyd gave inconsistent statements to Vicky Lyons of the OSBI and in testimony at the first state trial in response to whether contacting the OHP was Johnson's or Lloyd's idea. *Id.* at 1085.

DTF's Juan Beal that the time for attack was being moved up by several hours, despite the fact that Mr. Beal told him that it doing so would make it impossible to have his HAZMAT unit nearby.[8]

All unnecessary because as former Sheriff Philpot says in his recent declaration, it should have been done locally. He questioned, at the time, the decision to bring in the OHP, and he "will always believe that the sheriff's department should have executed the warrant, along with the drug task force."  Exhibit 7 at 2 ¶ 6.

Or, as Former Sallisaw Police Chief Gary Philpot states, "I have known Kenny Barrett and his family most of my life.  I think I could have gone out to Kenny Barrett's house and arrested him myself without incident."  Exhibit 8 Declaration of Gary Philpot. Despite conversion of the residence into a homicide crime scene, Lloyd and Johnson arrived after the shooting and were permitted to remain on the scene until the afternoon of the 24th.  (Testimony of Frank Lloyd, 1st St. Trial, TR vol. 6, p. 1081).

In 2003, before Barrett's second state trial, Richard Gray was elected District 27 District Attorney over Dianne Harrold-Barker, the DA at the time of the raid on Mr. Barrett's property.  According to DEA Agent Juan Beal, Barker-Harrold's thirst for publicity and hopes for re-election likely inspired the cavalcade of law enforcement dignitaries brought to watch the OHP Tac Team "practice" executing the no-knock nighttime search warrant.  Former Agent Beal knows Frank Lloyd and avers that his reputation for truth and veracity was bad.  Exhibit 1, p. 4.  (Declaration of Leonard Post

---

[8] It would seem then that the Mr. Lloyd and the OHP were never expecting to find a working lab.

33

regarding Juan Beal wherein Juan Beal, a DEA Agent at relevant times to Mr. Barrett's prosecution, advises Mr. Barrett's investigator that Frank Lloyd is not honest and "walked on a razor blade between legal and illegal conduct."  Mr. Beal also advised that Ms. Barker Harrold "thrived on publicity" – and the glory of kicking down doors.")

Reliance by the Tac Team on information from Lloyd was unreasonable and in reckless disregard of the truth.[9]  It set up OHP's unnecessarily hostile and deadly approach.

### b.    *The Government Knew that DTF Agent Johnson was Dishonest and a Criminal and had a Duty to so Inform the Defense*

As bad as Lloyd's reputation for dishonesty was, Clint Johnson's was far worse. He was at the time of Mr. Barrett's troubles, a dirty cop, a well-known dirty cop.  His lies and exaggerations set into motion the fatal confrontation. Johnson was the affiant on the search warrant relied upon to enter Mr. Barrett's premises.  Johnson was known to law enforcement to be unprofessional and unethical, a liar, thief and a criminal. Exhibit 2, Exhibit 12 Declaration of Courtney Bates.  The OHP decision to use force to serve a search warrant based on Clint Johnson's affidavit and other information from him was reckless and inexcusable.  The defense was entitled to know of the OHP's decision to rely on Johnson.

Based on the newly discovered evidence supplied by numerous law enforcement officials, it is clear that at the time of the issuance of the no-knock warrant, Clint Johnson

---

[9]  True to his reputation and character, during the post raid interviews, Agent Lloyd reported that Mr. Barrett had threatened to kill Agent Ottwell.  Exhibit 9 (Rosser report Lloyd IV).  The allegation was untrue. (Exhibits 10, 11) (Rosser report of interviews with Burgess and Ottwell).

had a bad reputation for truth and veracity, and that his penchant for unlawful behavior, including perjury and theft, was known to the government. *See e.g.,* Exhibit 2,

Detective Courtney Bates of the Catoosa Police Department, with eighteen (18) years of experience in law enforcement, described significant unethical and illegal acts by Mr. Johnson committed in late 2005 at or near the time of Mr. Barrett's federal trial.[10] Mr. Bates was a member of the District 27 Drug Task Force and was assigned by the District Attorney's Counsel, an advisory and administrative support agency for the district attorneys of the state of Oklahoma, to investigate the possible misuse of Confidential Informant (CI) funds. Exhibit 12, p. 2. In the course of his investigation, Detective Bates found that it was apparent that Johnson asked his CIs to lie to Det. Bates. The investigation also revealed that the majority of Clint Johnson's expenditures could not be explained and the money was lost. *Id.* As a result, Clint Johnson was fired. *Id.* When Detective Bates and Jeff Sheridan recovered Clint Johnson's issued vehicle, there was "drug paraphernalia," "several methamphetamine precursors, including Red Phosphorous and 'Heat'" Exhibit 12 at 3. "There were also some pills that were Narcotics, perhaps Oxycodone and Xanax.

Jason (J.C.) Chenault, the undersheriff in the Cherokee County Sheriff's Office in Cherokee, Oklahoma since 1999 averred that Johnson by reputation and personal observation is dishonest and has a bad reputation for truth and veracity. Chenault is personally aware that Johnson lied in claiming that a person he was chasing named John Baily fired multiple shots at Johnson. Mr. Chenault was in a position to see that no shots

---

[10] The federal trial began September 12, 2005 and ended November 17, 2005.

were fired by Bailey.  Johnson filed charges of felonious assault with a firearm on a peace officer – it was a lie.  Exhibit 13.

Richard Gray was elected District 27 District Attorney for Cherokee, Sequoyah, Adair and Wagoner counties from 2003 through 2007 and is well acquainted with the reputation and despicable conduct of Clint Johnson during those years, conduct that is clearly relevant to the state re-trial and the federal trial. Exhibit 14, p. 3. "Mr. Johnson is by reputation and conduct known to [Mr. Gray] to be a liar and wholly unworthy of belief."

Among Mr. Gray's concerns with Mr. Johnson's dishonesty was his failure to keep account of the money and evidence seized by the Drug Task Force, his use of seized money for personal purchases, and seized property such as rifles, shotguns and ammunition for his personal benefit.  *Id.* See also, Exhibit 16 (Declaration of Michael Reese); Exhibit 17 (Declaration of Leonard Post re Earl Beaver wherein OBN Agent Earl Beaver tells Mr. Barrett's investigator, Leonard Post, of a triple beam scales sporting a District 27  evidence tag that was found in the home of Mr. Johnson's relatives, an event that inspired an investigation by OBN with unknown results.)   DEA Agent Juan Beal advised Mr. Barrett's investigator that Clint Johnson was totally untrustworthy and that Agents Lloyd and Johnson were the only people in law enforcement he knew who met with their CIs individually without a second officer present. Exhibit 1, p. 2.  Mr. Beal also said that Clint Johnson and Michael Littlefield (the Assistant United States Attorney who prosecuted Mr. Barrett in federal court) were "very close and neither was trustworthy."  Exhibit 1, p. 5.

36

Even the state district court trial judge in Mr. Barrett's murder trials, the Hon. John Garrett, knew that Clint Johnson was not a truthful person and could not be trusted. In the judge's experience, Johnson "did a number of questionably ethical things and people were afraid of him because of the information he had and the power he possessed to use that information to the detriment of other people." Exhibit 2 Declaration of John Garrett.

It is information from Clint Johnson, known thief and liar, upon which OHP relied on when planning to execute the heavily armed nighttime raid that surprised a man in his home who was known to be paranoid, own guns and live on the margins. *See* Exhibit 18 Declaration of OHP Internal Affairs Investigator 2d Lt. Paul Gordon, March 15, 2012.

### 4. OHP Reliance on DTF Agents Lloyd and Johnson was in Bad Faith and Undermines Mr. Barret's Convictions.

Reliance by OHP Tac Team Members on District 27 Drug Task Force Agents Alan Franklin Lloyd and/or Clint Johnson, both of whom were well known to be dishonest and engage in illegal and unprofessional methods in the course of the duties with the Task Force, was evidence of the government's bad faith in its execution of the illegal warrants. In so doing, any claim to good faith is eviscerated. The OHP's reckless disregard of the truth in their reliance on Mr. Lloyd's information and its likely impact on the aggressive force used by OHP in the execution of the arrest and search warrant were exculpatory facts that should have been disclosed to the defense and made known to the court and jury; information without which the jury could not reasonably assess the lawfulness of the acts of the OHP including Trooper Eales at the time of the shooting.

37

Had the jury been appropriately apprised, no reasonable juror would have found Mr. Barrett guilty of murder. We should cite the collective knowledge doctrine again here. *See U.S. v. Gillette, supra; U.S. v. Shareef, supra.*

Clint Johnson, a cop known throughout the state to be a liar, a rule-breaker and, to many, a criminal. Johnson is the sole affiant on the search warrant that proved to promise far more evidence of "drug trafficking" than was found in and out of Mr. Barrett's house. Like the rest of the local law enforcement officers, the OHP was actually or putatively aware of Johnson's reputation in the law enforcement community, which included Juan Beal, a liaison between the Drug Task Force and the DEA, Earl Beaver an agent of the Oklahoma Bureau of Narcotics and partner to Kevin Ottwell, whose work on the alleged delivery case was initiated by the Drug Task Force Agent Lloyd and the confidential informant. Agent Beaver did the helicopter flyover with Johnson that resulted in an OBN investigation of Johnson. Exhibit 17 Declaration of Leonard Post re Earl Beaver at 2. Clint Johnson testifies as well to an ongoing relationship with the OHP. The knowledge of Johnson's reputed dishonesty and untrustworthiness is, at the very least, constructively attributed to the Tac Team, led on that fateful evening by Trooper Eales.

### 5. The Government's Attorney Michael Littlefield Actively Conspired With Johnson to Deprive Mr. Barrett of his Constitutional and Civil Rights.

Most indicative of the knowledge of the prosecution of the dishonesty and corruption of Clint Johnson is the relationship between the prosecutor Michael Littlefield and Clint Johnson. As described by Richard Gray:

38

> Mr. Littlefield relied on Agent Johnson to make many of his cases. In December of 2004, AUSA Littlefield asked if he could borrow Johnson's services for a week. I granted the request. In the spring of 2005, Littlefield again asked me if he could borrow Clint Johnson's services, this time for a month, shortly before Barrett's federal trial started. Again, I agreed to permit Agent Johnson to assist Mr. Littlefield. To the best of my knowledge Mr. Johnson attended many of the federal pretrial motions and the trial of Mr. Barrett.

Exhibit 15, p. 5. Supplemental Declaration of Richard Gray dated November 15, 2015.

*See also, U.S. v. Sparks,* 291 F. 3d 683 (2002) (Possession with Intent to distribute methamphetamine, with arresting officers Clint Johnson and John Owens of the Sallisaw Police Department.) In Barrett's first state trial, Owens is identified by Stephen Charles Smith as the law enforcement officer who advised him to commit perjury. 1st State Trial, Tr. Vol. 17, pp. 2848-2853 (.Testimony of Steven Carl Smith).

And in this small world of Southeastern Oklahoma, records show that one of the cases Littlefield and Johnson worked together was that of Thomas Doss Gann. In that case, Littlefield offered the testimony of a confidential informant named Steven Carl Smith, the nephew of a retired OHP trooper. Exhibit 20 Court documents of Thomas Gann and Karen Real. The same Mr. Smith was called to testify against Mr. Barrett in his first state trial. John Echols was appointed counsel for Mr. Barrett in state court. On cross-examination, Mr. Smith admitted he had perjured himself at the request of local law enforcement. 1st State Trial, Tr. Vol. 17, pp. 2848-2857. The fact that Littlefield and Johnson worked state and federal cases together and Johnson's CI Sanders testified falsely against Mr. Barrett establishes the extraordinary scale of the bad faith Johnson and Littlefield exhibited in convicting Mr. Barrett, truth be damned. Indeed, such an

39

informant appeared in Mr. Barrett's federal trial as well:  Karen Real, whose credibility

was unsuccessfully challenged because the jury was unaware of the unholy alliance

between the state agent and federal prosecutor.

There is no doubt of the government's knowledge of Johnson's dishonesty and

untrustworthiness, and of its ultimate disregard for Mr. Barrett's Fourth and Fifth

Amendment rights.  In this light, there can be no doubt about the authenticity of Sanders'

recantation and alleged subornation of perjury charges.  Exhibit 21 Declaration of

Charles Monk Sanders date May 11, 2015.[11]  If Mr. Sanders had in fact been out to Mr.

Barrett's place, as Johnson swore in his affidavit to obtain the no-knock-anytime search

warrant, he would have known that Mr. Barrett's son was living with him and told Mr.

Johnson.  No court with that knowledge would have granted such a warrant, and the OHP

would never have conducted such a raid. 6. The Government Suborned Perjury by

Charles "Monk" Sanders, a critical government witness.

### a. Charles Sanders was well-known to be untrustworthy and has an extensive criminal history.

Efforts to determine the identity of Clint Johnson's confidential informant on the

No-Knock-Anytime Search Warrant authorizing a search of Mr. Barrett's premises were

consistently rebuffed at the state trials and in the early days of the federal trial. Cr-115

Doc 066 Order Denying Defendant's Motion to Compel Production of Identity of

---

[11]  One of the seven drug-addicted snitches to testify against Mr. Barrett, Karen Real, is a co-defendant of Thomas Doss Gann – released for time served shortly after her testimony.  Exhibit 22. (Docket sheet of Karen Real).  The undisclosed benefits she received as a result of her testimony are set out in the original 2255. Doc 95 at 111-115.

Confidential Informant, Tr. Motion Hearing of October 24, 2000.  County District

Attorney, Richard Gray, was advised by United States Attorney Sheldon Sperling that he

was going to bring "weapons and murder" charges against Mr. Barrett in federal court.

Exhibit 14, p. 2 - Declaration of Richard Gray.

> After Mr. Barrett was charged in federal court, Assistant United
> States Attorney, Michael Littlefield, called me up and asked how
> he could keep the identity of the confidential informant a secret.
> Mr. Littlefield stressed that he did not want the information
> released to the defense.

Exhibit 14, p. 2.  It was not until the commencement of *voir dire* and during the ex parte

hearing that the government identified Charles "Monk" Sanders as the confidential

informant. Doc.339, Vol. 11, p. 2548

Mr. Sanders' extensive criminal record made him well-known to law

enforcement.  At the time the government called him as a witness against Mr. Barrett,

he was serving "25 years with 20 suspended and five to do" for "running a roadblock,

arson and receiving stolen property," and burglary. (Cr-115 Doc 339, RT vol 11 at

2491, 2493).  On direct examination, he admitted to felony convictions for delivery of

amphetamines (1987, 6 years), possession of dangerous controlled substance (1992, 10

years), possession of controlled substance and uttering forged instruments (2001, 20

years).  *Id.* at 5-6.  On cross-examination, it was shown he was convicted of

approximately six other felonies including sexual battery, forgery, numerous drug

charges and escape.  Cr-115 Doc 339, RT vol 11 at 2528.  In his § 2255 Motion, Mr.

Barrett produced significantly more undisclosed evidence showing Mr. Sanders' deep

41

involvement in the drug community and the hold that law enforcement had over him as a result. See Doc. 95 at 81.

At trial the Court denied a second Motion to Suppress under *Franks* based on a constitutionally defective warrant as a result of the conflicting testimony of Sanders.

> Having heard both the testimony of Clint Johnson and Charles Sanders in this trial, as well as the testimony of numerous other witnesses regarding the activities occurring at the defendant's residence during the time period in which Johnson was receiving information from Sanders, this Court finds there is absolutely no basis for the defendant's assertion that the information contained within the affidavit was not truthful. Specifically, because the affiant accepted as true what he was told by Sanders, and had found him to be reliable in the past, the Court finds the affidavit was properly supported. Furthermore, based upon the totality of the testimony presented herein, this Court finds the defendant has not even established that the information provided in 1999 by the informant was untruthful or unreliable. As such, the affiant's affidavit concerning information could not have been made with deliberate or reckless disregard for the truth.

CR-115 Doc. 253 at 7. In his original § 2255 Motion, Mr. Barrett challenged the Court's ruling on the *Franks* question based upon trial counsel's failure to properly marshal the evidence in support of the Motion to Suppress. Doc. 95 at 34-47. Without any additional evidence to show that the information given to Johnson was untrue and Johnson knew it to be untrue, Barrett's efforts failed again.

The § 2255 Motion also alleged *Brady* violations against the government for failing to disclose all of Sanders' criminal history and the entire agreement between Sanders and the government for his testimony, Doc. 95, pp. 270-78. This Court dismissed the claims finding that the defense was aware of Sanders' entire criminal history, the government was not obligated to seek out convictions and criminal history

42

of which it was not aware, and also found the government had advised the jury of its agreement with Sanders.  Doc. 214 at 41-42.

### b.  Charles Sanders was a Critical Witness for the Government.

At trial, Sanders testified that he had been out to Ken Barrett's place a week, three, four days maybe, before the shooting incident. Mr. Sanders claimed he was with "Geniece" Thomas [12] who picked up methamphetamine from Mr. Barrett. (Dkt. 339 RT vol 11, p. 2518-19).  He also testified that he told Clint Johnson of the incident a couple days prior to the raid on Mr. Barrett's domicile. (Dkt. 339 RT v. 11, p. 2321).

The government relied on Monk Sanders to give evidence on every critical issue it sought to prove about Mr. Barrett's drug activities (Doc. 339 RT vol 11, p. 2518-19). including an association with drug offenders (by virtue of recognizable names in an address book found in the trailer of his son) (CR-115 Doc. 339 RT v. 11 at 2497), the use, sale and delivery of methamphetamine (*id.* at 2511, 2515-17), a propensity to violence (*Id.,* at 2543) , ready access to and use  of weapons (*Id.* at 24-26), notice of the outstanding bench warrant (*Id.* at 2514-2515), and an intent to kill police officers, particularly John Philpot (*Id.* at 2543).

The informant testified against Mr. Barrett, claiming to have been at his residence a "couple of days" before the issuance of the search warrant and to have observed a drug transaction.  The informant testified he did not know that he was the informant on the

---

[12]  Janesse Thomas is the witness' name.  Thomas later executed declarations for both Mr. Barrett and the Government that she had not been at Kenny Barrett's the week before the incident; Dkt. # 95 Exhibit 13.  The government knew that Sanders was lying and did nothing to correct it.

43

search warrant at the time it was procured by Clint Johnson, but learned of this later. Cr 115 Doc. 340, vol. 12, p. 2596.

On cross examination, contrary to the assertions in the search warrant affidavit, the informant testified that when he went out to Mr. Barrett's house shortly before the raid, he saw guns but did not do or see any drugs other than a joint that he, his nephew and Mr. Barrett smoked, and that he reported the same to Johnson. See CR 115 Doc. 340, vol. 12, p. 2623. After a break called by the AUSA Littlefield, *Id.,* at 2631, the informant stated throughout his re-direct that he was uncertain of the times he had been to Mr. Barrett's and that he had observed drug activity. *See* CR 115 Doc#340, vol. 12, p. 2633. 2637. The informant admitted that Littlefield had talked with him during the break about the dates he was at Mr. Barrett's. *Id.* at p. 2640-41. He testified, however, that they did not discuss the nature of his testimony.

Though six other drug informant witnesses testified against Mr. Barrett, none of them testified to having observed any drug activity by him in the days immediately preceding the issuance of the warrant. *See generally,* CR 115 Doc. 324, Testimony of Randy Turman, vol. 2, pp. 363-392; Doc. 325, Testimony of Travis Crawford, vol. 3, pp. 450-488; Doc. 336, Testimony of Randall Weaver, vol. 8, pp. 1834-1850; Doc. 341, Testimony of Cindy Crawford, vol. 13, pp. 3058- 3079; Doc. 341, Testimony of Karen Real, vol. 13, pp. 3079 through Doc. 342, vol. 14, p. 3136, and; Doc. 343, Testimony of Brandie Price, vol. 15, pp. 3485-3511.

Mr. Barrett was convicted of all three counts. He was sentenced to death on Count 3, and life without possibility of release on Counts 1 and 2. This Court affirmed the

44

convictions and sentences on direct appeal. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007).

In his 28 U.S.C. § 2255 Motion, Mr. Barrett alleged the government had violated his rights to Due Process under *Brady v. Maryland,* 373 U.S. 83 (1963) and *Napue v. Illinois,* 360 U.S. 265 (1959) by its late disclosure and non-disclosure of impeachment evidence related to all of the drug informant witnesses. CV 105 Doc. 95, pp. 270-296. Mr. Barrett also alleged misconduct in the government's failure to disclose material impeachment evidence regarding the credibility of Clint Johnson and intimidation of witnesses by AUSA Michael Littlefield. *Id.* at pp. 297-303.

Mr. Barrett was denied an evidentiary hearing. The district court denied relief on the *Brady/Napue* claims. No COA was granted on the claims by the district court or this Court.

While his case pends appeal, Mr. Barrett discovered credible and admissible evidence that the informant lied in his trial testimony. Exhibit 21. *See also,* Motion to Remand Doc # 10284187 (10th Cir.) Contrary to his testimony and the testimony of Clint Johnson, the informant had not been at the Barrett residence in the two to three weeks preceding the issuance of the search warrant – and certainly not within 72 hours before the search warrant's issuance – as sworn to by Mr. Johnson. Evidence proffered here shows the informant did not tell Clint Johnson or any law enforcement officer that he had been at Mr. Barrett's residence within 72 hours of the issuance of the warrant. Exhibit 21. Sanders testified falsely against Mr. Barrett because AUSA Littlefield made promises to and threats against him and family. *Id.* at 2. During the informant's trial

45

testimony, Littlefield told the Sanders that he had to change his testimony, and he did so at the prosecutor's urging. *Id.* at 3.

The newly acquired evidence of the informant's and TFO Johnson's perjury, and Johnson's known bad acts and poor reputation for truth and veracity, never disclosed by the prosecution, makes clear the government engaged in egregious prosecutorial misconduct to Mr. Barrett's prejudice.

### c. *Newly Discovered Evidence Makes Clear the Prosecution and DTF Officer Johnson were Well Aware of the Incredibility of Sanders, and Conspired with Sanders to Concoct his Testimony.*

As noted above, Sanders was not identified as the informant underlying the search warrant affidavit until after John Echols had withdrawn as counsel, well into the federal proceedings, after the death qualification had already begun, and years after the event itself. Doc 339 RT vol 11, p 2548. Efforts to learn his identity had been rebuffed. *Id.* at 2548. One of the reasons the government did not disclose the identity of Sanders as an informant could reasonably rest in the fact that Sanders was not a credible source to support the search warrant. Both state court judges agree. Judge Sprouse, the judge who issued the no-knock search warrant admits he would not have done so on the word of Charles Sanders without more information. Exhibit 23 Declaration of Dennis Sprouse, Mar 20, 3015. Judge Sprouse says:

> I recently learned that the confidential informant's name was revealed in the course of Mr. Barrett's federal trial and that his name is Charles (Monk) Sanders, whom I knew to have a poor reputation for truth and veracity in and around 1999.
>
> Had I known that the confidential informant whose information materially established the basis of the no-knock search warrant was

46

> Mr. Sanders, it would have given me cause to pause before signing the warrant. Mr. Sanders was always getting into trouble. I would have had to think through whether or not I could believe the substance of the affidavit based upon Mr. Sanders' statements. My choices then would have been to not sign it or to put the affiant Clint Jonson under oath and record my questions and his answers, and then to decide one way or the other

*Id.* at 1-2 ¶¶ 4, 5.

Similarly, the state court trial judge, John Garrett was taken aback by the

disclosure that Sanders was the informant upon whom Johnson said he relied.

> I have been advised by Mr. David Autry and his investigator, Leonard Post, that the CI was purportedly an individual known to me as "Monk" Sanders.
>
> I was surprised to hear that as I know Mr. Sanders and would not believe anything he told me.
>
> His reputation in the community for truth and veracity is well-known and very bad.

Exhibit 10 at 2 ¶¶ 6-8.

In May, 2015 Mr. Sanders agreed for the first time to discuss his testimony

against Kenneth Barrett with Barrett's investigator. Sanders adamantly refused to talk

with Mr. Post previously. Exhibit 21, para 1. On May 11, 2015, Charles Sanders

declared under oath that he had lied at Mr. Barrett's trial when he said he had been at

Ken's place shortly before the incident. He said

> I lied about Kenny Barrett when I testified in the federal trial because of threats made against me and my family by U.S. Attorney Mike Littlefield and because of promises he made. Also, Clint Johnson promised me that a forgery charge against me would go away.

Exhibit 21, p. 1. Cr-115 Doc. 339 RT v. 11. According to Sanders, he had not been to

47

Mr. Barrett's for at least 2- 3 weeks and had not told "anyone in or out of law enforcement" otherwise. Exhibit 21. When Sanders testified that he had been at the Barrett residence shortly before the issuance of the warrant and observed drug activity by Mr. Barrett, he was lying and the government knew it.

Clint Johnson knew Sanders was lying. According to Sanders, he worked with Johnson for four years from 1996-2000. (Doc. 400, vol 12 at 2580) Oct 21 2005. It is reasonable to assume that Clint handled Sanders in the same unorthodox way he handled other informants. See Exhibit 4 - Declaration of Larry Blount, Exhibit 12 – Declaration of Courtney Bates.

> On the day I was to be released from Stringtown, (the Mack Alford Correctional Center), because I had finished doing my time, I was told that a federal hold had been put on me and they moved me to the Tulsa County Jail. [13] Mr. Littlefield came to the jail and told me he wanted me to testify against Kenneth Barrett and I told him that I wouldn't. Clint Johnson was with him. Mr. Littlefield got very angry.

> A few days later, Mr. Littlefield came back alone and brought me into an office and asked me to testify. When I again told him no, he got so angry he raked all the papers off the desk.

Exhibit 21 at 2 ¶¶ 7, 8. Records show that Mr. Sanders was moved from Stringtown, shortly before Mr. Barrett's trial. Exhibit 24.

According to Sanders, Littlefield threatened to file career offender charges against him, and promised that Sanders "would get 150 years and never see daylight again." Exhibit 21, p. 2. Beyond that, if Sanders cooperated and lied on the stand, Littlefield

---

[13] Though visitation records have been destroyed, the records do show that Mr. Sanders was picked up from Stringtown by the U.S. Marshal and removed to the Tulsa County Jail on September 19, 2005 and released on November 29, 2005.

promised he would give him $30,000.00, move his family, change his name and buy them a house. *Id*. at 3. Specific threats were made against Mr. Sanders' mother and Sanders "was scared for her and for [himself].

Michael Littlefield knew Sanders was lying. Sanders swears that during his testimony at Mr. Barrett's trial, Littlefield intimidated and threatened him, forcing him to change his testimony from the truth to he didn't recall. *Id.* at 3. Sanders was the perfect informant, someone whose compunction to lie could easily be cajoled or coerced. And Michael Littlefield was a man to do just that.

### d. Newly Discovered Evidence Shows that Michael Littlefield Used Threats and Intimidation to Bully People.

Newly discovered evidence reveals that Mike Littlefield had a close relationship with Clint Johnson, and it included Mr. Littlefield's reliance on the relationship with Johnson to avoid a lawful arrest for driving while intoxicated (Exhibit 14 at 2 ¶10; Declaration of Richard Gray). Given DTF Officer Johnson's reputation, AUSA Littlefield had reason to know and did know that the information in Clint Johnson's Affidavit in support of the Search Warrant was a lie. Exhibit 21. *See also, Exhibits 12, 13, 14, 15, 16.* According to Sanders, Littlefield had reason to know and did know that his testimony was a lie and that Littlefield knowingly suborned perjury.

Mr. Sanders' declaration is more than a recantation; it is an indictment of seriously illegal behavior on the part of an officer of the court. It cannot be ignored, especially when the record and other evidence corroborates him. During relevant periods of time, newly discovered evidence shows that Michael Littlefield with his then

49

wife Dawn, physically and psychologically abused and traumatized his minor adopted daughter, Lacy Littlefield, in part by medicating her at the age of 10 for purported schizophrenia and bipolar disorder with 40 pills a day including oxycodone and Ambien, as result of which Lacy was addicted by age 14 (the age she was at the time Mike Littlefield prosecuted Kenneth Barrett).  Exhibit 25 at 1 ¶¶ 1, 2 (Declaration of Lacy Littlefield, dated Feb. 17, 2016).  Lacy Littlefield's declaration states that Mr. Littlefield was a friend of Trooper Eales and was very upset about his death.  She says that he was frequently drunk when he came home, *Id*. at 1¶ 3. "He was a raging alcoholic at the time of the trial as he is to this day a nasty drunk.  He "was a bully" who got break after break from law enforcement officers and judges[.]"  *Id.* at 2 ¶5, 6.

The bullying behavior of Mike Littlefield described by his daughter in her declaration is consistent with the reports by witnesses including drug informants Travis Crawford, Doc 95, Exhibit 45 (wherein Travis Crawford recants his testimony at trial and says he" never heard Ken say he was going down in a blaze of glory") Internal Affairs Investigator Paul Gordon, Exhibit 18, at 26 ¶84 and Charles "Monk" Sanders, Exhibit 21.

Mike Littlefield's violent behavior, described by Lacy Littlefield, is the subject of several Muskogee County Sheriff's Office incident reports, wherein the abusive behavior is reported by Lacy and includes time periods relevant to the trial of Kenneth Barrett.  See Exhibit 26 – Incident Report regarding Mike Littlefield.

Former AUSA Mike Littlefield's child abuse case and the facts surrounding it constitute both *Brady* material and newly discovered evidence. Littlefield's abuse of his children was ongoing at the time of the Barrett investigation and trial. The abuse was fully investigated and shows that Littlefield's conduct during the trial was well outside the norms of civilized behavior – both in and out of the trial. Littlefield's abusive conduct is plainly relevant to Mr. Barrett's claim that Littlefield used his authority to bully and intimidate witnesses. The newly discovered evidence also corroborates the truthfulness of Mr. Sanders's recent declaration. It also corroborates the witnesses who had previously asserted the prosecutor bullied or intimidated them. *See* Travis Crawford, Doc 95, Exhibit 45, retired Internal Affairs OHP Trooper Paul Gordon Exhibit 18 at 26 ¶84

Most importantly, it corroborates that the government suborned the perjury of Charles Sanders to secure the sentence of death for Kenneth Barrett.

## IV.    THE NEWLY DISCOVERED EVIDENCE CONCERNING CLINT JOHNSON UNDERMINES THE SUFFICIENCY OF THE DRUG EVIDENCE AGAINST MR. BARRETT.

The newly discovered evidence that Clint Johnson carried red phosphorous in his vehicle, Exhibits 12, 14, 15, makes the likelihood that the red phosphorous allegedly found on Mr. Barrett was planted on the third search of him. There is nothing that supports a finding that at the time of the raid, Mr. Barrett was engaged in or intended to engage in drug trafficking. There were no drugs. There was no lab. And at least two of the ingredients required to manufacture methamphetamine were not there. Even more importantly, the red phosphorous was the only unlawful) substance that was found (allegedly) at Mr. Barrett's. There could not even have been a suspicion that there was a

51

lab or the government's approach to the residence would have been far different.  Exhibit 18, s*ee* CV-105, Doc 199-1 EXH.3 (The Meth Lab), 4 (Kitchens of Death).

As the DEA Agent Beal testified there was no lab, modified after a break to "no working lab" at Mr. Barrett's house. Doc 339 RT Tr 11:2440. There was no running water or drain and thus, nowhere to flush or destroy any drugs.  This should have been apparent to the OHP after their flyover.  Exhibit 27 Declaration of Lisa Cooper.

The government's argument that Mr. Barrett had "enough red phosphorous, iodine, and pseudoephedrine to manufacture about 55 grams of pure methamphetamine" Doc 339 RT Tr 11: 4280, 4283, is speculative at best and seriously undermined by the newly discovered evidence concerning Johnson.  The pseudoephedrine had not been processed so whether or not Mr. Barrett had sufficient amount of pseudo to manufacture methamphetamine in any specific amount is purely theoretical.  (Tr 13:3030-34.)  The argument rests entirely on the "appearance" in federal court of a "second" baggie of red phosphorous.  The baggie purportedly found by the sheriff and his Parks and Rec brother, Stanley Philpot, held 15 grams, an insufficient amount to allege the capacity to manufacture a sufficient amount of meth to merit a trafficking charge.  In the grand jury, the designated federal agent Darren Lane told the grand jury that Mr. Barrett had two baggies on him – one in the front and the other in the back.  Exhibit 57, Grand Jury Transcript, p. 34-35.  After six years of prosecution, this was the first mention of a second baggie of red phosphorous.[14]

---

[14] On July 20, 2015, the government references only "the baggie."  *See* Case No. 12-7086, *Government's Brief in Opposition to Motion to Remand,* Doc

The newly discovered evidence that Clint Johnson carried red phosphorous in his car, Exhibit 12, now makes the second baggie appear more likely to have been planted. In the first state trial, Sheriff Johnny Philpot testified only to the plastic baggie inside pill bottle supposedly found in left rear pocket. He says that's all he recovered from the clothing during the pat down.  1st St. Trial, Tr vol. 11, pp. 1955-56.  Stan Philpot took possession of Kenny's clothing at the hospital. When asked if he examined the pockets of the clothing he says "I didn't examine anything." 1st St. Trial, Tr vol. 11, p. 1971 Stanley Philpot supposedly bagged the clothes for OSBI, despite the fact that OSBI went to the hospital to pick the clothes up only to find they were not there.

The drug evidence, other than the red phosphorous, is nothing more than a list of ordinary objects and products that are lawful to own and useful for other purposes.[15] (Tr 11:2437-39.)  By the government's own admission, Mr. Barrett did not have lye and hydrochloric acid, ingredients necessary to manufacture meth.  BIO, p. 7-8.  The suggestion that because the items were available locally, Mr. Barrett had recently manufactured or was about to defies logic.  *Id.* at 8.  Everything offered by the government to "prove" manufacturing, other than the suspect precursor, was available locally.  And the newly discovered evidence of Johnson's possession of the precursor raises the specter of Clint Johnson having planted the same, surely something the jury had a right to know.

---

01019462256  at 1 ("At the time of the arrest, Barrett was found to be in possession of *a baggie of* red phosphorous… . . .") (Emphasis added)
[15] The "scales" the government mentions were not of the nature of a drug dealer and had no residue on them. (Tr 11:2421-23.)

The residue purportedly found in a syringe and tubing as well as the other syringes do suggest methamphetamine *use* but is far too little to prove the activity required by the superseding indictment.[16]  It is only Sanders' testimony that purports to show *any* drug activity at or near the time of the issuance or execution of the warrant.  And his testimony was a lie, perjury procured by the prosecution.

The government relied extensively on Mr. Barrett's possession in his pocket(s) of highly volatile red phosphorous. The circumstances of the pill bottle with a baggie containing a red powdery substance later confirmed as consistent with red phosphorous is so suspect that any juror who knew of the misconduct alleged here would undoubtedly have believed that the red phosphorous was planted.  *See generally,* POB. P. 7 n.6; RB, pp. 2-3; Exhibit 18, p. 16 ¶¶ 45-47.  The Oklahoma Highway Patrol Troopers Manion and Hash each searched Mr. Barrett and found no drugs, drug paraphernalia, or percursors.[17] No witness testified to the second baggie until the federal trial. In the second state trial, Johnny Philpot mentions finding the pill bottle with the baggie and says that he handed the bottle to Frank Lloyd to check. Then Lloyd gave Philpot the bottle back, and he put it back in Mr. Barrett's pocket. There is no testimony to this effect by Frank Lloyd at the preliminary hearing or the first state trial.  *See generally,* 1st St. Trial, Tr vols. 6, pp 1064-1090 and 11, pp 1944 – 1965. And there is no is no mention of second baggie.

---

[16] The residue on the paper towel in an open dumpster on the property is easily put there by anyone, friend or foe of Mr. Barrett's, or a law enforcement officer.
[17] Though Trooper Hash testifies in the federal trial that he did indeed feel something like a pill bottle when he patted Mr. Barrett down, remembered five years after the fact.

Johnny and Stan Philpot rode in the ambulance with Mr. Barrett. Exhibit 28 Declaration of Leonard Post re Casey Borders.  Stan went into Exam room with Mr. Barrett and took possession of clothing and bagged it in a red biohazard bag he got from the ER. First State Trial Tr Vol 11, p. 1972. He says he did not examine the clothing but placed it in the biohazard bag and tied it. 1st St Trial Tr Vol 11, p. 1972-73.  Stan testifies that he was called back to the scene to keep people out of the area, though there is no evidence that anyone was actually kept out of the area or of Stan guarding the perimeter. He took the biohazard bag with the clothing with him, kept them for about 12 hours, and then gave them to OSBI criminalists Lynette Lee & April Marcangeli. (2D St Trial, Testimony of April Marcangeli, Vol. 9, pp. 1510–1514, 1525-26 (Marcangeli)**;** Second State Trial, vol 10, p.1575 (Lynette Lee).  Stanley Philpot is not asked if he searched the pockets in the second trial and makes no mention of any baggies in that trial.  *See generally,* Second State Trial, vol. 5 pp. 877-888. Marcangeli does not mention the second baggie until cross-examination in the federal trial.  *Id.* vol 9 at 1513.  She does not testify to the nature of the substance.  *Id.*

It is only Terrance Higgs, the OSBI FATT examiner, who testifies to the items as the relevant red phosphorous at weights of 15 grams (the pill bottle baggie) and 33.2 g, making a total of 58.2g, suddenly an amount worthy of the grand juries drug charges, CR-115 Doc. 344, Tr Vol 16 at 3621- 3625 is an amount relied upon significantly by the government.

Add to that set of events, the fact that Clint Johnson returned to the scene. According to his testimony, he left with the Bronco transporting Eales and then drove

55

back to Dwight Mission Road and I-40 to meet the ambulance. 1st St. Trial, vol 6, p. 1040. The Bronco followed the ambulance to the Sallisaw City Hospital (Sequoyah Memorial). 1st St. Trial, vol 6, p. 1040. Johnson stayed at the hospital for approximately one and half hours and then went back to the scene. *Id.* at 1041. He arrived back at the scene around 2:30 or 3:00 a.m. *Id.* at 1063. Stanley Philpot and Clint Johnson appear to have been at the hospital at the same time.

Had the defense, court and jury known of the propensity of Clint Johnson to travel with red phosphorous in his car, and his willingness to perjure himself and compel his informants to lie, and given the "odd" if not broken, chain of custody of the baggie in the pill bottle, and the surprise introduction of a second baggie six years after the incident, there is little likelihood that the court would have admitted the evidence or testimony, or that any rational jury would have found the necessary drug trafficking elements to return a verdict of guilty to the charges.

## B. THE MISCONDUCT OF THE OKLAHOMA HIGHWAY PATROL.

It is relevant to the consideration of the claims presented here that the Oklahoma Highway Patrol has been aggressively engaged in the prosecution of Mr. Barrett from the early morning hours of September 24, 1999, perhaps as far back as 1996 when the OHP provided the CI for Agent Ottwell's controlled substance transaction that he says took place in December 1996. Exhibit 19 Declaration of Paul Mann. The OHP was permitted access to the crime scene throughout OSBI's processing of it, making corruption of the scene inevitable The degree and nature of that corruption, however, may never be known, but what we do know is bad enough.

56

Much of the once contradictory testimony "evolved" over three trials in a way that tightened the noose around Mr. Barrett.  There is little question that political pressure was the motivating force behind the federal prosecution. It was brought to bear by the state highway patrol and other state officials.  DEA Agent Juan Beal monitored the state trial to make sure the state had everything it needed.  When the state results were disappointing, Agent Beal wrote an email to then United States Attorney, Sheldon Sperling, - a letter he describes as attempting to light a fire in favor of federal prosecution.  Exhibit 43 article of April 20, 2004.

The record reflects a pattern throughout the legal proceedings of passionate intimidation by the OHP toward any party bound or inclined to be skeptical of the version of events promulgated by the OHP.  The record also clearly reflects an evolution of testimonial recollections of the events leading to, during and after the gun battle.  The changes in testimony are too directed and material to be mere lapsed or late- recovered memory issues.  The physical crime scene also suffered at the hands of the OHP and the OSBI, with little attention paid to preserving, documenting, and processing material evidence. The result was a skewed and inaccurate recreation of the events, the nature of which excludes good faith. The misconduct violated Mr. Barrett's right to a fair trial, adversely affecting the accuracy and reliability of the evidence, and therefore, the verdicts based upon that evidence. There can be no confidence in the trial or the verdict— the conviction cannot be sustained.

### 1.  Relevant Factual Background.

The plan was to have the scene secured within the two minutes - before the entourage of local law enforcement descended upon the scene. Four of the eleven Tac Team members were going to enter Mr. Barrett's house, Trooper Eales was to lead, followed by Troopers Hamilton, Manion and Greninger. All of the troopers were heavily armed, some, Manion for one, had automatic weapons. Mr. Barrett did not. The two lead vehicles, both white Broncos, one driven by Trooper Hamilton and the other by Raymond Greninger, were unmarked. The plan was to roll in dark. According to IA investigator Paul Gordon, they did just that – rolled in dark without even their headlights on initially. No emergency lighting was activated until after the brief and sudden firefight was over. Exhibit 18, p. 11, 12.

### 2. The "Ominous Presence" of the Oklahoma Highway Patrol.

The conduct of the OHP throughout these proceedings has been heavy-handed, to say the least. From the manner of the raid through the trials and into the postconviction proceedings, the OHP has made its presence and intent known. [18]

### A. Mr. Barrett was beaten upon arrest.

*I was grabbed by the hair of my head and jerked out in the yard, beat, stomped, repeatedly.*
> *-Kenneth Barrett, September 24, 1999*
> *Interview with Lt. John Randoph*

---

[18] Of some concern is a recent traffic stop of Mr. Post, Mr. Barrett's postconviction investigator, by Trooper C. Rohr and a guest appearance, deliberately off-camera by a Trooper Hamilton. While possibly coincidental, the incident followed Mr. Post's very open efforts to interview relevant OHP troopers and ended with an illegal search. Exhibit 29 Declaration of Leonard Post re C. Rohr.

Mr. Barrett was surprised in the middle of the night by his son's call for help. He ran outside momentarily and saw a vehicle barreling across his property. He ran back into the house as the vehicle slid into his porch. He was shot four times through the east window while shots hit his front door as it flew open. Falling to the ground, Mr. Barrett returned fire in the direction of the headlights at his front door. The shooting stopped. He was dragged out by his hair by Trooper Hamilton, handcuffed, beaten, stomped, and hit in the face with a flashlight, all the while being told he was going to be killed, and would die in jail. Exhibit 30 Barrett Interview with Internal Affairs Investigator John Randolph, September 24, 1999 at 9:33 a.m.. Mr. Barrett told Lt. Randolph that he had been shot in his house by someone shooting through the window. He said a truck pulled up in front of his house and:

> I was shot and didn't know what to do, just grabbed a gun and started protecting myself, and I shot back down out my door and then I was told, I stopped shooting and I was told to get up and couldn't get up, my legs were -- was shot out from under me[.]

*Id.* at 3. Mr. Barrett told Lt. Randolph that he did not know the people who attacked him. He saw a truck with headlights on, coming across his field, so he ran into the house because he didn't know what to do and then he was shot. He did not see any emergency lights. He grabbed his gun and tried to protect himself. *Id.* at 8. He could remember seeing only one truck that "almost pulled in his door." *Id.* at 13.

When he was dragged out, he was told he was going to be killed and then he was handcuffed, beaten and kicked. "Walked by every so often, took their foot, smashed it in my head, just kicked me, told me to look them straight in the eye and when I did, beat me

59

with a flashlight.  Told me I was going to die in the jail." Id. at 8-9. Exhibit 30, 31

Booking photo. Mr. Barrett denied knowing about a warrant and advised Randolph that

he was stuck at home because Frank Lloyd had threatened him two [years] ago with

prison if he did not become an informant.  *Id*.at 10-11.

### B.  The EMT attending Mr. Barrtt was harassed.

> *I have never witnessed such unprofessional conduct by law enforcement Officers[.]*

> *- Casey Borders, EMT*

On December 14, 2014, Leonard Post, Mr. Barrett's investigator, spoke at length

with Casey Borders, the Emergency Medical Technician who attended to Mr. Barrett

after Mr. Barrett had been shot four times.  Exhibit 28 Declaration of Leonard Post re

Casey Borders.  Mr. Borders told Mr. Post the following.

Mr. Borders was one of two emergency medical technicians [EMT] who

transported Kenneth Barrett to the hospital after he had been shot multiple times during

the September 1999 confrontation that left a trooper dead.  *Id*. at 1.  At the time of the

incident, Mr. Borders was a deputy sheriff in Haskell County, as he had been for 15

years.

When Mr. Borders and Mr. Sutton arrived, they were allowed through the gate,

but no farther. They were held there by law enforcement for more than 20 minutes before

they were allowed to attend the patient, who Mr. Borders later learned was Kenneth

Barrett. It was the only time in Mr. Borders' career as an EMT that he was prevented

from immediately attending a patient.

60

When Mr. Borders and Mr. Sutton were finally permitted to attend to Mr. Barrett, they found him at the side rear of his shack. It appeared that not only had he been shot, but that he had been beaten. Mr. Barrett had pump knots on his head, one of which Mr. Borders thought was made by the butt of a handgun.

Mr. Borders and Mr. Sutton put Mr. Barrett on a stretcher and were surrounded by highway patrol officers and others who were yelling and screaming at Mr. Barrett, Mr. Sutton and Mr. Borders. Mr. Borders felt threatened, as did Mr. Sutton. It only got worse when they were loading Mr. Barrett into the ambulance. OHP Trooper Manion, who Mr. Borders knew, was off the deep end and was one of the most vocal. *Id.* at 2.

When they arrived at the hospital, there must have been 50 OHP and other law enforcement vehicles at the hospital. The officers were screaming and hollering at the EMS team in a threatening manner. Mr. Borders did not feel secure. He had never witnessed such unprofessional conduct by law enforcement officers, notwithstanding the fact that they had lost an officer.

At the hospital Mr. Borders turned his run report in at the desk. A minute or two later, after reporting to the doctors and completing Mr. Barrett's transition to hospital staff, Mr. Borders went back to the desk to complete his report and take his copy. Mr. Borders was told by multiple members of law enforcement, none of whom Mr. Borders knew, that he could not have the report back. He had wanted to include these facts in his report. Mr. Borders never saw the report again.

Mr. Borders said that things were so bad at Mr. Barrett's house that it was apparent to him that what law enforcement wanted was for Mr. Barrett to die out there

61

and not be taken to the hospital alive. Exhibit 28 Declaration of Leonard Post re Casey Borders, Exhibit 32 – Declaration of Jimmy Sutton, Exhibit 33 – Declaration of Dale Barnhardt.

### C. The Troopers tried to intimidate people at the trial.

*"OHP officers filled the courtroom and appeared to be trying to intimidate a lot of people.."*

-Hon. John Garrett, Dist. Judge, Ret'd

The state judge, Hon. John Garrett describes the conduct of the OHP during the trial as an "ominous presence." Exhibit 2 at 2 ¶ 14. He "wouldn't let them bring their firearms into the courtroom, despite their argument that it offered the court protection. I told them I had two armed deputies . . .They were insistent and I had to firmly reject their request to wear firearms in the courtroom during the trial." *Id.* According to Judge Garrett, "OHP officers filled the courtroom and appeared to be trying to intimidate a lot of people. I believed they were trying to intimidate me." *Id.* ¶ 15. Though the judge was initially concerned that the [] jury might have been overwhelmed by them, [] as the testimony unfolded it became clear that the jury was concerned about the manner in which the troopers executed the raid." *Id.* at ¶ 16.

Jury tampering is the crime of unduly attempting to influence the composition and/or decisions of a jury during the course of a trial. Okla. Stat. tit. 21 §388. Jimmy Hurley, a juror in the first state trial was reportedly threatened. He was on the jury in the first trial and told his son that he received four threatening phone calls from Highway Patrol officers. "Jimmy started to wear a gun after that." Exhibit 34 Declaration of J.C.

62

Hurley.  The trial transcript reflects that Mr. Hurley received an anonymous phone call during the trial.  He reported it to the court.  At approximately 1:30 in the morning, the caller said "If you know what's good for you, you'll take care of Barrett."  1st St. Trial, vol XVI, p. 2513.  After the trial, Mr. Hurley was targeted in the press by the state prosecutor as "a rogue juror" and "a little bit radical . . . We try to weed them out, but we didn't with (Hurley)."  "I don't have anything against the patrol," Hurley said. "After the trial, I got a feeling of how he (Barrett) felt." "I was scared."  Sequoyah Times, December 28, 2002.

Similarly, defense counsel recall that the OHP were carrying their sidearms and were an intimidating presence in the courtroom.  Exhibit 44 Declaration of Geoffrey Standing Bear.  Both defense counsel and the investigator at the first trial recall that the judge was concerned about the safety of the entire defense team.  According to Chief Standing Bear, the judge called Mr. Echols and him to the bench and asked if they had checked out of their hotel rooms because he wanted to give them a head start to get out town ahead of the OHP.  *Id.* The investigator for the first state trial similarly recalls the judge telling them he would lock the courtroom to give them a head start because of the OHP's unhappiness with the trial.  Exhibit 45 Declaration of Jack Stringer.  Mr. Stringer also recalled that when he attempted to serve subpoenas for trial on OHP members, the OHP Chief Adams refused to accept the subpoenas.  Judge Garrett had to order him to have the officers present at trial.  *Id. ¶* 4.

In the second state trial, the reaction to the lesser included verdict of voluntary manslaughter was even more volatile.  "Thirty years just isn't much (punishment) for the

life of a law enforcement officer out there doing a job." Exhibit 43. Hamilton is later quoted as saying "If you want to get away with murder, come to Sequoyah County."

http://www.tulsaworld.com/NewsSTory.asp?ID=040208_Ne)A19_Attor.

DEA liaison and retired trooper, Danny Oliver, "was very angry, and said for all to hear in the courtroom that this was not the end of it, that he would see about the feds prosecuting Barrett." Exhibit 15 Richard Gray Supplemental Declaration. When the "feds" prosecuted, the jury was largely selected from the McAlester, Oklahoma area, home of the Oklahoma Highway Patrol, as well as that of Rocky Eales and his father, a longtime high school football coach who has a stadium named after him

### D. Trooper Paul Gordon, Internal Affairs Investigator.

The OHP's reaction to a fifteen-year veteran Internal Affairs Investigator 2nd Lt. Paul Gordon's failure to be a team player is very telling. In his declaration, the trooper explains that "at approximately 2 a.m. on the morning of the shooting, while driving to the shooting site, he received a phone call from the Highway Patrol Commissioner, Bob Ricks, who told Mr. Gordon that "the Tact Team had been set up and [Ricks] wanted [Gordon] to go over the entire scene and find out exactly what happened." Exhibit 18 at 2 ¶ 6. According to Mr. Gordon, however, during the course of his investigation, he found that the Tac Team "had failed to follow appropriate protocol" and that neither the OHP nor OSBI were interested in conducting an objective investigation. 2d Lt. Gordon's efforts to conduct an objective investigation were undermined by the State of Oklahoma and became a personal attack on him. Because Gordon was "vocally critical of the lack of appropriate surveillance and planning before attempting to execute a High Risk

64

Fugitive warrant, [he] was accused by Captain Burris and others of not being a team player and told to "adjust his attitude." Exhibit 18 at 6¶ 15.

After interviewing a number of state law enforcement, viewing the scene and evidence, and interviewing troopers under abnormal conditions for a shooting investigation, Mr. Gordon concluded, among other things, that "the OHP East Tactical Team failed to follow the handbook protocol, at the very least, in this regard: the Broncos were unmarked and the troopers did not activate their emergency lights to warn Barrett he was dealing with the police." "Under the circumstances admitted to me and observed by me, Mr. Barrett would not have known the incoming vehicles were law enforcement." *Id.* at 9 ¶ 23.

The response from OHP was immediate and fierce. Mr. Gordon was advised by at least two state troopers to watch [his] back and that the Highway Patrol was after [him]." The work environment was so openly hostile that Gordon took private employment in Bosnia. The OHP were not content to simply drum him out the Patrol but proceeded to crush his spirit and destroy his credibility. Mr. Gordon was charged with felony offenses of misappropriations of state funds and property for taking unapproved comp time and using a state telephone while working as a private investigator. According to Mr. Gordon, both Lt. Randolph and Captain Burris gave false statements to the grand jury. Though Mr. Gordon ultimately pleaded *nolo contendere* to a single count, a later audit raised concerns about the disturbing manner in which the matter was handled. *Id.* at 20-25. The conduct of the OHP suppressed the former investigator's ability to do an objective job and later, made sure he could not be of service to the truth.

65

### 1.  Trooper by trooper, they lied and misled the jury.

All of the troopers gave at least (3) initial statements to OHP Attorney Gary James on the morning thereof, OSBI Agent Ben Rosser, shortly thereafter, and Internal Affairs Investigator Paul Gordon, approximately 10 days after the event under rigid conditions. The troopers were called upon to testify throughout the state and federal trial proceedings, all under oath.  The evolution of that testimony makes clear that the OHP's interest was not in the truth but in securing a verdict of death.  The testimony that changed and ultimately can be called nothing other than perjury was evidence related to the question of notice and self-defense. The following are merely examples of the conflicting sometimes inexplicably opposite testimony of the individual troopers from one proceeding to the next.  It serves to lay before the Court sufficient evidence of perjury, misrepresentation and omission that compels more than constitutional concern for the accuracy and reliability of the third and final verdict against Mr. Barrett; it presents the likelihood that there is clear and convincing evidence in the record, as a whole in light of the newly discovered evidence, that Mr. Barrett is innocent.

At the preliminary hearing, Agent Rosser testified that when he arrived on the scene the only emergency lights on were on Trooper Hash's marked unit.  At the first trial Agent Rosser admitted that he had listened to the Troopers' testimony at the preliminary hearing and the first trial and in "many many" instances, that the testimony concerning emergency lighting differed from the sworn statements given under oath to Internal Affairs Paul Gordon.  1st St. Trial vol 11, at 2000.

66

Trooper Hamilton maintained that he had damaged the push guards on the Bronco by hitting a post at the driveway.  It was a lie. Agent Rosser testified the push guards were bent at the same height as the porch.  PH, vol. 1 p. 52.  In his interviews with OSBI Agent Rosser and IA Investigator Paul Gordon, Trooper Hamilton stated he did not shoot his gun.  Exhibit 46 Gordon interview, Exhibit 47 Rosser Interview.  Trooper Manion stated to both Rosser and Gordon that he knew of no one beside himself who shot their weapons.  They were lies. It was not until Trooper Hamilton was confronted with ballistics examination that showed his weapon was fired at least twice that he admits to shooting his gun – twice.[19]  See Exhibits 46, 47.

A critical issue at trial was exactly where the lead Bronco was when shooting broke out.  Mr. Barrett's position has always been that he shot from inside the cabin in the direction of the vehicle after it hit the porch.[20]  ("Directly to the left of the porch, it might have touched the porch.")  The government's version at the federal trial, however was that Mr. Barrett began shooting as the vehicle first crossed the ditch onto his property from the east.  Though Trooper Greninger told Agent Rosser that the gunfire began at the front porch; thereafter, he advised Trooper Gordon that he "drew a blank" from the ditch until they pulled up and heard gunfire.  Gordon Interview at p. 6.  In the first state trial, Greninger maintained his "memory block" story; in the second state trial, he testified the gunfire began as the Bronco approached the house.  2d St. Trial, vol. 4, p. 512.  By the

---

[19] The evidence suggests that Trooper Hamilton shot at least three times.  See Dalley testimony about a third shot that would have come from Trooper Hamilton's position.
[20] Trooper Darst consistently maintains the initial gunfire began when the vehicle was at the porch. CR 115, p. 1373.  Similarly Trooper Manion testifies that gunfire broke out as the first car drove up to the porch, very close to the front porch.  PH, vol 1, p. 50.

federal trial, Trooper Greninger again claims he had a memory block from the ditch to the stopping of the car. *Id.* at 790.

Trooper Hise testified in different proceedings that his lights were on and his lights were off. *See and compare,* 1st. St. Trial, vol. 10, p. 1769 (Headlights were on) *with* CR 115, vol 6, p. 1283 (Headlights were off).

Similarly, Trooper Hash's versions of his search of Mr. Barrett after arrest evolved to include "feeling a pill bottle." *See and compare,* 2d St. Trial vol 4, p. 599 (no mention of pill bottle) with CR-115, vol. 5, p. 1009 ("Yes, sir, there was what felt like a pill bottle in his right front pocket.") Trooper Hash did not tell either Agent Rosser or 2d Lt. Gordon that he felt anything in the pockets, less yet a pill bottle. Exhibit 49 Hash/Rosser interview at 54, Exhibit 50 Hash/Gordon interview at 6. He did not advise OSBI Criminalists of having felt a pill bottle. He did not testify to having felt a pill bottle in his testimony at the Preliminary Hearing. (See PH, vol. 3, p. 470). He testified that he felt a pill bottle in his pocket at the first state trial, though admitted there that he had only mentioned it to anyone the day before the trial.

The testimony reveals a propensity on the part of the OHP to strengthen their case against Mr. Barrett in any manner possible.

DEA Liaison Danny Oliver:

> "As soon as the first vehicle stopped in front of the residence I heard automatic weapon fire and could see a great deal of gun smoke in front of residence."

Handwritten Statement to Gary James, September 24, 1999.

68

Two critical evidentiary concerns are raised by Danny Oliver's original statement: the fact that the shooting didn't begin until the Bronco had plowed into Mr. Barrett's house and that the initiation of automatic gunfire could not have been Mr. Barrett because he did not have an automatic weapon. Both observations support Mr. Barrett's version of events. By the time Agent Oliver is before a federal jury, however, his version of events is very different. CR-115 vol 5, p. 1156 (At the time they heard gunfire "[w]e hadn't got into the ditch yet. The first Bronco was already through the ditch and the second was nearly through it when I first started hearing the gunfire.")

Even the head of the search warrant operation, Lt. Kerry Pettingill, dished out falsehoods to the triers of fact. *Compare* "I turned my headlights on as I pulled in." (1st St. Trial vol. 7 p. 1145) *with* "I had my headlights off because Hise was in front of me. I followed his headlights" (2d St. Trial, vol. 118). Two statements under oath. Both cannot be true. Like so many government witnesses, Pettingill perjured himself freely. If they were caught in one lie, the next prosecutor simply abandoned the witness, or changed topics. Federal defense counsel was unfamiliar with the evidentiary record, including transcripts, so they did not challenge the conflicting testimony. Steven Charles Smith, Lt. John Randolph, Lt. Pettingill, each made directly conflicting statements under oath, got caught and simply walked away. It illustrates the lengths to which the state agencies and the prosecutors were willing to go to secure a verdict of death against Mr. Barrett. Had the jury known of the pattern of perjury that infected the various prosecutions, it would undoubtedly have compelled the jury to scrutinize the

69

government's entire case more carefully, leading no rational juror convinced of Mr. Barrett's guilt.

Mr. Barrett has three times attempted to be heard in this Court and in the Court of Appeals on the damning evidence offered by the former Internal Affairs Investigator. Despite serious credible and corroborating evidence of perjury, subornation of perjury, destruction of evidence and intimidation of witnesses, neither this Court nor the Court of Appeals have even acknowledged the devastating impact of the conduct, if left unaddressed, on the courts and criminal justice system and the likelihood of such unchecked illegal behavior to result in the conviction of the innocent. This evidence is consistent with the concerns raised in the initial petition and the newly discovered evidence now offered. Sooner or later, a Court must hear the evidence.

## 2. The Destruction of Evidence in a Capital Case

### a. The Recorded Statement of Trooper Rick Manion

On September 24, 1999, Lt. John Randolph of Internal Affairs was sent by the head of Internal Affairs, Captain Rodney Burris, to talk to the troopers. 1st St. Trial, vol 16, p. 2742. The only trooper who was willing to speak to Randolph was Trooper Ricky Manion. *Id.* [21] Manion was the only trooper who admitted to having fired his gun. Lt. Randolph recorded part of the statement. *Id.* at 2743. During the interview, Lt. Randolph was reminded by General Counsel John Lindsay that they were not supposed to record troopers immediately after the incident. *Id.* at 2744. Randolph advised Manion

---

[21] Lt. Randolph also had a "mental image" of having talked with Trooper Gene Hise, who was very upset, but could not recall if it was in an interview setting or not. 1st St. Trial, vol 16, p. 2473.

that the tape would not be used and stopped recording, though the interview continued.

*Id.* at 2745. Lt. Randolph testified that he shredded his notes and "took the tape and

several others [] and gave them to Carolyn Rawlings, the trooper secretary[.]" *Id.* at

2475. Randolph asked her "to dispose of the taped, erase, reused, whatever they were

supposed to do with them [because he] no longer needed them." *Id.* Lt. Randolph

testified that the only other participation in the investigation by him was to "proofread

lieutenant Gordon's interview statements and try to correct the grammar of them so they

would be suitable for Burris to okay." *Id.* at 2475. [22]

Contradicting that testimony at the second state trial, as well as his response to

Judge Garrett's inquiry prior to the first trial, Lt. Randolph testified that he also

interviewed other troopers, including Gene Hise, Steve Hash, and Billy Poe, as well as

Kenneth Barrett. 2d St. Trial, p.1154. Lt. Rollins from Internal Affairs was also with Lt.

Randolph during these interviews. According to Lt. Randolph, Trooper Manion died in a

motorcycle accident after Lt. Randolph had shred his notes and destroyed the tape of

Manion's interview as well as the tapes of other interviews. *Id.* at 1156. All four

troopers interviewed by Randolph had been given and acknowledged their rights and

responsibilities on a "Garrity" form, *Id.* at 1157, notarized by Lt. Randolph. Mr.

Randolph admitted to destroying evidence because it violated their policy to have

recorded the statements. *Id.* at 1164. At the time of the preliminary hearing, the tape was

still in existence. *Id.* at 1169. The tape was in his drawer for a year or two after the

---

[22] Randolph and Burris coordinated the efforts to prosecute Lt. Paul Gordon for conduct commonly overlooked at OHP (surely when they themselves did it). Exhibit 18.

incident and was not destroyed until November, 2001, at a time when Lt. Randolph was aware that it was evidence in a capital case and that Trooper Manion was dead. *Id.* at 1171-1172. In short, he testified under oath that he had destroyed a tape sought by the defense, but later testified that he had destroyed the tape some two years later, long after the defense rightfully sought it and without the defense ever hearing it. Because of the duplicity and timing of the destruction, it is fair to say that there was exculpatory evidence on that tape.

### b. Failure to Preserve the Crime Scene

For unknown reasons, perhaps simply because of the number of people who were originally on the scene, there was no competent or professional attempt to secure the crime scene. See Exhibits 35, crime scene logs. There was no one in charge of the effort. Exhibit 36 Declaration of Roy Coleman. The lack of a secure crime scene left it vulnerable to corruption.

The most obvious of contaminating effects is OSBI's Iris Dalley's erroneous processing of the lead Bronco in a position to which it had been moved after the shooting. Notwithstanding 2d Lt. Gordon's effort to advise that the trajectory analysis would be flawed by the alteration of the scene, Ms. Dalley simply processed it as if it had been positioned over the dying trooper. Exhibit 18, at 13 ¶ 37.

Because Mr. Barrett has always maintained that the Bronco came barreling up to his porch, and he was shooting into headlights without knowing who he was shooting at, the position of the vehicle at the time of the shootout is critical. In the Rosser interviews, Trooper Darst told IA Investigator Gordon that the vehicle "touched the front porch, I

72

think it rolled up in front of the actual flooring." Darst Gordon Interview, p. 15. At the preliminary hearing, Agent Rosser testified that the Bronco appeared to have hit the porch. PH vol 1. P. 51. Rosser also testified in the second trial that the push bars were bent at the height of the porch and the draining transmission fluid would indicate that the Bronco had been up against the porch. 2d St. Trial, v. 1014.

Even at the federal trial, Rosser admits that his investigation showed that it had been moved. Fed. Tr. Vol 14, p. 3142. Sequoyah County Deputy Kenneth Wilson testified the Bronco was much closer to the porch than depicted at trial and that while he was at the scene, he heard someone shout to move the Bronco. He did not, however, see it moved. Vol 17, at 3986-97. In the first and second state trial Darst testifies that it may have touched the porch. When he starts to say that in the federal trial, Littlefield marches him away from the topic. 1st State Trial Tr Vol 10, p. 1849 , 2nd state trial  Vol. 4, p 696, Doc 338 RT Vol 6.

There is no doubt that the most credible evidence supports that the vehicle was just where Mr. Barrett described it. Rather than execute the trajectory analysis in that place, the criminalist was content to process it in position where it had been pushed some 15 feet back from the house, covering the blood pool where Rocky Eales presumably fell. The change in position changes the position of the shooter. And the government relied on the erroneous analysis, knowing full well it was erroneous. Parked against the porch as described by most who were on the scene, puts the Bronco at a place wholly consistent with Mr. Barrett's claim that he had been shot before he shot in the direction of headlights of the vehicle after it came to rest after impacting his porch.  See Exhibit 7.

73

Notwithstanding the undeniable truth that the Bronco ran into the porch, the government proceeded as if it were a matter of opinion, not fact, leaving its so called crime scene expert to testify to trajectories of bullets into the vehicle in what was known to be the incorrect position. Cr-115 Doc 348 Vol 20. The movement of the Bronco was an inexcusable corruption of the crime scene.

According to the other troopers at the raid, Eales was double vested. He wore a Kevlar personal body armor vest, sometimes referred to as a second chance vest, with a steel plate insert, and a ceramic turtle shell, circa Vietnam helicopter gunners. The Kevlar vest was worn by all of the troopers participating in the raid. The turtle shell vest was an older ceramic-type vest made by the military. The vest had been obtained by Eales and was not issued by the OHP. See Exhibit 37 Excerpts of Testimony of Troopers John Hamilton and Kerry Pettingill.

The turtle shell vest was sometimes referred to as a ballistics plate. It was collected at the crime scene (evidence #T50) and submitted to the OSBI lab in Tahlequah on September 25, 1999. See Exhibit 38 Excerpt from OSBI Report. In the first State Trial, Defense Attorney John Echols clarifies what the ballistics plate refers to with OSBI Criminalist Ryan Porter during his testimony. See Exhibit 39 Excerpt of Testimony of Ryan Porter.

> **Echols**: Some Kevlar vests are soft and have a pouch in which a person can place a hard Kevlar or steel plate within the soft bulletproof vest. When you say ballistics plate, I was thinking of that type of plate that would fit inside a Kevlar vest. Did you collect any items of that type?

**Porter**:  Not to my knowledge. This is what we collected and was called a ballistics plate at the scene.

**Echols**: I've heard reference to it as being a sort of turtle shell, hard shell in front and hard shell in back.

**Porter**: Right.

For no apparent reason, the ballistics plate/turtle shell was not analyzed. OSBI Criminalist Iris Dalley refers to it in her testimony, noting that "it had swipes and tears on the exterior." See Exhibit 40, Excerpt of Testimony of Iris Dalley. Without explanation, she admitted she did not "undertake any chemical or other residual analysis of that to determine whether those swipes or tears might be related to bullet trajectories." *Id.*

While the turtle shell vest was not tested, a load bearing vest purportedly worn by Eales *was* tested. Per the testimony of troopers at the raid, Eales was not wearing a load bearing vest (LBV). These vests are used for carrying equipment and do not offer any ballistic protection. Though Eales was not wearing this type of vest, Dalley tested an LBV found at the scene near the back of the Bronco, believing it belonged to Eales. Dalley also conducted her reenactment using an actor wearing a load bearing vest, but not wearing a turtle shell vest/ballistics plate. The trajectories for fragments hitting Eales may well have been incorrectly calculated due to this mischaracterization of the evidence. The actor used in the reenactment did not wear ballistics plates, but wore an LBV.  Echols begins to

75

address this discrepancy, but as he does so, Judge Garrett calls for a break and the issue is not continued after the recess. Exhibit 39.

> **Dowty**: Were you of the understanding that Eales was wearing a tactical vest?
>
> **Dalley**: Yes. One of the items that I examined that was identified as coming from Eales was this type of vest….
>
> **Echols on cross**: He's wearing two ballistic vests?
>
> **Dalley**: Yes.
>
> **Echols**: He's wearing this turtle shell armor that you didn't depict there, but we agree he was wearing this hard (inaudible) front and back?
>
> **Dalley**: Yes.
>
> **Echols**: You depicted him wearing a load bearing vest and there was some testimony that that vest may have belonged to Hise – one of those vests that has a lot of pockets and you hang things on…
>
> **Court**: Let's take a break.

1st St Trial vol 18, 3172-3173. Trooper Hise makes reference to retrieving a load bearing vest with first aid supplies from his vehicle and taking it to where Eales lay behind the Bronco. The LBV was left there after Eales was transported to the hospital and is likely the LBV referred to erroneously by Dalley as being worn by Eales. The error is an error of evidentiary importance. Failure to consider whether the vest could have caused a bullet to fragment excluded full consideration of the evidence.

There were five other .223s on the scene during the shootout besides Mr. Barrett's.  Five were carried by Tac Team members, including one trained as a sniper, the cover man, Poe who called his partner after the raid. When his partner arrived he put his .223 in it and his partner drove away. It would be another 12 hours before that weapon was turned in. Exhibit 56.

The record also reveals the movement on and off the scene of other important evidence.  For instance, the flashbang pin first catalogued at the hospital with Trooper Hamilton's possessions is later inexplicably placed at an arbitrary location at the crime scene.  Exhibit 41 OSBI Interview of Bryan Swim, Exhibit 42 Crime Scene Sketch. Similarly the lead Bronco's ignition key is returned from the hospital to the crime scene. By whom, it is unknown. For what reason, equally unexplained.

In the same vein, the OSBI criminalists, including Iris Dalley, April Marcangeli and Ryan Porter admitted that they did not collect all the casings, did not analyze fingerprints on the baggies or the pill bottle claimed to have been in Mr. Barrett's pockets did not analyze the blood on the porch, calculate the trajectory of the odd shots to the vehicle, or the third bullet into the cabin likely fired by Trooper Hamilton.  The door that had been shot in and through that held significant evidentiary value including the bullet fragments and blood was torn apart and left unexamined.  1st Vol 15, p.  2620.

The failure to manage the crime scene in a scientifically responsible manner left the sequence of events, critical to Mr. Barrett's defense, in a muddle.   It is in effect the destruction of evidence in a capital case.  The pervasive misconduct in the arrest and

77

prosecution of Mr. Barrett strongly suggests bad faith in the loss and destruction of potentially useful evidence. *See Arizona v. Youngblood,* 488 U.S. 51, 57-58 (1988). *See also, U.S. v. Bohl,* 25 F.3d 904 (10th Cir. 1994) (government's destruction of potentially useful evidence violated defendant's due process rights, and remedy for this due process violation was dismissal of the indictment).

Perhaps the most deficient analysis lay in the determination of the number of shots that were fired and by whom during the brief but deadly shootout. There were only three known shooters: Troopers Hamilton and Manion and Mr. Barrett. Trooper Eales was positioned in the middle of the trio, or foursome, if we include cover man Trooper Poe who is at his post near the gate with his .223 with a view of the porch and Mr. Barrett's front door.

All of Mr. Barrett's casing were in the cabin, 16 casings, 12 bullets in the clip, one bagged by OSBI, one in the shelf from behind where the weapons was found, That equals 30, the same number in his other clips. Maybe one is missing in the event he had chambered a round and then topped off his clip.

Trooper Manion fired 9 or 10 times depending on whether or not he had chambered a round and topped off his clip. He has two jammed in the chamber and 20 in his clip. His extra clip carried 31 bullets. Only 5 of his casing were found and one of his bullets, which came to rest on a refrigerator that was on the porch. Manion had been shooting in that direction. (RT (Higgs) 3736 [T-68])*; 2* in the chamber (RT 3736 *ll* 6-13 [T-70])*; 2d* Magazine held 31 rounds (RT Higgs p. 3735 [T-69]) 5 casings are

78

attributed to Manion's gun *(*RT p. 3715, *ll* 5-9), If 31, 5 unaccounted for (if fully loaded) (RT Higgs 3743 *ll* 5-7), one of which is fired across the porch and found resting on the mini-refrigerator (Lab No.F-37).

If the criminalists couldn't find five of Trooper Manion's casings, no wonder they are missing one of Mr. Barrett's.  Where Trooper Manion's other shots went we may never know. We do know that Mr. Barrett could not have been firing his weapon at troopers as they came across his property.

   **3.  Newly Discovered Evidence Reveals the Government's Evidence that Mr. Barrett Shot Trooper Eales is Outside the Parameters of Good Science.**

The United States Supreme Court has recognized the threat to fair criminal trials posed by the potential for incompetent or fraudulent prosecution forensics experts, noting that "[s]erious deficiencies have been found in the forensic evidence used in criminal trials *Hinton v. Alabama*, 134 S. Ct. 1081, 1090 (2014), quoting, *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 319, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) (citing Garrett & Neufeld, Invalid Forensic Science Testimony and Wrongful Convictions, 95 Va. L.Rev. 1, 14 (2009)).

This is a death penalty case. "[T]he representation of a person charged with a capital offense imposes the heaviest professional responsibility known to the practice of law." *Johnson v. Cabana*, 818 F.2d 333, 340 (5th Cir.1987).  In this case because of the importance and effect of expert testimony on jury deliberations, the prosecution's election to rely on experts, one of whom had been previously discredited by the

Oklahoma courts because of her bias toward the prosecution and the other who failed to present the most basic documentation to support his broad and unsubstantiated conclusion was misconduct itself and created an unreasonable risk of the execution of an innocent man.

### 4. Federal Trial Testimony was Significantly Exaggerated from his state court testimony.

In explaining his bullet comparison testing, Mr. Higgs, the government's ballistics expert, testified at the at the first state trial that "once I see *a preponderance of evidence* enough to make me say that this weapon – in that case I say that weapon fired this particular shell to the exclusion of all guns that are made and all guns that will be made in the future."  Vol 19 at 3328 *ll* 19-23.  In testifying about the specific fragment purportedly taken from Trooper Eales body during the autopsy (F-41), Mr. Higgs' concluded that "this is the fragment that ID'd back to the weapon we called P-1" Vol 19, p. 3374 *ll* 6-8.  P1 is the Colt Sporter .223 (Mr. Barrett's rifle).  The prosecutor asked Mr. Higgs:

> Q Was your method the same as to this fragment as it was to these other full size ` projectiles that you had.
>
> A Yes.
>
> Q You looked for the striation marks?
>
> A Striation marks. The same method I used to Id other items in this matter I   used to ID this fragment to that specific weapon."

*Id.*  A careful reading of the opinion rendered does not suggest that Mr. Higgs actually found that the fragment was a match.  When he says he "ID'd" it back, there is little

reference for its meaning.  He acknowledges he used the same *method* as with the full

size projectiles, and *looked* for striation marks but he does not say he came to the same

conclusion.  He does, however, use the phrase ID'd in relation to other projectiles as

having been "fired by that submitted weapon."  Vol 19, p. 3333.  The language is

imprecise; the conclusion arguably ambiguous.  Assuming for the sake of argument that

his intent was to opine that the projectile (autopsy fragment) F-41 was "fired by P-1"

even that does not rise to an opinion of an absolute match.  He defines his conclusion that

the weapon fired a particular shell "to the exclusion of all others" as by a preponderance,

i.e., more likely than not, but far short of "absolute" "clear and convincing" or certainly,

"beyond a reasonable doubt."  *Id.*

Moving then to the Firearms Examiner's testimony in the second state trial, we are

left without a transcript.  The government has acknowledged the lack of second state trial

transcripts.  *Barrett II*, 797 F. 3d at 1215 (in reference to the fact that Mr. Barrett's

attorney's did not have a transcript of the crime scene reconstructionist's second state

trial testimony.)  As Mr. Barrett is without ten volumes of the second state trial

transcripts, presumably the government will concede the lack of Higgs' testimony is

unavailable as well.

The lack of the court reporter's notes for the second state trial transcripts is

particularly disturbing, given significant and continuous efforts by Mr. Barrett's 2255

counsel to locate them.  In 2013, after many contacts by the defense with court reporter

Mark Woods, and his purported efforts to locate the notes, the Clerk's Office produced a

letter from Mr. Woods permitting destruction of the notes, long after the defense sought

81

them.  Exhibit 51.  The destruction of evidence that Mr. Barrett was actively pursuing and was absolutely entitled to raises its own due process concerns.

In an effort to reconstruct the testimony of Mr. Higgs at the second state trial, Mr. Barrett has declarations from two persons who were present at the second state trial and recall the testimony of Mr. Higgs.  The first is juror Ron Sullivan.  He says under oath that,

> The way the state prosecution connected the weapon that killed trooper Eales to Kenneth Barrett was that they identified the bullet that killed the trooper as being from a .223 and that the only person known to be firing a .223 was Mr. Barrett.

> The testimony in the state trial was not that the fragment's striations matched specifically to Mr. Barrett's .223 or that the bullet could have come from no other weapon in the world but Mr. Barrett's.

Exhibit 52 Declaration of Ron Sullivan.

The second person who recalls the testimony is Jack Gordon, Mr. Barrett's second chair defense counsel in the second state trial. Mr. Gordon recovered his trial notes which reflect his best memory of the trial testimony, including that the state's expert witness Terrance Higgs did not run comparisons of Kenny Barrett's Sporter against the other .223s on the scene. It also reflects that Higgs matched Ken's weapon to the fragment using a "preponderance of the evidence" standard.  Exhibit 53 Jack Gordon.  Mr. Gordon recalls that "the state in no way sufficiently matched Ken's weapon to the fragment identified as having been removed from Trooper Eales." *Id.*

That brings us to the testimony of the state's firearms examiner at the federal trial. There Terrance Higgs testified that "using the test that I fired in the .223 rifles that were

82

submitted to me from OHP and from the suspect, I was able to compare those bullets to this projectile [the fragment from Eales] . . .and matched it to the Mr. Barrett's weapons "to the exclusion of all guns that are made or that will be made." CR -115 vol 16, p. 3704, 3704-3705. Unlike the state trials, however, Mr. Higgs did not define for the jury his criteria for determining that exclusion as a determination by a preponderance. *See and compare,* 1st St. Trial vol 19, p. 3333. By omitting that explanation which presumably did not vary from trial to trial, the government's expert through the manipulation of the prosecutor Mr. Littlefield, left the jury with a far different impression than was merited. It was misleading. It was intentional. It was contrary to standards of the National Commission on Forensic Science. *See DOJ National Institute of Standards and Technology, "Testimony using the term "Reasonable Scientific Certainty."* Exhibit 55.[23] No more need be said than that. It is exactly reflects the fear the U.S. Supreme Court warned about in Melendez-Diaz.

5. **The Chain of Custody of the bullet fragment raises due process questions**.

Beyond the questionable testimony of Mr. Higgs at the federal trial, especially in light of his state trial testimony, there is a significant gap in the chain of custody of the bullet fragment. The government did not and cannot establish an unbroken chain of custody for retention of the fragment that purports to come from Eales' autopsy. The fragment is identified as F-41. Higgs testifies that "F" numbers are items of firearms evidence. T-items come from the Talequah lab.

---

[23] Original signed but not yet received.

The evidence shows that the Medical Examiner's assistant Donna Mann took possession of two fragments removed from Eales, one from the chest (F-41) and one from the lower back (F-40).

According to OSBI Agent Huntington at the first state trial, he collected an envelope from the medical examiner's offer on September 27, 1997. He then verified the contents and "sealed it and put his initials on it." When asked if the envelope had been unsealed when he got it, he denied it and said "It was sealed, but I double sealed it again. I didn't actually get inside and examine the content." 1st St. Trial, p. 2250. Of course, is it impossible to have both received a sealed envelope which he did not open and to verify its contents? At the federal trial, however, Agent Huntington testified that he put the vial of blood, scalp, hair samples, and other biological matter into the envelope. Cr-115 pp. 1726-27. He does not mention the fragment. After filling the envelope, Huntington claims he gave it to the Tahlequah lab on September 28, 1999. There is no explanation as to what happened to the fragment or where it was from September 27th to 28th. The Tahlequah lab records show that the items were taken by C. Curtis to the Oklahoma City lab on September 30, 1999 – another gap. Mr. Curtis testified in the state trial and did not testify to having delivered any F-numbered items, which would be the fragment. 1st St. Trial vol. 17, 2878. Instead he identified T-numbered items. The F-lab number  suggest that someone delivered the fragments

84

directly to Mr. Higgs, for whom there is no chain, though Mr. Curtis did testify that he had delivered firearms evidence though he had no personal knowledge of the contents. *Id.* at 2883. Simply put, the government cannot prove that the fragment that Mr. Higgs tested that he asserts came from Mr. Barrett's gun, also came from Trooper Eales' body. There is no question that there were many of Mr. Barrett's fragments left uncollected. And there is much evidence that Agent Huntington spent a great deal of time at the crime scene. Without an unbroken chain from Eales' autopsy, no reasonable juror could find that it was Mr. Barrett's bullet that killed Trooper Eales.

That the government's misleading evidence caused the federal jury to think otherwise is a violation of Due Process.

Iris Dalley's crime scene reconstruction testimony, complete with animations and a power point presentation, was the key component of the prosecution's claim that the physical evidence demonstrated Mr. Barrett killed a law enforcement officer intentionally. That though headlights were glaring at Mr. Barrett, he could somehow see the troopers after they exited the Bronco and identify them as law enforcement by what they were wearing. Thus, Dalley's testimony was important to the Government's case for the intent factors in Counts 1 and 2, the specific intent requirement of Count 3, as well as the intent "gateway" factors in the sentencing stage.

85

That the government crime scene reconstruction expert lacked sufficient knowledge of ballistics, vehicle construction, and the necessity of using consistent, accurate terms of reference when reconstructing a scene to render reliable, credible opinions about a shooting scene involving a vehicle and "did not follow widely accepted protocol used in shooting incident reconstruction. ... Consequently, her findings cannot be regarded as being generally reliable for purposes of reconstructing the events associated with the shooting under investigation."  Doc. 72, Exh. 109 at 3, 6 (Edward Hueske, Exh. 110).

As has been detailed in Mr. Barrett's initial § 2255 Motion to Vacate and on appeal, the government's "expert" OSBI Agent Dalley peddled junk. Near the time of her testimony in Mr. Barrett's case, Ms. Dalley was found by the Oklahoma Court of Criminal Appeals to be a partisan advocate who dresses up her personal opinions in the guise of "science."  The Oklahoma Court of Criminal Appeals has chastised Ms. Dalley, reversing a first degree murder conviction due to Dalley's unreliable, unscientific testimony, including the improper use of computer-generated animations. *Dunkle v. State,* 139 P.3d 228, 249-51 (Okl. Cr. 2006).  In that case, the defendant's murder conviction was reversed in large part because Iris Dalley's conclusions and computerized animations were not based on objective scientific findings, but simply restated the prosecution's theory of the case under a "scientific" gloss.  Based on Mr. Barrett's prior expert submission by a well-

86

qualified expert, Ms. Dalley did the same thing in Mr. Barrett's case.  CV-105, Doc. 72, Exh. 109 at 3, 6.  She used improper methodologies and techniques to "package" evidence already heard by the jury, offering conclusions based on an incompetent and unscientific evaluation of the evidence.

The trajectory analysis was performed with the Bronco in a position it was known not to be in during the gun battle, destroying any evidentiary value of Dalley's testimony regarding trajectories.  Her reenactment put Trooper Eales in a loadbearing belt he was not wearing and not in the ceramic vests that he was wearing destroying her theories of fragmentation, which never took into account the turtle shell vest. The movement of the Bronco to a place covering the place where Trooper Eales likely fell and the failure to test the items left behind by him, lessen the likelihood that any rational juror would have found Mr. Barrett guilty in light of the newly discovered evidence, the evidence offered in the initial § 2255 Motion and the evidence offered at trial.

### 6. Mr. Barrett has been diligent and timely in the discovery of the egregious prosecutorial misconduct.

The threats and intimidation of the witnesses were required to have been disclosed by the prosecution.  They were not.  The subordination of perjury of government witnesses Sanders, Johnson, and as previously alleged Travis Crawford Doc 95, Exhibit 45 and Randy Turman Doc 95 at 115-120 were required to have been disclosed to the court and defense. They were not.  The

87

discovery of the significant and substantial evidence of the unethical and illegal

intimidation of witnesses by the Assistant United States Attorney in Mr. Barrett's

criminal prosecution, despite denials by the Office of the United States Attorney

throughout the initial Section 2255 proceedings, was fortuitous.  The discovery of

the same before an innocent person is executed as a result of an overzealous and

unethical prosecution is the only required timeliness under the circumstances.  It

is the prosecution, not Mr. Barrett, who bears the blame and responsibility for the

late discovery and necessity of filing this successive 2255 Motion to Vacate.

**7. The newly discovered evidence, viewed in light of the whole record, establishes Mr. Barrett's innocence.**

The sworn declarations referenced above lay out the factual allegations of

additional and egregious prosecutorial misconduct and are filed herewith. The

government did not disclose that its informant and Johnson were testifying falsely

at trial. The government has at no time since, despite repeated requests, disclosed

that prosecutor Littlefield knowingly suborned perjury and made promises and

threats to secure the informant's testimony. This evidence would have been

admissible to impeach the informant's and Clint Johnson's testimony, and served

as grounds to grant Mr. Barrett §2255 relief.

At no time has the government disclosed that both Johnson and the

informant had bad reputations in the law enforcement and judicial community for

truth and veracity, or that Johnson was known to use questionable ethics in

88

handling drug informants, including being overbroad in his probable cause and meeting with informants alone, or that Johnson had engaged in illegal acts including perjury and possible theft, all of which would have been admissible to impeach Johnson and the informant. Individually or cumulatively, this evidence would have led to §2255 relief.

In his initial § 2255 Motion to Vacate, Mr. Barrett presented evidence of instances of misconduct by the Assistant United States Attorney Michael "Mike" Littlefield, including witness intimidation, bullying and suppression of exculpatory information.  *See e.g.,* Doc. 95 at 26, 30 (alleging failure to disclose identity of witness who would impeach Sanders' testimony that Mr. Barrett posed a danger to the informant witnesses, whose names were deliberately withheld until the trial began); at 39 ((under IAC claim for failure to adequately re-argue *Franks* claim, regarding Littlefield's "bathroom break" to talk to Sanders after his exculpatory testimony on cross-examination); at 62 (addressing Littlefield's avoidance of discovery by shielding witness interviews under work product, compelling the defense to "fly blind" on crossing the informants); at 72 (citing evidence that Littlefield "pressured, threatened and coached" the drug-addicted witness Cindy Crawford); 109 (regarding subtle threat of prosecution by Littlefield to informant Randy Weaver); at 266 (suppression of evidence of Sanders' dishonesty), and at 272 (alleging subornation of perjury by Randy

Turman, another of Littlefield's late-disclosed drug informants). *See also,* Doc 95 at 100-101.

The newly discovered evidence, including Sanders' recantation, the well-known reputations of both Sanders and Johnson for dishonesty and criminal inclination, and Littlefield's use of anger, intimidation, psychological and physical abuse renders the district court's previous rejection of Mr. Barrett's claims erroneous.[24]  *See* Docs. 214, 215 (Under Seal).

The newly discovered evidence was unquestionably information to which the defense – and court and jury had a right to hear.  Had the appropriate entities, judges, jury, defense been apprised of the evidence ultimately discovered despite the prosecution's withholding of the same from the time of the incident until the conclusion of the appeal of the denial of the 2255 Motion to vacate the prosecution of Kenneth Barrett would have ended very differently.  Judge Sprouse may well have withheld issuing the warrant – and would have insisted on a record of Johnson's and Sanders' interaction that would have enabled the defense to challenge the warrant pre-trial at the state level, likely avoiding the federal intervention at all.  Exhibit 21.  Judge Garrett would likely  have found the warrants illegal and the actions of the OHP in the botched service of the same

---

[24]  Pursuant to Court Order further discussion of the same is submitted under seal.  Mr. Barrett objects to the continuation of the Court Order addressed therein and respectfully request the matters discussed be made public.

90

unconstitutional, suppressing any and all of the drug evidence, such as it was, as well as, concluding as a matter of law that Trooper Eales was not lawfully discharging his duties at the time of the shootout. *See* Exhibit 2. More probably than not, had the defense known at the relevant state and federal prosecutions what the Constitution guaranteed then and guarantees now be disclosed to a criminal defendant, Mr. Barrett would not have faced charges of murder, or if he did, would have been acquitted of the same. Had the evidence presented here been disclosed or discovered during pre-trial proceedings, the court would have given a lesser included instruction and sua sponte order a self-defense instruction since counsel was not competent enough to ask for it. And Mr. Barrett would have has not faced the unique and constitutionally distasteful prosecution by both the state and federal courts for a single act of self-defense.

Respectfully submitted this 11th day of May, 2016.

DAVID AUTRY, OBA #11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
Eastern District of California

/s/ *Joan M. Fisher*
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, Third Floor
Sacramento, CA 95814
(916) 498-5700
(916) 498-5710 [fax]
Joan_Fisher@fd.org

Attorneys for Petitioner Kenneth Eugene Barrett

92

**PRAYER FOR RELIEF**

Based on the foregoing, the Movant, Kenneth E. Barrett, respectfully asks that the Court grant the following relief:

1.     That Petitioner be permitted to file a Memorandum of Law in Support of this Petition in accordance with a briefing schedule established by this Court;

2.     Require Respondent to file an Answer to the Petition in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States District Court, identifying all proceedings conducted in Petitioner's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3.     Permit Petitioner to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

4.     Permit Petitioner to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Petition, and refute any defenses thereto raised by the Respondent's Answer;

5.     Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Petitioner's Response to any Affirmative Defenses raised by the Respondent. Because Petitioner has

alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

6.      Permit oral argument as appropriate and required;

7.      Vacate Petitioner's convictions and sentences and order that appropriate retrial and/or sentencing hearings be conducted; and or any other relief to which movant may be entitled.

/s/ *Joan M. Fisher*
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender

94

**<u>VERIFICATION BY COUNSEL</u>**

I am an attorney licensed to practice law by the State of Idaho**,** and I am a member in good standing of the bar of the United States District Court for the Eastern District of Oklahoma. I am an Assistant Federal Defender in the Office of the Federal Defender for the Eastern District of California. In 2008, the Federal Defender's Office was appointed post-conviction counsel for Kenneth Eugene Barrett with David B. Autry as lead counsel.  I was assigned to represent Mr. Barrett in May, 2009.

I am authorized by Kenneth Eugene Barrett to file the foregoing amended motion to vacate, set aside, or correct the sentence pursuant to 28 U.S.C. § 2255. I am filing the amended motion on Mr. Barrett's behalf. Mr. Barrett is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana. I declare that the contents of the foregoing second § 2255 Motion to Vacate, Set Aside or Correct Convictions and Sentences is made pursuant to 28 U.S.C. § 2255 (h)(2) and is conditionally filed herein pending authority to file from the Tenth Circuit Court of Appeals.

I declare that the contents of the foregoing motion are true except for those matters based upon information and belief, and I believe the latter matters to be true. The sources of my information include, but are not limited to, official court records, various documents obtained or prepared during investigation of this

95

motion, and items in the possession of other lawyers, investigators and/or experts connected with the preparation of this amended motion. I make this verification pursuant to Rule 2(b)(5) of the Rules Governing § 2255 Proceedings because these matters are more within my knowledge than Mr. Barrett's knowledge.

I have met with and discussed the contents herein with Mr. Barrett and he has authorized me to file the same on his behalf.  An Authorization to that effect executed by Mr. Barrett is filed herewith.

/s/ *Joan M. Fisher*
Joan M. Fisher, ISB No. 2854
Assistant Federal Defender

## <u>CERTIFICATE OF ELECTRONIC FILING AND SERVICE</u>

This is to certify that on this 11th day of May, 2015, I caused the foregoing

**DEFENDANT/MOVANT'S SECOND SECTION 2255 MOTION TO VACATE, SET ASIDE, OR CORRECT HIS CONVICTIONS AND SENTENCES**

to be filed with the Clerk of the Court of Appeals using the ECF System for filing

and with service to be made electronically on the following ECF registrants:

Jeffrey B. Kahan,
United States Department of Justice,
jeffrey.kahan@usdoj.gov,

Christopher J. Wilson,
Assistant United States Attorney,
chris.wilson@usdoj.gov

To the undersigned's knowledge, there are no non-ECF registrants who are counsel in this case.

Dated: May 11, 2016

/s/ *Joan M. Fisher*
Joan M. Fisher, ISB No. 2854
Assistant Federal Defender