**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,     )
                              )
             *Movant,*    )
                              )
v.                            )
                              )
UNITED STATES OF AMERICA,    )
                              )
           *Respondent.*  )

---

**EXHIBIT 37**

---

**Attachment A** - Testimony of Troopers  John
Hamilton & Kerry Pettingill, 1st State Trial

PAGE    1312

Hamilton, Vol. 8, p. 1312

A    Yes, sir.

Q    With regard to the possibility of there being a lot of people, what kind of discussion did you have in that regard?

A    If there would have been a number of people, say for instance maybe ten people there, we might have called the mission off and just turned around and came back.  That's just an example.

Q    Can you tell us generally how your team members were equipped in terms of their clothing, dress, armor, weapons, generally speaking?

A    Everybody had personal body armor much like what I have on today.  It is at least a level two type body armor.  Trooper Eales was double vested.  He was the only one that was double vested.  He had on personal body armor and he also had on another piece of armor.  We all had sidearms, pistols, and some chose to carry shotguns.  We had two MP-5s that were going to be employed during this mission.  We chose not to take a lot of rifles with us because of the close proximity of the homes.  The home to the east -- correction.  To the west was a trailer house.  .223 rounds if we would have gotten into a gunfight would travel through a mobile home.  We took the MP-5s and shotguns.

Q    What's the difference in the type of ammunition in an MP-5 versus the .223 type?

A    An MP-5 is a Heckler & Koch nine millimeter select fire

Attachment A, continued

Testimony of Kerry Pettingill, Vol. 6, pgs. 1108-1109

Q    What decisions were made in that regard?

A    Mostly handguns were going to be taken inside and one MP-5, which is a automatic submachine gun that fires a nine millimeter round.

Q    Which officer was assigned the MP-5 weapon?

A    Trooper Manion was the one who was definitely going to have his.  Trooper Hamilton had one assigned to him, but he would only take it if whatever time he determined he wanted to take it.  But it was my understanding at the time that he was just going to in with a handgun.

Q    Other than being a fully automatic type weapon, is there anything else different or unusual about the MP-5?

A    Yes, sir.  The ones that we have are suppressed.

Q    What does that mean?

A    It means that it has a silencer on it.  So as the weapon is firing, essentially all you here is it cycling through, the chamber cycling.

Q    Did any of your officers carry any armor beyond what you've described to the jury?

A    Some do carry extra at the time.  Trooper Eales did.

Q    What about external protection armor, that type of thing?

A    We didn't have at the time entry vests, which would be a heavier type vest with a large amount of Kevlar on it.  But trooper Eales had a old ceramic type vest that he came up with

Attachment A, continued

somewhere that he would occasionally wear.  He was wearing it that night.

Q    Are you familiar with the ballistic shield type device?

A    Yes.

Q    Did your team members have those kinds of devices?

A    We did.  Trooper Eales was assigned a protect shield.

Q    In terms of the soft armor you described, what kind of weapons or rounds will that armor protect an officer from?

A    It varies on essentially where you're shot.  There is what we call a shock late that fits in the very front of it to protect these vital organs, which is a very hard steel plate essentially.  And then off to the sides of it, that's just Kevlar.  So it's going to be limited on what it can stop.  It might stop a .223 if you hit the shock plate, maybe.

Q    But in the soft Kevlar part of it, would that stop such a rifle?

A    I don't know that it would.  It would probably slow it down.  I don't know if it would stop it from penetrating.

Q    What about the protect shield you've described?

A    The protect shield would stop some.  Again, depending upon the angle, those type of things, it may or may not stop a .223.  But then probably would not stop a .308.

Q    What's the size of this shield you're describing?

A    I believe it's -- the ones that we had at that time were about four feet tall and probably two to two and a half feet

Attachment A, continued

Testimony of Kerry Pettingill, Vol. 7, pgs. 1242-1243    PAGE    1242

advised them that there was something suspicious at the back

and we had called for some help on that.  But we had not done

anything until they arrived, because we didn't want to go back

in to it or do anything to the residence until they arrived.

Q    What had you observed at the back of the residence that

you thought to be suspicious?

A    There was a device on the back that we thought

potentially could be a booby trap, so I called for a bomb

technician to come in to examine it.  I held the bomb

technician until OSBI gave us the go ahead to look at it.

Q    Did you go in or participate in that examination?

A    I did not.

Q    With regard to trooper Eales, you've testified that he

had a shell type of armor.  Do you recall that testimony?

A    Yes, sir.

Q    I don't know whether it was clear.  Was that armor

covered by any other apparel or anything, or was it on the

outside of his apparel?

A    I think it was on the outside.  Because when I first

approached him, he was lying face down.  That was one of the

first things I noticed.

Q    You also made reference in your earlier testimony to

some plates or armor plates.  Is that similar or the same as

this shell armor you've referred to?

A    The thing that Rocky wore was ceramic.  In ceramic,

Attachment A, continued

there were some old ceramic type vests that were made that the military used a long time ago.  Rocky was very into artifacts, military type artifacts.  Where came up with this, I'm not for sure.  It was something that he had come up with.  It was just a little extra safety for him.

Q    This was not something issued by the Oklahoma Highway Patrol?

A    No.

Q    Did members of your team -- were they allowed to acquire their own equipment, types of armor or anything like that?

A    I wouldn't stop anybody.  If they felt like there was a safety issue for themselves, they could buy whatever they want.  We would probably review it to see how it would be employed.  However, I would have to look at the liability issue of telling somebody they couldn't wear a safety feature.

Q    When you told Mr. Echols that trooper Manion had indicated at one of the meetings, and I'm not sure which one, that he had fired at a shadow in that east window, in that meeting, had trooper Manion also indicated to you that he had observed the person who was firing the weapon?

A    I don't recall that part of it.  The thing that I remembered was a shadow or something in a window.

Q    What he saw or perceived prior to that, you don't recall him saying anything about that in that particular meeting?

A    I do not recall.