## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,                  )
                                         )
              Petitioner/Defendant,      )
                                         )
vs.                                      )          Case No. CIV-09-105-RAW
                                         )
UNITED STATES OF AMERICA,                )
                                         )
              Respondent/Plaintiff.      )

## OPINION AND ORDER

Before this court is the Report and Recommendation of the magistrate judge in which the magistrate judge found that petitioner's counsel were deficient in their performance, which ultimately prejudiced petitioner. As a result, the magistrate judge recommended that the petitioner be given a new sentencing hearing on Count III, intentionally killing a state law enforcement officer in the commission of a drug trafficking crime. Both the petitioner and the government have filed objections to the report and recommendation. *See*, Dkt. #s 470 and 471.

## Statement of the Case

On November 17, 2005, petitioner was convicted of three counts, including: Count I: using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j); Count II: using and carrying a firearm during

and in relation to a crime of violence and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j); and Count III, intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer, engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). The jury returned verdicts of life in prison without the possibility of release on Counts I and II and a death sentence on Count III.   Petitioner was sentenced, on December 15, 2005, in accordance with the jury verdicts.   The court ordered the sentences to run consecutively. Additionally, petitioner was ordered to pay a special assessment of $100 on each count for a total assessment of $300.

Petitioner filed a direct appeal and the Tenth Circuit Court of Appeals affirmed the judgment.   *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007) (*Barrett I*). Thereafter, petitioner sought collateral relief pursuant to 28 U.S.C. § 2255, which was denied by this court on August 16, 2012.   Dkt. # 214.   On August 19, 2015, the Tenth Circuit affirmed in part and reversed in part, holding:

> We REVERSE and REMAND Defendant's death sentence for the district court to hold an evidentiary hearing on whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health and whether Defendant suffered prejudice from any deficiency during the penalty phase of his trial.   In all other respects we AFFIRM.

*United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015) (*Barrett II*).

On March 8, 2017, the case was referred to the magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) for an evidentiary hearing and for findings and recommendation.

The assigned magistrate judge heard evidence on March 27-30, 2017, June 12-13, 2017, and June 26, 2017.[1]   At the hearing, petitioner called eleven (11) witnesses and introduced forty-four (44) exhibits.   The respondent called three (3) witnesses and introduced forty-three (43) exhibits.   Thereafter, the parties were given until July 31, 2017 to file proposed findings of fact and conclusions of law.   On August 10, 2018, the magistrate judge issued a report and recommendation that concluded ". . . [trial] counsel were deficient in their performance, which ultimately prejudiced the Defendant, and that the Defendant is therefore entitled to relief under 28 U.S.C. § 2255 and to a new sentencing hearing."   Dkt. # 467 at 34.   The court granted an extension of time to file objections and objections were timely filed.   *See*, Dkt. #s 470 and 471.

## **Standard of Review**

Because this matter was referred to the magistrate judge to conduct an evidentiary hearing, Rule 72(b) of the Federal Rules of Civil Procedure required any party that disagreed with the magistrate judge's report and recommendation to file "specific written objections" to the report.   Under Rule 72(b)(3), this court must make a de novo determination of any part of the report or specified proposed findings or recommendations

---

[1]Transcripts of the evidentiary hearing were filed as Dkt. #s 429, 430, 446, 447, 450, 453, 454, and 464.   The magistrate judge's report utilized the actual page numbers of the evidentiary hearing transcript itself as opposed to the CM/ECF docket #s and the page numbers contained in the CM/ECF headers.   For ease of reference and because the transcript is filed as eight different documents, this court will refer to the evidentiary transcript by Dkt. # and the page number contained on the CM/ECF headers.

to which an objection was made.  *See also*, 28 U.S.C. § 636(b)(1)(C).  This court is not required to conduct another hearing to review the magistrate judge's findings or credibility determinations.  *Goffman v. Gross*, 59 F.3d 668, 671 (7th Cir. 1995) (citing *United States v. Raddatz,* 447 U.S. 667, 675 (1980)).  Rather, the district court  "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C);  Fed.R.Civ.P. 72(b)(3).  Thus, it is clear that "[t]he authority—and the responsibility—to make an informed, final determination . . . remains with the [district court] judge."  *Raddatz*, 447 U.S. at 681 (citing *Mathews v. Weber*, 423 U.S. 261, 271 (1976)).

## Government's objections to magistrate's findings

The government does not object to the magistrate judge's finding regarding counsel's deficient performance in developing a mitigation strategy.  Rather, the government objects to the prejudice analysis arguing that the magistrate judge failed to evaluate the credibility of petitioner's mental health evidence.  Dkt. # 471.  The government argues that the magistrate judge premised its prejudice finding solely on trial counsel's failure to present mental health evidence, as opposed to the absence of testimony by the petitioner's relatives.  *Id*., at n. 2.  Based upon the petitioner's substantial planning and premeditation of the murder, the government argues the evidence presented by petitioner at the evidentiary hearing would not have had an impact on the outcome of the trial.  Thus, the government is actually arguing that the foregone mitigating evidence did

not tip the scale in favor of a sentence less than death.   In his response, petitioner argues the government's objections are fatally flawed because they are not specific enough.

### Legal Principles applicable to claims of ineffective assistance of counsel during penalty phase of trial

Counsel's performance at the sentencing stage of a capital trial is governed by the principles enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984).   Thus, in order to prevail on this claim, petitioner must establish both deficient performance and prejudice. In order to establish that counsel's performance was deficient, the petitioner must establish that  counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed by the Sixth Amendment.   *Id*., 466 U.S. at 687.   During the second stage of trial, counsel's role is "to ensure that the adversarial testing process works to produce a just result under the standards governing the decision."   *Id*., 466 U.S. at 686.   The focus of the deficient prong is "not what is prudent or appropriate, but only what is constitutionally compelled."   *Breechen v. Reynolds*, 41 F.3d 1343, 1365 (10th Cir. 1994).

As recognized in this case by the Tenth Circuit, trial counsel's penalty-phase performance is evaluated "under the prevailing professional norms at the time of . . . trial [September 2005 in this case]."   *Barrett II,* 797 F.3d at 1223.   Counsel's duty is to undertake a reasonable investigation or make a reasonable decision that a particular investigation is unnecessary.   *Walker v. Gibson,* 228 F.3d 1217, 1233 (10th Cir. 2000); *Brecheen,* 41 F.3d at 1366.   In light of the extremely important role that mitigating

evidence plays in the "just imposition of the death penalty,"[2] this court is required to apply close scrutiny when reviewing the performance of counsel at the sentencing stage. *Battenfield v. Gibson*, 236 F.3d 1215, 1226 (10th Cir. 2001). At the same time, the "failure to present available mitigating evidence is not per se ineffective assistance." *Hale v. Gibson*, 227 F.3d 1298, 1315 (10th Cir. 2000) (quoting *Brecheen*, 41 F.3d at 1368). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Thus, an attorney "'is not required to investigate all leads' as long as the decision not to pursue a particular lead, or to pursue a particular lead only so far, is reasonable under the circumstances." *Breechen*, 41 F.3d at 1366; *see also Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.") Moreover, "the reasonableness of an attorney's investigation is dependent on the circumstances of the case." *Smith v. Workman*, 550 F.3d 1258, 1270 (10th Cir. 2008) (citing *Walker*, 228 F.3d at 1233).

Petitioner must also establish that any deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. During the second stage of trial, a petitioner must show there is a reasonable probability that, absent the errors, the sentencer would have concluded, after balancing the aggravating and mitigating factors, that the death penalty was not warranted.

---

[2]*Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000).

*Id*., at 694. Put another way, deficient performance is prejudicial only where it is clear that "but for trial counsel's errors, there is a reasonable probability that the ultimate result would have been different." *Washington v. Johnson*, 90 F.3d 945, 953 (5th Cir. 1996). Thus, deficient performance in a capital sentencing proceeding prejudices the defendant if "there is a reasonable probability that one juror would have chosen a sentence other than death." *Wood v. Carpenter*, 907 F.3d 1279, 1290 (10th Cir. 2018) (quoting *Matthews v. Workman*, 577 F.3d 1175, 1190 (10th Cir. 2009)). "To assess that probability, [this court] must consider 'the totality of available mitigation evidence—both that adduced at trial, and the evidence adduced [at the evidentiary hearing]'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000). *See also*, *Littlejohn v. Royal*, 875 F.3d 548, 552 (10th Cir. 2017).

## Legal Analysis

### A.  Performance of counsel

Since the government has not objected to the magistrate judge's finding that counsel's performance was deficient, this court adopts the magistrate judge's conclusion that trial counsel rendered constitutionally deficient performance in developing a mitigation strategy. In determining that trial counsel's performance was deficient, however, the magistrate judge stated that "federal trial counsel neither hired a mitigation or mental-health professional nor  attempted to investigate themselves in any depth the [petitioner's] mental health or family background."  Dkt. # 467 at p. 10.  This court would

like to correct this finding by noting that trial counsel did hire Jeanne Russell, Ed.D. (a

licensed psychologist). While the scope of Russell's work for the federal trial was

apparently limited to completing an updated risk assessment, based upon the information

contained within Russell's 2003 report,[3] there can be no question that petitioner's federal

trial counsel was, in fact, aware of the very information which petitioner has been relying

upon to establish that counsel's investigation of his mental health and/or family history was

not comprehensive and/or in-depth enough to uncover important mitigating evidence.[4]

According to Russell's psychological evaluation, the petitioner was "not exhibiting

symptoms of a major mental illness (*i.e.*, Schizophrenia, Schizoaffective Disorder, Bi-

---

[3]*See* Govt. Exh. # 34.

[4]At the evidentiary hearing, trial counsel's recollections of exactly what they knew and when they learned the information was sketchy at best. For instance, Brett Smith recalled various things that occurred during his representation of the petitioner only when those things were pointed out to him and at one point during his testimony he stated that his "recollection has probably been tainted by my recent work because . . . I have read some materials recently, which has probably contaminated my memory as it relates to 2005." Dkt. # 446, at p. 28 and 56 (Smith again indicates his memory has been tainted by recent readings). Smith did remember, however, having discussed with Roger Hilfiger, shortly after his appointment to the case, hiring a mitigation specialist but based upon their discussions they did not hire one.

Hilfiger also had difficulty remembering details concerning his time representing the petitioner, but stated he did not hire a mitigation opinion expert because "We just didn't feel like that a mitigation opinion expert would do us any good when we could -- when we used the information we had from previous reports and talked to those people and had them testify." Dkt. # 447 at p. 97. It is inconceivable that trial counsel would have known to call Russell to update her report if they were not aware of her report and the information that was contained within that report.

Polar Disorder, or Major Depression)"[5] and while acknowledging that persons close to the petitioner had described symptoms they associated with mental illness and other records indicated a history of paranoia and impulsiveness, Russell opined these "behaviors appear exacerbated by drug use."[6] Moreover, in compiling this report, Russell reviewed all of the petitioner's mental health records and her report contained, among other information, a list of all of the records she had reviewed, a summary of petitioner's legal history, family history, education, relationships, employment history, medical and mental health history/treatment, and a significant substance abuse history. *See* Govt. Exh. # 34.

In considering the reasonableness of counsel's actions, this court cannot rely on "hindsight;" but must examine the reasonableness of counsel's actions from "'counsel's perspective at the time' the investigative decisions [were] made." *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466 U.S. at 689). It seems axiomatic that an attorney should be able to rely on a mental health expert's prior opinion in determining the significance of a defendant's mental health records, including whether or not that defendant has a major mental illness; and then, based upon that opinion, decide to forego further mental health testing of that defendant. While none of the mental health professionals who had examined the petitioner prior to 2005 had ever diagnosed the petitioner with a major mental illness, *see* Govt. Exh. #s 4-6, 8-9, 11, 16, 34 and 35, petitioner's counsel did

---

[5]Govt. Exh. # 34 at p. 9.

[6]*Id*.

not actually consult with Russell prior to deciding to forgo any further mental health evaluations.[7]  For this reason alone, this court agrees with the magistrate judge's conclusion that trial counsel's performance was deficient.

## B.  Lack of prejudice

This court finds, however, based upon the evidence presented at the evidentiary hearing, that petitioner was not prejudiced by counsels' performance.  Simply because petitioner was able to obtain experts who described the petitioner as having mental health disorders so severe that he could not have rationally assisted his attorneys in the preparation of his defense,[8] does not mean the jury would have given much weight to that testimony in light of the evidence it heard over the course of the entire trial.  That evidence was summarized by the Tenth Circuit Court of Appeals as follows:

> Barrett had been aware for some time of the outstanding warrant for his arrest, and anticipated that law enforcement officials would come to his house to arrest him at some point.  Tr. at 400-01.  Despite that awareness, or perhaps because of it, Barrett exhibited a defiant attitude towards law enforcement officials.  On the front gate leading to his residence, Barrett had

---

[7]If counsel had consulted with Russell, they would have learned that she had not conducted a "comprehensive" mental health evaluation.  *But see* Govt. Exh. 12 (affidavit Faust Bianco, Ph.D., a psychologist licensed in Oklahoma, who performed a neuropsychological evaluation of the petitioner prior to the federal court trial, opining that further neurological testing was unwarranted).  Counsel also did not consult with Bianco prior to deciding to forgo any further mental health evaluations.

[8] *Contra* Govt. Exh. # 52 at 71-72; Dkt. # 446, at p. 33 (defense counsel acknowledged that the petitioner was "among the most cooperative criminal . . . defense clients I've ever had" and "[h]e was very helpful during the trial to me.  He knew as much about it as I did."; and Govt. Exh. # 38-40 (defendant's notes to counsel).  *See also*, Govt. Exh. # 34.

installed a sign reading: "Keep Out. I don't give a shit who you are, if you cross my gate or come on my property, I'll shoot." *Id.* at 399. Further, in the months and weeks leading up to the date of the shooting, Barrett regularly told friends and family that if law enforcement officers came to his house, "[t]here was going to be a shootout," *id.* at 412, "he would shoot the first police that came through his door," *id.* at 2515, and "he was going to take out as many [law enforcement officers] as he could before they got him." *Id.* at 412-13; *see id.* at 3068-69, 3106, 3493. Indeed, on the evening of September 23, 1999, Barrett observed three of the Tact Team members drive by his residence in an unmarked vehicle, and subsequently stated to his cousin, Travis Crawford, that he knew the vehicle belonged to law enforcement officials, that he didn't "give a fuck" if they came back to serve the arrest warrant, and that "he was going out in a blaze of glory" if they did so. *Id.* at 466.

Barrett's conduct in the months, weeks, and days leading up to the shooting incident suggests his threats were far from idle. Barrett possessed multiple firearms at his residence, including five rifles, three shotguns, and two pistols. *Id.* at 401, 1862-63, 1882-83, 1888, 1895, 1899-1901. During the day, Barrett typically kept a rifle nearby. *Id.* at 461-62, 3086, 3493-94. He also carried a nine millimeter pistol in his pants at all times. *Id.* at 409-10, 3106, 3496.

As for the night of the shooting incident, the evidence presented at trial was more than sufficient to have allowed the jury to reasonably find that Barrett knew it was law enforcement officials who were approaching his residence en masse. At the time the Tact Team approached Barrett's property, there was a full moon and no clouds in the sky. *Id.* at 993. The two lead Tact Team vehicles that approached Barrett's residence from the east were white Ford Broncos. *Id.* at 984. Although the Broncos were unmarked, Barrett had observed one of these vehicles on the afternoon prior to the shooting (it was used in the drive-by performed by Tact Team members), and suspected that it belonged to law enforcement officials. Further, although the lead Bronco did not exhibit any flashing lights (because Barrett began shooting at it before the two officers inside had an opportunity to turn on the lights), *id.* at 610, the second Bronco did. *Id.* at 732. More specifically, the second Bronco had a flashing strobe-type light on the sun visor and "wig-wag" headlights, all of which had been activated. *Id.* at 732, 1094. The third vehicle to enter Barrett's property, immediately following the two lead Broncos, was a marked Oklahoma Highway Patrol car with its emergency lights activated (including a standard light bar on top and "wig-wag" headlights). *Id.* at 760, 987, 991. The lights from this third vehicle

were described by witnesses as sufficient to illuminate the scene in front of Barrett's residence. *Id.* at 1101 (testimony from Trooper Steve Hash, the driver of the second Bronco, that he observed red and blue strobe lights reflecting off of Trooper Eales as he got out of the lead Bronco), 1158-59 (indicating the lights of marked unit lit up the whole area), 1343 (indicating that light bar on top of marked unit was very visible), 1496 (indicating that red and blue lights from marked unit were reflecting off the shards of glass coming from the lead Bronco), 1797-98 (indicating that lights from marked unit illuminated a wide area around the vehicle).

Finally, and perhaps most significantly, Barrett's conduct in shooting at the officers that night clearly would have allowed the jury to reasonably find that he intended to kill one or more of those officers, including Eales. Barrett began shooting at the lead vehicle, a Ford Bronco driven by Trooper Hamilton, as soon as the vehicle cleared a ditch that ran between Barrett's house and a property to the east. *Id.* at 537. According to Hamilton, Barrett's shots were hitting in the middle of the windshield of the Bronco, at approximately "head level." *Id.* As Hamilton continued driving the Bronco westward towards Barrett's residence, the gunfire intensified and the windshield of the Bronco began to disappear. *Id.* at 539. The gunfire continued after Hamilton stopped the Bronco near the edge of the front porch of Barrett's residence. *Id.* at 540. Eales, who was a passenger in the lead Bronco driven by Hamilton, opened the passenger side door (which was closest to the front porch of Barrett's house), got out, and began heading towards the rear of the Bronco (presumably to obtain cover). As he did so, Eales was struck by three separate rounds of gunfire from Barrett. *Id.* at 1687 (testimony from pathologist opining that Eales' wounds were sustained while facing away from Barrett). One round struck the handgun that Eales carried on his right hip and then ricocheted and struck Eales' right elbow. *Id.* at 1661. A second round struck Eales' left flank region, entering approximately twenty-five inches from the top of Eales' head, down from the area on the back of his left arm pit where the skin is folded. *Id.* at 1605. A third, and fatal, round entered Eales' chest on the left side of his upper back. *Id.* at 1611. After shooting Eales, Barrett continued firing rounds at the Tact Team members, stopping only after he himself was shot in the legs by a Tact Team member. *Id.* at 545, 548. Even after being shot and dragged outside of his residence by Tact Team members, Barrett made movements as if reaching for a pistol he had concealed in the waistband of his jeans. *Id.* at 1113. Subsequent investigation of the crime scene by law enforcement officials revealed that Barrett used a Colt Sporter .223 rifle, equipped with three loaded magazines taped together (with a total of ninety-one rounds of

ammunition), to fire at least nineteen shots at Tact Team members, including the three shots that hit Eales. *Id.* at 1884, 3256. The Colt Sporter rifle had a lethal range of approximately 541 to 595 yards, and was capable of penetrating the metal of an automobile. *Id.* at 3573, 3586. At the time Barrett fired the three shots that wounded Eales, he was no more than ten to fifteen feet away from Eales. *Id.* at 4304-05.

In sum, although Barrett's defense during the first-stage proceedings was that he was unaware that the persons entering his property were law enforcement officials, and that he was simply reacting in defense of himself and his son, the above-described evidence was more than sufficient to allow the jury to reasonably find that Barrett knew that Eales and the other persons approaching his residence were law enforcement officers and that he intended to kill Eales.

*Barrett I*, 496 F.3d at 1113-15 (footnotes omitted).

While petitioner's experts identified issues at the evidentiary hearing that they opined might have compromised the petitioner's ability to process information under pressure, petitioner had clearly resolved to murder Trooper Eales or any other law enforcement officer long before this incident played out. Moreover, several aspects of the testimony presented at the evidentiary hearing convince this court that the jury would have rejected the mental health diagnosis provided by petitioner's expert witnesses. First, according to the government's expert witness, Steven Pitt, D.O. (psychologist licensed in Texas, Oklahoma and Arkansas and a board-certified neuropsychologist) petitioner's extensive history of substance abuse precluded a diagnosis for bipolar disorder and petitioner admitted to numerous mental health professionals that there was never a time when he was not abusing drugs, even attributing any history of manic episodes to his own abuse of intoxicants. Dkt. # 454 at p. 30. *See also* Govt. Exh. # 52 at p. 59 and 65.

Second, petitioner's recollections of his prior head injuries differed over the years including whether, and for how long, petitioner had lost consciousness. Dkt. # 430 at p. 271-81. In fact, some of petitioner's medical records revealed that the petitioner denied a history of head injury. *See* Govt. Exh. #s 5 (Eastern State Hospital record dated October of 1986 which indicates petitioner "denies head injuries") and 66 at p. 3 (personal health history completed sometime after 2004 and signed by the petitioner which indicated that he had never had any periods of unconsciousness, blurred vision, double vision, depression or excessive worry, frequent thoughts of suicide, paralysis, etc.). Additionally, despite George Woods, M.D. (board certified psychiatrist and a neuropsychiatrist licensed in California) testifying that petitioner's left lobe injury would impact him being able to do math effectively, Woods admitted that petitioner's educational records showed that petitioner had made an "A" in the first semester and a "B" in the second semester of ninth grade in math. Dkt. # 430 at 33-36. *See also*, Pet. Exh. # 41 at p. 1, Pet. Exh. # 55 at p. 3.

Further, despite petitioner's experts denying any malingering by the petitioner on the neuropsychological tests which were administered by Mila Young, Ph.D. (clinical psychologist licensed in California and a board-certified neuropsychologist), petitioner's performance on the Wisconsin Card Sorting Test (WCST) (a test which measures ones ability to develop a simple concept and then to carry out that simple concept) was in the severe range. According to Young, petitioner's performance on the WCST correlated to one's ability/inability to grasp and consistently carry out daily functions such as driving an

automobile. Pet. Exh. # 25 at p. 22.[9]  The evidence heard by the jury at trial, however, demonstrated the petitioner was not only capable of driving a car,[10] but also was considered by one witness, in his criminal trial, as "a real good mechanic."  Dkt. # 352 at p. 230-32 in Case No. CR-04-115-RAW (J.T. Tr., Vol. 24 at p. 4930-32).  This evidence was consistent with evidence from the petitioner's maternal uncle at the evidentiary hearing.[11]  Additionally, petitioner was employed as a carpenter for approximately three years[12] and testimony in the jury trial revealed that the petitioner had personally built the cabin/home where he lived.[13]  *See also* Govt. Exh. # 52, § 3 at p. 158 (petitioner told Pitt he was good at working on motors).  Furthermore, and perhaps most significant (as demonstrated by the facts set out above regarding the petitioner's conduct in the months, weeks, and days leading up to the shooting), the petitioner was able to make plans, grasp weapons and carry out his long term threats to kill any law enforcement officers who

---

[9] Deborah Miora, Ph.D. (clinical psychologist and neuropsychologist from California) testified she partially premised her diagnosis of dysexecutive syndrome on the WCST administered by Young.  Dkt. # 464 at p. 187-92.

[10] *See* Govt. Exh. # 34 at pp. 4-5 (petitioner's employment history which included a job as a truck driver "until he lost his license due to accumulating too many points because of traffic violations").

[11] Mark Dotson testified that the petitioner was a good mechanic, having a natural talent for it.  Dkt. # 429 at p. 64.  *See also* Pet. Exh. # 16 (declaration of maternal great aunt stating that the   petitioner "tried to make a living fixing cars").

[12] *See* Govt. Exh. # 34 at 5.

[13] Dkt. # 325 at p. 477 in Case No. CR-04-115-RAW (J.T. Tr., Vol. III at p. 477).

entered his property. More specifically, the petitioner was able to perform functions including the taping together of three loaded magazines with a total of ninety-one rounds of ammunition, concealing a gun in his waist band (just in case he needed more firepower), and aiming a rifle "at approximately head level, middle of the windshield of the lead vehicle."[14] As a result, this court finds the jury would not have been impressed by the petitioner's experts' opinions and, therefore, would have given little, if any weight to those opinions.

Moreover, the government's experts offered a more rational explanation of the petitioner's conduct to the jury, "it's drugs, drugs, and more drugs." Dkt. # 453 at pp. 37-38. Specifically, Randall Price, Ph.D. (psychologist licensed in Dallas, Texas) testified that while the neuropsychological testing did not reveal evidence of a severe brain injury, petitioner did have a long-standing learning disorder, not otherwise specified; polysubstance dependence; dysthymic disorder (a form of depression) that is long-standing and chronic, but not a major depressive disorder; and a personality disorder[15] with antisocial and paranoid traits and features. Dkt. # 450 at p. 127-28.

---

[14]*Barrett I*, 496 F.3d at 1114 (petitioner began shooting at lead vehicle hitting the middle of the windshield at head level). *See also* Govt. Exh. # 52 at p. 72.

[15]According to Price, "[a] personality disorder is not a mental disorder, rather it is more of a long-term characterological condition that is either a source of distress for that person that it interferes with their functioning and it's always been there, at least since adolescence, early adulthood, or it may not be a source of distress for that person but it is for other people." Dkt. # 450, at p. 128.

Pitt testified that the petitioner "had a serious problem with drug addiction"[16] and he attributed petitioner's changes in mood to his drug usage. Dkt. # 454 at p. 59. Pitt also testified that, in his opinion, the petitioner does not and did not, at the time of the offense, have bipolar disorder. *Id.* at p. 64. Moreover, the records reveal that none of the health professionals who treated the petitioner prior to this offense ever diagnosed him with bipolar disorder. *See*, Govt. Exh. # 6 at p. 2; Govt Exh. #s 7-11; and Govt. Exh. # 102 at p. 17. Furthermore, Pitt testified that the petitioner was not suffering from posttraumatic stress disorder at the time of the shooting. Dkt. # 454 at p. 65. While admitting that Bill Sharp, Ph.D. (licensed clinical psychologist) had diagnosed the petitioner with avoidant and paranoid personality disorder, Pitt indicated that, in his opinion, petitioner's paranoia was caused by his drug use.[17] *Id.* at 103. Finally, Pitt diagnosed the petitioner with "amphetamine dependence with physiologic dependence, features of an antisocial personality disorder, cannabis dependence;" but stated that he did not know if the petitioner had a learning disorder. *Id.* at 71.

In light of the significant amount of evidence that the Tenth Circuit found the jury heard at trial about the petitioner's drug use, this court finds it much more likely that the

---

[16]Dkt. # 454 at p. 58. *See also* Govt. Exh. # 52, § 3 at p. 91, lines 12-27 and p. 154-57.

[17]This opinion was consistent with Russell's personality assessment which trial counsel apparently relied upon in forgoing additional mental health testing. *See* Govt. Exh. 34. According to Russell, petitioner's behaviors "appear to be exacerbated by drug use." *Id.* at p. 9.

jury would have found that the defendant did, in fact, have a significant drug problem as opposed to a major mental health disorder.[18] In fact, the testimony at the evidentiary hearing revealed that the petitioner had such a significant problem with narcotics, that within a year of this incident, petitioner's maternal aunt, Ruth Harris, had made contact with the petitioner in an unsuccessful effort to convince him to make a lifestyle change by getting off of illegal drugs.[19] *See also* Pet. Exh. # 16 (petitioner's maternal great aunt acknowledged that the petitioner had a drug problem) and Dkt. # 429 at 74 (testimony from Mark Dotson, petitioner's uncle and a podiatrist, regarding the effects which methamphetamine has on the human body, including significant dental problems, paranoia, and trouble sleeping).

---

[18]According to the Tenth Circuit,

The jury was also presented with significant evidence of [petitioner's] drug use, including the testimony of a drug addict that he took methamphetamine with [petitioner] and the testimony of a state prison employee that [petitioner] self-reported first using alcohol at age 12, cocaine and heroin at age 14, and methamphetamine at age 20, and had been using marijuana, methamphetamine, heroin, tranquilizers, and other drugs up until the time of the shooting. And, of course, there was the guilt-phase evidence of [petitioner's] outstanding warrant for failure to appear in state court on drug charges and the drug paraphernalia found on [petitioner's] person and property after the shooting.

*Barrett II*, 797 F.3d at 1232.

[19]*See* Dkt. # 429 at p. 70-73.

While the magistrate judge found that the petitioner had a "long family history including mental health problems going back to great-great grandparents, and that the [petitioner's] own immediate family included parents who were violent with each other, and whose relationship was characterized by infidelity and ultimately divorce, as well as both engaging in alcohol abuse,"[20] even if true, this evidence did not add anything of value to the personal and family history[21] of the petitioner that was actually heard by the jury at trial nor did it offer any compelling mitigation evidence when weighed against the evidence

---

[20]Dkt. # 467 at p. 19. The generational history evidence included things such as the petitioner's grandfather and father had a tendency to drink heavily; petitioner's mother was an alcoholic but was able to function and always maintained employment; petitioner's father did not provide a lot of guidance to the petitioner and was not around a lot when the petitioner was growing up; and some of his relatives had mood swings, including a cousin who has been diagnosed with bipolar disorder and another cousin, Travis Crawford, who has experienced anxiety and panic attacks. *See* Pet. Exh. #s 16, 20, 27, and 36. The jury heard testimony at trial from Travis Crawford, however, that indicated Crawford had used methamphetamine for fifteen years, including around the time of this incident, some of which he obtained while he was inside the petitioner's house. *See* Dkt. # 325 at p. 64-65 in Case No. CR-04-115-RAW (Vol. III of Jury Trial Transcript at p. 457-58).

[21]This is not a case where no mitigation investigation regarding petitioner's family was ever conducted. Rather, records at the evidentiary hearing revealed that a mitigation investigator, Roseanne Schaye, had interviewed numerous family members, some of them more than one time during the course of the state court proceedings. *See* Govt. Exh. #s 19-25 and 54-62. Additionally, during the state court trials an investigator for the Oklahoma Indigent Defense System ("OIDS") collected those interview summaries and documentation from facilities, hospitals, and schools. Dkt. # 430 at p. 141. Boxes of files from the state court cases were delivered to Hilfiger by OIDS and additional paper files were picked up from John Echols after he was allowed to withdraw from the federal case. Dkt. # 447 at 45-46.

that the jury heard regarding petitioner's cold-blooded and premeditated killing of a state law enforcement officer engaged in the performance of his official duties.

In other words, this court finds the petitioner has failed to establish that there is a reasonable probability that even one juror's decision would have been different. This is especially true when the court considers the totality of the mitigating evidence adduced at trial[22] and that adduced at the evidentiary hearing from petitioner's witnesses regarding organic brain disorder, which was unconnected to the facts presented to the jury and included symptoms of mood swings described as "reactive violence" and/or "chronic irritability," and the additional witnesses who discussed petitioner's less than ideal childhood.[23] This additional mitigating evidence was countered by the government with

---

[22]Evidence summarized by the Tenth Circuit included:

> The jury did not find unanimously that the government had proved beyond a reasonable doubt that [petitioner] would pose a continuing and serious danger to others in prison, and unanimously found that [petitioner] was a father and a loved son and stepson, and that his death would have an impact on his family and friends. Seven jurors found that he was a good neighbor and friend; five found that he had accepted responsibility for Eales's death from his state-court conviction and that he had been convicted and punished for the killing; and two found that he would not be a danger to society if imprisoned for life without parole.

*Barrett II*, 797 F.3d at 1224.

[23]While similar to testimony heard by the jury at trial, the government would have been able, through these witnesses, to again emphasize the petitioner's substance abuse.

testimony which included that described above, as well as statements by the petitioner that: 1) revealed the petitioner has not accepted responsibility for Eales's death; rather, he maintains that he was shot in the act of retrieving a weapon to defend his son and that he had no idea that the vehicles entering his property were police vehicles;[24] 2) petitioner maintains that he and his son were the victims in this case;[25] 3) the jury might have found that the petitioner was a continuing danger to others in prison and/or to society since he was not afraid to violate the rules;[26] 4) petitioner's brother recalled having seen his mother and the petitioner in physical altercations;[27] and 5) petitioner violently attacked his younger brother on at least two separate occasions.[28]  Weighing all of the mitigating evidence adduced at trial and the evidentiary hearing against the aggravating factors found by the jury, *i.e.,* 1) knowingly creating a grave risk of death to one or more persons in addition to the victim of the offense; 2) commission of the offense after substantial planning and

---

[24]*Compare* Dkt. # 429 at p. 220 (Woods testimony that the petitioner believed his actions were justified on the night of the shooting) and Dkt. # 72-66 (petitioner's description of the events leading to his arrest) *with* Govt. Exh. # 52, § 3 at pp. 7-17, 71-72 (petitioner states that he did not shoot Eales) and p. 281.

[25]Govt. Exh. # 52, § 3 at p. 56-57.

[26]Petitioner admitted to having obtained and using drugs while in jail.  *See* Govt. Exh. # 52, § 3 at p. 154 and 157.  Petitioner also admitted to having talked a jailer into letting him out of his cell for the purpose of engaging in sexual activity with another inmate. *See* Govt. Exh. # 52, § 3 at p. 254-257.

[27]Dkt. # 429 at p. 94-95.

[28]Dkt. # 429 at p. 117.

premeditation; and 3) that petitioner caused injury, harm, and loss to the victim's family because of the victim's personal characteristics as an individual human being and the impact of the death on the victim's family and friends[29] and the evidence the government produced at the evidentiary hearing to counter the additional mitigating evidence, convinces this court that there is no reasonable probability that even one juror would have voted for a sentence less than death. Accordingly, this court rejects the magistrate judge's conclusion that the petitioner was prejudiced by counsel's performance.

## Conclusion

In light of the facts of this case, and for the reasons set forth herein, the Report and Recommendation (Dkt. # 467) is accepted in part and rejected in part; the report and recommendation is accepted as to the magistrate judge's conclusion that trial counsel's performance was deficient; but the report and recommendation is rejected as to the magistrate judge's conclusion that petitioner was prejudiced by counsel's performance. Accordingly, the court denies petitioner's § 2255 motion as it relates to his claim of ineffective assistance of counsel during the penalty phase of trial.

Furthermore, in light of this order, Petitioner's Objection to the Magistrate Judge's Report and Recommendation (Dkt. # 470), requesting to be resentenced on all three counts of the indictment, is denied as moot.

---

[29]*See* Penalty Phase Special Verdict Form, Dkt. # 258, in *United States v. Barrett*, Case No. CR-04-0115-RAW.

Finally, Rule 11 of the Rules Governing Section 2255 Proceedings, requires this court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." This court recognizes that "review of a death sentence is among the most serious examinations any court of law ever undertakes." *Brecheen*, 41 F.3d at 1370. A certificate of appealability, however, may only be granted if petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard can be met by demonstrating that the issues raised are debatable among jurists of reason or that the questions deserve further proceedings. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). While this court strongly believes petitioner was not prejudiced by counsel's failure to develop the evidence at trial which was admitted at the evidentiary hearing herein, this court hereby grants a certificate of appealability thereby allowing further consideration of this issue.

It is so ordered on this 28th day of March, 2019.

Ronald A. White
United States District Judge
Eastern District of Oklahoma