accurate reflection of the bill. But it, nonetheless, surprises me, because what it does is introduce another element in this bill of constitutional infirmity.

The bill does, apparently, authorize, in some circumstances during the sentencing hearing, the introduction of illegally seized evidence.

(Mr. ADAMS assumed the chair.)

Mr. D'AMATO. With the caveat, I might add.

Mr. LEVIN. I said under some circumstances. I understand that. I do not know of what court opinions you have to support that.

Mr. D'AMATO. I think there are a long line of cases as it relates to the admissibility of evidence and how it has been obtained as it relates to whether or not the court would allow in even that which is illegally seized.

Now we go beyond the jury trial. Now we go to the mitigating factors and circumstances, and there is a very real need to giving to the defendant the kind of guarantees that he wants. So we say he can bring in all of these things.

Mr. LEVIN. We are not talking about the defendant. We are talking about the prosecution.

Mr. D'AMATO. And, on the prosecution side, we say that he can offer some of these things provided that— and then we use pretty specific language—that its probative value is not substantially outweighed by the danger of the unfair prejudice, confusion of the issues, or misleading the jury.

Mr. LEVIN. My question is: Since evidence that is illegally seized is not admissible at trial, I am wondering whether or not the Senator from New York does have court opinions of the Supreme Court which authorizes the introduction of illegally-seized evidence even under those circumstances in the sentencing hearing, whether there are Supreme Court cases that give that kind of authority.

Mr. D'AMATO. That is an open question, I would say to my distinguished colleague. I might also indicate that on lines 11 through 14, on page 6, the same subsection, it indicates: "The burden of establishing the existence of any aggravating factor is on the Government, and is not satisfied unless established beyond a reasonable doubt"—beyond a reasonable doubt. So even when it comes to establishing, whether it is premeditation or a contract killing, this is after the trial, it must be established that there was at least one of those aggravating factors beyond a reasonable doubt.

Mr. LEVIN. Well, that, of course, is clear. No one is challenging that.

Mr. D'AMATO. Well, I think you have to read the totality of the section, when you start with 1, right through 14, 15, and 16.

Mr. LEVIN. Part of that totality which we have to analyze is that you have to look at the parts of the total as well as the total, and part of the totality is that this bill would purport to allow in a sentencing hearing evidence that was not allowed at trial. I do not know of authority for that. It is another constitutionally suspect part of this bill.

But I would like to go back, if I can, to other questions which I have raised with the Senator from New York which I do not believe he has answered and one is the question of whether or not a jury can return to the court and say: "We think that either a sentence of death or a sentence of life without parole is justified."

Mr. D'AMATO. No, they cannot.

Mr. LEVIN. Why is it that this bill does not allow a jury to recommend the death sentence rather than simply say that it is justified? Because it is very common in human affairs for each of us to say: "Yes, that course of action is justified, but a different course of action is also justified"— either of two courses is justified—and then to be forced to decide which one we will follow.

This bill does not provide that the jury will recommend the death sentence or decide on a death sentence or select a death sentence. This bill has language which says a jury will be asked whether or not a death sentence is justified. That tilts the balance towards the death penalty, because it is very possible that a death penalty could be justified in the eyes of all of the jurors but those same jurors could say that a life sentence without parole is also justified.

So the language should be changed. The language should be changed that the jury recommends, not decides simply that one course is justified, where they could very well decide another alternative course is equally justified.

Mr. D'AMATO. That is simply not provided.

Mr. LEVIN. I know it is not provided and it should be.

Mr. D'AMATO. No. The question is not whether or not it is life imprisonment or the death penalty. The question is whether or not the death penalty is appropriate.

Mr. LEVIN. No; it is not.

Mr. D'AMATO. And in this bill, what we are saying is that the jury shall decide, in essence—and we did not say "shall"—whether or not it is justified. If they find it is justified, the judge does not have the ability to decide whether or not they will choose to impose it or not. We say that if that happens that the court shall sentence the defendant to death.

Mr. LEVIN. Exactly.

Mr. D'AMATO. I suggest to you that they are absolutely consistent; that

the jury makes a finding and it says the death penalty is justified, then the court makes the imposition and it says there shall be a penalty of death upon that finding. It is a legal term of art and we do not open the door to them coming in with two findings, one that it is justified but also that life imprisonment is justified. That was never the intent. They have to find that the circumstances were aggravating enough so that the death penalty would be justified. The person who passes the sentence is the court.

Mr. LEVIN. But I am positing, if my friend would yield, I am positing a situation which is common in human affairs, where two courses of action are justified and we have to decide which is preferable or which we are going to follow or which we are going to recommend. This bill does not do that.

Indeed, it is a term of art. It is a term I have not seen in any death statutes, although there may be some. I have seen it in other bills. I have seen the word "justified" in bills but not in statutes.

Perhaps my friend from New York has statutes which provide precedent for that word but let me suggest to you it is a mistake. It is a mistake which tilts this bill toward the death penalty.

I do not think you intend this mistake, may I say. I think what you really intend to say in this bill is that if the jury recommends the death penalty, that then the court shall impose it. That is not what the bill says. The bill says, and I think unwittingly, that if the jury finds that the death penalty is justified that the court shall impose it, even though that same jury—as even we as humans—might find another course of action is equally justified.

So that is my question. My question to my friend from New York is: Do you not really intend to say that when a jury finds that a sentence of death is the correct approach, the approach it recommends, that then the court will impose it? And, if so I would suggest that you change that word.

Mr. D'AMATO. I would say to my good friend that I certainly will ask counsel to review the distinction between "recommend" and "justify." But I would also suggest that as you were making your point, the jury considers and determines whether or not the death penalty is—it almost comes off the lips—whether it is justified. Whether it is justified.

Indeed, I think that we are talking about that. The person has already been convicted of the crime. Now the question is, Should there be a death penalty?

Mr. LEVIN. No.

Mr. D'AMATO. And by the way, there is a distinction. There is a dis-

6:04-cr-00115-RAW    Document 471-1    Filed in ED/OK on 01/10/22    Page 2 of 4

tinction. I think you have made it. Should it be applied in this case?

Mr. LEVIN. Will the Senator yield? The question is not whether or not the death penalty should be imposed. That is not what the jury is being asked. It is a very significant difference.

Mr. D'AMATO. I will take the matter that the distinguished Senator has raised and ask counsel to review it. Maybe we can even do something as it relates to the technical corrections with it.

Mr. LEVIN. Mr. President, on another matter where there is an infirmity in this bill, I would refer to page 9 where the first aggravating factor for homicide, the first aggravating factor is the following:

"(1) The defendant—

"(A) intentionally killed the victim;

"(B) intentionally inflicted serious bodily injury which resulted in the death of the victim;

"(C) intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim.

"(D) intentionally engaged in conduct which—

"(i) the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and

"(ii) resulted in the death of the victim."

My question to my friend from New York—and I appreciate his going through this with me because I think it is important. There have been no committee hearings on this and no committee report on this bill and it is different in some significant ways from the judiciary bill of 1986. So I think it is important that we go through, as much as the time allowed permits us, some of these specifics on the floor.

My question is: Why is this an aggravating factor when what it says is, basically, you did it. These are the elements of the offense. Or to put the question another way, how is this aggravating factor any different from the elements of the offense?

Mr. D'AMATO. You were referring to the particular section covering "Aggravating Factors for Homicide."

"(n) If the defendant is found guilty of or pleads guilty to an offense under subsection (e), the following aggravating factors shall be considered but are not exclusive."

We are saying if he is found guilty, "(A) intentionally killed the victim," we might have a finding——

Mr. LEVIN. Or (B).

Mr. D'AMATO. "(B) intentionally inflicted serious bodily injury which resulted in the death of the victim."

Again, we may have a finding of guilt; then as it relates to the imposition of the death penalty, the following factors shall be considered and in the "intentionally inflicted serious bodily injury which resulted in the death—or intentionally engaged in the conduct intending that the victim be killed or that lethal force be employed against him—" that is the intent. That is one of those factors.

Mr. LEVIN. (D).

Mr. D'AMATO. "Intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense."

Very easy. I can give you a case that takes place regularly. Some fellow came in and sprayed an area, shot it up. They did not know that Rosa Brown up on the first floor was going to be hit. But they intentionally engaged in the conduct which posed grave risk to people in that community. And they should be held, if they are as other sections say, to have acted in some disregard of life.

Mr. LEVIN. I would agree with that. But that is the element of the offense, if you go back to the offense on page 2:

Any person engaging in a continuing criminal enterprise, or anyone working in furtherance of a continuing criminal enterprise—

And then your bill says:

. . . who intentionally, or with reckless indifference to human life, kills or participates substantially in the killing of any individual, shall be sentenced . . .

Mr. D'AMATO. First you come to the finding of guilt or innocence. And after that finding of guilt—there is still a difference. A person may be able to mitigate how it is they were at the scene of this crime, it was their gun, their bullet—they were found guilty—that killed Rosa Brown up on the first floor of the apartment, but they have then an opportunity to mitigate that.

But if they cannot, I would suggest to you that these sections would apply. They would have an opportunity to mitigate. Say, well, let me tell you what happened. We were walking down the street and the next thing we know, gunfire started pouring out on us. We did not know. We thought it was coming from that building. I pulled out a gun. I knew that so-and-so was up there. I shot at him. I had no intention of killing.

Now, a jury found that person guilty of killing. Now comes the question of whether or not the death penalty is justified. That same jury that convicted that person and said "you are guilty," may say, well, no, it was not with reckless disregard for life, it was not with that intention to kill somebody else, and therefore we find his explanation that he was afraid that he was going to be a target of an assassin, one that mitigates against the death penalty and we recommend less than that. And the judge may impose a sentence of 20 years. He may, indeed, impose a sentence of life. And by the way, that might even take place when an officer is killed.

This Senator does not get up here and say that if you pass this bill for every officer who is cut down by a gunman, then that gunman is automatically going to be executed. There may be some mitigating circumstances.

He may have not known it was an officer who approached him. He may have feared it was someone who threatened him with bodily harm.

You are not going to give him a medal, but I doubt with circumstances in that case that you would find a jury that would say: Death penalty. That may be a mitigating factor.

Mr. LEVIN. My question to the Senator from New York, though, is how can the person in the example you gave be convicted if the jury finds there was no reckless indifference to human life and therefore that is a mitigating factor on sentencing? How could that jury have found the person guilty with the element of the offense required, an intentional or reckless indifference to human life? That is may question.

Mr. D'AMATO. He was shooting at somebody. But unintentionally killed another person. And they find him guilty of killing that person. Then comes the question—and he is part of a continuing criminal enterprise. He has been involved in the selling of drugs. He has been convicted half a dozen times. So you have all of the elements there necessary to find: Did he kill? Yes, he did. It was his gun and he was with the continuing criminal enterprise. Now the question as to sentencing arises. That is how I see the difference.

Mr. LEVIN. Can the Senator from New York give us any instance when a defendent did, (A), (B), (C), or (D), on page 9?

Mr. D'AMATO. Page 9?

Mr. LEVIN. Yes, if these are the aggravating factors.

Mr. D'AMATO. Can I think of——

Mr. LEVIN. Can you give us any instance where one of those factors does not exist where the person could be convicted under the elements of the offense of page 2? Can you give us one instance, one example where one of those factors does not exist where the person can be convicted?

How can you be convicted unless you "intentionally killed the victim"; or "intentionally inflicted serious bodily injury"; or "intentionally engaged in conduct intending," so forth; or "intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person"? How can you be convicted of a crime unless you also did one of those four things on page 9?

Mr. D'AMATO. "Any person, during the commission of, in furtherance of, or while attempting to avoid apprehension, prosecution or service of a prison sentence" certainly falls within that factor.

I can think of any number of cases that would entitle the jury to consider whether or not there was an aggravating factor. Any person engaging in continuing criminal enterprise or working in furtherance of one who intentionally or with reckless indifference to human life kills or participates, what we are saying is it gives the jury a second opportunity. If they find the murder was committed in the course of a drug exchange, they find that person guilty of that drug exchange, and find that during that transaction they did kill that person, now it comes to the question of whether or not he or she can mitigate.

I would suggest to you that it is not the aggravating situation which must be considered again. What happens is that in mitigation, evidence that could not come in at the trial comes in on the defendant's side. If anything, we have bent over backwards to give him every possible opportunity to bring in mitigation against the death penalty. This is what happened. We would not allow it to take place, hearsay evidence to come in, et cetera, during the determination of guilt or innocence. But, during the penalty phase, we can allow other people to come in who testify, "Yeah, we know there was a contract out on Johnny Jones and so, therefore, he was in fear of his life, and that is why he recklessly opened up and sprayed this area."

So I suggest to you that, simply, that is why we say that, on the aggravating factor side, that we have to, once again, let these factors be considered. Yes, maybe what we are saying is that the defense has two shots, and that is fine, and that the prosecutor has to establish the aggravating factors again even after they had to be considered the first time.

Mr. LEVIN. May I suggest to my friend from New York, to wind this up, basically what (n)(1) does is reiterate the element of the crime. What (n)(1) basically says is if the jury finds that you did it, that is an aggravating factor.

Mr. D'AMATO. There may be a new jury; there may be a new judge as it relates to the imposition of the death penalty, and if we are talking about providing adequate constitutional guarantees, is it not necessary to state that you are going to have to prove and demonstrate at that hearing that at least one of these aggravating factors for homicide be there?

I suggest it is an attempt to deal with the constitutional problems that have been raised heretofore, not just in this debate, but that have been considered by the Judiciary Committee and that have been considered by the courts because there may be a new jury.

Just the fact that one jury found in their determination of guilt or innocence that there were those elements of the crime, the other jury may not, and particularly when the defendant has the opportunity to offer the kind of evidence that he could not get in on the first trial, due to the limitations of the rules of evidence.

Mr. LEVIN. That is an intriguing possibility.

Mr. D'AMATO. Well, I just thought of it on the spur of the moment. I thought it was pretty good.

Mr. LEVIN. I am afraid a lot of this bill is being written on the spur of the moment.

The PRESIDING OFFICER. If the Senators will suspend. The Chair will inform the Senator from Michigan that the time yielded to him by the Senator from Washington has now expired. The Senator from Michigan has remaining 3 minutes in his own right. The Senator from New York, Senator D'AMATO, has 13 minutes in his own right. Who yields time?

Mr. D'AMATO. Mr. President, I yield 3 minutes, or whatever time my colleague from Illinois, Senator DIXON, needs.

The PRESIDING OFFICER. The Senator from Illinois is recognized.

Mr. DIXON. Mr. President, I thank my colleague from New York for yielding to me.

This has been a very interesting discussion that has taken place between the Senator from Michigan and the Senator from New York. I am sure that many here feel the concern that this Senator feels for this issue as it is presented to us in the Senate. I spent many years in the Illinois Legislature, both as a member of the house and the Illinois Senate. As chairman of the Judiciary Committee of the house and later as the leader of my party in the senate, from time to time this issue was before us in those days.

In my professional career, Mr. President, I served as an assistant State's attorney in my home county and also from time to time as criminal defense counsel in major felony cases in the southern part of my State. I have had a good many years to think seriously about the problem of capital cases and whether the death penalty is truly a deterrent.

I think there is some legitimate difference of opinion about this, but I would like to say that based upon my own professional and personal experience in my lifetime, I believe that the death penalty, in many cases, is a deterrent. I have had personal experiences of my own that have convinced me of the value of the death penalty in capital cases.

I would like to relate just two of them to the Senate as personal experience of my own that have helped to formulate my opinion on this subject matter.

As a very young man, I once defended a man by the name of Charles Palmer who was charged with killing his wife in a vicious murder. In my hometown of Belleville, his wife operated a little tavern called The Brown Derby. Charles Palmer, during a domestic dispute with his wife, got a shotgun and shot his wife, almost tearing her in half, and killed her.

I defended Charles Palmer in his murder case. We were ultimately able to prevail upon the court, and Charles Palmer was given a life sentence at Menard Penitentiary in southern Illinois. Shortly after he had been in the penitentiary a year or two, several ladies, who were religious people who worked in the penitentiary system, came to me and said they were delighted to inform me Charles Palmer had became a very religious person and was involved in the penitentiary in many good works and should be considered for early parole.

Later I wrote several letters on behalf of Charles Palmer, and after 12 years in the penitentiary, Charles Palmer was paroled, came back to my hometown of Belleville, came to me and asked me to represent him because he was going into the auto repair business. I helped put him in business. He married a lady in our city who had a child by a prior marriage, and for some time I thought that Charles Palmer's life had straightened out.

Finally, one day his wife came to me and said that Charles Palmer had left after committing some very grievous acts upon his own stepdaughter. To this day, I have not heard anything more of Charles Palmer.

Shortly, after that, we elected a man sheriff of my county who had served on the police department in East St. Louis, a very fine law enforcement officer. At that time, the issue of the death penalty was again before us in the Illinois State Senate. I do not remember the particular circumstances of the issue at that time.

But the sheriff called upon me and said he wanted to relate to me an experience that he had had as a policeman in East St. Louis, and he urged me to support the death penalty. This is the story that he told me was his own personal experience in that city.

A robbery had taken place and as a police officer he was in hot pursuit of the individual who had carried out the crime. He followed the individual into a house in East St. Louis. It was in the summer and it was a moonlight night. When he got into the house, he could hear the person moving around upstairs. He went up the stairway, and he ultimately found the individual, the felon who had fled from the crime, hiding under the bed. He arrested him and he took him to the police station, but when he arrested him he found that the individual had a pistol on his person. In the police car going to the jail in East St. Louis, he said to him,

6:04-cr-00115-RAW    Document 471-1    Filed in ED/OK on 01/10/22    Page 4 of 4

"You know, it was a moonlight night and I was coming up that stairway. When I got into the frame of the door, I know you could see me. Why didn't you shoot me?" And he tells me that the individual said to him, "While I heard you coming up that stairway, I had a moment to reflect on this whole thing, and I figured for the crime I committed I might get a couple of years in jail, but if I shoot you, I could go to the electric chair."

Now, that made a profound impression upon me at that time. It is something I have remembered all of these years. That police officer, who ultimately became sheriff of our county, was I think in his era the most respected law enforcement individual in my part of the State. That was a personal experience that he had had. My contact with Charlie Palmer was a personal experience that I had.

Now, there are some who say in sincerity, and I respect that point of view, "Look, the death penalty only affects the very poor; it is a penalty against a class."

I would like to just respond to that for a moment. When I was a very young man in the Illinois House of Representatives, I was one of the co-sponsors of legislation that set up a public defender system in my State. When I was just a kid practicing law, we did not have public defenders. You went into court on a Monday morning in criminal session and the judge assigned young lawyers to defend the felony cases that came up pro bono, without fee.

I will admit in that system there was a serious question of whether the poor were receiving the kind of defense they required. But we passed public defender legislation in Illinois over 30 years ago. Almost every State in the Union and the Federal Government now have a very fine public defender system. I would certainly suggest that the poor now receive competent defense from the public defender system in most parts of the country.

Mr. President, in conclusion, there are equally fine points of view on both sides of this argument. I respect all of them. But on the basis of my own experiences in my lifetime, I am sincere when I say that I believe the death penalty does serve a useful purpose of deterrence in our society and I want to support the Senator from New York and others who are urging the passage of the legislation.

[Applause in gallery.]

The PRESIDING OFFICER. The galleries will refrain from any expression either for or against any of the speeches under rules of the Senate.

Who yields time?

Mr. LEVIN. Mr. President, I think it may be appropriate to send an amendment to the desk at this point. We all have some time remaining. I believe the Senator from New York has some

time remaining, and the Senator from Washington has some time remaining in opposition. I have a few minutes.

Mr. D'AMATO. Mr. President, may I ask, how much time do we have remaining?

The PRESIDING OFFICER. The Senator from Michigan has 3 minutes remaining; the Senator from New York has 4 minutes and 43 seconds on the bill; and in addition there is to be 1 hour evenly divided upon each amendment.

Mr. LEVIN. It is my understanding the Senator from Washington in opposition also controlled half the time, and I am wondering if there is any time remaining for the Senator from Washington.

The PRESIDING OFFICER. That time has been consumed.

Mr. D'AMATO. I certainly have no objection to having the amendment sent to the desk. We might proceed, but save each of us 3 or 4 minutes to wrap up.

Mr. LEVIN. If we are going to have our vote at 3:30, as I indicated we would, and a cloture vote at 3:45, that would leave an hour for debate.

Mr. D'AMATO. Fine.

AMENDMENT NO. 2339

(Purpose: To substitute mandatory life imprisonment without the possibility of release for the death penalty)

Mr. LEVIN. Mr. President, I send an amendment to the desk on behalf of myself, Senator EVANS, and Senator DANFORTH.

The PRESIDING OFFICER. The clerk will report the amendment.

The assistant legislative clerk read as follows:

The Senator from Michigan [Mr. LEVIN], for himself, Mr. EVANS, and Mr. DANFORTH, proposes an amendment numbered 2339.

Mr. LEVIN. Mr. President, I ask unanimous consent that further reading of the amendment be dispensed with.

The PRESIDING OFFICER. Is there objection? Hearing no objection, it is so ordered.

The amendment is as follows:

SECTION 1. MANDATORY LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF RELEASE

Section 408 of the Controlled Substances Act (21 U.S.C. 848) is amended—

(1) by redesignating subsection (e) as subsection (f); and

(2) by adding a new subsection (e) as follows:

"Mandatory Life Imprisonment Without the Possibility of Release

"(e)(1) In addition to the other penalties set forth in this section—

"(A) any person engaging in a continuing criminal enterprise, or anyone working in furtherance of a continuing criminal enterprise who intentionally, or with reckless indifference to human life, kills or participates substantially in the killing of any individual not participating in the continuing criminal enterprise, shall be sentenced to mandatory life imprisonment without the possibility of release;

"(B) any person, during the commission of, in furtherance of, or while attempting to avoid apprehension, prosecution or service of a prison sentence for, a felony violation of the Controlled Substances Act (21 U.S.C. 801 et seq.) who intentionally, or with reckless indifference to human life, kills or participates substantially in the killing of any federal, state, or local law enforcement officer engaged in, or on account of, the performance of such officer's official duties, shall be sentenced to mandatory life imprisonment without the possibility of release; and

"(C) any person described in subparagraph (A) or (B) who kills or participates substantially in the killing of an individual other than an individual described in subparagraph (A) or (B) shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment.

"(2) No person shall be sentenced to mandatory life imprisonment without the possibility of release under subparagraph (A) or (B) of paragraph (1) who was less than 18 years of age at the time the crime was committed.

"(3) As used in paragraph (1)(B), the term 'law enforcement officer' means a public servant authorized by law or by a Government agency or Congress to conduct or engage in the prevention, investigation, prosecution or adjudication of an offense, and includes those engaged in corrections, probation, or parole functions.".

Mr. LEVIN. Mr. President, one of the anomalies and unusual aspects of the bill before us is that while it provides the possibility of the death penalty for persons who commit these heinous crimes which have been referred to, it also permits the possibility that these people will be let off after as little as 17 years in prison because the minimum sentence in the bill which is before us is a 20-year sentence. That means that a defendant who has been convicted of some of the worst, despicable, indescribable offenses can walk out of prison. That is a mistake. It is a mistake for us to allow a drug czar, who kills a police officer and is convicted of that killing, the possibility that he is going to be paroled. We should have a mandatory sentence of life in prison without the possibility of parole for persons who engage in the killing of law enforcement officers or other innocent people. That is not this bill.

The bill before us has a number of anomalies. First, it treats a person who is convicted of the killing of a drug czar in the same way as a person who is convicted of the killing of a police officer. I want to repeat that because it is a critical issue before us. This bill violates I believe common sense, traditional values of our people, in providing the same penalty for people convicted of the killing of a law enforcement officer or other innocent people as it provides for people convicted of the killing of a drug czar.

Now, we have done some survey work. Probably 99 percent of drug-related murders are murders where