**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-RAW** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | **CAPITAL CASE** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MOTION TO STRIKE THE GOVERNMENT'S NOTICE OF INTENT
TO SEEK THE DEATH PENALTY AND REQUEST FOR A NEW TRIAL
AND BRIEF IN SUPPORT**

Comes now Kenneth Eugene Barrett, through counsel, and pursuant to the Fifth, Sixth and Eighth Amendments to the United States Constitution, files this Motion to Strike the Government's Notice of Intent to Seek the Death Penalty Based on Heightened Reliability Concerns, for a new trial altogether, or, in the alternative, for an evidentiary hearing where lay and expert testimony may be provided in support of this motion. The government objects to this motion.

**I.      Introduction**

Twenty-four years ago, in the middle of the night, eleven Oklahoma law enforcement officers traveling in convoy converged onto the private property of Kenneth Eugene Barrett. Aiming to take Mr. Barrett by surprise, officers sought to execute a no-knock, day-or-night search warrant on his small cabin located in rural Sallisaw. The caravan was led by an

1

unmarked Ford Bronco driven by Trooper John Hamilton with his partner, Trooper David Eales, beside him. The Bronco covertly approached the cabin from the east, with emergency lights off, to avoid detection. It sped closer towards Mr. Barrett's home leaving tread marks in the earth. Gunshots erupted. Trooper Eales was tragically killed, and Trooper Hamilton suffered serious injuries. The Bronco was riddled with bullets.

The bullet-riddled Bronco became the prosecution's focus at all three of Mr. Barrett's previous capital trials. The prosecution offered and endorsed crime scene reconstructionist Iris Dalley, claiming that the jury could discern Mr. Barrett's intent and supposed guilt from the evidence forever embedded in the Bronco, and the scientific conclusions drawn by their experts. Dalley claimed to have reconstructed how many shots struck the Bronco, the angle of impact, the direction of the trajectory, and the type of ammunition that traveled through each hole.  She offered a PowerPoint illustration for her testimony, purporting to depict how Trooper Eales was shot, unsupported by facts, scientific measurements, the laws of physics, or any reliable forensic evidence.

Dalley, however, made these determinations *without* taking any written measurements for any subsequent parties to examine. No crime scene documentation was made of how large each hole was, nor precisely how many bullets hit the Bronco. While Dalley did attempt to determine the trajectory of some bullets by taping together sagging dowel rods, there was no scientific way to determine the angle at which each shot entered the Bronco because, again, she took no measurements of  the size and angle of entry of each shot. Dalley's botched analysis of the Bronco was further complicated because she examined the vehicle *after* it had been moved from its original resting place during the gunfire, a fact she openly admitted in trial. As will be demonstrated below, it will never be known from what height or location any shot entered the

Bronco.  It will never be known the position of each shooter at the scene, or the precise timing of the shots fired, or even precisely how many shots were fired and from what direction.

Unbeknownst to the parties, including the current prosecution team involved in the instant federal litigation, and in clear violation of policy, Lt. Commander—now Chief—Pettingill, on January 5, 2011, ordered the Bronco's destruction while Mr. Barrett's capital case was still pending before this United States District Court.[1] Lt. Commander Pettingill was on scene and the head of the tactical team at the time of the raid, and knew full well the importance of the Bronco to this litigation.  Pettingill's actions rendered obsolete the ability to answer any questions with proper scientific methods. We will never be able to examine the Bronco with a modern-day expert or methods. We will never be able to take those crucial measurements. The crucial silent factual witness to the shooting events from that September night has been destroyed.

Further complicating this case, the tactical team members who were eyewitnesses to the event have given statements over the years—handwritten and recorded—that have since been actively destroyed or lost. Lt. George Randolph admitted to destroying Trooper Manion's recorded interview provided immediately after the incident.[2]  Trooper Manion, without dispute,

---

[1] Willful destruction of evidence was discussed during in the second state proceeding through the deposition of Jerry Cason, former lieutenant colonel of the Oklahoma Highway Patrol, on December 11, 2003. When asked what would be the consequence to a trooper who caused evidence to be destroyed, he responded, "Well, I can only speak for me. **It would be a violation of our policy** and we would have to deal with it on an administrative -- **as you're aware, there are criminal laws that govern that**, but internally what we would deal with **would be a violation of our policy** and we would have to look at it from an administrative standpoint." Cason Dep. 2142, Dec. 11, 2003 (emphasis added).

[2] Trooper Manion admitted to firing his weapon on the scene into a room through a veil of curtains, not knowing or being able to see how many people were in that room when he fired four rounds through the window. *See* Exhibit 1 at 3 (Rosser Interview of Trooper Rick Manion); *see also* Trial 1, Vol VIII, p. 8331.

fired his weapon on the scene and shot Mr. Barrett through a curtain-covered window, not knowing who was in the room – or how many people were in that room. It is unclear how many other times Trooper Manion fired his weapon at the scene. Without this recording of Manion's earliest description of the event, while his memory was fresh, it is impossible to know what other dispositive or potentially exculpatory information has been withheld from that interview, and other trooper interviews over the years. And Trooper Manion has died.

Based on this disturbing pattern of evidence destruction by state governmental officials, Mr. Barrett moves pursuant to the Fifth, Sixth and Eighth Amendments to the U.S. Constitution to strike the death penalty and respectfully requests a new trial, where a jury can hear the evidence and make their decision based upon the physical facts that remain.

## II.   Factual and Procedural History

Shortly after midnight on September 24, 1999, eleven law enforcement officers assigned to a specialized tactical unit of the Oklahoma Highway Patrol executed a no-knock, day-or-night search warrant at Mr. Barrett's home—a self-constructed cabin in rural Oklahoma that lacked running water and plumbing. The tactical unit traveled by convoy; the lead vehicle – an unmarked Ford Bronco – was driven by Trooper John Hamilton with Trooper David Eales in the passenger seat. As the Ford Bronco quickly approached from the east, a 17-year-old boy, later identified as Mr. Barrett's son, stood in the front yard. Trial 1, Vol X, p. 1744 (Trooper Hise first state trial testimony describing how he covered and cuffed Toby Barrett while gunfire erupted, as Toby yelled, "…dad, dad, dad" three to five times). Startled by the noise and presence of foreign vehicles on his property, Mr. Barrett emerged from his front door. A shootout occurred between Mr. Barrett and law enforcement, resulting in the tragic death of Trooper David Eales, and serious injuries sustained to Trooper Hamilton. Mr. Barrett was shot

4

four times.

Oral, handwritten, and recorded statements were made by officers present on the scene, and were taken again in the days and weeks following the incident, including interviews by Internal Affairs Investigator Paul Gordon.[3] A bullet trajectory analysis was performed that night on the Ford Bronco by OSBI criminalist Iris Dalley. Prior to Dalley's arrival, the Ford Bronco had been moved from its original resting location during the gun fight. Rather than move the Ford Bronco back to its prior position, Dalley created trajectories with drooping dowel rods (Exhibit 11) from the new location.[4] Trial 1, Vol XVIII, p. 3132 (Dalley testifying that "the Bronco…had moved twice or appeared to have been moved at least twice somewhere during this event."). Internal Affairs investigator Paul Gordon advised his supervisors on the scene of the shooting that the Bronco was being processed in the wrong place – his supervisors told him to stay out of it. Other irregularities took place. Contrary to common practice and policy,[5] not all department issued firearms were collected immediately from the scene. Most of the troopers' weapons were taken from the scene by the officers themselves and not surrendered to a different location until the afternoon of September 24th. Exhibit 2 (OHP Confiscated Property Receipts). In particular, Trooper Poe, who was stationed at the base of Mr. Barrett's driveway as the designated sniper, did not surrender his .223 rifle (same caliber weapon as Mr. Barrett) until around 4:30 p.m.[6] OHP Internal Affairs investigator Paul Gordon was not permitted to

---

[3] A summary of the various statements made by law enforcement is discussed *infra* Section III(2)(a)(ii).

[4] Responding Internal Affairs Officer Paul Gordon "advised [his] supervisors Lt. George Randolph and Captain Rodney Burris that the vehicle was being processed in the wrong place and would give the wrong evidentiary information about the location and bullet angle. They both advised me this was an OSBI investigation and to stay out of it. I filmed the process showing where the processing effort took place for further review." Exhibit 4 at ¶38.

[5] Exhibit 4 at ¶11(d) (Declaration of Paul Gordon).

[6] "When they finished, they backed out of the house and POE went to HISE'S car while someone

interview responding officers until weeks after the raid, when common past practice was within 72 hours of an incident. Exhibit 4 at ¶11(b). And an audio recorded interview of Trooper Manion taken immediately after the incident was deliberately destroyed by Lt. George Randolph in November 2001 (ten-months *before* jury selection began in Mr. Barrett's *first* state capital trial, and two years after the shooting):

> Mr. Echols: Who did you speak with then at this building that you referred to?
>
> Lt. Randolph: The best I can recall, all the tac team members were in a room. When I asked any of them if they would speak to me, the only one at the time that would talk to me was Ricky Manion. I spoke to Ricky Manion.
>
> Q: How long did you speak with him?
>
> A: The whole interview probably lasted ten or 15 minutes at most.
>
> Q: Without telling us what he said, what was the general nature of your interview with him?
>
> A: I just asked him what had happened on the incident that had taken place.
>
> Q: Did you record that interview?
>
> A: Yes, sir, I did. Part of it.
> …
> I've thought about this over and over again. Please bear in mind it was three years ago. I know for a fact I spoke to Ricky Manion. I remember that very well. I have a mental image of speaking with Gene Hise somewhere that day, but I don't know what setting it was. I can't tell you if that was an interview or not. I remember Gene Hise being extremely upset. I can't tell you if it was an interview setting or not.
>
> Q: Would you know if you in any way recorded or kept any notes or records of that discussion with Gene Hise on that day?

---

taped off the area. POE recalled someone telling him to call home, so he telephoned his wife. After that, he telephoned his partner, Trooper BILL BOOKER. He remained at the scene a while and then they were all moved to the District Attorney's Annex. On Friday afternoon Lieutenant KERRY PETTINGILL told them that their weapons had to be turned in. POE had secured his rifle in BOOKER'S vehicle, so POE recovered the weapon and met with the OHP Internal Affairs in Gore, Oklahoma, to turn over his weapon." *See* Exhibit 3 (OSBI Interview of Billy Poe).

A: No, sir. I made none of those.

Q: As to Trooper Manion, you did a tape recording?

A: Partially, yes, sir.

Q: What did occur during the course of that interview?

A: When trooper Manion told me he had fired shots through the east window of Mr. Barrett's residence, I stopped the interview.

Q: Why did you do that?

A: At that time, the assistant commissioner, Scott Watkins, and the assistant chief, we were kind in a quandary at times about whether we were going to interview troopers after they had been involved in a shooting and tape record that or if we were not going to tape record that. I did not know that Ricky Manion had fired any shots when I started the interview. When he told me he had fired some shots, I stopped the tape and went out in the lobby or the hallway and spoke with John Lindsay about it.

Q: Who is John Lindsay?

A: He's DPS general[] counsel. John again reminded me we weren't supposed to be tape recording these troopers after the shooting incident immediately after an incident.

Q: After that advisement, what did you do with regard to this interview?

A: I went back in and told trooper Manion that I was going to not use the tape recording. It was not supposed to have been made. It would never be transcribed and become part of the file and let him go ahead and finish his story.

Q: So you did continue to speak with him?

A: Yes, I did. I believe I did.

Q: You just didn't record it?

A: No, sir, I did not.

Q: Did you make notes of the further discussion with him?

A: Yes, sir. I made field notes as such. One or two words sentences so I could remind myself what to tell the administration about what had happened.

Q: Did you ever generate any report of your conversation or interview with [T]rooper Manion at that location?

A: No, sir, I did not.

Q: Did you retain the notes that you took during the interview?

**A: I retained them as far as getting back to my office in Oklahoma City. They eventually were shredded in a shredder. I didn't need them. They weren't transcribed. They weren't used in a report.**

**Q: What happened to the tape recording of trooper Manion's partial interview?**

**A: The tape recording was in my desk. Has been in my desk for several years. The last I remember when I transferred to planning and research, I took that tape and several other the best I can recall and gave them to Carolyn Rawlings the trooper secretary and asked her to dispose of the tapes, erase, reuse, whatever they were supposed to do with them. I no longer needed them.**

**Q: Do you know when that was done?**

**A: That would have been in November of last year.**

Trial 1, Vol XVI, pp. 2742-45 (emphasis added); *see also* Exhibit 5 (Excerpt of George Randolph first state trial testimony).  Randolph was never called at the guilt phase of the federal trial, and the jury never heard about Randolph destroying this evidence.

Despite these serious issues, the State of Oklahoma proceeded to prosecute Mr. Barrett capitally. But 16-months prior to the start of jury selection in Mr. Barrett's first state trial, OHP marked that the Ford Bronco be sent "To Sale File" on May 17, 2001. Exhibit 6 at 4 (DPS Vehicle Inventory Detail Screen).[7] But it wasn't sold at that time.  Instead, roughly ten years later, with Mr. Barrett's federal capital case still pending, Chief Kerry Pettingill—prior

---

[7] These records pertaining to the destruction of the Ford Bronco is newly discovered evidence located by the government on January 10, 2024. The government promptly disclosed these items to the defense on the same date they were discovered, upon request of defense counsel.

commander of the 1999 tactical unit and present on the scene—authorized the destruction of the Ford Bronco. *Id*. at 1; *see also* Exhibit 7 at 2 (government correspondence verifying that Chief Kerry Pettingill of OHP authorized the destruction of the Ford Bronco, which was subsequently sold at auction to Standard Iron in Oklahoma City and crushed).

### A. The State Trials

Mr. Barrett was initially charged in state court with one count of first-degree murder, one count of shooting with intent to kill, and two counts of discharging a firearm with intent to kill. The case proceeded to trial in 2002. Unable to reach a verdict, the jury hung.  Mr. Barrett was retried almost two years later by the state in 2004.[8] The jury acquitted him on the first-degree murder charge and instead found him guilty of the lesser-included crime of first-degree manslaughter. The jury also acquitted on the charge of shooting with intent to kill and found him guilty of the lesser-included offense of assault and battery with a dangerous weapon. Mr. Barrett was acquitted on the remaining two charges of discharge of a firearm with intent to kill. The state court sentenced Mr. Barrett to consecutive terms of 20 years in prison on the manslaughter conviction and 10 years on the assault and battery conviction. Accepting responsibility, Mr. Barrett did not appeal his state convictions or sentences. *United States v. Barrett*, 985 F.3d 1203, 1209 (10th Cir. 2021) (resentencing order).

### B. Federal Proceedings

Seven months after the second state trial verdict, the federal government filed a

---

[8] Neither party has a complete transcription of the second state trial. At a minimum, four volumes have been lost or destroyed that would have included: opening statements, closing arguments, day twelve of testimony featuring at a minimum prosecution experts Terrance Higgs (ballistics) and Iris Dalley (trajectory analysis), and day thirteen testimony of Janice Sanders, the charge conference, the jury charge, and the return of the verdict. The prejudice suffered due to the incomplete and inaccurate transcripts is discussed *infra* Section (II)(A)(2)(a)(iii).

9

Complaint against Mr. Barrett charging him with drug and weapons violations across eight counts. DN 1. A federal grand jury then indicted Mr. Barrett on three counts: Count 1 – using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. §924(c)(1)(A) and (j), Count 2 – using and carrying a firearm in relation to a crime of violence—the killing of a state law enforcement officer engaged in or on account of the performance of such officer's official duties—and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. §924(c)(1)(A) and (j), and Count 3 – intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in the performance of his official duties, in violation of 21 U.S.C. §848(e)(1)(B). *See United States v. Barrett*, 496 F.3d 1079, 1086 (10th Cir. 2007) (*Barrett I*) (direct appeal). The case went to trial, and the jury found Mr. Barrett guilty of all three counts. The jury recommended sentences of life imprisonment without the possibility of release on Counts 1 and 2, and death on Count 3. The district court imposed the recommended sentences.

Mr. Barrett appealed his convictions, which were affirmed by the Tenth Circuit. Mr. Barrett then petitioned for relief under 28 U.S.C. §2255, raising 19 challenges, including ineffective assistance of counsel. *See Barrett v. United States*, No. 09-CIV-105-JHP, 2012 WL 3542609, at *1, *5 (E. D. Okla. Aug. 16, 2012). The district court denied the motion and declined to issue a COA.[9] *Id*. at *94. Mr. Barrett successfully sought a COA from the Tenth Circuit on seven issues related to ineffective assistance of counsel. The case was remanded for

---

[9] In 2011, a year before the district court denied Mr. Barrett's 2255 petition, OHP Lieutenant Dawson Blackee, Director of Transportation, was given permission by Chief Kerry Pettingill (former commander of the 1999 tactical unit that raided Mr. Barrett's home) to destroy the Bronco. *See* Exhibits 6 and 7.

an evidentiary hearing to determine whether trial counsel's performance at Mr. Barrett's penalty phase was deficient and prejudicial. Following the evidentiary hearing, the district court found deficient performance but no prejudice, and again denied relief. Mr. Barrett appealed. The Court of Appeals reversed the district court's decision, vacated his death sentence, and remanded the case for a resentencing on Count 3.

The unavailable evidence detailed below is essential to Mr. Barrett's defense at the pending capital resentencing hearing. [10] Heightened reliability and fundamental fairness demand that Mr. Barrett be afforded a fair opportunity to rebut the government's aggravation and present his own mitigation. The cumulative prejudicial effect of the lost or destroyed evidence in this case renders that requirement of reliability and due process impossible.

### C. Destroyed and Missing Evidence

Over the passage of time, numerous items have either been lost, destroyed, or were not preserved for evidentiary inspection by various state governmental actors in this case:[11]

- 1995 Ford Bronco, VIN: #1FMEU15H7SLB32457 driven by Officer Hamilton.

- Second state court capital trial transcripts.

- OSBI Criminologist Iris Dalley failed to measure and document the precise size and angle of bullet holes entering and exiting the Ford Bronco.

- Department issued firearms carried by law enforcement on the incident.[12]

---

[10] The new sentencing hearing must start anew with the government's case in aggravation, beginning with the intent factors set out in 21 U.S.C. §848(n)(1). *See United States v. Johnson*, 764 F.3d 937, 944 (8th Cir. 2014). This includes the government's burden to prove beyond a reasonable doubt that the defendant intentionally killed the law enforcement victim in this case. For ease of reference and in order not to repeat the same here, *see* DN 491 at 4-9 for full briefing on this legal issue.

[11] This listing of lost or destroyed evidence is not exhaustive as defense investigation is ongoing.
[12] *See* Exhibit 2.

11

- Trooper Billy Poe's .223 rifle, and other Troopers' weapons, were removed from the scene.[13]

- Audio recordings of Trooper Rick Manion's taped interview destroyed by Oklahoma Highway Patrol Officer George Randolph.[14]

- Paul Gordon's handwritten notes of his interviews with troopers after the tape recordings were turned off.[15]

- Trooper statements have been lost, destroyed, or were failed to be preserved.

- OSBI Firearms Examiner Terrance Higgs bench notes and records of Mr. Barrett's ballistics and firearms testing.[16]

- OHP Policy Manual.[17]

Essential government and defense witness are now deceased. An inexhaustive list includes:

- Prosecutor on scene Diane Barker-Harrold

- Trooper Bill Booker

- Trooper Steve Hash

- Officer Tom Lowe

- Trooper Rick Manion

- Drug Task Force Director Jeff Sheridan

- Court Reporter Mark Woods for the second state capital trial.

- Perhaps most important, numerous members of Mr. Barrett's family have passed

---

[13] *See* Exhibit 3; *see also supra* note 6.

[14] *See* Exhibit 5

[15] *See* Exhibit 4 at ¶¶28-29.

[16] At the first state trial, Higgs references reading from his notes while testifying. Those notes are lost or have been destroyed. Trial 1, Vol XIX, p. 3291.

[17] *See* Exhibit 4 at ¶22.

away since September 24, 1999. His father, a paternal uncle, and two cousins that also lived on his street, three close friends, and three former defense team members. These witnesses could have testified at a sentencing hearing about Mr. Barrett's upbringing, his childhood trauma, and family history of mental illness. These witnesses—and their uniquely powerful mitigation testimony—are no longer available.

The multiple pieces of crucial evidence that are now unavailable, lost, or destroyed, support the fact that the standards of heightened reliability, due process, and fundamental fairness can simply not be met.

## III. Argument

### A. The lost or destroyed evidence in this case violates Mr. Barrett's right to Heightened Reliability under the Eighth Amendment.

The sheer volume of unavailable evidence and witnesses calls into question the reliability of any capital penalty phase proceeding. The death penalty should be stricken as an available punishment.

#### 1. Legal background

##### a. Heightened Reliability

"The bedrock principle that 'death is different' is always a consideration in the handling of death [penalty] cases." *Buntion v. Quarterman*, 524 F.3d 664, 675 (5th Cir. 2008). Accordingly, the Supreme Court has "imposed protections [in death penalty cases] that the Constitution nowhere else provides." *Harmelin v. Michigan*, 501 U.S. 957, 994 (1991). Justice O'Connor's concurrence in *Thompson v. Oklahoma*, 487 U.S. 815, 856 (1988), lends further support for the notion that a trial court must apply heightened scrutiny to all decisions that may lead to the imposition of a death sentence:

Under the Eighth Amendment, the death penalty has been treated differently from all other punishments. . . Among the most important and consistent themes in this Court's death penalty jurisprudence is the need for special care and deliberation in decisions that may lead to the imposition of that sanction. The Court has accordingly imposed a series of unique substantive and procedural restrictions designed to ensure that capital punishment is not imposed without the serious and calm reflection that ought to precede any decision of such gravity and finality.

One such protection is the "keystone"[18] requirement of "heightened reliability." *See Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different." (internal citation omitted)); *Lockett v. Ohio,* 438 U.S. 586, 604 (1978) ("We are satisfied that this qualitative difference between death and other penalties call for a greater degree of reliability when the death sentence is imposed."); *Woodson v. North Carolina* (1976) 428 U.S. 280, 305 ("Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case"); *Mills v. Maryland*, 486 U.S. 367, 376 (1988) ("[I]n reviewing death sentences, the Court has demanded even greater certainty [than in other criminal cases] that the jury's conclusion rested on proper grounds."); *Monge v. California,* 524 U.S. 721, 732 (1998) ("Because the death penalty is unique 'in both its severity and its finality,' we have recognized an acute need for reliability in capital sentencing proceedings," (internal citation omitted)); *Murray v. Giarratano*, 492 U.S. 1, 8-9 (1989) ("The finality of the death penalty requires 'a greater degree of reliability' when it is imposed."); *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("we have held that the Eighth Amendment requires

---

[18] *See, e.g., United States v. Friend*, 92 F.Supp.2d 534, 541 (E.D. Va. 2000) (noting "the fundamental requirement of *heightened reliability* that is the keystone in making the determination that death is the appropriate punishment in a specific case." (internal quotation marks omitted)).

14

a greater degree of accuracy and factfinding than would be true in a noncapital case."); *United States v. Solomon*, No. 02:05cr385, 2007 U.S. Dist. LEXIS 35070, at *16 (W.D. Pa. May 14, 2007) ("Without doubt, a 'heightened reliability' is essential to the process of imposing a death sentence."); *United States v. Watson*, No. 05-80025, 2007 U.S. Dist. LEXIS 94736, at 6 (E.D. Mich. Dec. 28, 2007) ("Two fundamental, constitutional principles underlie death penalty jurisprudence. The first principle requires courts to 'assure heightened reliability in capital sentencing because capital punishment is qualitatively different from other punishments.'").[19]

However, as Justice Breyer observed in 2015, "[t]here is increasing evidence … that the death penalty as now applied lacks that requisite reliability." *Glossip v. Gross*, 576 U.S. 863, 910 (2015) (Breyer, J., dissenting). Three years later, Justice Breyer updated his remarks, noting that "in the past three years, further evidence has accumulated suggesting that the death penalty as it is applied today lacks 'requisite reliability.'" *Jordan v. Mississippi*, 138 S. Ct. 2567, 2571 (2018) (Breyer, J., dissenting).

Given the heightened reliability the Supreme Court has long required for fact-finding in capital cases, the lost or destroyed evidence and trial transcripts in this case will prevent Mr. Barrett from receiving a capital sentencing that comports with due process. Fundamental fairness

---

[19] For additional cases on this point, *see, e.g.*, *United States v. Fell*, 360 F.3d 135, 143 (2d Cir. 2004) ("We fully agree with the district court that 'heightened reliability' is essential to the process of imposing a death sentence ... The finality of the death penalty requires a greater degree of reliability when it is imposed") (citations omitted); *Underwood v. Royal*, 894 F.3d 1154, 1175-76 (10th Cir. 2018) ("… we are mindful of the need for heightened reliability in determining a capital sentence" (internal quotation marks omitted)); *Bush v. Carpenter*, 926 F.3d 644, 667 (10th Cir. 2019) ("In harmless error analysis in a capital case, we are mindful of the need for heightened reliability in determining a capital sentence." (internal quotation marks omitted)); *United States v. Pleau*, No. 10-184-1 S, 2013 U.S. Dist. LEXIS 55023, at *24-25 (D.R.I. Apr. 17, 2013) ("The Supreme Court has … emphasized the need for heightened reliability in [capital sentencing] proceedings.").

therefore requires that the Notice of Intent to seek the death penalty (NOI) be struck and Mr. Barrett's request for a new trial be granted.

## 2. Analysis

Heightened reliability cannot be achieved in the instant case, due to the cumulative effect[20] of the following factors:

### a. Destruction and unavailability of evidence

A fundamental constitutional guarantee is that a defendant may not be sentenced to death "on the basis of information which he had no opportunity to deny or explain." *Gardner v. Florida*, 430 U.S. 349 (1977). The *Gardner* doctrine is implicated here due to the destruction and unavailability of key evidence. *See supra* Section (I)(C).

The spoliation of evidence by state governmental actors here raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it. *Sanders v. Univ. of Idaho*, *Coll. of Law*, No. 3:19-cv-00225-BLW, 2022 U.S. Dist. LEXIS 185694, at *17 (D. Idaho Oct. 7, 2022). *See also, United States v. Deaner*, 1 F.3d 192, 201 (3d Cir. 1993) ("…destruction of physical evidence material to sentence that the defendant has sought to discover, without giving him notice and an opportunity to inspect the evidence before it is destroyed, could be detrimental to the government.")

---

[20] The "cumulative effect" doctrine recognizes "the common-sense adage that the whole is sometimes greater than the sum of its parts and that the whole is what matters." *United States v. Rosario-Pérez*, 957 F.3d 277, 294 (1st Cir. 2020). As the Tenth Circuit noted in Mr. Barrett's direct appeal, "[a] cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Barrett*, 496 F.3d 1079, 1121 (10th Cir. 2007) (internal quotation marks omitted). *See also, United States v. Tuma*, 738 F.3d 681, 691 (5th Cir. 2013) ("We have recognized that 'the cumulative effect of a series of errors may require reversal, even though a single one of those errors, standing alone, would not require such a result.'").

16

### i. The Ford Bronco

Trooper Hamilton drove the lead Ford Bronco that received significant gunfire and came to a stop on Mr. Barrett's front lawn. Officers moved the vehicle from its resting position when they learned Trooper Eales had been seriously injured. After the scene was cleared and prepared for processing, no attempt was made to move the Ford Bronco back to its original location – the location where it incurred significant gunfire. Trajectory analysis was conducted from the Ford Bronco's changed position and no measurements were taken as Dalley's testimony from the first state trial illustrates:[21]

> Mr. Echols: Tell me why you didn't measure the angles. Was there a scientific reason not to measure the angles?
>
> Ms. Dalley: Yes, Sir.
>
> Q: What was that?
>
> A: Because when I arrived at the scene, I determined what type of analysis I was going to do based on what I found at the scene. Had I found evidence at the scene that I believed could lend itself to specifically identify the exact points where for example the shooter and the Bronco were at any particular point, then I would have taken more measurements. **What I found in fact was that the Bronco, for example, had moved twice or appeared to have been moved at least twice somewhere during this event. Since the position of the Bronco was apparently not where it had been during the incidents, then there would be no way to use all of those measurements to pinpoint the exact location of the shooter. Therefore, I decided that what I would do would be to simply find the entries, exits and to visualize the trajectory to the Bronco.**
>
> Q: You never really intended your analysis there at the scene to be what you might call precise or accurate down to the particular angles that were involved?
>
> A: It's accurate, but **it's my opinion that based on the evidence that I saw at the scene that that one could not take those trajectories and pinpoint the exact location of where the Bronco and the shooter were for any given shot or any given point in time.**

---

[21] Mr. Barrett's first state capital trial concluded in a hung jury.

Q: I understand that, ma'am. What I'm saying, though, is when the jurors watch this presentation and you have these large oversized rods going into the Bronco and it spins and moves and whatnot, you're not asking that the jurors interpret your computerized image as being a precise analysis of the trajectories, that being the angles are correct, et cetera?

A: Not precise in that you can look at any given point and measure the exact angle of entry of any particular projectile.

Q: **How much error would there be? How much error do you think there could be in terms of the different rods or tubes you depicted going into the vehicle versus the actual angle if somebody had taken a protractor and measured it or something like that?**

A: **I don't know**.

Trial 1, Vol XVIII, pp. 3132-3133(emphasis added).

### *The Missing Second State Court Trial Transcripts*

Dalley was also called to testify on day twelve (February 2, 2004) of Mr. Barrett's second state trial. *See* Exhibit 8 (handwritten notes that appear to originate from the bench copied from Sequoyah County Courthouse file). Unfortunately, the audio recordings and transcribed testimony of Dalley, and the prosecution's ballistics expert Terrance Higgs, have been lost or destroyed.[22] At a minimum, the second state trial record is missing four volumes of transcripts that would have included: (i) the charge conference, (ii) opening statements, (iii) closing statements, (iv) day twelve of testimony featuring prosecution experts Terrance Higgs (ballistics) and Iris Dalley (trajectory analysis), (v) day thirteen testimony of Janice Sanders, (vi) the charge conference, jury charge, the taking of the verdict and any polling of the jury. Additionally, the

---

[22] There were also an additional eleven prosecution witnesses who testified in the first state trial for whom there are no transcripts for in the second trial. Those individuals include: Dr. Jim Campbell, Danny Farris, Jeremiah Hoyt, Alan Lloyd, Jim McBride, Danny Oliver, J. Douglas Perkins, Gary Philpot, Tommy Sanders, Steve Smith, and Bruce Spence. While it is possible that not all fourteen testified again at the subsequent trial, but the fact remains that no one will know for certain, and the record remains significantly incomplete.

actual dates printed on the second state trial transcripts are inaccurate. They are inconsistent with dates described by media outlets covering the trial as well as the trial court's notes. *See* Exhibit 9.

Mr. Barrett's prior defense team proceeded ill-advised to the federal trial without the benefit of complete transcriptions of the second trial that resulted in a manslaughter conviction, injecting further heightened reliability concerns into this case. At the September 9, 2005, status/pretrial conference before the U.S. District Court, the defense advised it "does not have all of the state court transcript and the court reporter may not be able to complete it anytime soon, as there is a trial docket star[t]ing in Sequoyah County on 9/12/05. [The] Court inquire[d] if counsel request[ed] a continuance on that basis. The Court direct[ed] counsel to advise by Monday, 9/12/05, if a continuance [wa]s needed, in order to be able to tell the prospective jurors when the trial will start." Minute Entry (Sept. 9, 2005). Jury selection commenced on September 12, 2005.

In the federal trial, Dalley again testified to her trajectory analysis and utilized a computer-based animation PowerPoint presentation. By this time, the government had also created a physical model of the cabin and crime scene (Government's Exhibit 1) through reconstructionist, Robert Thomas. Using the model, Dalley drew conclusions about how the shooting occurred that were not based on actual measurements or a reliable scientific method:

> By Mr. Littlefield: In relation to Trajectory 2, if that shot was fired with the Bronco in that position and the shooter inside the residence at approximately that inside door, would that -- and from a normal height for that type of weapon, would that trajectory be consistent from that location with what you saw in Trajectory 2?

> Ms. Dalley: The only way I could determine that would be to actually put a rod there and see if there's a straight line between those two locations.

> Q: Can you do that?

A: Yes, sir.

Mr. Littlefield: I would ask that she be allowed to approach the model.

The Court: You may.

Q: (By Mr. Littlefield) Go ahead.

A: I'm sorry. Could you identify for me the position of the gun?

Q: Held in a normal position, standing in the area of the door separating the rooms.

A: If we take a normal position to mean point shoulder position, that is raise the rifle to shoulder height, then it would be feasible that someone standing in that interior doorway could possibly make that shot.

Federal Trial, Vol XIV, pp. 3176-3177. The "normal position" referenced by Dalley, is not an accurate measurement by any stretch of the imagination. As high school students learn in trigonometry, correct measurements are crucial for any reliable determination of the angle and trajectory at which an object travels. Dalley took no measurements of the size or angle of the bullet holes in the Bronco in 1999 or at any later time the location of the Ford Bronco at the time Trajectory 2 was created remained unknown, and the model was built six years later. The defense in this case has absolutely no method of recreating these missing measurements, and the entire analysis is unscientific. This renders any physical demonstration made before the jury unreliable, falling far short of the heightened reliability standard demanded by Eighth Amendment capital punishment jurisprudence.

Dalley claimed the animated PowerPoint served as an accurate replica of the tragic shooting of Trooper Eales. After consulting with the medical examiner, Dalley identified a male officer of similar physical proportions as Trooper Eales, and dressed him with a similar uniform and ballistics shield:

20

Mr. Littlefield: And what else did you do, ma'am?

Ms. Dalley: I also got another individual that was the same height, weight and body build as Mr. Eales.

Q: And how was that person equipped or dressed?

A: I had him dressed the same way I was told Mr. Eales was dressed there that night.

Q: Same kind of protective equipment and everything else?

A: Yes, sir.

Federal Trial, Vol XIV, pp. 3239-3241. Using the "stand-in," Dalley directed the man to move in a manner that tactical officers are trained to do and how Trooper Eales *might* have moved when exiting the Ford Bronco. She also secured *another* Ford Bronco of the same make and model for her recreation. Dalley took photographs of the stand-in's movements as he exited the replacement Ford Bronco, which she then superimposed on the actual crime scene photographs taken at Mr. Barrett's property in 1999. This, apparently, was an attempt to demonstrate to the jury precisely how Trooper Eales was inflicted with a fatal wound:

Mr. Littlefield: After you superimposed the individual with the shield getting out of the Bronco onto the photographs that you took of the trajectories entering the Bronco, what did you find in relation to the trajectories and the position of the -- in relation to the position on the actor?

Ms. Dalley: I found that the Trajectory 2 was consistent with the area of the flank wound on Mr. Eales and that Trajectories 3 and 4 were each consistent with the trajectory into Mr. Eales that entered in his left shoulder area and traveled across.

Federal Trial, Vol XIV, p. 3243. Dalley's use of a "stand-in," who was not at the raid, not under fire, nor experiencing the unquestionable adrenaline of the moment, to approximate Trooper

21

Eales movements is highly prejudicial and lacks any probative value.[23] Her entire starting point for her crime scene analysis was from an undisputed moved location, and therefore cannot be used to draw any conclusions as to how these events occurred. She testified to the same nonetheless.

Not only does the prior trajectory analysis of the Ford Bronco serve little to no probative value, the current parties are precluded from inspecting and analyzing the vehicle because it was not preserved. Chief Kerry Pettingill[24] authorized the destruction of the Ford Bronco in 2011 while the case was engaged in post-conviction proceedings in the Eastern District of Oklahoma. **This new evidence recently came to light, on January 9, 2024, when both parties learned that the Ford Bronco had been sold to Standard Iron for destruction on January 5, 2011.** Exhibit 6. The government immediately disclosed this new information to defense counsel that same day.

Had the Ford Bronco been preserved, a competent forensic crime scene reconstruction expert could have conducted a reliable and scientific analysis that would have included:

1. Counting and verifying the number of bullet holes in the vehicle.
2. Examining the holes for possible size difference or caliber difference.

---

[23] It is of note, that in *Dunkle v. State,* a computer-generated animation built by Dalley was found to be "inappropriate and potentially highly misleading." 139 P.3d 228, 249 (Okla. Crim. App. July 7, 2006). In *Dunkle,* the Court found that Dalley's "**analysis was not based upon principles of math, science, or physics**. In reality, Dalley's 'crime scene reconstruction' testimony was based almost entirely upon her analysis of" Ms. Dunkle's statements and the prosecution's case-in-chief. *Id.* at 250 (emphasis added). Similarly, in this case, Dalley's analysis and recreation was not based upon the principles of math, science, or physics and was arguably inappropriate.

[24] At the time of the incident, Chief Pettingill had been a first lieutenant troop commander since 1997, and was the commander of the bomb squad and tactical team that raided Mr. Barrett's home on September 24, 1999. In 2011, when the Bronco was authorized for destruction, Pettingill had advanced to the rank of Chief within the Oklahoma Highway Patrol, a state governmental entity.

3. Examining the holes to determine if an intermediate target was struck before entering the vehicle.
4. Measuring, recording and photographing the exact locations of each hole on the vehicle.
5. Measuring and recording the size of each individual hole. Such measurements would assist in confirming angle of impact.
6. Measuring, recording, and photographing the angle of each hole using a trajectory rod, protractor, and angle finder to determine vertical and horizontal angle of impact.
7. Using updated technology in photography that was not available 25 years ago to capture clearer pictures that provide more information to all parties to the litigation.
8. Using laser technology that was not available 25 years ago to gain a more accurate depiction of the origin of the bullets that impacted the vehicle and how those bullets traveled through that vehicle. This would help with accurately lining up secondary holes in the vehicle with the 1st impact holes.

The inability to examine and inspect the destroyed Ford Bronco is material as it goes to Mr. Barrett's ability to present a competent defense against the statutory aggravating factor under 21 U.S.C. §848(n)(1). While this evidence was not independently examined by a defense expert in prior federal proceedings, had it been properly preserved, Mr. Barrett would have a right to examine it as part of the obligation of effective counsel in the present capital re-sentencing hearing. *See* Fed.R.Crim.P. 16(a)(1)(E); *United States v. DeLeon*, 428 F.Supp.3d 716, 774 (D. New Mexico 2019); *United States v. Giardina*, No. 04-cr-29J, 2005 WL 3088441, at *7 (W.D. Pa. 2005).

Because of Pettingill's actions in the state,[25] and the failure of OSBI Agent Dalley to conduct a reliable and credible trajectory analysis, there is no meaningful way for any competent

---

[25] *See, e.g., Independent Investigation of State v. Richard E. Glossip Final Report*, Reed Smith LLP, at 19 (June 2022) (finding "The state's destruction and loss of key evidence before Glossip's retrial deprived the defense from using the evidence at trial (**and has deprived the defense today of the ability to perform forensic testing using DNA and technology advancements**), the tunnel-vision and deficient police investigation, the prosecution's failure to vet evidence and further distortion of it to fit its flawed narrative, and a cascade of errors and missed opportunities by defense attorneys, fundamentally call into question the fairness of the proceedings and the ultimate reliability of the guilty verdict against Glossip for murder."). The United States Supreme Court recently granted certiorari to Richard Glossip on January 22, 2024, and will now consider whether Oklahoma's suppression of prosecution witness testimony

expert to recreate the analysis of the Ford Bronco. The parties are now left to rely upon twenty-four-year-old photos and videos documenting Dalley's original trajectory analysis that offer minimal probative value. The photographs are grainy and of poor quality, it is impossible to determine from the images (i) whether a mark is a deflection in the paint or an actual bullet hole, (ii) the size and diameter of each bullet hole to determine the potential caliber of bullet, and (iii) the distance between each bullet hole. The dowel rods depicted in the video are visibly dipped and bowed, making any exact trajectory measurements impossible and unreliable under any standard let alone under the stringent requirements necessary for heightened reliability.

Relying on proffered information from prior testimony is equally a poor substitute for the destroyed Ford Bronco. The transcripts from the second state court trial, which covered prior testimony of both Higgs and Dalley, are missing for all parties to this litigation, and to this Court. *See infra* Section (II)(A)(2)(a)(iii). The Court reporter who transcribed those proceedings is now deceased. The lost or destroyed capital trial transcripts presents serious heightened reliability concerns. Finally, even if proffered information is relevant and sufficiently reliable, it may still be excluded if its probative value 'is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.' 18 U.S.C. § 3593(c). "The balance of probative value and unfair prejudice must be weighed more carefully in a death penalty case than in normal cases. Under the statute, probative value need not be 'substantially' outweighed by prejudice, as Fed. R. Evid. 403 generally requires." *United States v. Gilbert*, 120 F.Supp.2d 147, 151 (D. Mass. 2000).

---

violated due process, whether the entirety of the suppressed evidence must be considered when assessing prosecutorial misconduct claims, and whether "due process of law requires reversal…where a capital conviction is so infected with errors that the State no longer seeks to defend it." The issues Mr. Glossip presents are nearly identical to the claims Mr. Barrett raises herein.

### ii. Troopers' recorded statements

Much happened in the hours immediately following the shootout on Mr. Barrett's property. While the OHP troopers were still at the scene, some were told to write recollections of the event on a piece of paper.  Statements from five troopers have been produced in discovery – Darst, Greninger (who started one, stopped, and then created a second one at some point), Hash, Manion, and Oliver. Darst wasn't sure which individual told him to write the statement, but recalled that it was per McBride's request. Trial 1, Vol. X, p. 1837.  Greninger said that at the scene McBride approached and told them to write something down. Trial 1, Vol. IX, pp. 1514-15.  Hash also said McBride asked them to make a handwritten statement. Trial 1, Vol IX, pp. 1647-48.  Hise said that he was never asked to prepare a handwritten statement, and that he had left the scene in Greninger's Bronco. Federal Trial, Vol. VI, p. 1297.  McBride was asked at trial whether Pettingill or anyone else asked him to write in his own handwriting his recollection of the evening, and he said no. Trial 1, Vol VII, p. 1281.  Pettingill, in his trial testimony, said that he told them to make handwritten statements but doesn't know who complied with the request. Pettingill further testified that he told the officers to fold up their respective statements and place them in their pockets for future reference. Trial 1, Vol VII, pp. 1150-52.

Later that day, the troopers were at the District Attorney's Child Support office ("DA's office"), and they recalled giving their handwritten statements to the attorney for the OHP, Gary James.  Darst said that he gave James the statement before leaving the DA's office. Trial 1, Vol X, p. 1840.  Greninger recalled that they told James they had the statements and James told them to give them to him, and he (James) would get them to who needed to get them – Greninger assumed that would be the investigators. Trial 1, Vol. IX, pp 1519-20.  Hash said that at the time he didn't know what happened to his statement, but now he knows James had them, and he

25

thinks he gave James the statement at the DHS office. Trial 2, Vol. IV, pp. 604-05.  Oliver, unlike others who said they wrote their statements at the scene, said that he wrote his later, at the DA's office.  He further stated that Pettingill came in and told them that Gary James was there and to quit writing the statements, and that James wanted them.  He said Pettingill took his statement and he assumed it went to James. Trial 1, Vol IX, pp. 1617-18.  During Pettingill's trial testimony, he said it was his understanding that the handwritten statements were given to Gary James, who was on scene at some point. Trial 2, Vol II, pp. 143-44.

It is unclear whether trooper Poe created a handwritten statement. Poe recalled Pettingill asking them to write a statement, but did not remember sitting down and writing one.  He did, however, confirm that he told the OSBI that he thought the statements had been turned over to James. Trial 1, Vol X, pp. 1879-80.  Poe later testified that he didn't remember telling OSBI that someone told them to write a statement until he saw the OSBI report – and again said he doesn't remember writing one. Trial 2, Vol V, p. 764; Federal Trial, Vol VII, pp. 1453-54.  For obvious reasons, statements written immediately after the events took place would be crucial. Based on the differing accounts of the various people at the DA's office that afternoon, along with further questions related to the chain of custody of those statements, there is no way to know exactly who wrote statements, at whose direction, and what exactly happened to them.

While at the DA's office, two Internal Affairs investigators were present, George Randolph and B.D. Robins.  The investigators had each trooper sign a Disciplinary Interview Advice of Rights form, which were notarized by Randolph and Robins.  Exhibit 10 (Advice of Rights Forms).  Darst said he can't remember if he was interviewed by Randolph, but he thinks he was, and doesn't know if notes were taken or if it was audio recorded. Trial 1, Vol X, pp. 1838-39; Trial 2, Vol IV, pp. 707-09.  Greninger said he had a short interview with Randolph,

but that he didn't believe Randolph took notes or had a tape recorder, and had no idea whether a report was prepared. Trial 1, Vol IX, p. 1518. During trial, Hash said he spoke briefly to Robins or Randolph but didn't recall if they took notes and didn't know if tape recorders were available. Trial Vol. 1, Vol. IX, pp. 1648-50. Hise said Robins and Randolph interviewed him for 10-15 minutes and he was pretty sure they took notes. Trial 1, Vol X, pp. 1755-56. Manion said when he was interviewed both Randolph and Robins were present, Randolph took notes, and the interview was tape recorded and later erased by Lt. Randolph. Trial 1, Vol. VIII, pp. 1458, 1473-74. McBride denied being interviewed at the DA's child support office. Trial 1, Vol VII, p. 1281. Oliver also denied being interviewed, saying no one asked him and he didn't ask to be interviewed. Trial 1, Vol IX, p. 1593. During the first trial, Pettingill said he spoke to either Randolph or Robins and he's pretty sure the person took notes, and in the second trial he said he spoke with Robins, who was taking notes. Trial 1, Vol VII, pp. 1153-55; Trial 2, Vol II, pp. 145-47, 238-39, 302. It is unclear whether trooper Poe was interviewed by Randolph or Robins. **Despite all of the above, undersigned counsel have no records or recordings of any kind for any of the interviews that occurred at the DA's office on September 24, 1999**. And not because the current prosecution team has not tried to provide everything to this defense team – they have tried and provided to the defense all that they have.

Randolph testified that Manion was the only trooper who would speak to him, and he interviewed him for 10-15 minutes, recording part of it. He said he had a mental image of speaking with Hise but can't remember in what setting it was. Randolph hadn't realized Manion fired any shots, and when he did, he spoke to John Lindsay, who reminded him they weren't supposed to be recording them immediately after a shooting incident, so he went back in and told Manion he wasn't going to use the tape recording. He said he made field notes, one or two word

27

sentences to remind himself what happened, but did not generate a report. He said he retained the notes until he got back to his office in Oklahoma City and then eventually shredded them. He said the recording was in his desk for years, and last he remembered he transferred it to Carolyn Rawlings, the trooper secretary, and asked her to dispose of them or erase them, he didn't need them any longer – he said that was in November 2001. Trial 1, Vol XVI, pp. 2742-46. In the second state trial Randolph said that when he spoke to Manion, John Lindsay and who he thought was Hise were in the room, but he had since been told it was Russell Knoke in the room. When asked why he wasn't supposed to record Manion if he had fired a shot, he said it was policy to not record statements from troopers who had just been involved in shootings. He said he doesn't have any record of interviewing any tactical team members that morning, and when asked how many others he interviewed that morning, he said he thinks two, Hise and Hash Trial 2, Vol. VII, pp. 1150-54.

On October 2, 2002, Dowty stated on the record that he phoned Robins and Randolph, per the Court's directive, and that Robins said he didn't interview anyone at that facility on September 24, 1999, and had no records or documentation supporting any interviews that may have occurred there. Randolph maintained previous testimony that he only interviewed Manion and has no records of any further interviews conducted at that location on that date. Trial 1, Vol XI, pp. 1999-2000.

Based on the varying statements and discrepancies between the troopers' statements and Randolph/Robins' statements, it is unclear how many of the troopers were interviewed about the incident at the DA's office. Based on trooper testimony, notes *were* taken, and it is unclear whether there were audio recordings of the interviews. From Randolph's perspective, he claims to have only stopped audio recording Manion once he learned that he had fired shots – which

28

would suggest that if he had interviewed other troopers who hadn't fired shots, he would have been able to record their interviews according to policy.  With these interviews being the first interviews of the troopers after the incident, they are critical in understanding what happened at the scene early on that same day. The lack of organization, failure to document, and abandonment of any sort of protocol calls into serious question the reliability and credibility of this investigation and thus violates Mr. Barrett's rights to due process and heightened reliability.

### iii.   Missing and inaccurate transcripts

The Tenth Circuit is "fully aware of the hazards of trying to assess the impact of testimony when we are limited to reviewing a cold record consisting of transcripts." *United States v. McGirt*, 71 F.4th 755, 761 (10th Cir. 2023).  "Cold record" problems are magnified exponentially where - as here - the dated transcripts which do exist are incomplete and, at times, inaccurate, and therefore, "unreliable."

Neither this Court nor the parties in the instant federal case have ever possessed complete trial transcripts from the state capital trial proceedings.  See argument, *supra*, at 18-19. A review of the significantly incomplete and possibly inaccurate second state court capital trial transcripts raises serious heightened reliability concerns. An indigent criminal defendant must be provided "a 'record of sufficient completeness' to permit proper consideration of [his] claims." *Mayer v. City of Chicago*, 404 U.S. 189, 194 (1971) (alteration in original) (quoting *Draper v. Washington*, 372 U.S. 487, 499 (1963)); *see also Higginbotham v. Louisiana*, 817 F.3d 217, 222 (5th Cir. 2016) ("[C]laims based on incomplete transcripts must show that 'the absence of such a transcript prejudiced [the defendant's] appeal.'" (alteration in original) (quoting *Mullen v. Blackburn*, 808 F.2d 1143, 1146 (5th Cir. 1987)); *United States v. Huggins*, 191 F.3d 532, 536 (4th Cir. 1999) ("[W]hether an omission from a transcript warrants a new trial depends on whether the appellant

has demonstrated that the omission specifically prejudices his appeal[.]") (citation and internal quotation omitted); *State v. Frantz*, 521 P.3d 1113, 1140 (Kan. 2022) ("Criminal defendants have a due process right to reasonably accurate trial transcripts, and a defendant may be entitled to a new trial if manifestly incomplete or inaccurate transcripts preclude meaningful appellate review.").

### b. Deceased and unavailable witnesses

Due to the extraordinary passage of time, critical government and defense witnesses have died or become unavailable. *See supra* Section (I)(C).

This factor has greatly compromised the "heightened reliability" required in capital cases. "Historical experience has taught us that testimonial evidence has the highest reliability because the credibility of the witness can be evaluated, and the factual issues narrowed by cross-examination." *Sanders v. Monsanto Co.*, 574 F.2d 198, 200 (5th Cir. 1978). However, when the "testimonial evidence" consists of decades-old transcripts from prior proceedings, the requisite "heightened reliability" is dramatically reduced.

As the Tenth Circuit has acknowledged, "sincerity and credibility are difficult to discern from a cold record." *United States v. Bustamante-Conchas*, 850 F.3d 1130, 1144 (10th Cir. 2017). Indeed, "the superiority of live testimony as contrasted with a transcript of prior testimony has been … praised in our own judicial system since its inception." *United States v. Yida*, 498 F.3d 945, 950 (9th Cir. 2007). *See also*, *Vinci v. Paramo*, No. 13cv1756-BTM (PCL), 2015 U.S. Dist. LEXIS 117247, at *18 (S.D. Cal. Sep. 1, 2015) ("The Court is certainly mindful of the reasons why live testimony is preferred over reading prior testimony from a cold record."); *Allen v. United States*, No. 1:20-00234, 2022 U.S. Dist. LEXIS 101489, at *5 (S.D. W. Va. June 7, 2022) ("To be sure, courts must always be sensitive to the problems of

making credibility determinations on the cold record."), quoting *United States v. Raddatz*, 447 U.S. 667, 679 (1980). The utter confusion over which troopers produced statements or not and how many times – a basic inquiry – cannot even be determined in this case, and further supports the pitfalls of a cold record that is incomplete, poorly preserved, and simply too old.

"Credibility" is, of course, an essential aspect of "reliability." *See*, *e.g.*, *Latif v. Obama*, 666 F.3d 746, 761 (D.C. 2011) (discussing "evaluation of [a witness'] credibility, which in turn bears on the reliability of the Government's evidence."); *Moberly v. Sec'y of HHS*, 592 F.3d 1315, 1325-26 (Fed. Cir. 2010) ("Assessments as to the reliability of expert testimony often turn on credibility determinations"); *United States v. Wright*, No. 21-40849, 2023 U.S. App. LEXIS 19008, at *9 n.5 (5th Cir. July 25, 2023) (noting that "… three indicia of reliability fit most comfortably under the first *Gomez* factor - the credibility of the informant."); *Gregory v. North Carolina*, 900 F.2d 705, 708 (4th Cir. 1990) ("emphasizing the declarant's credibility as a factor in evaluating reliability").

### B. The government's failure to preserve material exculpatory evidence violates Mr. Barrett's right to due process under the Fifth Amendment.

#### 1. Legal background

The Government's duty to preserve evidence derives from the Due Process Clause of the Fifth Amendment, as construed by the United States Supreme Court in two landmark cases: *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488 U.S 51 (1988).

An affirmative duty to preserve evidence arises when the evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta* at 489; *United States v. Bohl*, 25 F.3d 904, 909-10 (10th Cir. 1994). The prosecution's duty to preserve evidence extends to evidence "that might be expected to play a

significant role in the suspect's defense." *Trombetta*, at 488. *See also* Fed. R. Crim. P. 5(f)(1) (newly adopted rule in 2020 requiring district courts to issue orders at the outset of a federal criminal prosecution confirming the government's obligations to disclose exculpatory evidence to the defense).

Even if the exculpatory nature of the evidence is not plain from the circumstances, evidence that is merely "potentially useful," if destroyed in bad faith, amounts to a denial of the due process of law. *Arizona v. Youngblood*, 488 U.S. at 58. And pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963), suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, ***irrespective of the good faith or bad faith of the prosecution***.

The Government's constitutional requirement to safeguard exculpatory evidence, as set forth in *Trombetta*, *Youngblood,* and *Brady* is applicable not only to a defendant at trial, but also to sentencing proceedings. *United States v. Donaldson*, 915 F.2d 612, 614 (10th Cir. 1990).

When deciding on the appropriate remedy, the "principle concern is to provide the accused an opportunity to produce and examine all relevant evidence, to insure a fair trial." *United States v. Loud Hawk*, 628 F.2d 1139, 1151 (9th Cir. 1979) (Kennedy, J., concurring). "The degree of government fault is relevant" to the inquiry. *Id.* "In a rare case, government action may be so culpable that deterrence of future violations and protection of judicial integrity become the principal concern," in which case little or no prejudice need be shown to warrant relief. *Id*. at 1152.

If this Court presumes bad faith on the part of the state governmental actors here – specifically Oklahoma Highway Patrol Lt. Commander Pettingill who ordered the destruction of the Bronco during the pendency of this federal litigation – the government will be unable to rebut

32

that presumption. And even if the Court does not apply the presumption, the *Trombetta* and *Brady* analysis weighs strongly in Mr. Barrett's favor. The destruction of the Ford Bronco in this case will produce a sentencing proceeding that are fundamentally, and irreparably, unfair.

### 2. Analysis

### a. The Exculpatory Value of the Ford Bronco Was Known to Law Enforcement at the Time of the Destruction, Meeting the *Trombetta* Standard.

To invoke *Trombetta*, an accused must first demonstrate that the exculpatory value of the evidence was apparent before its destruction. *United States v. Bohl*, 25 F.3d at 910. Exculpatory evidence is any evidence reasonably tending to negate guilt or reduce punishment. *See generally*, *Brady v. Maryland*. The Ford Bronco was central to understanding the sequence of events that led to the death of Trooper Eales and therefore essential to Mr. Barrett's defense. *See supra* Section II(A)(2)(a) (detailing actions a defense ballistics expert could have taken if the Ford Bronco had been preserved). No past defense team has undertaken a scientific analysis in rebuttal to the faulty, unscientific analysis offered by OSBI Agent Dalley. The Bronco's destruction has deprived Mr. Barrett of the ability to independently and scientifically measure the Bronco as a fundamental and core part of a crime scene reconstruction in this case. The Bronco's destruction has denied Mr. Barrett his due process right to present potentially exculpatory evidence to refute the allegations that he acted with intent to kill the decedent.

### b. No Comparable Evidence is Available to Mr. Barrett

The second prong of the *Trombetta* test requires a finding that the defendant is "unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489. If the evidence is irreplaceable, the *Trombetta* claim has been established. In *United States v. Bohl*, *supra*, the government destroyed physical evidence (radio towers built by the defendants, purportedly with inferior steel) that could have been tested and might have exonerated the

defendants. 25 F.3d at 908-09. Before the destruction, the government conducted its own testing of the towers, resulting in inculpatory results. *Id*. at 907. The defendants asserted that without the ability to conduct independent testing, they were left with no adequate means to rebut the allegations. *Id*. at 908. The government argued that access to photographs, small samples, and the government's test results was comparable evidence. *Id*. The Tenth Circuit rejected the argument, finding the evidence available to the defense was an "inadequate substitute," mandating the dismissal of the indictment. *Id*. at 912.

In *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993), the government destroyed laboratory equipment alleged to have been used to manufacture methamphetamine preventing the defendants from establishing that the equipment was incapable of withstanding the high temperature necessary for drug manufacturing. *Id*. at 930. A defense expert testified that based on the defendant's description, the equipment could not withstand the temperatures needed to manufacture methamphetamine, but without conducting an examination of the equipment he could not reach a firm conclusion. *Id.* The court held that photographs taken of the equipment were inadequate to properly assess the evidence and left the defendants no alternative means of defending themselves against testimony by government witnesses about the equipment. *Id*. at 932.

In this case, as in *Bohl* and *Cooper*, the destroyed evidence is irreplaceable. The examination conducted by law enforcement immediately after the incident was fraught with errors as detailed above. There is no comparable evidence that would allow Mr. Barrett to now adequately challenge the Government's expert opinions drawn from their examination of the vehicle. In *Bohl* and *Cooper*, the courts found that photographs alone of the lost evidence were inadequate, and that testimony by experts was inadequate where the experts were unable to

34

conduct their own analysis of the evidence. The photographs taken in Mr. Barrett's case are of poor quality and were taken 24 years ago and do not lend themselves to any proper analysis of the size or the angle of each hole entering or exiting the Bronco. Reliance on prior transcripts is also inadequate as the second state trial transcripts, which discussed the government's inspection and examination of the Ford Bronco, are lost or destroyed. There simply is no substitute for the destroyed Ford Bronco or the trial transcripts depicting the government's experts' prior testimony.

### c. Because the *Trombetta* Standard Has Been Met, Bad Faith Need Not Be Shown, Nonetheless Bad Faith Exists.

The exculpatory value of the Ford Bronco was readily apparent, and therefore the *Youngblood* requirement of bad faith need not be shown. Nonetheless, it is undeniable that the intentional decision to destroy the Ford Bronco in 2011 during the pendency of Mr. Barrett's capital federal proceedings constitutes bad faith.

The inquiry into bad faith turns on law enforcement's knowledge of the exculpatory value of the evidence at the timing of destruction. *Bohl*, at 911. The Tenth Circuit has identified five factors relevant to the bad faith determination: (1) whether the government had notice that the evidence was potentially exculpatory; (2) whether the exculpatory nature of the evidence was more than speculation or conjecture; (3) whether the government had control of the evidence at the time it learned of its exculpatory value; (4) whether the destroyed evidence was central to the case; and (5) whether the government offers an innocent explanation for its failure to preserve the evidence. *See United States v. Beckstead*, 500 F.3d 1154, 1159-61 (10th Cir. 2007); *Bohl*, 25 F,3d at 911. All of the above factors are met.

No reasonable justification for the failure to preserve the evidence exists. The appropriate remedy for the government's actions is to strike the NOI and grant Mr. Barrett a new trial.

35

IV.    **Given the cumulative impact of improperly withheld *and* unavailable evidence, striking the NOI and granting a new trial is the only appropriate remedy.**

It is well-established that the disclosure of evidence favorable to the accused and "material either to guilt or punishment," including impeachment evidence, must be disclosed. *Brady v. Maryland,* 373 U.S. 83, 87 (1963); *Giglio v. United States,* 405 U.S. 150 (1972). "A fair analysis of the holding in *Brady* indicates that implicit in requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *United States v. Agurs,* 427 U.S. 97, 104 (1976). "The 'prosecution' includes 'not only the individual prosecutor handling the case, but also extends to the prosecutor's entire office, **as well as … other arms of the state involved in investigative aspects of a particular criminal venture**.'" *United States v. Holloway,* 939 F.3d 1088, 1105 (10th Cir. 2019) (quoting *Smith v. Sec'y of New Mexico Dep't of Corr.,* 50 F.3d 801, 824 (10th Cir. 1995) (emphasis added). Here it is the defendant's position that the arm of the state involved in this investigation of this homicide – the Oklahoma Highway Patrol – is the governmental entity that destroyed the evidence during the pendency of this federal litigation.  If the defense establishes by a preponderance of the evidence that "(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material" then the proper remedy is a new trial. *United States v. Quintanilla,* 193 F.3d 1139, 1149 & n. 10 (10th Cir.1999).

"The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Fontenot v. Crow*, 4 F.4th 982, 1080 (10th Cir. 2021) (quoting *Strickler v. Greene*, 527 U.S. 263, 290 (1999)), *cert. denied*, 142 S. Ct. 2777 (2022). The materiality of withheld evidence is evaluated "in light of the entire record in order to determine if 'the omitted evidence creates a reasonable doubt that did not otherwise exist.'" *Id.* at

1080–81 (internal quotation marks omitted). Therefore, the court "do[es] not consider each piece of withheld evidence in isolation." *Id.* at 1080 (quoting *Simpson v. Carpenter*, 912 F.3d 542, 572 (10th Cir. 2018)). Instead, it "review[s] the cumulative impact of the withheld evidence, its utility to the defense as well as its potentially damaging impact on the prosecution's case." *Id.* (quoting *Simpson*, 912 F.3d at 572). "Whether withheld evidence is material is not a sufficiency-of-the-evidence test." *United States v. Reese*, 745 F.3d 1075, 1084 n.8 (10th Cir. 2014); *see also Kyles v. Whitley*, 514 U.S. 419, 435 (1995) ("One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.").

In addition to the courts, Congress also views the prosecution's obligations under *Brady* very seriously and passed the Due Process Protections Act in 2019.[26] This Act amended Federal Rule of Criminal Procedure 5. Since 2020, federal judges in criminal proceedings are required to enter an order confirming the obligation of the prosecutor to disclose exculpatory evidence *and* the consequences for violating such an order. Fed. R. Crim. P. 5(f). In the Eastern District of Oklahoma, the order currently reads: "Pursuant to the Due Process Protections Act, the government is reminded of its obligations pursuant to *Brady v. Maryland* and its progeny to disclose material that is favorable to the defendant and material to the defendant's guilt or punishment. The failure to do so in a timely manner may include dismissal of the indictment or information, dismissal of individual charges, exclusion of government evidence or witnesses, or any other remedy that is just under the circumstances as to [defendant]."

---

[26] Senator Murkowski of Alaska introduced the bill following the trial of Senator Ted Stevens in 2008, which later investigation found replete with instances of prosecutorial misconduct.

37

The State of Oklahoma's intentional destruction of the Ford Bronco – material and potentially exculpatory evidence – while Mr. Barrett's federal criminal proceeding was still pending is deeply troubling. Perhaps equally troubling, the State of Oklahoma buried or lost critical OHP paperwork documenting the circumstances related to its spoliation.

To be clear, this information was withheld from the defense as well as the federal prosecutors in this case. It was finally located and disclosed to federal prosecutors in January 2024 who in turn promptly complied with their *Brady* obligations by immediately disclosing this new evidence to defense counsel. Further, the State of Oklahoma's intentional suppression and then destruction of Trooper Manion's audio recorded interview taken shortly after the incident (as well as contemporaneous notes of his statement), two yeas after the statement was recorded and **one year prior** to Mr. Barrett's first state capital trial is outrageous.  As is the fact that the individual troopers who were part of the raid were allowed to leave the shooting scene with their weapons, and no accurate count of the rounds fired has never been established in this case.

This misconduct by the State of Oklahoma is not isolated to Mr. Barrett's case. Oklahoma City Attorney General Genter Drummond, the state's chief law enforcement officer, has contended Richard Glossip's 1997 capital murder conviction should be vacated and remanded back to district court amid revelations of suppressed false testimony by the prosecution's key witness.[27] *See also* Pet., *Glossip* v. *Oklahoma*, 22-6500 (U.S.) (raising three issues before the United States Supreme Court: whether Oklahoma's suppression of prosecution witness testimony violated due process, whether the entirety of the suppressed evidence must be considered when assessing prosecutorial misconduct claims, and whether "due process of law

---

[27] Oklahoma Office of the Attorney General, *Drummond remarks on U.S. Supreme Court Decision to Hear Glossip Case* (Jan. 22, 2024), https://www.oag.ok.gov/articles/drummond-remarks-us-supreme-court-decision-hear-glossip-case.

requires reversal…where a capital conviction is so infected with errors that the State no longer seeks to defend it."). The State of Oklahoma's intentional destruction of material evidence coupled with the sheer volume of evidence now unavailable in this case – incomplete and lost state trial transcripts, over a dozen deceased witnesses, lost witness statements and law enforcement interview notes, lost or destroyed expert notes and measurements, consumed ballistics evidence, lost policy manuals, and missing department-issued firearms present on scene – has created a cumulative prejudicial effect beyond repair that violates Mr. Barrett's rights to due process and heightened reliability. This behavior cannot satisfy any measure of justice in a case involving the highest penalty known to mankind. The only appropriate remedy is to strike the notice of intent to seek death, forbid the case from proceeding capitally, and grant Mr. Barrett a new trial on the underlying charges.

## V.    Conclusion

For the reasons described above, this Court should strike the NOI and prohibit the government from seeking the death penalty in the case of conviction, and grant Mr. Barrett's request for a new trial. In the alternative, Mr. Barrett urges this Court to set this matter for an evidentiary hearing where expert testimony may be provided.

DATED this 31st day of January, 2024.

Respectfully submitted,

*/s/ Kimberly C. Stevens*
Kimberly C. Stevens
NC State Bar # 20156
Senior Capital Resource Counsel
1070-1 Tunnel Road, Ste 10-215
Asheville, NC 28805
Telephone: (336) 575-4337
E-mail: Kim_Stevens@fd.org

39

*/s/ Laura E. Udall*
Laura Elisabeth Udall
AZ Bar # 010501
Laura E. Udall, PLLC
P.O. Box 40294
Tucson, AZ 85717-0294
Telephone: (520) 770-1414
E-mail: Laura@udall.me

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served on the United States by e-filing same to its counsel of record, Jeffrey B. Kahan, United States Department of Justice; Christopher J. Wilson, Assistant United States Attorney, United States Department of Justice, Eastern District of Oklahoma, this 31st day of January, 2024.

*/s/ Kimberly C. Stevens*
Kimberly C. Stevens