**EXHIBIT 5**

PAGE    2642

IN THE DISTRICT COURT OF SEQUOYAH COUNTY

STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

DEC 2 2 2003

BERNELL EDWARDS, COURT CLERK

BY_____DEPUTY.

STATE OF OKLAHOMA,              )
                               )
             Plaintiff,         )
                               )
        - VS -                  )      Case No. CF-99-493
                               )
KENNETH EUGENE BARRETT,         )
                               )
             Defendant.         )

COPY

JURY TRIAL

VOLUME XVI

In the above stated case, taken on the 9th day of October, 2002, in the City of Sallisaw, County of Sequoyah, State of Oklahoma, before Mark P. Woods, a Certified Shorthand Reporter, within and for the State of Oklahoma, commencing at the hour of 9:00 a.m., before the Honorable Judge John Garrett, District Judge.

------------------------------------------------------------

REPORTED BY:
MARK P. WOODS, C.S.R.
Official Court Reporter
Sequoyah County
120 East Chickasaw
Sallisaw, Oklahoma  74955
OFFICE (918) 775-5792

00009527

US v KENNETH BARRETT - DEFENSE COPY

00009527

INDEX

WITNESSES                                                    PAGE

RYAN PORTER

Direct Examination by Mr. Dowty........................ 2665
Cross-examination by Mr. Echols....................... 2689
Redirect Examination by Mr. Dowty..................... 2718
Recross-examination by Mr. Echols..................... 2723
Further Redirect Examination by Mr. Dowty............ 2726
Further Recross-examination by Mr. Echols............ 2728

JIM CAMPBELL

Direct Examination by Mr. Dowty....................... 2729
Cross-examination by Mr. Echols....................... 2732

GEORGE RANDOLPH

Direct Examination by Mr. Dowty....................... 2734
Cross-examination by Mr. Echols....................... 2747

WILLIAM WOOD

Direct Examination by Mr. Dowty....................... 2783
Cross-examination by Mr. Echols....................... 2787
Redirect Examination by Mr. Dowty.................... 2792

DONITA MARTIN

Direct Examination by Mr. Dowty....................... 2793
Cross-examination by Mr. Echols....................... 2796

GEORGE RANDOLPH (cont)

Cross-examination by Mr. Echols....................... 2797
Redirect Examination by Mr. Dowty.................... 2812
Recross-examination by Mr. Echols.................... 2813

- - -

US v KENNETH BARRETT - DEFENSE COPY

Q    Were you directed or assigned to go to this other building?

A    I was sent there by captain Burris to try to talk to the tac team members so I could find out what happened and tell the upper administration what had transpired.

Q    Who is captain Burris?

A    He was my boss in internal affairs.  He was in charge of internal affairs.

Q    Did you participate in any way in the examination or the work that was being done at the residence?

A    No, sir, I did not.

Q    Did you attempt to interview any persons there?

A    No, sir, I did not.

Q    Who did you speak with then at this building that you referred to?

A    The best I can recall, all the tac team members were in a room.  When I asked any of them if they would speak to me, the only one at the time that would talk to me was Ricky Manion.  I spoke to Ricky Manion.

Q    How long did you speak with him?

A    The whole interview probably lasted ten or 15 minutes at most.

Q    Without telling us what he said, what was the general nature of your interview with him?

A    I just asked him what had happened on the incident that

US v KENNETH BARRETT - DEFENSE COPY

00009628
00009628

had taken place.

Q   Did you record that interview?

A   Yes, sir, I did.  Part of it.

Q   Is he the only officer that you had the opportunity to speak with at that location?

A   Sir, I spoke to several people there in the hallway and such.

Q   I guess I should refer to a formal interview of persons.

A   I've thought about this over and over again.  Please bear in mind it was three years ago.  I know for a fact I spoke to Ricky Manion.  I remember that very well.  I have a mental image of speaking with Gene Hise somewhere that day, but I don't know what setting it was.  I can't tell you if that was an interview or not.  I remember Gene Hise being extremely upset.  I can't tell you if it was an interview setting or not.

Q   Would you know if you in any way recorded or kept any notes or records of that discussion with Gene Hise on that day?

A   No, sir.  I made none of those.

Q   As to trooper Manion, you did a tape recording?

A   Partially, yes, sir.

Q   What did occur during the course of that interview?

A   When trooper Manion told me he had fired shots through the east window of Mr. Barrett's residence, I stopped the

US v KENNETH BARRETT - DEFENSE COPY

00009629

00009629

interview.

Q    Why did you do that?

A    At that time, the assistant commissioner, Scott Watkins, and the assistant chief, we were kind in a quandary at times about whether we were going to interview troopers after they had been involved in a shooting and tape record that or if we were not going to tape record that. I did not know that Ricky Manion had fired any shots when I started the interview. When he told me he had fired some shots, I stopped the tape and went out in the lobby or the hallway and spoke with John Lindsay about it.

Q    Who is John Lindsay?

A    He's DPS generalk counsel. John again reminded me we weren't supposed to be tape recording these troopers after a shooting incident immediately after an incident.

Q    After that advisement, what did you do with regard to this interview?

A    I went back in and told trooper Manion that I was going to not use the tape recording. It was not supposed to have been made. It would never be transcribed and become part of the file and let him go ahead and finish his story.

Q    So you did continue to speak with him?

A    Yes, I did. I believe I did.

Q    You just didn't record it?

A    No, sir, I did not.

US v KENNETH BARRETT - DEFENSE COPY

00009630
00009630

Q    Did you make notes of the further discussion with him?

A    Yes, sir.  I made field notes as such.  One or two word sentences so I could remind myself what to tell the administration about what had happened.

Q    Did you ever generate any report of your conversation or interview with trooper Manion at that location?

A    No, sir, I did not.

Q    Did you retain the notes that you took during the interview?

A    I retained them as far as getting back to my office in Oklahoma City.  They eventually were shredded in a shredder. I didn't need them.  They weren't transcribed.  They weren't used in a report.

Q    What happened to the tape recording of trooper Manion's partial interview?

A    The tape recording was in my desk.  Has been in my desk for several years.  The last I remember when I transferred to planning and research, I took that tape and several others the best I can recall and gave them to Carolyn Rawlings the trooper secretary and asked her to dispose of the tapes, erase, reuse, whatever they were supposed to do with them.  I no longer needed them.

Q    Do you know when that was done?

A    That would have been in November of last year.

Q    Were you aware of any directive either from your

US v KENNETH BARRETT - DEFENSE COPY

department or from any court to retain or preserve any of the records or recordings with regard to this interview of trooper Manion?

A    No, sir, I was not.

Q    In so far as the 24th of September, 1999, would that be all the persons you had contact with in terms of interview or discussion?

A    That I can recall, sir.

Q    Did you subsequently have occasion to interview the tac team members were regard to these events?

A    No, sir, I did not.

Q    So did you participate further in the production of any report or recommendations of internal affairs with regard to this matter?

A    The only participation I had in it would be to proofread lieutenant Gordon's interview statements and try to correct the grammar of them so they would be suitable for captain Burris to okay, because he was real particular about how the sentence structure was to be put in these interview reports.

Q    But other than that editing function, did you have anything to do with the reports of internal affairs with regard to this matter?

A    No, sir, I did not.

MR. DOWTY:  If your Honor please, I believe that's all I have of this witness.  Thank you.

00009632

US v KENNETH BARRETT - DEFENSE COPY

00009632