**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

**UNITED STATES OF AMERICA,**

     Plaintiff**,**

v.

**KENNETH EUGENE BARRETT,**

     Defendant.

Case no. 6:04-cr-00115-RAW

---

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE THE NOTICE
OF INTENT TO SEEK THE DEATH PENALTY AND REQUEST FOR A NEW TRIAL**

---

Comes now, Plaintiff, the United States of America, by and through undersigned counsel and submits this brief in opposition to Defendant Kenneth Eugene Barrett's motion to strike the notice of intent to seek the death penalty and request for a new trial (Dkt. 496). Barrett premises his motion on the loss or destruction of supposedly exculpatory evidence. Because Barrett has not demonstrated that the federal government bears any real or constructive responsibility for the loss of the evidence, his motion should fail. Additionally, Barrett fails to substantiate his speculative assertions that any identified evidence had exculpatory value or was lost through bad faith of some actor. To the extent Barrett attempts to aggregate his claims into a novel request to vacate his conviction, his argument fails procedurally: he has fully litigated a motion to vacate and cannot do so again without securing the permission of the Tenth Circuit Court of Appeals.

**<u>PRELIMINARY STATEMENT</u>**

In 1999, an Oklahoma state court issued a warrant for Barrett's arrest after he failed to appear for trial on drug charges. *United States v. Barrett*, 797 F.3d 1207, 1211 (10th Cir. 2015) ("*Barrett II*"). The police later learned that Barrett had isolated himself at home, where he sold

1

methamphetamine and "had promised to kill any officer who came to arrest him." *Id*. The police took Barrett's threat seriously, understanding he "routinely carried firearms," and lived on a dead-end road near several relatives. *United States v. Barrett*, 496 F.3d 1079, 1083 (10th Cir. 2007) ("*Barrett I*"). Given the evident risks in arresting Barrett, the police obtained a "no-knock" nighttime service warrant and engaged the assistance of an Oklahoma Highway Patrol ("OHP") tactical team. *Id*. at 1082-83.

Shortly after 12:00 a.m., September 24, 1999, three tactical team vehicles entered Barrett's property, headed toward his house. *Barrett II*, at 1211; *Barrett I*, at 1084. The lead vehicle was an unmarked Ford Bronco. *Barrett I*, at 1084. Another Bronco and a marked patrol car followed close behind with flashing emergency lights. *Id*. As the vehicles approached the house, gunfire erupted, hitting the lead Bronco in "the middle of the windshield, at approximately 'head level.'" *Barrett II*, at 1212; *Barrett I*, at 1084. The gunfire intensified as the Bronco neared the house, where the vehicle eventually stopped at or near the southeast corner. *Barrett I*, at 1084; *Barrett II*, at 1212. The Bronco's passenger, Trooper David "Rocky" Eales, exited and sought cover behind the Bronco. *Barrett II*, at 1212; *Barrett I*, at 1084-1085. But as Trooper Eales exited the vehicle, Barrett fatally shot him in the back and arm. *Barrett I*, at 1085. The Bronco's driver, Trooper John "Buddy" Hamilton exited the vehicle and sustained a non-fatal gunshot wound to the shoulder. *Id*. Taking cover with the mortally wounded Eales behind the Bronco, Trooper Hamilton and another team member, Trooper Ricky Manion, saw Barrett standing in the doorway of his home with a rifle. *Id*.

Eventually, Trooper Hamilton fired two errant rounds toward Barrett, and Trooper Manion moved to the east side of the house and discharged two bursts of gunfire through a window, wounding Barrett in the lower body. *Barrett I*, at 1085. Members of the tactical team

took Barrett into custody despite the defendant's apparent efforts to brandish a pistol from his waistband. *Barrett II*, at 1212. Inside the home, the police found cash, firearms, and materials used to manufacture methamphetamine. *Id*.

Oklahoma state officials charged Barrett with first degree murder, shooting with intent to kill, and two counts of discharging a firearm with intent to kill. *Barrett II*, at 1212. An initial state trial ended in a hung jury. *Id*. On retrial, a jury convicted Barrett of two lesser offenses—manslaughter and battery with a dangerous weapon, and the court imposed a 30-year prison sentence. *Id*.

After the state proceedings, the U.S. Attorney secured an indictment, charging Barrett with drug and firearm murder offenses. *Barrett II*, at 1212-13. The U.S. Attorney subsequently filed a notice of intent to seek the death penalty ("NOI"), and an amendment thereto. Dkt. 59 and 60. At trial, a jury convicted Barrett, as charged, of two counts of causing death through use of a firearm during a drug trafficking and a violent crime (18 U.S.C. § 924(c)(1)(A) & (j)(1) (Counts One and Two)) and one count of killing a law enforcement officer during a felony drug offense (21 U.S.C. § 848(e)(1)(B) (Count Three)). *Id*. at 1213. The jury recommended, and the court imposed, a death sentence on Count Three and life sentences on Counts One and Two. *Id*. On direct review, the Tenth Circuit Court of Appeals affirmed, and the U.S. Supreme Court denied certiorari. *Barrett I*, *cert. denied*, 552 U.S. 1260 (2008).

In 2009, Barrett moved for relief under 28 U.S.C. § 2255, which this Court denied. *Barrett v. United States*, no. 09–CIV–105–JHP, 2012 WL 3542609 (E.D. Okla. Aug. 16, 2012) ("*2255 Opinion*"). On appeal from that decision, the Tenth Circuit affirmed in part and reversed in part, remanding for an evidentiary hearing on a claim that trial counsel rendered ineffective assistance during the penalty phase hearing. *Barrett II*, at 1208. Barrett sought rehearing and

certiorari from those aspects of the opinion with which he disagreed, but the Court of Appeals and Supreme Court denied further review. *Barrett II*, *reh'g denied* Oct. 16, 2015, *cert. denied, Barrett v. United States*, 137 S. Ct. 36 (2016). On remand, this Court conducted a multi-day evidentiary hearing, denied relief in an unpublished order, and granted a certificate of appealability. *Barrett v. United States*, no 09-CIV-105-RAW, Dkt. 478 and 479. On appeal, the Tenth Circuit Court of Appeals reversed and remanded for resentencing on Count 3, the only count for which Barrett received a death sentence. *United States v. Barrett*, 985 F.3d 1203 (10th Cir. 2021) ("*Barrett IV*").

Separately, on May 12, 2016, while seeking certiorari from his first § 2255 appeal (*Barrett II*), Barrett moved for permission to file a second or successive § 2255 motion, announcing his desire to challenge his convictions with a claim that "continuous, pervasive egregious prosecutorial and police misconduct" violated his due process rights at trial. *See In re: Barrett*, 10th Cir. Case no. 16-7035 ("*§ 2255(h)-I*"). The Tenth Circuit denied the request in a published opinion. *In re: Barrett*, 840 F.3d 1223 (10th Cir. 2016) ("*Barrett III*"). On May 23, 2016, Barrett moved for a second time for permission to file a successive § 2255 motion, proposing to attack one of his two § 924 convictions based on an allegedly vague provision in the statute. *In re: Barrett*, 10th Cir. case no. 16-7039 ("*§ 2255(h)-II*")). On June 24, 2016, the Court of Appeals ordered the request held in abeyance. On May 15, 2019, Barrett petitioned for a third time to file a successive § 2255 motion (*In re: Barrett*, 10th Cir. case no. 19-7028 ("*§ 2255(h)-III*")), seeking permission to argue that his trial attorneys had not acted on his personal goals for the defense. The Tenth Circuit denied *§ 2255(h)-III* but eventually granted the request in *§ 2255(h)-II*, citing, inter alia, *United States v. Davis*, 139 S. Ct. 2319, 2336 (2019).

On December 13, 2019, in accordance with the order in *§ 2255(h)-II* (Dkt. 452), Barrett

4

filed a successive motion for § 2255 relief in which he asserted that the predicate felony for

Count Two did not constitute a qualifying crime of violence. Dkt. 453. On December 6, 2021,

the Court denied the motion and a certificate of appealability ("COA") (Dkt. 467), and Barrett

sought reconsideration. On November 13, 2023, this Court denied Barrett's request to amend its

judgment except to the extent it granted a COA. Dkt. 482. The resulting appeal is pending in

Tenth Circuit case no. 23-7086.

On January 31, 2024, in anticipation of resentencing, Barrett filed the instant motion,

asserting that the spoliation of evidence required the dismissal of the NOI and a vacatur of his

conviction. Dkt. 496 ("Br."). This opposition follows.

## ARGUMENT

**I.     ANY ALLEGED DESTRUCTION OF EVIDENCE, TO THE EXTENT IT
       IMPLICATES CONDUCT ATTRIBUTABLE TO THE GOVERNMENT,
       DID NOT INVOLVE BAD FAITH OR CONCERN DEMONSTRABLY
       EXCULPATORY MATERIAL**

Barrett claims this Court should dismiss the NOI as a remedy for the spoliation of

evidence. Specifically, and most significantly, he complains the OHP ordered the destruction of

the Ford Bronco that carried Trooper Eales to the scene of his murder. Barrett also argues his

spoliation claim embraces notes and recordings from witness statements, transcripts from state

trials, and witnesses who have passed away over the last 24 years. According to Barrett, the

Court should apply an undefined standard of "heightened reliability" in its evaluation of his

claims because the dispute arises in the context of a capital case.

Barrett misstates the operable law in seeking application of an undefined standard of

"heightened reliability" to a straightforward spoliation issue. Indeed, his claim falls within well-

established and clearly defined Supreme Court doctrine. Moreover, Barrett attempts to ascribe to

the federal government all manner of evidentiary erosion, ranging from the actions of state

agencies uninvolved in the criminal investigation to the simple fact of human mortality. But Barrett casts his net too broadly: the courts have recognized that they cannot remedy losses of evidence for which the prosecution and its agents bear no responsibility. Assuming the federal government had some agency with the actors responsible for the evidence, Barrett fails to show that all the losses occurred in a pre-trial context, when any error would sound within the Due Process Clause. Finally, Barrett has not demonstrated the exculpatory value of the missing evidence or the bad faith of any known actor involved with its loss.

    A.   <u>Spoliation of Evidence Can, Under Certain Circumstances, Violate Due Process</u>

Under the *Trombetta* rule, "The government violates a defendant's right to due process when: (1) it destroys evidence whose exculpatory significance is 'apparent before' destruction; and (2) the defendant remains unable to 'obtain comparable evidence by other reasonably available means.'" *United States v. Bohl*, 25 F.3d 904, 909-10 (10th Cir. 1994) (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)). If the lost material had "indeterminate" exculpatory value but "was 'potentially useful' for the defense," a due process violation will lie under *Arizona v. Youngblood* if the defense shows "that the government acted in bad faith in destroying the evidence." *Id*. (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 1988)). The defense bears the burden of proof on spoliation claims. *United States v. Ludwig*, 641 F.3d 1243, 1253-54 (10th Cir. 2011).

The standards applicable to spoliation issues do not become more stringent by dint of their application in capital cases, though the Supreme Court has recognized that the Eighth Amendment requires heightened reliability in death penalty prosecutions. *E.g., Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability").

Heightened reliability focuses on "(1) the need to delineate, ex ante, the particular offenses for which death is a proportionate punishment and (2) the need for the jury to be able to consider all factors (particularly mitigating, but also aggravating) relevant to choosing an appropriate punishment once the death penalty is in play. *United States v. Fields*, 483 F.3d 313, 336 (5th Cir. 2007); *see also Sumner v. Shuman*, 483 U.S. 66, 72 (1987) (observing "the heightened reliability demanded by the Eighth Amendment" drove the decision to require guided discretion in capital sentencing). Given the limited reach of the "heightened reliability" doctrine, it has not as Barrett suggests been expanded into other areas. *See Fields*, at 336 (rejecting "heightened reliability" as a standard for excluding evidence); *see also, e.g., United States v. Umana*, 750 F.3d 320, 347 (4th Cir. 2014) (citing *Fields* with approval). Accordingly, courts have consistently applied the unadorned *Trombetta/Youngblood* doctrines in capital cases. *See, e.g., United States v. Purkey*, 428 F.3d 738, 747-48 (8th Cir. 2005) (finding the district court had not clearly erred in applying *Trombetta* in a federal capital case); *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) (applying *Youngblood/Trombetta* directly to a capital case on collateral review); *United States v. Sablan*, No. 1:08–CR–00259–PMP, 2014 WL 3385167, *6-7 (E.D. Cal. July 10, 2013) (applying *Youngblood/Trombetta* to a federal capital case); *United States v. Lujan*, NO. CR 05-0924 RB, 2011 WL 13210251, *2-3 (D.N.M. May 11, 2011) (same).

The *Trombetta/Youngblood* doctrine obtains only when the government or its agent destroyed or lost the evidence. *See United States v. Fernandez*, 24 F.4th 1321, 1332 (10th Cir.) (holding that the spoliation doctrine did not apply when a private actor, who lacked an agency relationship with the government, lost evidence), called into question on other grounds, *United States v. Porter*, 66 F.4th 1223, 1226 n.2 (10th Cir. 2023); *Bullock v. Carver*, 297 F.3d 1036, 1056–57 (10th Cir. 2002) (same). If a non-governmental actor loses evidence, that error does not

7

redound to the government as a due process violation by dint of some similarity of interests.  *See*

*Bullock*, at 1056-57 (refusing to find, in a sexual abuse case, that state officials bore liability for

spoliation of evidence caused by a therapist, employed by largely state-funded company, who

interviewed children concerning abuse).  The government has no due process obligation to

preserve evidence it never possessed or could access.[1]  *See Champ v. Zavaras*, 431 F. App'x 641,

648 (10th Cir. 2011); *see also United States v. Hartman*, 194 F. App'x 537, 542 (10th Cir. 2006)

(observing that "it is not clear under the precedents cited that the government has any duty to

preserve evidence not in its control").

Even when the government bears responsibility for the preservation of evidence, its due

process obligations appear to end with conviction.  *Trombetta* and *Youngblood* involve the pre-

trial destruction of evidence, and the Supreme Court has not clearly established that post-

conviction spoliation violates due process.  *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007).

B.   State Officials Independently Destroyed Trooper Eales' Ford Bronco After Trial and Without Bad Faith

In 2011, approximately six years after the conclusion of Barrett's third homicide trial, and

more than two years after the commencement of his first § 2255 proceeding, the OHP ordered

the destruction of the Ford Bronco that carried Trooper Eales to the scene of his fatal shooting.

More than 11 years later, at Barrett's request, the government learned of the Bronco's disposal

and informed the defense.  *See* Br. Ex. 7.  The vehicle had sustained substantial damage from the

fusillade Barrett unleashed, and it had undergone analysis by Iris Dalley, a criminalist employed

by the Oklahoma State Bureau of Investigation ("OSBI").  *2255 Opinion*, at *76; Tr. XIV: 3164-

---

[1] Relatedly, due process requires disclosure of only that exculpatory information within the government's possession or knowledge, either actual or constructive.  *United States v. Lujan*, 530 F. Supp. 2d 1224, 1231 (D.N.M. 2008) (citing *United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999)).

65.[2] Dalley authenticated photographs of the vehicle and the process of her evaluation.  *See* Tr. XIV: 3151 (offer of proof).  Dalley testified during Barrett's federal trial, and the defendant disputed her findings in his first § 2255 motion, claiming his attorneys had failed to adequately investigate her crime scene reconstruction.  *See* 2255 Opinion, at 76.  This Court rejected the claim, finding that counsel had employed an effective cross-examination and observing that Dalley had reached only "two significant conclusions:  1) the defendant could not have fired all of the shots from a prone position and 2) the wounds to Eales's flank and elbow were sustained after he exited his Bronco."  *Id*.

The destruction of the Bronco by the OHP did not involve the federal government or any organization it controlled or directed.  When the government elected to prosecute this case, it designated the DEA as its investigative agency, a fact this Court has previously recognized.  *See 2255 Opinion*, at *22 ("The investigative team for purposes of the federal charges was the United States Drug Enforcement Agency (DEA)").  The DEA supplanted the Oklahoma State Bureau of Investigation ("OSBI"), which had begun investigating the murder in its immediate aftermath.  *See* Tr. VII: 1514-15, 1852.  The OSBI is independent of the OHP and its parent agency, the Oklahoma Department of Public Safety.  *Compare* 74 O.S. § 150.2; *with* 47 O.S. § 2-117.

Briefly stated, the United States did not rely upon or direct any investigation of Trooper Eales' murder undertaken by the OHP.  Of course, as agencies of separate sovereigns in a federal system, the federal government does not exercise direct control over the OHP.  Although information possessed by federal agents "is typically imputed to the federal prosecutors" for due process purposes, the state's knowledge and possession of evidence generally is not.  *United States v. Beers*, 189 F.3d at 1304; *see also United States v. Romo*, 914 F.2d 889, 899 (7th Cir.

---

[2] "Tr. refers to the 2005 trial transcript in this case by volume and page number.

1990) (finding no error in denial of defendant's motion to compel prosecutors to make various inquires of local police in absence of showing by defendant that specific material, exculpatory information existed of which government knew).

Because no agency relationship existed between the federal government and the OHP, Barrett cannot attribute the state agency's destruction of evidence to the United States. A joint investigation between the federal government and a state agency might create an "align[ment]" of interests that joins them for due process purposes. *See Beers*, 189 F.3d at 1304 n.2. Presuming that rule obtained here, the government's interests would align with the OSBI, which actually investigated the murder, not the OHP whose personnel suffered the crime.

In this case, Barett's crimes against the tactical team created a potential conflict of interest for the OHP in investigating the offenses, as the defendant argued at trial. *See* Tr. XX: 4327 (counsel's argument that OHP protected its troopers at the expense of the truth). Indeed, the OHP and its troopers had independent litigation interests that conflicted with those of the defendant. *See, e.g., Barrett v. Philpot*, No. 09-7008, Dkt. 01018330623 (10th Cir. Dec. 15, 2009) (affirming the dismissal of Barrett's civil rights suit against, inter alia, Trooper Hamilton and an unknown trooper for use of excessive force during the arrest). Whether the OHP perceived or acted on any conflict does not matter. The OHP's brief involvement in the case long predated federal adoption. The OHP did not share resources with the federal government in this case, did not conduct interviews on behalf of the federal government, and provided only eyewitness testimony regarding the crime. *See, e.g.*, Tr. IV-VI. After the murder, the OSBI investigated the case and would have presumptively collected any existing documentation from the OHP long before the federal indictment, when the DEA took over the case.

Even if the federal government bore some responsibility for the destruction of the

10

Bronco, Barrett cannot demonstrate that its destruction lies within the spoliation doctrine.

Spoliation under *Youngblood* and *Trombetta* concerns the destruction of evidence **before** trial.

*See United States v. De Leon*, 428 F. Supp. 3d 841, 1177-78 (D.N.M. 2019) (citing *Bohl*, 25 F.3d

at 906 and *Ferguson v. Roper*, 400 F.3d 635, 638 (8th Cir. 2005)).  Here, in contrast, the OHP

destroyed the Bronco six years after Barrett's third trial and three years after the judgment had

become final by virtue of the defendant's unsuccessful petition for certiorari on appeal.  552 U.S.

1260.  The fact Barrett had a pending § 2255 motion did not vitiate finality, as the courts have

recognized in a variety of contexts.  *See Jimenez-Guzman v. Holder*, 642 F.3d 1294, 1297 (10th

Cir. 2011) (holding collateral review does not negate finality of conviction for immigration

purposes);  *United States v. Price*, 400 F.3d 844, 849 (10th Cir. 2005) (holding collateral review

does not vitiate finality for purposes of retroactive application of a rule announced by the

Supreme Court); *United States v. Allen*, 24 F.3d 1180 (10th Cir. 1994) (holding collateral attack

does not render a conviction non-final for purposes of imposing an enhanced sentenced under

USSG § 4B1.1).  The presumptive finality of Barrett's conviction permitted the OHP to dispose

of its property as it saw fit, without any danger of violating due process despite a speculative

possibility the defendant might one day obtain retrial.

Assuming, arguendo, Barrett could successfully impute to the United States the post-trial

destruction of state property by a non-federal actor, he cannot show the Bronco had any obvious

exculpatory value or that its destruction involved bad faith.  Tellingly, Barrett fails to point to a

single instance in the history of this case that defense counsel sought to inspect, photograph, test,

present, or otherwise make evidentiary use of the Bronco.  Indeed, he concedes his attorneys

have never undertaken an analysis of the vehicle.  Br. at 33.  Whatever exculpatory value the

Bronco may have contained, and Barrett never describes it, multiple teams of experienced

11

defense attorneys apparently failed to recognize it. Even now, whilst insisting "the exculpatory value of the Ford Bronco was known to law enforcement," Barrett can only tepidly argue that destruction of the vehicle deprived him "of the ability to independently and scientifically measure the Bronco." *Id*. (capitalization removed). In essence, Barrett has not and cannot carry his burden to demonstrate that the Bronco constituted recognizable evidence of his innocence (*cf. Ludwig*, 641 F.3d at 1253-54) and, by extension, cannot successfully claim application of *Trombetta* (*cf. Bohl*, 25 F.3d at 909-10).

Because the Bronco, at most, had some indeterminate exculpatory value, Barrett can only prevail by demonstrating bad faith on the part of the OHP in ordering its destruction. *Bohl*, 25 F.3d at 909-10. Barrett, however, attempts to evade that burden by inviting the court to "presume[] bad faith on the part of the state governmental actors here." Br. 32; *cf. Ludwig*, 641 F.3d at 1253-54. This Court should resist Barrett's invitation to relieve him of his burden and, likewise, reject the suggestion the known facts create an inference of bad faith.

As noted, the OHP waited for years after the finality of Barrett's third trial before disposing of the Bronco. By that time, more than a decade after the murder, the OHP could have reasonably concluded it bore no continuing burden to store a badly damaged SUV with no apparent evidentiary value. Even if the OHP possessed imputed knowledge of Barrett's then pending § 2255 claims, it would have reached the same conclusion. Barrett argued on collateral review that his trial counsel should have employed a criminalist to counter Dalley's testimony, not to undertake an independent analysis of the Bronco. *See Barrett*, 2012 WL 3542609, *76. At no point did Barrett's § 2255 motion request an opportunity to make use of the vehicle. *See* Case No. 09cv105, Dkt. 95 at 127-39. For want of any reason the OHP should or would have believed the Bronco had evidentiary value to the defendant, Barrett cannot show the agency acted in bad

faith when it sold it for scrap.

In other words, when the OHP ordered the destruction of the Bronco, it had no objective "reason to believe that further tests on the [destroyed evidence] might lead to exculpatory evidence." *Bohl*, 25 F.3d at 911. By the time Barrett first asked to inspect the vehicle, long after he obtained § 2255 relief, the OHP had destroyed it. *Cf. United States v. Beckstead*, 500 F.3d 1154, 1160 (10th Cir. 2007) (considering whether the government controlled the lost evidence when the defendant indicated it might have exculpatory value). The Bronco, moreover, did not have a central role in the case. Its bullet-riddled condition merely corroborated the accounts of the eyewitnesses, whose testimony established Barrett's guilt alongside the government's firearms evidence. *See Barrett III*, at 1237-38 (noting the significance of the witness accounts and elsewhere observing "there was no evidence, or even argument, at trial that anyone but Defendant shot Eales"); c*f. Beckstead,* at 1160-61. Although the OHP has not offered a reason for disposal of the Bronco, one can hardly imagine a reason to maintain it. In 2011, the SUV was 16 years old, perforated with bullet holes, had 132,316 miles of wear (*see* Br. Ex. 6) and no apparent evidentiary value. Lacking any indication of the vehicle's monetary or litigative value, the OHP would have had little choice but to sell it for scrap. c*f. Beckstead,* at 1161.

Thus, Barrett has failed to demonstrate actionable spoliation in the destruction of the Bronco.

C. Unidentified Individuals May Have Failed to Retain Written Witness Statements

Barrett complains the assistant commander of the tactical team, Lt. Jim McBride, asked the OHP troopers under his command to hand write accounts of the murder. According to Barrett, Gary James, an attorney employed by OHP collected the notes. Barrett claims the disposition, whereabouts, and contents of the notes are unknown and unknowable: "there is no

13

way to know exactly who wrote statements, at whose direction, and what exactly happened to them." Br. 26.

Barrett describes an unfortunate loss of evidence, but not an actionable violation of his due process rights. He has failed to identify the person responsible for the loss or destruction of the notes, much less that person's connection to the federal prosecution. More to the point, for want of any clue as to the contents of the notes, Barrett can only speculate they contained exculpatory observations or remarks. Barrett notes evidence that the troopers surrendered the statements to an attorney employed by the OHP but fails to show such an official would have had an agency relationship with the federal government or owed a due process duty to the defendant, rather than his own client. (*See, e.g.*, Tr. II: 235 (defense counsel states "a private attorney representing the Highway Patrol Association took all of those written statements, and didn't give them to the investigators"). Without knowing the contents of the notes, the reason for their disappearance, or even their last custodian, Barrett cannot carry his burden of demonstrating they had some apparent value to him, were destroyed in bad faith, or the federal government bears any connection to their loss. *See Bullock*, 297 F.3d at 1056; *see also United States v. Beckstead*, 500 F.3d at 1158 & n.4 (noting the defendant's burden to show bad faith if he cannot establish the destruction of innately exculpatory evidence).

D. <u>Unidentified Individuals May Have Failed to Retain Notes and Recordings of Witness Statements</u>

In a near repetition of his complaints about the loss of written witness accounts, Barrett argues that the OHP Internal Affairs investigators made notes and possible recordings while interviewing members of the tactical team. But by his own account, Barrett does not know who underwent an interview, what they said, or how precisely the investigators memorialized the conversations: "Based on the varying statements and discrepancies between the troopers'

14

statements and [IA investigator] statements, it is unclear how many of the troopers were interviewed . . . . Based on trooper testimony, notes were taken, and it is unclear whether there were audio recordings of the interviews." Br. 28.

Barrett identifies a single specific piece of lost evidence—a recording of Trooper Manion, which was made in derogation of OHP policy and supposedly retained for some time before its eventual destruction. Barrett, as in a previous attempt to raise this issue, fails to show the recording contained exculpatory evidence or that its destruction involved bad faith. *See Barrett III*, 840 F.3d at 1237 ("There is no evidence that the taped interview would in fact have supported Defendant's claim of innocence).

Barrett can say even less about any remaining interviews of the tactical team—he fails to identify any specific interviewees, describe any exculpatory statements, or explain the circumstances that occasioned the loss of any documentation. His conclusory argument will not suffice to establish a violation of due process. As with his earlier claims, Barrett cannot attribute the loss of evidence to anyone charged with the federal investigation or prosecution of his crimes. Even if he could, he can only guess that lost notes or recordings might have benefitted him at trial. Notably, his past efforts to identify meaningful discrepancies in the troopers' accounts failed to impress the Tenth Circuit. *See Barrett III*, 840 F.3d at 1235-37. Having failed to show the loss of innately exculpatory evidence, Barrett has likewise failed to meet his burden of showing bad faith by the unknown individuals responsible for the absence. His claim, therefore, fails. *See id.* at 1237; *Bullock*, 297 F.3d at 1056.

E.  <u>Unidentified State Actors Reasonably Failed to Maintain a Record of Barrett's Second State Trial</u>

Barrett claims he cannot obtain accurate records of his second state trial. Without invoking the *Youngblood/Trombetta* doctrine, he argues that the lack of an accurate record

violated his right to perfect an appeal. Br. 29-30. Barrett's claim lacks any meaningful basis in law or reason.

Barrett, as he concedes, waived appeal following his second state trial. Br. 9 ("Mr. Barrett did not appeal his state convictions or sentences"). He cannot complain the state judiciary deprived him of a transcript for an appeal he forsook. To the extent he might seek to reconstrue the failure to create transcripts or maintain their underlying notes within *Youngblood/Trombetta*, he cannot succeed, as the state judiciary and its employees plainly did not participate in the investigation or prosecution of the federal case against Barrett. More to the point, Barrett fails to identify any patently exculpatory aspects of the missing transcript that would bring its loss within *Trombetta*. He likewise cannot establish bad faith on the part of anyone responsible for the failure to produce transcripts to which he affirmatively waived his constitutional right.

F.  <u>Witnesses Died and Evidence Was Lost Through no Fault of the U.S. Government</u>

Barrett claims that people with significant knowledge about him and his case have passed away, rendering a retrial of his case fundamentally unfair. He likewise reiterates claims he has made at various junctures in this litigation about the loss of investigative notes and the inadequacy of some investigative efforts. Br. 11-13, 30-31. None of this states a due process claim within *Trombetta* or *Youngblood*.

Barrett lists the missing evidence and witnesses without argument or any attribution of loss to the federal government. Though it should go without saying, the government did not cause the deaths of any of the potential witnesses Barrett identifies, much less did it do so with an eye toward prejudicing the case against him. Indeed, several of the listed witnesses, including members of the tactical team, would have presumptively testified for the government, if at all.

16

Their deaths do not constitute due process violations of any stripe.

Of the remaining evidence claimed as missing, and not otherwise addressed in this brief, Barrett mentions Iris Dalley's failure to measure and document the precise size and angle of bullet holes in the Bronco. That omission did not violate Barrett's constitutional rights, as "the Due Process Clause is [not] violated when the police fail to use a particular investigatory tool." *Youngblood*, 488 U.S. at 58-59 (noting also that "the police do not have a constitutional duty to perform any particular tests"). Similarly, the removal of some police weapons from the crime scene may have amounted to less-than-ideal investigative procedure but did not violate the defendant's rights. *See id*. A third piece of supposedly missing evidence, the bench notes of Terrance Higgs, were patently *inculpatory*, as he testified Barrett's Colt Sporter killed Trooper Eales and that Trooper Manion could not have done so. Tr. XV: 3448, XVI: 3703-05. Higgs testimony provides no basis in reason to conclude the post-conviction loss of his notes damaged the defendant's case or occurred in bad faith.

Finally, Barrett alludes in conclusory fashion to an OHP policy manual, mentioned repeatedly in Paul Gordon's declaration as a document the declarant twice acquired and twice provided to a third party (Br. Ex. 4). Gordon's observations, to the extent they referenced OHP policy, did not impress the Tenth Circuit as exculpatory: "his underlying assumption---the lack of emergency lights [employed by the tactical team at the crime scene]---was contrary to the substantial evidence at trial." *Barrett III*, at 1234. Assuming the OHP has literally lost or destroyed every copy of the tactical team's manual from 1999--something Barrett fails to allege---the defendant has not explained how the book might prove more exculpatory now than it did when the Tenth Circuit rejected Gordon's views. For want of any theory of exculpation or showing of bad faith, the supposed loss of the manual does not constitute a due process violation.

17

## II.   BARRETT MAY NOT SEEK TO VACATE HIS CONVICTION WITHOUT PERMISSION OF THE COURT OF APPEALS

In a parting blow, Barrett argues that the aggregate impact of the missing evidence he has identified requires the vacatur of his conviction and the provision of a new trial.  Br. 36-39.  Barrett's argument wholly overlooks the procedural posture of his case, in which he could only seek a new trial by first persuading the Tenth Circuit Court of Appeals to allow his filing of a successive § 2255 motion.

As noted, Barrett's conviction became final in 2008, when the Supreme Court denied certiorari from his unsuccessful direct appeal.  In a § 2255 proceeding that lasted from 2009 to 2021, Barrett obtained partial relief when the Tenth Circuit remanded for the pending penalty phase retrial.  To the extent the original § 2255 motion sought to vacate Barrett's convictions, it failed: this Court denied relief as to all the § 2255 claims, and the Tenth Circuit affirmed as to all issues except sentencing.  *See Barrett IV*, at 1233, at *Barrett II*, at 1232.

Having completed a full round of § 2255 litigation, Barrett cannot do so again without the permission of the Tenth Circuit.  "Federal prisoners are barred from attacking their federal convictions through second or successive § 2255 motions except in very limited circumstances." *United States v. Kelly*, 235 F.3d 1238, 1241 (10th Cir. 2000).  The circuit court may not authorize the filing of a successive motion absent a prima facie showing that (1) there is "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty"; or (2) the conviction or sentence is unlawful under "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."  28 U.S.C. § 2255(h).

It appears highly unlikely Barrett could obtain leave for a successive collateral attack on

18

the theories presented here.  He argues, in essence, that the aggregate loss of exculpatory evidence (much of it post-dating his federal trial) merits a vacatur and new trial.  To the extent he argues for relief based on non-governmental actor or post-conviction spoliation, it appears Barrett seeks the application of new rules of constitutional law.  Such claims will not lie, as new rules of constitutional criminal procedure do not apply to cases that have already become final. *See Welch v. United States*, 136 S. Ct. 1257, 1264 (2016) (quoting *Teague v. Lane*, 489 U.S. 288, 310 (1989) (plurality opinion)); *see also Edwards v. Vannoy*, 141 S. Ct. 1547, 1560 (2021) (describing as "moribund" a prior exception to the retroactivity rule for "watershed" rule of procedure).  To the extent Barrett's complaints concern evidence lost before trial, it does not appear he can satisfy any aspect of the § 2255(h) standard.

Accordingly, this Court should disregard Barrett's request for a new trial.

**CONCLUSION**

Based on the foregoing reasoning and analysis, this Court should deny Barrett's motion to strike the NOI and grant a new trial.

Dated: February 6, 2024.

Respectfully submitted,

CHRISTOPHER J. WILSON, OBA # 13801
United States Attorney
Eastern District of Oklahoma

*/S/ Christopher J. Wilson*
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Deputy Chief, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 6, 2024, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

- Kimberly C. Stevens, Attorney for Defendant
- Laura E. Udall, Attorney for Defendant

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN
Deputy Chief, Capital Case Section
