**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-RAW** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | **CAPITAL CASE** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**REPLY TO RESPONSE TO MOTION TO STRIKE THE
GOVERNMENT'S NOTICE OF INTENT TO SEEK THE DEATH
PENALTY AND REQUEST FOR A NEW TRIAL**

On January 31, 2024, Defendant Kenneth Eugene Barrett filed a motion to dismiss the

notice of intent to seek the death penalty and request for a new trial. DN 496. The Government

responded on February 6, 2024. DN 500. Mr. Barrett now replies in limited fashion to new

arguments raised by the Government.

**I.        Mr. Barrett does not seek an improper remedy.**

The Government argues that Barrett is barred from filing "a successive §2255 motion"

without permission from the Tenth Circuit, citing *United States. v. Kelly*, 235 F.3d 1238 (10th

Cir. 2000). DN 500 at 18. The argument misses the mark, and *U.S. v. Kelly* is inapposite.

Barrett's motion to strike the death notice and request for a new a trial is not brought pursuant

to 28 U.S.C. § 2255. It is brought pursuant to the district court's authority derived from the

Tenth Circuit's remand, that allows any remedy necessary to correct a manifest injustice. "[A]

district court, following the appellate vacation of a sentence, possesses the inherent

1

discretionary power to expand the scope of the resentencing beyond the issue that resulted in the reversal and vacation of sentence." *United States v. Moore*, 83 F.3d 1231, 1235 (10th Cir. 1996).

When a defendant's sentence is vacated on appeal and remanded for new sentencing, the defendant is entitled to a *de novo* proceeding. *United States v. Ortiz*, 25 F.3d 934, 935 (10th Cir. 1994). In that proceeding, the defendant is entitled to present any relevant evidence that would have been permitted in the original sentencing hearing. *Id.* Likewise, when a death sentence imposed pursuant to 21 U.S.C. § 848 is vacated and remanded for resentencing, the district court must conduct a full sentencing rehearing. *United States v. Johnson*, 764 F.3d 937, 943 (8th Cir. 2014). In the new sentencing proceeding, the court may hear evidence that was permissible at the original sentencing proceeding "even on issues that were not the specific subject of the remand." *Moore*, 83 F.3d at 1234.

The Tenth Circuit's decision to limit the remand to a new sentencing hearing was made without the knowledge of the significant loss and destruction of material exculpatory evidence. The recent discovery of the loss of evidence, and the questionable reliability of evidence previously used to gain a conviction against Barrett, may - and should - inform this court's determination as to the scope of relief warranted.

The district court's authority to grant Barrett a new trial and strike the death notice lies in the exception to what is known as the "mandate rule." The mandate rule is a subsidiary of the law-of-the-case doctrine. Under the mandate rule, "a trial court, on [resentencing] remand, '*generally* is foreclosed from reconsidering the underlying merits of the conviction.'" *United States. v. Aquart*, --- F.4th ---, *3 (2024 WL 314947) (quoting *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001) (emphasis added)). However, while the mandate rule generally limits the

2

scope of the trial court's remedy to the specific dictates of the remand order, the Tenth Circuit

has acknowledged that the rule "is a discretion-guiding rule subject to exception in the interests

of justice." *Moore*, 83 F.3d at 1234. The mandate rule "is a rule of policy and practice, not a

jurisdictional limitation, which thus allows some flexibility in exceptional circumstances." *Id*. at

1234-35 (citing *United States v. Bell*, 988 F.2d 247, 251 (1st Cir. 1993)).  The recognized

principal exceptions that justify departing from the mandate rule are: "(1) an intervening change

in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to **prevent**

**manifest injustice**." *Aquart,* 2024 WL 314947 at *3 (emphasis added).

##        II.        Impeachment Evidence is Exculpatory

In its Response, the Government narrowly defines what constitutes exculpatory evidence.

Impeachment evidence is also considered exculpatory for *Brady* purposes, as is evidence

relevant to both the issues of guilt and penalty.[1] *United States v. Bagley*, 473 U.S. 667, 676

(1985); *United States v. Smith*, 534 F.3d 1211, 1222 (10th Cir. 2008). "Impeachment evidence

is material if it tends to undermine the credibility of an important government witness." *United*

*States v. Cooper*, 286 F.Supp.2d 1283, 1297 (D. Kan. Sept. 25, 2003); *see also Bagley,* 473 U.S.

at 682.

Impeachment evidence is critical in a case that is 24 years old - particularly when

material pieces of evidence relied upon by the Government in its case in chief were

intentionally destroyed by a state governmental entity entrusted by the DEA with key physical

---

[1] When using *Brady* to test if a violation of a defendant's due process rights have occurred, "[c]ourts have in the main been more concerned with fairness to the defendant, on the one hand, and the government's ease of access to the documents sought, on the other, than with the issue whether the documents are actually within the physical possession of the prosecutor." *United States v. Poindexter,* 727 F. Supp. 1470, 1477 (D.D.C.1989).

evidence in the case. Both "the Government and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any of the aggravating or mitigating factors and as to the appropriateness in that case of imposing a sentence of death." 21 U.S.C. 848(j).

The destruction and loss of irreplaceable evidence, as set forth in DN 496, which includes eyewitness law enforcement officer statements taken in the immediate aftermath of the shooting (and the erased taped-recorded interview of Trooper Manion who fired his weapon multiple times at the scene), the governmental investigators' failure to measure and record the size and angle of the bullet strikes to the Bronco, followed by the state government destroying the Bronco itself during the life of this federal criminal action,[2] combined with the inexplicably missing trial testimony of the Government's two expert witnesses from the second state court capital trial (and other unknown testimony), all work in combination to deprive these capital proceedings of the heightened reliability required by the Fifth, Sixth and Eighth Amendments.[3] It is impossible for current counsel to fairly investigate and challenge – through exculpatory and impeaching evidence – the Government's evidence on the circumstances of the offense under

---

[2] To be clear, the United States provided DN 496, Exhibit 7, emails verifying the destruction of the Ford Bronco, promptly to defense counsel upon receiving the email correspondence themselves.

[3] *See* Pet., *Glossip* v. *Oklahoma*, 22-7466 (U.S. May 4, 2023) (counsel also corrects the citation to the second *Glossip* petition referenced in DN 496 at 38). As Justice Breyer observed in 2015, "[t]here is increasing evidence … that the death penalty as now applied lacks that requisite reliability." *Glossip v. Gross*, 576 U.S. 863, 910, 135 S. Ct. 2726, 2756 (2015) (Breyer, J., dissenting). Three years later, Justice Breyer updated his remarks, noting that "in the past three years, further evidence has accumulated suggesting that the death penalty as it is applied today lacks 'requisite reliability.'" *Jordan v. Mississippi*, 138 S. Ct. 2567, 2571 (2018) (Breyer, J., dissenting).

21 U.S.C. § 848(n).  Accordingly, the defendant requests the death notice be stricken and a new trial awarded.

### III.    Responsibility For Maintaining the Physical Evidence

The Government argues essentially that because the initial investigation of Trooper Eales' death was conducted by the Oklahoma State Bureau of Investigation ("OSBI"), and because members of the Oklahoma Highway Patrol ("OHP") participated in the federal trial only as witnesses, the possession and destruction of the Bronco by OHP cannot be imputed to the federal prosecution nor its investigative agency, the DEA. DN 500 at 9.  The cooperation between federal and state agencies here – from the first phone call from a DEA task force member to the OHP requesting assistance conducting the raid on the Barrett cabin -- created an agency relationship requiring the OHP not to destroy physical evidence entrusted to its custody while this federal criminal case was pending.

The OHP did play an investigative role in interviewing Mr. Barrett himself while he was still in the hospital, even Mirandizing him first, along with participating in interviewing a key eyewitness from the scene, Toby Barrett. [4]  Additionally, there were law enforcement agents who participated in the raid both as members of the Oklahoma Highway Patrol and as part of a federal DEA task force.  Cherokee County Deputy Danny Oliver and OHP Tactical Unit

---

[4] OHP Internal Affairs Investigator Randolph, with the Internal Affairs and Special Investigations Section of the Department of Public Safety, Oklahoma Highway Patrol, interviewed Kenneth Barrett at the hospital in the immediate aftermath of the shooting, and recorded the interview. OHP Investigator Randolph also Mirandized Mr. Barrett prior to the interview. (Government Bates Stamp 00001957).  Further, OHP Internal Affairs Investigator BD Robins was present at the eyewitness interview of Toby Barrett immediately after the shooting and prepared a written summary.  (Government Bates Stamp 00001685).  At least in that regard, the OHP participated in the investigation of this matter by conducting key suspect and eyewitness interviews.  Additionally, OHP Investigator Paul Gordon conducted interviews in the case, including recording interviews of the troopers who were present at the scene.

Commander Kerry Pettingill were members of a DEA task force when they participated in the raid on Mr. Barrett's property. OSBI agent Ben Rosser, in his interview summary with Pettingill, notes that at the time of the raid, "PETTINGILL was also a member of the Drug Enforcement Agency Task Force at McAlester, Oklahoma." (Government Bates Stamp 00000259). Rosser also notes that Oliver was a member of the DEA task force, and Oliver testified at the first state court capital trial that "I was assigned to the DEA task force as a task force out of McAlester." (Government Bates Stamp 00000256; Trial 1, Vol. IX, p. 1567). Members of the OSBI (Agents Dalley and Higgs) served as expert witnesses for the federal Government at the federal trial in the areas of crime scene reconstruction and ballistics.

Numerous members of the Oklahoma Highway Patrol cooperated and served as witnesses in the federal prosecution. While the DEA took custody of much of the physical evidence pertinent to the federal trial, they chose to entrust the Bronco, along with the numerous firearms possessed by – and fired by – law enforcement officers at the scene of the shooting, to the care and custody of the Oklahoma Highway Patrol. The DEA should have gathered and kept control of all key pieces of evidence during the life of this federal criminal prosecution or taken reasonable steps to ensure that the OHP did so.

The Government argues that OHP, in preserving evidence and cooperating with the federal prosecution of Mr. Barrett, were not acting as state agents, and cites cases referencing truly independent third parties, who possess no agency relationship with the federal government, such as private businesses and civilians. *See* DN 500 at 7; *United States v. Fernandez*, 24 F.4th 1321, 1332 (10th Cir. 2022) (the Albuquerque Greyhound bus terminal); *United States v. Porter*, 66 F.4th 1223, 1226 n.2 (10th Cir. 2023) (a warehouse office manager); *Bullock v. Carver*, 297 F.3d 1036, 1056–57 (10th Cir. 2002) (a clinical director of the

Intermountain Sexual Abuse Treatment Center). The involvement and aid of civilians is demonstrably distinct from the cooperation and assistance of other law enforcement agencies. "Imposing a rigid distinction between federal and state agencies which have cooperated intimately from the outset of an investigation would artificially contort the determination of what is mandated by due process. Rather than endorse a Per se rule, we prefer a case-by-case analysis of the extent of interaction and cooperation between the two governments." *United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979).

In this case, where federal prosecutors worked closely with state actors as investigators, experts, and witnesses, Mr. Barrett asserts that "bureaucratic boundary [between agencies is] too weak to limit the duty" to disclose and maintain the key physical evidence in this case. *United States v. Brooks,* 966 F.2d 1500, 1503 (D.C.Cir.1992)*; see United States v. Ehrlichman,* 559 F.2d 31, 74 (D.C.Cir.1976). While the federal government did not physically possess the Ford Bronco, the agencies did collaborate closely. "The important determinant is whether the person or agency has been 'acting on the government's behalf' or 'assisting the government's case.'" *People v. Superior Ct.*, 80 Cal.App.4th 1305, 1315, 96 Cal. Rptr. 2d 264 (2000), *holding modified by Facebook, Inc. v. Superior Ct. of San Diego Cnty.*, 471 P.3d 383 (2020) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) and *In re Brown*, 952 P.2d 715, 720 (1998)). It is not unreasonable to expect that OHP was aware of Mr. Barrett's ongoing case at the time of the Ford Bronco's destruction and should have safely maintained the physical evidence left in its care and custody by the DEA and federal government.

Without access to the Bronco, and without precise scene measurements having been preserved from the vehicle, the defense cannot fairly investigate and challenge the evidence presented as to the sequence of events or position of the various shooters on scene, based upon

the physical evidence that remains.  And the "circumstances of the offense" is a crucial piece of

the upcoming sentencing hearing presentation of the aggravating and mitigating factors under

21 U.S.C. Section 848(n).  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (The Eighth Amendment

requires that the sentencer "not be precluded from considering, *as a mitigating factor*, any

aspect of a defendant's character or record and *any of the circumstances of the offense* that the

defendant proffers as a basis for a sentence less than death.") (emphasis added); *see also*

*Murray v. Giarratano*, 492 U.S. 1, 8-9 (1989) ("The finality of the death penalty requires 'a

greater degree of reliability' when it is imposed.") (quoting *Lockett*); *Gilmore v. Taylor*, 508

U.S. 333, 342 (1993) ("we have held that the Eighth Amendment requires a greater degree of

accuracy and factfinding than would be true in a noncapital case").

Mr. Barrett has insisted from the moment he was interviewed at the hospital by OHP

investigator Randolph (the same Randolph who, incidentally, erased the Manion interview

tape), that he did not fire his weapon until after he had been shot, and that he fired all of those

shots from inside of his cabin, where 16 .223 shell casings were ultimately recovered.

(Government Bates Stamp 00001957).  The Government argued at trial that Barrett fired 18

rounds, two from the porch at the oncoming Bronco and 16 rounds while inside the home. The

two rounds allegedly fired from the porch were part of the basis for Barrett's convictions.  The

Government offered, in support of its theory, testimony from crime scene analyst Iris Dalley

that there were a total of 18 bullet holes in the Bronco, and claimed that they all came from

Barrett's rifle in order to support the argument that Barrett fired from the porch.  However, a

qualified ballistics expert, with access to the Bronco, could determine the precise size and angle

of the bullet holes in the vehicle, and could have revealed that the 18 bullet strikes were not in

fact all made by rounds from Barrett's weapon. Trooper Manion was known to have fired his 9

8

mm weapon in the direction of the Bronco, from east to west across the front of the cabin. Trooper Hamilton fired his weapon at the scene. Other officers may have as well. It is difficult to know because many of the officers took their weapons from the scene of the incident and turned them in later at a separate location. But simple measurements of the size and angle of the bullet strikes would have revealed whether and which bullet strikes were likely made from other firearms present and fired at the scene.

Now, with the destruction of the Bronco, as well as the statement made by Manion within hours after the shooting, Mr. Barrett has permanently lost access to reliable scientific evidence that would have potentially disproved evidence that played a crucial role in his convictions. With the cumulative impact of the lost and destroyed evidence crucial to the investigative and factfinding processes of this case, the defendant requests, for the reasons more fully briefed in DN 496 and herein, that this Court strike the death notice and grant a new trial, in order to correct a manifest injustice, and in accord with the Fifth, Sixth and Eighth Amendments to the United States Constitution.

DATED this 12th day of February, 2024.

Respectfully submitted,

*/s/ Kimberly C. Stevens*
Kimberly C. Stevens
NC State Bar # 20156
Senior Capital Resource Counsel
1070-1 Tunnel Road, Ste 10-215
Asheville, NC 28805
Telephone: (336) 575-4337
E-mail: Kim_Stevens@fd.org

*/s/ Laura E. Udall*
Laura Elisabeth Udall
AZ Bar # 010501

Laura E. Udall, PLLC
P.O. Box 40294
Tucson, AZ 85717-0294
Telephone: (520) 770-1414
E-mail: Laura@udall.me

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served on the United States by e-filing same to its counsel of record, Jeffrey B. Kahan, United States Department of Justice; Christopher J. Wilson, Assistant United States Attorney, United States Department of Justice, Eastern District of Oklahoma, this 12th day of February, 2024.

*/s/ Kimberly C. Stevens*
Kimberly C. Stevens